1  Lloyd Winawer (State Bar No. 157823)
   *lwinawer@goodwinprocter.com*
2  **GOODWIN PROCTER LLP**
   10250 Constellation Boulevard, 21st Floor
3  Los Angeles, CA 90067
   Telephone:  310-788-5177
4  Facsimile:  310-286-0992

5  Brian C. Devine (State Bar No. 222240)
   *bdevine@goodwinprocter.com*
6  **GOODWIN PROCTER LLP**
   53 State Street
7  Boston, MA 02109-2802
   Telephone:  617-570-1000
8  Facsimile:  617-523-1231

9  *Attorneys for Defendants*
   Countrywide Financial Corp.,
10 Countrywide Home Loans, Inc., CWALT,
   Inc., CWMBS, Inc., CWABS, Inc.,
11 CWHEQ, Inc., Countrywide Capital
   Markets, Countrywide Securities Corp.,
12 and N. Joshua Adler

13            **UNITED STATES DISTRICT COURT**
             **CENTRAL DISTRICT OF CALIFORNIA**
14

15 STICHTING PENSIOENFONDS ABP,      Case No.

16            Plaintiff,
         v.                          **COUNTRYWIDE DEFENDANTS'**
17 COUNTRYWIDE FINANCIAL             **NOTICE OF REMOVAL**
   CORPORATION; COUNTRYWIDE
18 HOME LOANS, INC.; CWALT, INC.;
   CWMBS, INC.; CWABS, INC.;
19 CWHEQ, INC.; COUNTRYWIDE
   CAPITAL MARKETS; COUNTRY-
20 WIDE SECURITIES CORPORATION;
   BANK OF AMERICA CORP.; NB
21 HOLDINGS CORPORATION;
   DEUTSCHE BANK SECURITIES
22 INC.; UBS SECURITIES, LLC;
   GREENWICH CAPITAL MARKETS,
23 INC. A.K.A. RBS GREENWICH
   CAPITAL; BARCLAYS CAPITAL
24 INC.; STANFORD L. KURLAND;
   DAVID A. SPECTOR; ERIC P. SIER-
25 ACKI; N. JOSHUA ADLER; RANJIT
   KRIPALANI; JENNIFER S. SANDE-
26 FUR; and DAVID A. SAMBOL,

27            Defendants.

28

---
NOTICE OF REMOVAL

FILED
CLERK, U.S. DISTRICT COURT
SEP 2 9 2010
CENTRAL DISTRICT OF CALIFORNIA
BY                    DEPUTY

CONFORM COPY

CV10 7275

GHK

FMOx

1   TO THE CLERK OF THE UNITED STATES DISTRICT COURT FOR THE

2   CENTRAL DISTRICT OF CALIFORNIA:

3        PLEASE TAKE NOTICE that Defendants Countrywide Financial Cor-

4   poration, Countrywide Home Loans, Inc., CWALT, Inc., CWMBS, Inc., CWABS,

5   Inc., CWHEQ, Inc., Countrywide Capital Markets, Countrywide Securities Corpora-

6   tion and N. Joshua Adler (together, the "Countrywide Defendants") hereby remove

7   Case No. BC-444033, filed with the Superior Court of California, Los Angeles, and

8   all claims and causes of action therein (the "Action"), to the United States District

9   Court for the Central District of California.[1]  As grounds for removal, the Country-

10  wide Defendants state as follows:

11  **I.     JURISDICTION**

12       1.     This Court has original jurisdiction over this matter pursuant to 28 U.S.C.

13  § 1334(b) because this Action is related to a pending bankruptcy proceeding, and all

14  claims and causes of action in the Action may be removed to this Court under 28

15  U.S.C. § 1452.  This Court is part of the "district and division" embracing the place

16  where this Action was filed—Los Angeles, California, in Los Angeles County, Cali-

17  fornia.  *See* 28 U.S.C. § 1446(a).

18  **II.     PROCEDURAL HISTORY AND TIMELINESS OF REMOVAL**

19       2.     On or about August 18, 2010, Plaintiff Stichting Pensioenfonds ABP

20  ("Stichting" or "Plaintiff") filed a summons (the "Summons") and a complaint (the

21  "Complaint") in this action in the Superior Court of the State of California in the

22  County of Los Angeles.  The case, entitled *Stichting Pensioenfonds ABP v. Country-*

23  *wide Financial Corporation, et al.*, was assigned case number BC-444033.

24       3.     On September 24, 2010, the Countrywide Defendants, through their

25  counsel, agreed to accept service of the Summons and Complaint.  A copy of all proc-

26

27  [1]    The Countrywide Defendants specially appear only for the purpose of re-

28      moval.  They reserve all defenses, jurisdictional and otherwise, available to them.

ess, pleadings, and orders in the Action and served on the Countrywide Defendants is attached hereto as Exhibit 1.

4. The Complaint alleges, among other things, that certain prospectuses and other offering materials filed in connection with residential mortgage-backed securities ("MBS") sold by one or more of the Countrywide Defendants, and identified by Plaintiff in Paragraph 52 of the Complaint, contained misstatements and omissions in violation of Section 11, 12, and 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77k, 77l and 77o, in violation of the California Corporations Code §§ 25401, 25501 and 25504, and in violation of the California Civil Code §§ 1572 *et seq.* and 1709 *et seq.*, as well as the common law. The Countrywide Defendants dispute that they have any liability whatsoever to Plaintiff.

5. The Countrywide Defendants' time to answer the Complaint has not expired and none of the Defendants to the Action have served or filed an answer.

6. No motions or other proceedings in this Action are pending in the Superior Court of Los Angeles County.

7. This notice of removal is timely under 28 U.S.C. § 1446(b) and Fed. R. Bankr. P. 9027(a)(3) because it is being filed within thirty (30) days after the receipt of the Summons and the Complaint.

## III. REMOVAL IS PROPER UNDER 28 U.S.C. § 1452

8. Removal is proper under 28 U.S.C. § 1452, which provides that "[a] party may remove any claim or cause of action in a civil action . . . to the district court for the district where such civil action is pending, if such district court has jurisdiction of such claim or cause of action under section 1334 of this title." Title 28 U.S.C. § 1334, in turn, confers jurisdiction upon this Court to hear all civil proceedings that are "related to cases under title 11," which is the United States Bankruptcy Code.

9. In their Complaint, Plaintiffs allege that they purchased MBS from, among other trusts, issuing trust CHL Mortgage Pass-Through Trust 2006-HYB1 (the "2006-HYB1 Trust"). Complaint ¶ 52.

10.    The MBS issued by the 2006-HYB1 Trust are backed in part by loans originated not by any Countrywide-related entity, but rather by American Home Mortgage ("AHM").  Certain of the Countrywide Defendants entered into an agreement (the "Purchase Agreement") with AHM in connection with the purchase of the mortgage loans originated by AHM.  The Purchase Agreement applies to, among other things, the purchase of the AHM loans that back the MBS issued by the 2006-HYB1 Trust.

11.  On August 6, 2007, AHM filed a voluntary petition for reorganization under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware.  *See In re Am. Home Mortgage Holdings, Inc.*, Case No. 07-11047-CSS (Bankr. D. Del. filed Aug. 6, 2007).

12.    In accordance with the provisions of the Purchase Agreement and applicable law, one of the Countrywide Defendants, Countrywide Home Loans, Inc. ("CHL"), has claims against AHM for indemnification that arise out of this Action (the "Indemnification Claims").  CHL filed a proof of claim for the Indemnification Claims that is currently pending in the bankruptcy proceedings of AHM.

13.    In accordance with the provisions of the Purchase Agreement and applicable law, CHL has claims against AHM for the repurchase of mortgage loans that underlie a portion of the 2006-HYB1 Trust (the "Repurchase Claims").  CHL filed a proof of claim for the Repurchase Claims that is currently pending in the bankruptcy proceeding of AHM.

14.    Consequently, this action is "related to" the bankruptcy proceeding of AHM because AHM owes CHL obligations that, as a result of any costs and expenses incurred by CHL to defend this Action and any judgment against CHL, could affect the estate of the debtor AHM.  As such, this Court has original jurisdiction under 28 U.S.C. §§ 1334(b) and 1452(a).

**IV.    SECTION 22(a) DOES NOT BAR REMOVAL**

15.    The bankruptcy removal statute controls over the anti-removal provi-

3

sion of Section 22(a) of the Securities Act. *See Cal. Pub. Employees' Ret. Sys. v. WorldCom, Inc.*, 368 F.3d 86, 108 (2d Cir. 2004) ("[W]e hold that generally nonre-movable claims brought under the Securities Act of 1933 may be removed to federal court if they come within the purview of 28 U.S.C. § 1452(a), which confers federal jurisdiction over claims that are related to a bankruptcy case."); *Pac. Life Ins. Co. v. J.P. Morgan Chase & Co.*, No. SA CV 03-813GLT(ANx), 2003 WL 22025158, at *2 (C.D. Cal. June 30, 2003) (removal based on "'related to' jurisdiction under sec-tion 1452 . . . was not barred by section 22(a)").

16.    Consent to removal is not required under the bankruptcy removal stat-ute. *See* 28 U.S.C. § 1452(a).  In any event, all defendants join in this Notice of Removal and consent to the removal of this action to this Court, subject to and with-out waiving any defenses and rights available to them.

17.    The Removing Defendants are entitled to have this case heard in fed-eral court rather than in state court because the case is related to bankruptcy pro-ceedings.

**V.    PROCEDURAL REQUIREMENTS AND LOCAL RULES**

18.    This is not a "core proceeding" under 28 U.S.C. § 157(b)(2).  As required by Fed. R. Bankr. P. 9027(a)(1), the Countrywide Defendants state that they do not consent to entry of final order of judgment by any bankruptcy judge.

19.    Pursuant to 28 U.S.C. § 1446(d), the Countrywide Defendants will serve a copy of this Notice of Removal on counsel for Plaintiff and will file a copy with the Clerk of the Superior Court, County of Los Angeles.  Pursuant to 28 U.S.C. § 1446(a), and attached hereto as Exhibit 2, is a copy of a Notice of Filing of Notice of Removal, which will be filed with the Clerk of the Superior Court of California, County of Los Angeles.

20.    The Countrywide Defendants sign this Notice of Removal pursuant to Rule 11 of the Federal Rules of Civil Procedure and Rule 9011 of the Federal Rules of Bankruptcy Procedure.

4

21.     All other defendants named and/or served in this Action consent to the removal of this Action.

Dated:  September 29, 2010                **GOODWIN PROCTER LLP**

Lloyd Winawer (State Bar No. 157823)
Brian C. Devine (State Bar No. 222240)

*Of Counsel:*

Brian E. Pastuszenski
Inez Friedman-Boyce

*Counsel for the Countrywide Defendants*

# EXHIBIT 1

# EXHIBIT 1

# SUMMONS
## *(CITACION JUDICIAL)*

**SUM-100**

FOR COURT USE ONLY
*(SOLO PARA USO DE LA CORTE)*

**NOTICE TO DEFENDANT:** Countrywide Financial Corporation; Countrywide
*(AVISO AL DEMANDADO):* Home Loans,Inc.; CWALT,Inc.; CWMBS,Inc.;
CWABS, Inc.; CWHEQ,Inc.; Countrywide Capital Markets;Countrywide
Securities Corporation;Bank of America Corp.; NB Holdings Corporation;
Deutsche Bank Securities Inc.; UBS Securities,LLC; Greenwich Capital
Markets,Inc. A.K.A. RBS Greenwich Capital; Barclays Capital Inc.; Stanford L.
Kurland; David A. Spector; Eric P. Sieracki; N. Joshua Adler; Ranjit Kripalani;
Jennifer S.Sandefur and David A. Sambol.

**YOU ARE BEING SUED BY PLAINTIFF:**   Stichting Pensioenfonds ABP
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*

**FILED**
SUPERIOR COURT OF CALIFORNIA
COUNTY OF LOS ANGELES

AUG 18 2010

John A. Clarke, Executive Officer/Clerk

By_____ Deputy
RUGENA LOPEZ

---

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

   You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

   There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.**

   *¡AVISO! Lo han demandado.  Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

   *Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

   *Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

---

| The name and address of the court is: *(El nombre y dirección de la corte es):* | **CASE NUMBER:** *(Número del Caso):* |
|---|---|
| LOS ANGELES COUNTY SUPERIOR COURT<br>111 North Hill Street<br><br>Los Angeles, CA 90012 | **BC444033** |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Maxwell M. Blecher, Esq.                          Tel: (213) 622-4222    Fax: (213) 622-1656
Maryann R. Marzano, Esq.
BLECHER & COLLINS, P.C.
Los Angeles, California 90071-3334

DATE:   AUG 18 2010                    Clerk, by _____ CLERK, Deputy
*(Fecha)*                              *(Secretario)*                    RUGENA LO...  *(Adjunto)*

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served
1.  ☐ as an individual defendant.
2.  ☐ as the person sued under the fictitious name of *(specify):*

3.  ☐ on behalf of *(specify):*

   under:  ☐ CCP 416.10 (corporation)          ☐ CCP 416.60 (minor)
           ☐ CCP 416.20 (defunct corporation)  ☐ CCP 416.70 (conservatee)
           ☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)
           ☐ other *(specify):*
4.  ☐ by personal delivery on *(date):*

[SEAL] SUPERIOR COURT LOS ANGELES COUNTY CALIFORNIA

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**

Legal Solutions Plus

Code of Civil Procedure §§ 412.20, 465

EXHIBIT 1 - 6



1  BLECHER & COLLINS, P.C.
   MAXWELL M. BLECHER (State Bar #26202)
2  MARYANN R. MARZANO (State Bar #96867)
   515 South Figueroa Street, Suite 1750
3  Los Angeles, California 90071-3334
   Telephone: (213) 622-4222
4  Facsimile: (213) 622-1656
   E-mail: mblecher@blechercollins.com
5  E-mail: mmarzano@blechercollins.com

6  GRANT & EISENHOFER, P.A.
   JAY W. EISENHOFER (Pro Hac Vice Application pending)
7  GEOFFREY C. JARVIS (Pro Hac Vice Application pending)
   HUNG G. TA (Pro Hac Vice Application pending)
8  DEBORAH A. ELMAN (Pro Hac Vice Application pending)
   485 Lexington Avenue, 29th Floor
9  New York, New York  10017
   Telephone: (646) 722-8500
10 Facsimile: (646) 722-8501

11 Attorneys for Plaintiff
   STICHTING PENSIOENFONDS ABP

12

13            SUPERIOR COURT OF THE STATE OF CALIFORNIA

14                      COUNTY OF LOS ANGELES

15 STICHTING PENSIOENFONDS ABP,        Case No.   **BC444033**

16              Plaintiff,

17      vs.                             **COMPLAINT**

18 COUNTRYWIDE FINANCIAL
   CORPORATION; COUNTRYWIDE HOME
19 LOANS, INC; CWALT, INC.; CWMBS, INC.;   **JURY TRIAL DEMANDED**
   CWABS, INC.; CWHEQ, INC;
20 COUNTRYWIDE CAPITAL MARKETS;
   COUNTRYWIDE SECURITIES
21 CORPORATION; BANK OF AMERICA
   CORP.; NB HOLDINGS CORPORATION;
22 DEUTSCHE BANK SECURITIES INC.; UBS
   SECURITIES, LLC; GREENWICH CAPITAL
23 MARKETS, INC. A.K.A. RBS GREENWICH
   CAPITAL; BARCLAYS CAPITAL INC.;
24 STANFORD L. KURLAND; DAVID A.
   SPECTOR; ERIC P. SIERACKI; N. JOSHUA
25 ADLER; RANJIT KRIPALANI; JENNIFER S.
   SANDEFUR; and DAVID A. SAMBOL,
26

27              Defendants.

28

EXHIBIT 1  -7-

**TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................1

SUMMARY OF ALLEGATIONS ........................................................................1

JURISDICTION AND VENUE ............................................................................5

PARTIES ...............................................................................................................5

SUBSTANTIVE ALLEGATIONS .....................................................................10

I.      THE SECURITIZATION PROCESS GENERALLY.................................10

II.     THE COUNTRYWIDE SECURITIZATIONS AND ABP'S INVESTMENTS IN THE CERTIFICATES.........................................................................................13

III.    THE IMPORTANCE OF UNDERWRITING STANDARDS AND PROPERTY APPRAISALS TO INVESTORS IN THE CERTIFICATES .......................................17

IV.     COMMENCING IN 2003, COUNTRYWIDE ENGAGED IN WIDESPREAD AND SYSTEMATIC ABANDONMENT OF ITS UNDERWRITING GUIDELINES AND STANDARDS WHEN ORIGINATING MORTGAGES ...........................................19

        A.      Countrywide Abandoned Its Underwriting Guidelines By Flagrantly Ignoring The Borrower's Ability and Willingness to Repay the Loan ...........................................................................21

        B.      Countrywide Departed From Its Underwriting Guidelines By Using False Metrics To Assess Its Borrowers' Ability To Repay....................24

        C.      Countrywide Created A Permissive Culture By Which Underwriting "Exceptions" Were Liberally Issued To Borrowers, For Example, By Allowing Employees To Ignore and Over-Ride the Recommendations of Countrywide's Highly Touted CLUES Underwriting Program ...................26

V.      COUNTRYWIDE SYSTEMATICALLY FAILED TO OBTAIN APPRAISALS IN ACCORDANCE WITH INDUSTRY APPROVED APPRAISAL STANDARDS ...................27

VI.     DEFENDANTS' MATERIAL MISSTATEMENTS AND OMISSIONS IN THE OFFERING DOCUMENTS..................................................................................................30

        A.      CWHEQ Revolving Home Equity Loan Trust, Series 2005-A .............................30

        B.      CWHEQ Revolving Home Equity Loan Trust, Series 2005-D .........................32

        C.      CWHEQ Revolving Home Equity Loan Trust, Series 2005-E..........................35

i

D.  CWABS Revolving Home Equity Loan Trust, Series 2004-Q.............................36

E.  CWABS Revolving Home Equity Loan Trust, Series 2004-R.............................38

F.  CWABS Asset-Backed Certificates Trust 2006-24.............................39

G.  CWABS Asset-Backed Certificates Trust 2007-2.............................41

H.  CWABS Asset-Backed Certificates Trust 2007-6.............................43

I.  CWABS Asset-Backed Certificates Trust 2007-BC2.............................44

J.  CWABS Asset-Backed Certificates Trust 2007-8.............................48

K.  CWABS Asset-Backed Certificates Trust 2007-10.............................49

L.  CWALT Alternative Loan Trust 2005-J1.............................51

M.  CWALT Alternative Loan Trust 2005-40CB.............................52

N.  CHL Mortgage Pass-Through Trust 2006-HYB1.............................54

O.  Defendants Misrepresented That Countrywide Originated Loans In Compliance With Its Underwriting Guidelines.............................55

P.  Defendants Misrepresented That Countrywide Originated Loans In Compliance With Proper Appraisal Methods.............................57

VII.  BECAUSE OF THE ABANDONMENT BY COUNTRYWIDE OF ITS UNDERWRITING GUIDELINES AND STANDARDS, AS WELL AS PROPER APPRAISAL METHODS, PLAINTIFF ABP HAS SUFFERED LOSSES ON ITS PURCHASES OF CERTIFICATES ....58

A.  CWALT LOANS.............................58

B.  CWABS LOANS.............................59

C.  CWMBS LOANS.............................59

D.  CWHEQ LOANS.............................60

VIII.  THE UNDERWRITER DEFENDANTS DID NOT PERFORM ADEQUATE DUE DILIGENCE .............................60

FIRST CAUSE OF ACTION (Violation of Section 11 of the Securities Act) .............................63

SECOND CAUSE OF ACTION (Violation of Section 12(a)(2) of the Securities Act) .............................65

THIRD CAUSE OF ACTION (Violation of Section 15 of the Securities Act) .............................66

ii

FOURTH CAUSE OF ACTION (Untrue or Misleading Statements in the Sale of Securities Cal. Corporations Code §§ 25401, 25501) .....................................................................................67

FIFTH CAUSE OF ACTION (Negligent Misrepresentation
Cal. Civil Code §§ 1572 et seq. and 1709 et seq., and Common Law) ....................................68

PRAYER FOR RELIEF .............................................................................................................69

DEMAND FOR JURY TRIAL ...................................................................................................70

Plaintiffs, through their attorneys, allege as against Defendants, as follows:

## INTRODUCTION

1. Plaintiff Stichting Pensioenfonds ABP ("ABP"), by its undersigned counsel, brings this action pursuant to the California Corporate Securities Act, Sections 11, 12(a)(2) and 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§77k, 77l(a)(2), and 77o,[1] the California Civil Code, and the common law against Defendants Countrywide Financial Corporation ("CFC"); Countrywide Home Loans, Inc. ("CHL"); CWALT, Inc. ("CWALT"); CWMBS, Inc. ("CWMBS"); CWABS, Inc. ("CWABS"); CWHEQ, Inc. ("CWHEQ"); Countrywide Capital Markets ("CCM"); Countrywide Securities Corporation ("CSC"); Bank of America Corp. ("Bank of America"); NB Holdings Corporation ("NB Holdings"); Deutsche Bank Securities Inc. ("Deutsche Bank"); UBS Securities, LLC ("UBS"); Greenwich Capital Markets, Inc. a.k.a. RBS Greenwich Capital ("RBS"); Barclays Capital Inc. ("Barclays"); Stanford L. Kurland ("Kurland"); David A. Spector ("Spector"); Eric P. Sieracki ("Sieracki"); N. Joshua Adler ("Adler"); Ranjit Kripalani ("Kripalani"); Jennifer S. Sandefur ("Sandefur"); and David A. Sambol ("Sambol") (collectively, the "Defendants"). Plaintiff makes the allegations in this Complaint based upon personal knowledge as to matters concerning Plaintiff and its own acts, and upon information and belief as to all other matters. This information is derived from the investigation by Plaintiff's counsel, which has included a review and analysis of annual reports and publicly filed documents, press releases, news articles, analysts' statements, conference call transcripts and presentations, and transcripts from speeches and remarks given by the Defendants. Based on the foregoing, Plaintiff believes that substantial additional evidentiary support exists for the allegations herein, which Plaintiff will find after a reasonable opportunity for discovery.

## SUMMARY OF ALLEGATIONS

2. This action arises out of ABP's purchases of certain residential mortgage backed securities ("RMBS"), as evidenced in the form of "Certificates", during the period from December 2004 through

---

[1] Because Plaintiff asserts claims for violations of Sections 11, 12(a)(2) and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l(a)(2) and 77o, this action involves solely strict liability and negligence claims under the Securities Act. Plaintiff specifically disclaims any allegations of fraud on the part of any Defendant. The claims and allegations are not based on any knowing or reckless misconduct on the part of any Defendant.

1

EXHIBIT 1  -11-

June 2007, in reliance on the false and misleading statements that were negligently made by Defendants. Plaintiff reasonably and justifiably relied on these untrue statements and omissions of important information in deciding to purchase the Certificates.   The Certificates are "securities" within the meaning of the California Corporate Securities Act and the Securities Act of 1933.

3.   As a result of these material misrepresentations and omissions, ABP purchased securities that were far riskier than represented, backed by mortgages worth significantly less than represented, that had been made to borrowers who were dramatically less creditworthy than had been represented.   As a consequence, ABP has suffered losses on its purchases of Certificates.

4.   The securities acquired by ABP were collateralized against mortgages made by Defendant CFC and its wholly owned subsidiary, Defendant CHL (collectively "Countrywide" or the "Company"). Until its collapse, Countrywide was one of the largest mortgage lenders in the United States, responsible for originating and/or servicing more than 18% of residential mortgages nationally.   In 2005 and 2006 alone, Countrywide originated in excess of $850 billion in home loans throughout the country.

5.   Countrywide did not, however, hold the mortgage loans that it originated.   Rather, taking advantage of an unprecedented boom in the securitization industry, Countrywide pooled many of the mortgage loans that it originated in 2005, 2006 and 2007, and deposited the loans into special-purpose entities or "trusts" that were created by Countrywide and its affiliates.   These pools of mortgage loans were then securitized into RMBS and sold by the trusts to investors in the form of Certificates. Underwriters, including the Underwriter Defendants (as defined herein) named in this action, assisted the trusts in making these sales.

6.   The Certificates entitled investors to receive monthly distributions of interest and principal on cash flows from the mortgages held by the trusts.   The Certificates issued by each trust were divided into several classes (or "tranches") that had different seniority, priorities of payment, exposure to default, and interest payment provisions.   Rating agencies, such as Moody's Investors Service, Inc. ("Moody's"), Standard & Poor's Corporation ("S&P") and Fitch, Inc. ("Fitch"),[2] rated the investment quality of all

---

[2]     Moody's, Fitch and S&P are approved by the SEC as "Nationally Recognized Statistical Rating Organizations" and provide credit ratings that are used to distinguish the creditworthiness of different securities under the federal securities laws.

tranches of Certificates based upon information provided by the Defendants about the quality of the mortgages in each mortgage pool and the seniority of the Certificate among the various Certificates issued by each trust.  These ratings, in part, determined the price at which these Certificates were offered to investors.  At the time of purchase, the Certificates acquired by ABP were rated A or above, with the vast majority having been rated AAA.

7.  In selling the Certificates, the Defendants prepared and filed with the Securities and Exchange Commission ("SEC") certain registration statements (the "Registration Statements"), prospectuses (the "Prospectuses") and prospectus supplements (the "Prospectus Supplements" and together with the Registration Statements and Prospectuses the "Offering Documents").  In these Offering Documents, Defendants repeatedly assured investors that the mortgages underlying the Certificates were originated in accordance with Countrywide's underwriting guidelines and standards, and assured investors of the strength of these underwriting guidelines and standards.  In addition, in the Offering Documents, Defendants repeatedly assured investors as to the soundness of the appraisals used to arrive at the value of the underlying properties and, specifically, that the real estate collateralizing the loans had been subjected to objective and independent real estate appraisals that complied with the Uniform Standards of Professional Appraisal ("USPAP").

8.  As it turns out, Defendants' representations in the Offering Documents were false and misleading.  Specifically, Countrywide had not followed its underwriting guidelines and standards when originating the mortgage loans.  In fact, as set forth below, Countrywide had engaged in a wholesale and systematic abandonment of its underwriting guidelines, thereby granting mortgage loans to borrowers who did not satisfy the eligibility criteria as described in the Offering Documents.  In addition, the mortgages underlying the Certificates had been extended based on collateral appraisals that were not performed in accordance with USPAP, so that the value of the underlying properties had been overstated, thereby exposing investors such as ABP to additional losses in the event of foreclosure.

9.  Countrywide's practices, including the subjects of the misrepresentations and omissions in the Offering Documents, have been and continue to be the target of multiple state and federal investigations and proceedings.  In June 2009, the SEC filed a civil suit (the "SEC Action") against three former top Countrywide executives: Angelo Mozilo, former chairman of the board and chief executive officer;

<div align="center">3</div>

<div align="center">COMPLAINT</div>

EXHIBIT 1  -13-

Defendant Sambol, chief operating officer and president; and Defendant Sieracki, chief financial officer. According to the SEC, these three individuals defrauded investors by falsely claiming that Countrywide underwrote low-risk mortgages at a time when the company was getting into increasingly risky parts of the lending business, including "subprime" mortgages – those made to less creditworthy borrowers. The SEC further asserts that Mozilo engaged in insider trading of Countrywide stock. The U.S. Attorney's Office is also investigating Countrywide for criminal violations and, according to an April 2010 article in THE WALL STREET JOURNAL, has stepped up the pace of its investigation, calling witnesses before a grand jury.

10. Various state attorneys general, including those from California, Connecticut, Florida, Illinois, and Indiana, brought lawsuits and/or initiated investigations against Countrywide based on its lending, underwriting and appraisal practices for mortgage loans. The Florida Attorney General investigated Countrywide for "unfair and deceptive trade practices", including the Company's sales and marketing tactics and its subprime loan underwriting, and whether Countrywide put borrowers "into mortgages that in the first place they couldn't afford or loans with rates that were not what they were advertising or that were misleading." On October 6, 2008, Countrywide announced that it had settled the fraud claims brought by 11 states, including California and Illinois, for an estimated *$8.4 billion*, which, according to the California Attorney General, is likely the largest settlement of allegations of predatory lending.

11. In addition, on June 7, 2010 Countrywide agreed to pay $108 million to settle charges brought by the Federal Trade Commission (the "FTC") that it collected excessive fees from cash-strapped borrowers who were struggling to keep their homes. According to the complaint filed by the FTC, Countrywide's loan-servicing operation deceived homeowners who were behind on their mortgage payments into paying inflated fees after many of the homeowners had taken out loans originated or funded by Countrywide's lending arm, including subprime or "nontraditional" mortgages such as payment option adjustable rate mortgages, interest-only mortgages, and loans made with little or no income or asset documentation.

12. ABP has suffered losses in excess of $25,000 on its purchases of Certificates.

## JURISDICTION AND VENUE

13.  The claims asserted herein arise under and pursuant to Sections 11, 12(a)(2) and 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§77k, 77l(a)(2), and 77o; the California Corporate Securities Act; the California Civil Code and common law.

14.  With respect to the claims under the Securities Act, this Court has jurisdiction over the subject matter of this action pursuant to Section 22 of the Securities Act, 15 U.S.C. §77v.  With respect to the remaining claims, the Court has original jurisdiction because the matter in controversy exceeds the sum or value of $25,000.

15.  This Court has personal jurisdiction over the Defendants pursuant to California Code of Civil Procedure § 410.10.  Defendants' CFC and CHL's principal place of business is in the State of California, and many of the remaining Defendants have offices, conduct and are registered to do business in California.  In addition, the violations of law complained of herein occurred in California, including the preparation and dissemination of materially false and misleading statements in the Registration Statements and the Prospectus Supplements, and the offer and sale of the Certificates by Defendants to Plaintiff in California.

16.  Venue is proper in this Court because the violations of law complained of herein occurred in this County, including the preparation and dissemination of materially false and misleading statements in the Registration Statements and the Prospectus Supplements. Furthermore, Defendants CFC and CHL, and many of their affiliated entities, maintain their principal executive offices in this County, and each of the Underwriter Defendants (as defined herein) conducts business and/or is headquartered in this County.

## PARTIES

### Plaintiff

17.  Plaintiff ABP is an independent administrative pension fund established under the laws of the Kingdom of The Netherlands.  ABP serves as the pension fund for public employees in the governmental and education sectors in The Netherlands.  With assets amounting to nearly €220 billion, ABP is one of the three largest pension funds in the world.

**Defendants**

18. Defendant CFC is a Delaware corporation with its principal executive offices located at 4500 Park Granada, Calabasas, California. Until its acquisition by Bank of America, CFC was a public company listed on the New York Stock Exchange, and one of the largest mortgage lenders in the United States. CFC is a holding company which, through its subsidiaries, is engaged in mortgage lending and other real estate finance-related businesses, including mortgage banking, banking and mortgage warehouse lending, dealing in securities and insurance underwriting. The Company operates through five business segments: Mortgage Banking, which originates, purchases, sells and services non-commercial mortgage loans nationwide; Banking, which takes deposits and invests in mortgage loans and home equity lines of credit; Capital Markets, which operates an institutional broker-dealer that primarily specializes in trading and underwriting RMBS; Insurance, which offers property, casualty, life and disability insurance as an underwriter and as an insurance agency; and Global Operations, which licenses and supports technology to mortgage lenders in the United Kingdom.

19. According to Defendant CFC's Form 10-K for the year ended December 31, 2007, filed with the SEC on February 29, 2008 ("2007 Form 10-K"), Defendant CFC also "operate[s] an institutional broker-dealer that primarily specializes in trading and underwriting MBS" known as CSC. The financial results of CSC are set forth in the Capital Markets Segment of Defendant CFC's financial statements. Defendant CFC further stated in its 2007 Form 10-K that it was "ranked fourth among Non-Agency MBS Underwriters" for 2007, but that its underwriting activities had tapered off towards the latter half of 2007 due to issues in the market.

20. In January 2008, CFC was acquired by Bank of America Corporation for $4.1 billion.

21. Defendant CHL is a New York corporation, with its principal place of business at 4500 Park Granada, Calabasas, California, the same location as CFC, and is a direct wholly-owned subsidiary of CFC. Until the acquisition of Countrywide by Bank of America, CHL was the wholly-owned subsidiary of CFC operating in Countrywide's Mortgage Banking business division. CHL originated, purchased, sold and serviced mortgage loans. As discussed below, CHL acted as the "seller" of the mortgage loans underlying the Certificates purchased by Plaintiff ABP.

22. Defendant CCM is a direct wholly-owned subsidiary of CFC. CCM's principal executive

offices are located at 4500 Park Granada, Calabasas, California, the same location as CFC. CCM operates through its two main wholly-owned subsidiaries, Defendant CSC and Countrywide Servicing Exchange. According to Defendant CFC's Form 10-K, "Capital Markets participates in both competitive bid and negotiated underwritings and performs underwriting services for CHL, Countrywide Bank and third parties." The financial results of CCM are set forth in the Capital Markets Segment of Defendant CFC's financial statements.

23. Defendant Bank of America is a successor to Defendant CFC, having *de facto* merged with CFC. On July 1, 2008, Defendant CFC completed a merger with Red Oak Merger Corporation ("Red Oak"), a wholly-owned subsidiary of Bank of America, pursuant to the terms of an Agreement and Plan of Merger, dated as of January 11, 2008, by and among Bank of America, Red Oak, and CFC. The Countrywide brand was retired shortly after the merger and currently CFC's former website redirects to the Bank of America website. Moreover, Bank of America has assumed CFC's liabilities, having paid to resolve other litigation arising from misconduct such as predatory lending allegedly committed by CFC. On November 7, 2008, substantially all of Countrywide's assets were transferred to Bank of America, in connection with Countrywide's integration with Bank of America's other businesses and operations, along with certain of Countrywide's debt securities and related guarantees. CFC ceased filing its own financial statements in November 2008, and instead its assets and liabilities have been included in Bank of America's financial statements. Further, many of the same locations, employees, assets and business operations that were formerly CFC continue under the Bank of America Home Loans brand. CSC, CHL and CCM likewise are now part of Bank of America.

24. Defendant NB Holdings is one of the shell entities used to effectuate the merger between Bank of America and CFC, and is a successor to Defendant CHL. On July 3, 2008, Defendant CHL completed the sale of substantially all of its assets to NB Holdings Corporation, a wholly-owned subsidiary of Bank of America.

25. Defendant CWALT is a Delaware corporation and a limited purpose financing subsidiary of CFC. CWALT's principal executive offices are located at 4500 Park Granada, Calabasas, California, the same location as CFC.

26. Defendant CWMBS is a Delaware corporation and a limited purpose financing subsidiary of

7

COMPLAINT

EXHIBIT 1 -17-

1   CFC. CWMBS' principal executive offices are located at 4500 Park Granada, Calabasas, California, the

2   same location as CFC.

3        27. Defendant CWABS is a Delaware corporation and a limited purpose financing subsidiary of

4   CFC. CWABS' principal executive offices are located at 4500 Park Granada, Calabasas, California, the

5   same location as CFC.

6        28. Defendant CWHEQ is a Delaware corporation and a limited purpose financing subsidiary of

7   CFC. CWHEQ's principal executive offices are located at 4500 Park Granada, Calabasas, California,

8   the same location as CFC.

9        29. Defendant CSC, an affiliate of CFC, acted as an underwriter, within the meaning of the

10   Securities Act, 15 U.S.C. §77b(a)(11), for the Certificates identified in ¶ 57 below, and drafted and

11   disseminated the Prospectus Supplements pursuant to which the Certificates were sold to ABP.

12       30. Defendant Deutsche Bank is an SEC registered broker-dealer, principally located at 60 Wall

13   Street, New York, New York 10005. Deutsche Bank acted as an underwriter, within the meaning of the

14   Securities Act, 15 U.S.C. §77b(a)(11), for the Certificates identified in ¶ 57 below, and drafted and

15   disseminated various Prospectus Supplements pursuant to which Certificates were sold to ABP.

16       31. Defendant UBS is an SEC registered broker-dealer, principally located at 1285 Avenue of

17   the Americas, 19th Floor, New York, New York 10019. UBS acted as an underwriter, within the

18   meaning of the Securities Act, 15 U.S.C. §77b(a)(11), for the Certificates identified in ¶ 57 below, and

19   drafted and disseminated various Prospectus Supplements pursuant to which Certificates were sold to

20   ABP.

21       32. Defendant RBS is an SEC registered broker-dealer, principally located at 600 Steamboat

22   Road, Greenwich, Connecticut 06830. RBS acted as an underwriter, within the meaning of the

23   Securities Act, 15 U.S.C. §77b(a)(11), for the Certificates identified in ¶ 57 below, and drafted and

24   disseminated various Prospectus Supplements pursuant to which Certificates were sold to ABP.

25       33. Defendant Barclays is an SEC registered broker-dealer, principally located at 200 Park

26   Avenue, New York, New York 10166. Barclays acted as an underwriter, within the meaning of the

27   Securities Act, 15 U.S.C. §77b(a)(11), for the Certificates identified in ¶ 57 below, and drafted and

28   disseminated the Prospectus Supplements pursuant to which the Certificates were sold to ABP.

<center>8</center>

34.   Defendant Kurland was, at all relevant times, the Chief Executive Officer ("CEO"), President and Chairman of the Board of Directors for CWALT, CWMBS and CWABS.   Defendant Kurland signed: CWALT's September 23, 2004 and July 25, 2005 Registration Statements; CWMBS' July 25, 2005 Registration Statement; CWABS' October 18, 2004, February 21, 2006 and August 8, 2006 Registration Statements; and CWHEQ's December 17, 2004 and August 4, 2005 Registration Statements.   Defendant Kurland was concurrently the Executive Vice President and Chief Operating Officer ("COO") of Defendant CFC.

35.   Defendant Spector was, at relevant times, Vice President and a member of the Board of Directors for CWALT, CWMBS, CWABS and CWHEQ.   Defendant Spector signed: CWALT's September 23, 2004 and July 25, 2005 Registration Statements; CWMBS' July 25, 2005 Registration Statement; CWABS' October 18, 2004, February 21, 2006, and August 8, 2006 Registration Statements; and CWHEQ's December 17, 2004 and August 4, 2005 Registration Statements.   Defendant Spector was concurrently the Senior Managing Director of Secondary Marketing of Defendant CFC.

36.   Defendant Sieracki was, at relevant times, the Executive Vice President, Chief Financial Officer ("CFO"), Treasurer and member of the Board of Directors for CWALT, CWMBS, and CWABS. Defendant Sieracki signed: CWALT's July 25, 2005 Registration Statement; CWMBS' July 25, 2005 Registration Statement; CWABS' February 21, 2006, August 8, 2006, and April 24, 2007 Registration Statements; and CWHEQ's August 4, 2005 Registration Statement.   Defendant Sieracki was concurrently the Executive Vice President and CFO of Defendant CFC.

37.   Defendant Adler was, at relevant times, President, CEO and a member of the Board of Directors for CWALT, CWMBS, CWABS and CWHEQ.   Defendant Adler signed CWABS' April 24, 2007 Registration Statement.

38.   Defendant Kripalani was, at relevant times, a member of CWALT's, CWMBS', CWABS' and CWHEQ's Board of Directors.   Defendant Kripalani signed CWABS' April 24, 2007 Registration Statement.   Defendant Kripalani was concurrently the Senior Managing Director of Defendant CCM.

39.   Defendant Sandefur was, at relevant times, a member of CWALT's, CWMBS', CWABS' and CWHEQ's Board of Directors.   Defendant Sandefur signed CWABS' April 24, 2007 Registration Statement.   Defendant Sandefur was concurrently the Senior Managing Director and Treasurer of

9

COMPLAINT

EXHIBIT 1   -19-

1  Defendant CHL.

2      40.  Defendant Sambol was, at relevant times, President, CEO and a member of the Board of

3  Directors for CWHEQ. Sambol also was the mastermind of Countrywide's mortgage-backed securities

4  business. Defendant Sambol signed CWHEQ's January 10, 2007, March 2, 2007 and April 17, 2007

5  Registration Statements. Defendant Sambol was concurrently the President and COO of Defendant

6  CFC.

7      41.  Defendants Kurland, Spector, Sieracki, Adler, Kripalani, Sandefur and Sambol are

8  collectively referred to hereinafter as the "Individual Defendants."

9      42.  Defendants CWALT, CWMBS, CWABS, CWHEQ and CFC are collectively referred to

10  herein as the "Issuing Defendants."

11      43.  Defendants CFC, CCM, CSC, Deutsche Bank, UBS, RBS, and Barclays are referred to

12  herein as the "Underwriter Defendants."

13      44.  The Issuing Defendants and Underwriter Defendants are collectively referred to herein as

14  the "Issuing and Underwriter Defendants."

15              **SUBSTANTIVE ALLEGATIONS**

16  I.    **THE SECURITIZATION PROCESS GENERALLY**

17      45.  Traditionally, the process for extending mortgage loans to borrowers involved a lending

18  institution (the loan originator) making a loan to a home buyer in exchange for a promise, documented

19  in the form of a promissory note, by the home buyer to repay the principal and interest on the loan. The

20  loan originator obtained a lien against the home as collateral in the event the home buyer defaulted on its

21  obligation. Under this simple model, the loan originator held the promissory note until it matured, and

22  was exposed to the risk that the borrower might fail to repay the loan. As such, the loan originator had a

23  financial incentive to ensure that the borrower had the financial wherewithal to repay the promissory

24  note, and that the underlying property had sufficient value to enable the originator to recover its

25  principal and interest in the event that the borrower defaulted.

26      46.  Beginning in the 1990s, however, banks and other mortgage lending institutions increasingly

27  used securitization to finance the extension of mortgage loans to borrowers. Under the securitization

28  process, after a loan originator issues a mortgage to a borrower, the loan originator sells the mortgage to

10

COMPLAINT

EXHIBIT 1  -20-

a third-party financial institution.  By selling the mortgage, the loan originator not only obtains fees, but receives the proceeds from the sale of the mortgage up front, and thereby has new capital to issue more mortgages.  The financial institutions that purchase the mortgages then pool the mortgages together and securitize the mortgages into what are commonly referred to as residential mortgage-backed securities or RMBS.  In this manner, unlike the traditional process for extending mortgage loans, the loan originator is no longer subject to the risk that the borrower may default; that risk is transferred with the mortgages to investors who purchase the RMBS.

47.   The securitization of residential mortgage loans, and the creation of RMBS collateralized against these loans, typically follows the same structure and pattern in every transaction.  First, a loan originator, such as a mortgage lender or bank, originates the underlying residential mortgage loan.  After a loan has been made, a "sponsor" or "seller" (who either originated the loans itself or acquired the loans from other loan originators) sells the mortgage loans to a "depositor."  The depositor pools these loans and deposits them into a special purpose entity or trust created by the depositor.  One trust is established to hold the pool of mortgages for each proposed offering.  In order to facilitate multiple offerings of RMBS, a depositor sets up multiple trusts to hold the different pools of mortgages that are to be securitized.  In the case of each offering, in return for the pool of mortgages acquired from the depositor, the trust issues and distributes RMBS certificates to the depositor.  The depositor then works with an underwriter to price and sell the certificates to investors.  Thereafter, a servicer is appointed to service the mortgage loans held by the trust, *i.e.*, to collect the mortgage payments from the borrower in the form of principal and interest, and to remit them to the trust for administration and distribution to the RMBS investors.  The diagram below illustrates the typical structure of a securitization:

//

//

//

//

//

//

11

COMPLAINT

EXHIBIT 1  -21-



48.   In selling the certificates to investors, the depositor and underwriters disseminate to investors various disclosure or offering documents describing the certificates being sold.  The offering documents comprise: (1) a "shelf" registration statement (under SEC Rule 415, an issuer may file one registration statement covering several offerings of securities made during a period of up to three years after the filing of the registration statement); (2) a "base" prospectus; and (3) a "prospectus supplement." Because a depositor will create multiple trusts to hold different pools of mortgages for multiple offerings of RMBS (as described above), the depositor files one shelf registration statement and one base prospectus that apply to multiple trusts that the depositor proposes to establish.  With respect to each specific trust, however, the depositor also files a prospectus supplement that applies only to that particular trust.  Thus, for any given offering of securities, the relevant offering documents will typically be a shared registration statement and shared base prospectus, as well as an individual, trust-specific

12

1    prospectus supplement.

2          49. Each investor who purchases an RMBS certificate is entitled to receive monthly payments of

3    principal and interest from the trust. The order of priority of payment to each investor, the interest rate

4    to be paid to each investor, and other payment rights accorded to each investor, including the speed of

5    principal repayment, depend on which class or tranche of certificates the investor purchases.

6          50. The highest or senior tranche is the first to receive its share of the mortgage payments and is

7    also the last to absorb any losses should mortgage borrowers become delinquent or default on their

8    mortgages. Accordingly, these senior tranches receive the highest investment rating by the rating

9    agencies, usually AAA. After the senior tranche, the middle tranches (referred to as mezzanine

10   tranches) next receive their share of the proceeds. These mezzanine tranches are generally rated from

11   AA to BB by the rating agencies. The process of distributing the mortgage proceeds continues down the

12   tranches through to the bottom tranches, referred to as equity tranches. This process is repeated each

13   month and all investors receive the payments owed to them so long as the mortgage borrowers are

14   current on their mortgages.

15   **II.    THE COUNTRYWIDE SECURITIZATIONS AND ABP'S INVESTMENTS IN THE**
16   **         CERTIFICATES**

17         51.    In the case of Countrywide's securitizations, the transactions among the

18   originator/sponsor/seller, depositor, trusts and underwriters were not arms-length transactions, as CFC

19   controlled nearly all the entities.

20         52. CFC set up each of the Defendants CWALT, CWMBS, CWABS, and CWHEQ to act as the

21   depositor. In their role as the depositors, Defendants CWALT, CWMBS, CWABS and CWHEQ then

22   set up numerous issuing trusts for the issuance of RMBS. In this case, the trusts established by

23   CWALT, CWMBS, CWABS and CWHEQ from which ABP purchased the Certificates in question

24   were:

               • CWABS Revolving Home Equity Loan Trust, Series 2004-Q
25             • CWABS Revolving Home Equity Loan Trust, Series 2004-R
               • CWHEQ Revolving Home Equity Loan Trust, Series 2005-A
26             • CWALT Alternative Loan Trust 2005-J1
               • CWALT Alternative Loan Trust 2005-40CB
27             • CWHEQ Revolving Home Equity Loan Trust, Series 2005-D
28             • CWHEQ Revolving Home Equity Loan Trust, Series 2005-E

                                              13
                                          COMPLAINT

EXHIBIT 1  -23-

- CHL Mortgage Pass-Through Trust 2006-HYB1
- CWABS Asset-Backed Certificates Trust 2006-24
- CWABS Asset-Backed Certificates Trust 2007-2
- CWABS Asset-Backed Certificates Trust 2007-6
- CWABS Asset-Backed Certificates Trust 2007-BC2
- CWABS Asset-Backed Certificates Trust 2007-8
- CWABS Asset-Backed Certificates Trust 2007-10

(collectively, the "Issuing Trusts").

53. In connection with their role as depositors, Defendants CWALT, CWMBS, CWABS and CWHEQ prepared and filed with the SEC numerous shelf registration statements. This process was directed at all material times by CFC. For purposes of this action, the Certificates purchased by ABP are traceable to the following Registration Statements prepared and filed by Defendants CWALT, CWMBS, CWABS and CWHEQ:

### CWALT

| Registration Statement | Date Filed | Amount Registered |
|---|---|---|
| 333-117949 | September 23, 2004 | $ 24,126,942,035 |
| 333-125902 | July 25, 2005 | $45,335,287,290 |

### CWMBS

| Registration Statement | Date Filed | Amount Registered |
|---|---|---|
| 333-125963 | July 25, 2005 | $40,742,304,251 |
| 333-131662 | March 6, 2006 | $60,846,662,430 |

### CWABS

| Registration Statement | Date Filed | Amount Registered |
|---|---|---|
| 333-118926 | October 18, 2004 | $60,598,485,932 |
| 333-135846 | August 8, 2006 | $ 58,102,953,923 |
| 333-140960 | April 24, 2007 | $113,336,555,700 |

COMPLAINT

EXHIBIT 1 -24-

*CWHEQ*

| Registration Statement | Date Filed | Amount Registered |
|---|---|---|
| 333-121378 | December 17, 2004 | $20,000,000,000 |
| 333-126790 | August 4, 2005 | $30,572,949,813 |

54. By preparing the above Registration Statements, each of Defendants CWALT, CWMBS, CWABS and CWHEQ was an "issuer" within the meaning of the Securities Act, 15 U.S.C. §77b(a)(4), of the Certificates traceable to the above Registration Statements. Each of the above Registration Statements was signed by the Individual Defendants.

55. At the time of filing, each Registration Statement contained an illustrative form of a prospectus supplement that would be used in the offering of the Certificates. At the effective date of the offering of the Certificates, the Underwriter Defendants prepared and filed a final Prospectus Supplement with the SEC containing a description of the mortgage pool underlying the Certificates and the underwriting standards by which the mortgages were originated. The Underwriter Defendants then marketed and sold the Certificates pursuant to these Prospectus Supplements.

56. Finally, after the Certificates were sold, CHL acted as the servicer of the mortgages held by the Issuing Trusts.

57. The following chart summarizes and identifies (1) each Issuing Trust that issued and sold the Certificates purchased by ABP, (2) the dates of the Registration Statements and Prospectus Supplements pursuant to which the Certificates were issued and sold, and (3) the identities of the depositor, the underwriters, and the sponsor/seller for each issuance.

| Amended Registration Statement Date | Issuing Trust | Prospectus Supplement Date of filing | Depositor | Underwriter(s) | Sponsor /Seller |
|---|---|---|---|---|---|
| 9/23/2004 | Alternative Loan Trust 2005-J1 | 2/1/2005 | CWALT | CSC | CHL |

15
COMPLAINT

EXHIBIT 1 -25-

| | | | | | |
|---|---|---|---|---|---|
| 10/18/04 | CWABS Revolving Home Equity Loan Trust, Series 2004-Q | 11/22/2004 | CWABS | CSC | CHL |
| | CWABS Revolving Home Equity Loan Trust, Series 2004-R | 12/21/2004 | CWABS | CSC | CHL |
| 12/17/04 | CWHEQ Revolving Home Equity Loan Trust, Series 2005-A | 2/22/2005 | CWHEQ | CSC/UBS | CHL |
| 7/25/2005 | Alternative Loan Trust 2005-40CB | 8/29/2005 | CWALT | CSC | CHL |
| 7/25/2005 | CHL Mortgage Pass-Through Trust 2006-HYB1 | 1/31/2006 | CWMBS | CSC | CHL |
| 8/4/2005 | CWHEQ Revolving Home Equity Loan Trust, Series 2005-D | 8/30/2005 | CWHEQ | CSC | CHL |
| | CWHEQ Revolving Home Equity Loan Trust, Series 2005-E | 8/30/2005 | CWHEQ | CSC | CHL |
| 8/8/2006 | CWABS Asset-Backed Certificates Trust 2006-24 | 1/4/2007 | CWABS | CSC/RBS | CHL |

16

COMPLAINT

EXHIBIT 1  -26-

| | | | | | |
|---|---|---|---|---|---|
| CWABS Asset-Backed Certificates Trust 2007-2 | 3/2/2007 | CWABS | CSC/RBS | CHL |
| CWABS Asset-Backed Certificates Trust 2007-6 | 4/3/2007 | CWABS | CSC/RBS | CHL |
| 4/24/2007 | CWABS Asset-Backed Certificates Trust 2007-BC2 | 4/30/2007 | CWABS | CSC | CHL |
| | CWABS Asset-Backed Certificates Trust 2007-8 | 6/4/2007 | CWABS | CSC/Lehman/ RBS | CHL |
| | CWABS Asset-Backed Certificates Trust 2007-10 | 7/3/2007 | CWABS | CSC/ Barclays/ Deutsche Bank | CHL |

III.     **THE IMPORTANCE OF UNDERWRITING STANDARDS AND PROPERTY APPRAISALS TO INVESTORS IN THE CERTIFICATES**

58.   In purchasing the Certificates, ABP, like other investors, attached critical importance to: (a) the underwriting standards used to originate the loans underlying the Certificates; and (b) the appraisal methods used to value the properties securing the underlying mortgage loans.

59.   Sound underwriting was critically important to ABP because the ability of Countrywide's borrowers to repay principal and interest was the fundamental basis upon which the investments in the Certificate were valued.  Reflecting the importance of the underwriting standards, each of the Offering Documents contained representations concerning the standards purportedly used to underwrite the mortgages held by the Issuing Trusts.  For example, each of the Registration Statements issued by CWALT and CWMBS represented that: "All of the mortgage loans in the trust fund will have been

17

COMPLAINT

EXHIBIT 1  -27-

1    originated or acquired by Countrywide Home Loans in accordance with its credit, appraisal and
2    underwriting standards. Countrywide Home Loans' underwriting standards are applied in accordance
3    with applicable federal and state laws and regulations." Each of the Registration Statements issued by
4    CWABS and CWHEQ similarly indicated the importance of loan underwriting, expressing their
5    compliance with "applicable federal and state laws and regulations."[3]

6        60.   Independent and accurate real estate appraisals were also critically important to investors
7    such as ABP because they ensured that the mortgage loans underlying the Certificates were not under-
8    collateralized, thereby protecting RMBS investors in the event a borrower defaulted on a loan. As such,
9    by allowing RMBS investors to assess the degree to which a mortgage loan was adequately
10   collateralized, accurate appraisals provided investors such as ABP with a basis for assessing the price
11   and risk of the Certificates.

12       61.   One measure that uses the appraisal value to assess whether mortgage loans are under-
13   collateralized is the loan-to-value ("LTV") ratio. The LTV ratio is a mathematical calculation that
14   expresses the amount of a mortgage as a percentage of the total value of the property, as obtained from
15   the appraisal. For example, if a borrower seeks to borrow $900,000 to purchase a house worth
16   $1,000,000, the LTV ratio is $900,000/$1,000,000, or 90%. If, however, the appraised value of the
17   house is artificially increased to $1,200,000, the LTV ratio drops to just 75% ($900,000/$1,200,000).

18       62.   From a lender's perspective, the higher the LTV ratio, the riskier the loan, because it
19   indicates the borrower has a lower equity stake, and a borrower with a lower equity stake in a property
20   has less to lose if s/he defaults on the loan. Worse, particularly in an era of falling housing prices, a high
21   LTV ratio creates the heightened risk that, should the borrower default, the amount of the outstanding
22   loan may *exceed* the value of the property.

23       63.   Real estate appraisals are governed by USPAP, which are the generally accepted standards

24   _____
[3]      *See, e.g.*, Registration Statement filed by CWABS on Form S-3/A on February 21, 2006 (at S-38)
25   ("Prior to the funding of any credit blemished mortgage loan, Countrywide Home Loans underwrites the
     related mortgage loan *in accordance with the underwriting standards established by Countrywide*
26   *Home Loans*. In general, the mortgage loans are underwritten centrally by a specialized group of
     underwriters who are familiar with the unique characteristics of credit blemished mortgage loans. In
27   general, Countrywide Home Loans does not purchase any credit blemished mortgage loan that it has not
28   itself underwritten.") (emphasis added).

for professional appraisal practice in North America promulgated by the Appraisal Standards Board of the Appraisal Foundation, as authorized by Congress.  With respect to real estate appraisals, the USPAP requires the following:

> An appraiser must perform assignments with impartiality, objectivity, and independence, and without accommodation of personal interests.

> In appraisal practice, an appraiser must not perform as an advocate for any party or issue.

> An appraiser must not accept an assignment that includes the reporting of predetermined opinions and conclusions.

> * * * * *

> It is unethical for an appraiser to accept an assignment, or to have a compensation arrangement for an assignment, that is contingent on any of the following:

> 1.    the reporting of a predetermined result (e.g., opinion of value);

> 2.    a direction in assignment results that favors the cause of the client;

> 3.    the amount of a value opinion;

> 4.    the attainment of a stipulated result; or

> 5.    the occurrence of a subsequent event directly related to the appraiser's opinions and specific to the assignment's purpose.

64.    Reflecting the importance of independent and accurate real estate appraisals to investors such as ABP, the Offering Documents contained extensive disclosures concerning the value of the collateral underlying the mortgages pooled in the Issuing Trusts, and the appraisal methods by which such values were obtained.  Each Prospectus Supplement also reported the average LTV ratios of the mortgage loans pooled in the Issuing Trusts.

**IV.    COMMENCING IN 2003, COUNTRYWIDE ENGAGED IN WIDESPREAD AND SYSTEMATIC ABANDONMENT OF ITS UNDERWRITING GUIDELINES AND STANDARDS WHEN ORIGINATING MORTGAGES**

65.    As has now come to light, contrary to Defendants' representations in the Offering Documents, Countrywide engaged in a systematic departure from its underwriting standards when originating the mortgages underlying the Certificates purchased by ABP.  As a result of Countrywide's

19

COMPLAINT

EXHIBIT 1  -29-

1  wholesale abandonment of its underwriting guidelines, the mortgage pools underlying the Certificates

2  have suffered serious delinquencies and foreclosures far above the rates that ABP anticipated based on

3  Defendants' representations concerning the underwriting standards and quality of mortgages pooled in

4  the Issuing Trusts.  As a consequence, the Certificates have lost value and ABP has suffered damages.

5      66.  In the earlier part of this decade, as an unprecedented boom in the housing market got

6  underway, Countrywide embarked on a scheme to profit from the boom by originating large numbers of

7  mortgage loans, regardless of the borrower's ability to pay, and then quickly flipping these loans at a

8  profit on the secondary market.  Indeed, in January 2004, Countrywide Financial's founder and CEO,

9  Angelo R. Mozilo ("Mozilo"), publicly declared during a call with analysts that the Company's

10  objective was to double its share of the national market for all mortgage loans to 30%.

11      67.  A central part of Countrywide's scheme was to aggressively market mortgage loans to

12  borrowers with poor credit histories and who were thus at a heightened risk of default.  Because

13  Countrywide was marketing mortgage loans to customers with a heightened risk of default, such loans

14  did not comply with Countrywide's internal underwriting guidelines.  Therefore, in order to facilitate its

15  scheme, Countrywide departed from its underwriting guidelines at the same time that it was mass

16  marketing these loan products to risky borrowers.  The different ways by which Countrywide abandoned

17  its underwriting guidelines have now been detailed extensively in numerous governmental investigations

18  and private lawsuits.[4]

19      68.  One way by which Countrywide abandoned its underwriting guidelines was to systemically

20  disregard and/or affirmatively manipulate the income, assets and employment status of borrowers

21  seeking mortgage loans, in order to qualify these borrowers for mortgages.  In many instances, this was

22  accomplished by inflating borrowers' stated income, or facilitating income inflation by encouraging

23

---

24  [4]   *See, e.g., The People of the State of California v. Countrywide Financial Corporation, et al.*, No.
LC081846.  Similar actions have been filed in the States of Illinois and Connecticut.  The allegations in

25  these actions have been confirmed by investigations in other states such as Florida, Indiana, Washington
and West Virginia, which revealed the nationwide scope of Countrywide's departures from the

26  underwriting standards set forth in each Registration Statement and Supplemental Prospectus.

27      In addition, an FBI investigation of Countrywide has revealed further misconduct.  *See, e.g.,*
"FBI Investigates Countrywide – U.S. Scrutinizes Filings on Financial Strength, Loan Quality for

28  Fraud" THE WALL STREET JOURNAL (March 8, 2008).

1   ineligible borrowers to resort to "no documentation loans" and "stated income loans", as described

2   further below.

3       69.   Another way Countrywide departed from its underwriting guidelines was to approve loans

4   based on false affordability metrics, for example, the borrower's ability to make loan repayments based

5   on low, introductory "teaser" interest rates.  Countrywide deliberately omitted any assessment of the

6   borrower's ability to make repayments once the interest rate reset to a higher rate, at the expiration of

7   the teaser interest rate period.

8       70.   A further way by which Countrywide departed from its underwriting guidelines was to

9   implement specific procedures by which employees – from the underwriter level up to regional vice

10  presidents – were authorized to liberally make "exceptions" and issue loans even though the loans did

11  not pass muster under Countrywide's underwriting guidelines.  Thus, Countrywide employees were

12  specifically authorized to override any recommendation by Countrywide's "CLUES" underwriting

13  system denying a loan, and even to change the terms of a loan suggested by CLUES.

14      71.   Because of the scheme described above, Countrywide was able to vastly expand the volume

15  of its loan origination.  Between 2004 and 2006, Countrywide's total loan production increased, from

16  $363 billion to $468 billion.  In its 2006 annual report, Countrywide boasted that "[w]hile the overall

17  residential loan production market in the United States has tripled in size since 2000, from $1.0 trillion

18  to $2.9 trillion at the end of 2006, Countrywide has grown nearly three times faster, going from $62

19  billion in loan originations in 2000 to $463 billion in 2006."

20  **A.   COUNTRYWIDE ABANDONED ITS UNDERWRITING GUIDELINES BY FLAGRANTLY**
21  **IGNORING THE BORROWER'S ABILITY AND WILLINGNESS TO REPAY THE LOAN**

22      72.   As represented in the Offering Documents, Countrywide's underwriting guidelines were

23  primarily intended to assess the ability and willingness of the borrower to repay the mortgage loan, apart

24  from the adequacy of the mortgaged property as collateral for the loan.  Accordingly, Countrywide's

25  underwriting guidelines required the consideration of, among other things, the borrower's assets,

26  liabilities, income, employment history and credit history.  These items of information were used to

27  calculate the borrower's debt-to-income ratio ("DTI"), *i.e.*, the ratio of the borrower's total monthly

28  credit obligations to the borrower's gross monthly income.

73.  Notwithstanding these explicit requirements in its underwriting guidelines, Countrywide extended numerous loans even though the borrower's information was not provided, or even if it was, where that information was patently false and Countrywide's underwriters knew that the borrower was misrepresenting her or his income, occupation and other information, and was engaged in outright mortgage fraud.  In many cases, Countrywide's employees actively assisted in the misrepresentation of income, occupation and other information.

74.  These practices were most evident with respect to Countrywide's underwriting of the so-called stated asset, stated income ("SISA") loans, *i.e.*, a "low-doc" loan; and the no income, no assets ("NINA") loans, *i.e.*, a "no-doc" loan.  Under the SISA program, the borrower's income and assets were simply stated in the loan application but not documented.  Employment was verbally confirmed and income was supposed to be roughly consistent with incomes earned in the type of job claimed by the borrower.  NINA loans allowed a borrower to simply state her/his income without providing any documentation or proof of this income.

75.  With respect to SISA loans, Countrywide's employees deliberately omitted to take any steps to verify income information even though the means for such verification were readily available.  According to an April 6, 2008 article entitled, "A Road Not Taken by Lenders," authored by Gretchen Morgenson of the NEW YORK TIMES, even though Countrywide had the right to verify stated income on an application through the Internal Revenue Service ("IRS") (and this check took less than one day to complete), Countrywide verified income with the IRS on only 3% to 5% of all loans that Countrywide made in 2006.  In other situations, if a potential borrower applying for a SISA loan provided a bank name, address and account number for asset verification, it was the practice at Countrywide not to verify the bank balance.

76.  Not only did Countrywide employees fail to verify income and other information, Countrywide employees circumvented Countrywide's guidelines by affirmatively facilitating mortgage fraud by borrowers.  According to a lawsuit filed by the Illinois Attorney General on June 25, 2008, with respect to reduced documentation loans, the only check on fraudulent income was a "reasonableness standard" allegedly employed by Countrywide.  Early on, Countrywide employees were required only to use their judgment in deciding whether or not a stated income loan seemed reasonable.  Beginning in

22

COMPLAINT

EXHIBIT 1  -32-

2005, to supplement an employee's judgment as to whether or not a potential borrower's income was "reasonable", Countrywide required its employees to utilize a website, www.salary.com, in order to determine if the borrower's stated income was indeed reasonable. The website, however, provides only a range of salaries based on the zip code and stated job title of the loan applicant.

77. Many employees knew ahead of time the range of salaries that www.salary.com would provide for a particular job and, therefore, knew by how much they could overstate a borrower's income. Countrywide's loan officers typically explained to potential borrowers that "with your credit score of X, for this house, and to make Y payment, Z is the income that you need to make." After such advice, the borrower would state that she or he made Z amount of income. In this manner, Countrywide's loan officers affirmatively assisted loan applicants in submitting loan applications with *false income amounts*, so that applicants could get loans under false pretenses. Unsurprisingly, as a result of these departures from Countrywide's underwriting guidelines, the Illinois Attorney General found that approximately 90% of all reduced documentation loans sold out of one Chicago office had inflated incomes.

78. Because of the ease with which SISA loans could be manipulated to secure approval, as described above, Countrywide employees routinely converted full documentation loan applications into SISA loan applications. In a May 7, 2007 letter to the Office of Thrift Supervision, Countrywide itself admitted that it engaged in a practice whereby, if Countrywide received proper income documentation (*i.e.*, a W-2 form) demonstrating that the borrower did *not* qualify for a loan, the loan was submitted as a SISA loan so as to obtain approval of the loan.

79. This practice is also detailed in a complaint filed by Mark Zachary ("Zachary"), a former Regional Vice President of Countrywide KB Homes Loans, Inc. ("CWKB"), in an action commenced on January 17, 2008, styled *Zachary v. Countrywide Financial Corporation,* No. 4:08-cv-00214. According to Zachary, loans were being canceled at prime regional operations centers as full documentation loans and transferred to the sub-prime operations center in Plano, Texas, as SISA or NINA loans. Thus, rather than denying an applicant based on the information revealed in the original mortgage application, Countrywide pretended that it did not see the disqualifying information (such as insufficient income or assets) and, instead, allowed applicants to apply for a no documentation loan,

23

COMPLAINT

EXHIBIT 1  -33-

1  implicitly encouraging them to lie on these renewed applications.

2      80. Numerous other sources confirm the extent by which Countrywide departed from its

3  underwriting guidelines by allowing and/or facilitating misrepresentations by borrowers as to their

4  income, occupation and other vital information. In the SEC Action against Mozilo, Sambol and

5  Sieracki, the SEC alleges that a quality control audit at Countrywide Bank revealed that *fifty percent* of

6  the stated income loans audited by the bank showed a variance in income from the borrowers' IRS

7  filings of greater than ten percent. Of those, 69% had an income variance of *greater than 50%*.

8      81. Further, according to the SEC, in an April 13, 2006 email to Defendants Sambol and

9  Sieracki, Mozilo expressed his concern that loans had been originated "through our channels with

10  disregard for process [and] compliance with guidelines." Mozilo went on to write that he had

11  *"personally observed a serious lack of compliance within our origination system as it relates to*

12  *documentation and generally a deterioration in the quality of loans originated versus the pricing of*

13  *those loan* [sic]." Mozilo then noted that, *"[i]n my conversations with Sambol he calls the 100% sub*

14  *prime seconds as the 'milk' of the business. Frankly, I consider that product line to be the poison of*

15  *ours."*

16      82. Finally, in connection with a lawsuit filed by MBIA Insurance Corporation ("MBIA")

17  against Countrywide on September 30, 2008, MBIA commissioned an analysis of pools of loans that it

18  alleges it had been fraudulently induced to insure. *MBIA Ins. Corp. v. Countrywide*, No. 08/602825

19  (N.Y. Sup. Ct., filed Sept. 30, 2008). According to MBIA, the analysis revealed that *almost 90%* of

20  defaulted or delinquent loans in at least one pool of Countrywide securitizations showed material

21  discrepancies.

22      **B.**   **COUNTRYWIDE DEPARTED FROM ITS UNDERWRITING GUIDELINES BY USING FALSE METRICS TO ASSESS ITS BORROWERS' ABILITY TO REPAY.**

23

24      83. Another widespread method by which Countrywide departed from its underwriting practices

25  was to assess borrowers' ability to pay based on false metrics, so that the loan applications would pass

26  muster.

27      84. In a December 13, 2007 memo that was sent to Mozilo in his capacity as Countrywide's

28  chairman of the board, Countrywide's enterprise risk assessment officer noted that:

Countrywide had reviewed limited samples of first- and second-trust-deed mortgages originated by Countrywide Bank during the fourth quarter of 2006 and the first quarter of 2007 in order to get a sense of the quality of file documentation and underwriting practices, and to assess compliance with internal policies and procedures. The review resulted in . . . the finding that *borrower repayment capacity was not adequately assessed by the bank during the underwriting process* for home equity loans. *More specifically, debt-to-income (DTI) ratios did not consider the impact of principal [negative] amortization or an increase in interest.*

(emphasis in original). The latter was a fatal flaw, given the huge increase in interest rates built into many of Countrywide's loans.

85. In an effort to increase the fees that it received, Countrywide steered borrowers to loans with the highest interest rates and the most fees, while concealing less expensive loan products that those customers could afford. Among other products, Countrywide originated and sold adjustable rate mortgages ("ARMs") with low initial or "teaser" interest rates. The "teaser" rate, typically 1%-1.25%, only applied to the loan for the first month. Once the teaser rate expired, the interest rate on the ARM reverted to a fully indexed rate.

86. The fully indexed rate can change over time and is dependent on fluctuations in the current value of the chosen rate index, such as the 11th District Cost of Funds Index ("COFI"), the 12 Month Treasury Average Index or the London Interbank Offer Rate. The fully indexed rate is calculated by adding the current value of the rate index (which fluctuates monthly) to a margin agreed to by the borrower. The margin remains static for the life of the loan. The margin on Countrywide loans could be as high as 4%. Thus, if the Countrywide ARM identifies the rate index as COFI (which was at 2.8% in July 2008) and the margin as 4%, then once the cap or "teaser rate" has expired, the borrower will be subject to an interest rate equal to the fully indexed rate, or 6.8%, for that month.

87. In the case of "option ARMs", the borrower had the option of making monthly payments as though the interest rate had not changed, thereby making only a "minimum" payment that was based on the teaser rate of 1% to 1.25% as opposed to the fully indexed rate of 6.8%. This meant that the borrower was making payments that were less than the amount of interest accruing on the loan after the teaser rate had already expired. The unpaid interest that accrued while the borrower was making the payment based on the teaser rate was tacked on to the principal. Once the principal hit 115% of the original loan, the borrower's monthly payment immediately was raised to a level that would pay off the

COMPLAINT

EXHIBIT 1  -35-

1  new balance (original principal plus the unpaid interest) of the loan.   This resulted in borrowers
2  experiencing "payment shock" after the interest-only payment period expired.

3      88.  In order to ensure that mortgage products such as these ARMs and option ARMs passed
4  muster, Countrywide engaged in the practice of approving the loans based on the borrower's ability to
5  pay the teaser rate, as opposed to the fully indexed rate, and steered customers to "hybrid" ARMS.
6  Hybrid ARMS have a fixed interest rate for a period of 2, 3, 5, 7, or 10 years, and then an adjustable
7  interest rate for the remaining loan term.   In the fourth quarter of 2006 alone, almost 60% of the
8  borrowers who obtained subprime hybrid ARMs from Countrywide would not have qualified at the fully
9  indexed rate, and 25% of the borrowers would not have qualified for any other Countrywide product,
10  according to the Company's May 7, 2007 letter to the Office of Thrift Supervision.

11      89.  In a September 3, 2007 article entitled "Countrywide's Confident Tone Turned to Crisis,"
12  the LOS ANGELES TIMES reported that Countrywide tightened its lending standards in the summer of
13  2007 in order to ensure that borrowers could afford loans at the fully indexed rate (as opposed to just the
14  teaser rate).   According to a December 28, 2007 LOS ANGELES TIMES article, "Prime Loans Seeing Rise
15  in Defaults," Countrywide admitted that, had those guidelines been in effect during the relevant time
16  period, "it would have rejected 89% of the option ARM loans it made in 2006, amounting to $64 billion,
17  and $74 billion, or 83%, of those it made in 2005."

**C.  COUNTRYWIDE CREATED A PERMISSIVE CULTURE BY WHICH UNDERWRITING "EXCEPTIONS" WERE LIBERALLY ISSUED TO BORROWERS, FOR EXAMPLE, BY ALLOWING EMPLOYEES TO IGNORE AND OVER-RIDE THE RECOMMENDATIONS OF COUNTRYWIDE'S HIGHLY TOUTED CLUES UNDERWRITING PROGRAM**

90.  Countrywide departed from its underwriting guidelines by allowing "exception" loans to be made even though the exceptions were not justified under Countrywide's underwriting guidelines. Although Countrywide's underwriting guidelines allowed for exceptions to be made, such exceptions could be made only when "compensating factors" were present.   Compensating factors were defined to include the borrower's employment stability, favorable credit history, and equity in the property.

91.  Instead of requiring employees to clearly document the process by which exceptions were made, Countrywide created a high-pressure environment that drove the origination of loans. Furthermore, Countrywide implemented specific procedures for bypassing the underwriting guidelines

1    and liberally granting exceptions.

2        92.  Countrywide's CLUES computer underwriting system generated a loan analysis report that
3    rated the borrower's creditworthiness and indicated whether a proposed loan complied with
4    Countrywide's underwriting standards.  Based on this analysis, the CLUES report would recommend
5    that a loan be approved, declined, or be referred for a further, manual analysis by a Countrywide
6    underwriter.    However, Countrywide employees were specifically authorized to override any
7    recommendation by CLUES denying a loan, by obtaining the approval of a supervisor.  Countrywide
8    employees were also authorized to change the terms of loan as suggested by CLUES.  As a result,
9    Countrywide employees at every level were authorized to liberally make exceptions to Countrywide's
10   underwriting standards.

11       93.  If all else failed, Countrywide employees could also submit a request for an exception to
12   Countrywide's Structured Loan Desk in Plano, Texas, a department set up specifically for the purpose of
13   granting underwriting exceptions.  Commencing in late 2004, the Structured Loan Desk employed
14   software called the Exception Processing System or EPS in order to obtain approval for loans that
15   should have been rejected by Countrywide's underwriting standards.  As many as 15% to 20% of the
16   loans generated each day at the Company's Structured Loan Desk were run through EPS and very few
17   were ever rejected.  The objectives of EPS were to approve virtually every borrower and loan profile,
18   especially high risk borrowers.

19       94.  According to the complaint filed in the SEC Action, in May 2005, Defendant Sambol was
20   personally warned by a senior risk management employee that exceptions were being made on terms
21   "more aggressive" than Countrywide's guidelines, and that increased defaults would cause repurchase
22   and indemnification requests to rise and the performance of Countrywide-issued RMBS to deteriorate.

23   **V.     COUNTRYWIDE SYSTEMATICALLY FAILED TO OBTAIN APPRAISALS IN**
     **        ACCORDANCE WITH INDUSTRY APPROVED APPRAISAL STANDARDS**
24
25       95.  Not only did Countrywide systematically abandon its underwriting guidelines, Countrywide
     also departed from USPAP when obtaining appraisals for the properties securing the mortgages
26   underlying the Certificates.
27
28       96.  According to Countrywide's "Subprime Appraisal Requirements", virtually every loan

EXHIBIT 1  -37-

needed to be accompanied by at least one independent appraisal performed by an appraiser working through Countrywide's subsidiary, Landsafe Appraisals, Inc. ("Landsafe"), or a secondary appraisal from an "approved appraisal company", including eAppraiseIT.com, Lender Services Inc. and LandAmerica Lender Services.

97. Notwithstanding Countrywide's "Subprime Appraisal Requirements", the appraisals obtained by Countrywide underwriters were not independent. For example, since at least 2005, loan officers from all of Countrywide's origination divisions were permitted to (i) hire appraisers of their own choosing, (ii) discard appraisals that did not support loan qualification, and (iii) substitute more favorable appraisals by replacing appraisers when necessary to obtain a more favorable LTV so as to qualify a loan for approval. Countrywide loan officers were allowed to lobby appraisers to assign particular values to a property in order to support the closing of a loan.

98. Furthermore, numerous appraisers have confirmed that the inflation of appraisals was commonplace. For example, the owner of a small Midwest residential real estate appraisal firm in Illinois – who was approved and/or utilized by CHL and other originators in approximately 200 transactions – stated that mortgage brokers would call him and say "I need this number." This appraiser also stated that he was frequently threatened with, "either give us this home value or you will never do business for us again."

99. An independent appraiser from Florida, who was approved by CHL and other originators, stated that she was told by brokers and/or lenders that: "WE NEED THIS NUMBER, OR YOU WILL NEVER WORK FOR US AGAIN." In order to stay in business, she gave the valuations the broker or lender demanded, even if it required driving 20 miles away to identify a "comparable" sale that could be used to justify the appraisal. During the relevant period, this appraiser completed more than 100 appraisals for Defendant CHL and other originators that were inflated.

100. A real estate appraiser in Las Vegas stated that when the Las Vegas market had peaked, Defendant CHL required appraisers to come up with real estate appraisals reflecting escalating values or it would blackball them. This appraiser conducted over 300 appraisals that in his opinion were inflated for CHL and other originators. According to this appraiser, typically the appraisals demanded by CHL were 15% to 25% over the actual market.

101. Another independent appraiser stated that CHL in-house or outside loan officers demanded inflated numbers from him in Compton and Watts, California. The officers told him to either give them the appraisal numbers they wanted or that he would be "done" and that he would be blackballed by every lender doing business in California. According to this appraiser, he completed over 100 inflated appraisals just for CHL and one other originator. In some cases he was appraising houses for $100,000 more than they were worth in such dangerous neighborhoods that he never even got out of his car, but simply drove by and took pictures of the house and gave the broker or the lender the number that was demanded.

102. Apart from these numerous accounts from appraisers, multiple lawsuits have been filed against Countrywide and its appraisal subsidiary, Landsafe, as well as several of the "approved appraisal companies", alleging that the appraisals obtained were inflated.

103. On June 25, 2008 and July 24, 2008, shareholders of Fannie Mae and Freddie Mac, respectively, commenced derivative actions on behalf of those companies against, among others, Countrywide, Landsafe and eAppraiselT.com. *See Agnes v. Raines*, No. 1:08-cv-01093-RJL (D.D.C.) (Fannie Mae) and *Adams Family Trust v. Syron*, No. 1:08-cv-00773-LMB-TCB (E.D. Va.) (Freddie Mac). In both actions, the plaintiff shareholders assert that Fannie and Freddie were harmed by purchasing from Countrywide portfolios of mortgage loans that had been made to borrowers based on artificially high and unjustified appraisals for the underlying real estate.

104. In the *Zachary* action, Zachary (a former employee of the Countrywide and KB Homes joint venture, CWKB) alleges that Landsafe – the only appraiser employed by CWKB to appraise the homes on behalf of the joint venture – was encouraged to inflate the value of appraised homes by as much as 6% in order to allow the borrower to "roll up" the closing costs of the mortgage. This practice resulted in the actual home value being less than the mortgaged amount, putting the home buyer "upside down" on the home immediately after purchasing it. It also put RMBS investors such as ABP at risk because they were unaware of the true value of the underlying real estate assets.

105. In *Zaldana, et al. v. KB Home, et al.*, No. CV 08-3399 (EDL) (N.D. Ca.), a class action brought on behalf of purchasers of houses built by KB Home, the plaintiffs describe a process whereby KB Home paid Countrywide to make loans with subsidized initial payments to KB Home borrowers.

This allowed KB Home to prop up the ostensible sales price of the houses and sell to buyers who would not otherwise be able to afford or qualify for the monthly mortgage payments. In turn, Countrywide had its Landsafe appraisers ignore the subsidies and appraise the houses at the full stated sales price, thereby inflating the actual value of the house.

106. In a stunning admission of its flagrant departure from proper appraisal methods, since the end of 2007, Countrywide has tightened its standards for appraisals it will accept. For example, in a fall 2007 letter to its "Valued Business Partner[s]," Countrywide provided "additional appraisal due diligence controls" in soft markets "in an effort to make decisions based on accurate current market values and trends."

## VI. DEFENDANTS' MATERIAL MISSTATEMENTS AND OMISSIONS IN THE OFFERING DOCUMENTS

107. In light of (a) the systematic abandonment by Countrywide of its underwriting guidelines and (b) the failure by Countrywide to obtain independent and accurate property appraisals described above, the Offering Documents disseminated by Defendants in the course of selling the Certificates contained numerous misstatements and omissions, as set forth below.

### A. CWHEQ REVOLVING HOME EQUITY LOAN TRUST, SERIES 2005-A

108. The Offering Documents prepared and filed by Defendants in connection with the Certificates issued by this Issuing Trust were: (a) a Registration Statement and Prospectus, dated December 17, 2004; and (b) a Prospectus Supplement filed February 22, 2005.

109. The December 17, 2004 Registration Statement contained the following misleading statements:

> Credit Blemished Mortgage Loans. The following is a description of the underwriting procedures customarily employed by Countrywide Home Loans with respect to credit blemished mortgage loans. … *Prior to the funding of any credit blemished mortgage loan, Countrywide Home Loans underwrites the related mortgage loan in accordance with the underwriting standards established by Countrywide Home Loans.* In general, the mortgage loans are underwritten centrally by a specialized group of underwriters who are familiar with the unique characteristics of credit blemished mortgage loans. In general, Countrywide Home Loans does not purchase any credit blemished mortgage loan that it has not itself underwritten.

Countrywide Home Loans' underwriting standards are primarily intended to evaluate the value and adequacy of the mortgaged property as collateral for the proposed mortgage loan and the borrower's credit standing and repayment ability. On a case by case basis, Countrywide Home Loans may determine that, based upon *compensating factors*, a prospective borrower not strictly qualifying under the underwriting risk category guidelines described below warrants an underwriting exception. Compensating factors may include low loan-to-value ratio, low debt-to-income ratio, stable employment, time in the same residence or other factors.

\* \* \* \* \*

After obtaining all applicable employment, credit and property information, Countrywide Home Loans uses a debt-to-income ratio to assist in determining whether the prospective borrower has sufficient monthly income available to support the payments of principal and interest on the mortgage loan in addition to other monthly credit obligations. ... The maximum monthly debt-to-income ratio varies depending upon a borrower's credit grade and documentation level (as described below) but does not generally exceed 50%. Variations in the monthly debt-to-income ratios limit are permitted based on compensating factors.

Countrywide Home Loans' underwriting standards are applied in accordance with applicable federal and state laws and regulations and require an independent appraisal of the mortgaged property prepared on a Uniform Residential Appraisal Report (Form 1004) or other appraisal form as applicable to the specific mortgaged property type. Each appraisal includes a market data analysis based on recent sales comparable homes in the area and, where deemed appropriate, replacement cost analysis based on the current cost of constructing a similar home and generally is required to have been made not earlier than 180 days prior to the date of origination of the mortgage loan.

*See* Registration Statement filed by CWHEQ on Form S-3 on Dec. 17, 2004 (at S-25-26) (emphasis added).

110. The Prospectus Supplement filed February 22, 2005 contained the following misleading statements:

The underwriting process is intended to assess the applicant's credit standing and repayment ability, and the value and adequacy of the real property security as collateral for the proposed loan. Exceptions to the applicable originator's underwriting guidelines will be made when compensating factors are present. These factors include the borrower's employment stability, favorable credit history, equity in the related property, and the nature of the underlying first mortgage loan.

31

COMPLAINT

EXHIBIT 1  -41-

\* \* \* \* \*

Full appraisals are generally performed on all home equity loans. These appraisals are determined on the basis of a sponsor-approved, independent third-party, fee-based appraisal completed on forms approved by Fannie Mae or Freddie Mac. For certain home equity loans that had at origination a credit limit between $100,000 and $250,000, determined by the FICO score of the borrower, a drive-by evaluation is generally completed by a state licensed, independent third-party, professional appraiser on forms approved by either Fannie Mae or Freddie Mac. The drive-by evaluation is an exterior examination of the premises by the appraiser to determine that the property is in good condition. The appraisal is based on various factors, including the market value of comparable homes and the cost of replacing the improvements, and generally must have been made not earlier than 180 days before the date of origination of the mortgage loan. For certain home equity loans with credit limits between $100,000 and $250,000, determined by the FICO score of the borrower, Countrywide may have the related mortgaged property appraised electronically. The minimum and maximum loan amounts for home equity loans are generally $7,500 (or, if smaller, the state-allowed maximum) and $1,000,000, respectively. Borrowers may draw under the home equity loans in minimum amounts of $250 and maximum amounts up to the remaining available credit, in each case after giving effect to all prior draws and payments on the credit line. The minimum amount for draws does not apply to borrowers that are Access Card holders.

After obtaining all applicable income, liability, asset, employment, credit, and property information, the applicable originator generally uses a debt-to-income ratio to assist in determining whether the prospective borrower has sufficient monthly income available to support the payments on the home equity loan in addition to any senior mortgage loan payments (including any escrows for property taxes and hazard insurance premiums) and other monthly credit obligations. ... [T]the maximum monthly debt-to-income ratio is 45%. Variations in the monthly debt-to-income ratios limits are permitted based on compensating factors. The originators currently offer home equity loan products that allow maximum combined loan-to-value ratios up to 100%.

*See* Prospectus Supplement for CWHEQ Revolving Home Equity Loan Trust, Series 2005-A, filed on Form 424B5 on February 22, 2005 (at S-19-20).

**B.    CWHEQ REVOLVING HOME EQUITY LOAN TRUST, SERIES 2005-D**

111.    The Offering Documents prepared and filed by Defendants in connection with the Certificates issued by this Issuing Trust were: (a) a Registration Statement and Prospectus, dated August 4, 2005; and (b) a Prospectus Supplement filed August 30, 2005.

32

COMPLAINT

EXHIBIT 1  -42-

112. The August 4, 2005 Registration Statement contained the following misleading statements:

Credit Blemished Mortgage Loans. The following is a description of the underwriting procedures customarily employed by Countrywide Home Loans with respect to credit blemished mortgage loans. ... *Prior to the funding of any credit blemished mortgage loan, Countrywide Home Loans underwrites the related mortgage loan in accordance with the underwriting standards established by Countrywide Home Loans.* In general, the mortgage loans are underwritten centrally by a specialized group of underwriters who are familiar with the unique characteristics of credit blemished mortgage loans. In general, Countrywide Home Loans does not purchase any credit blemished mortgage loan that it has not itself underwritten.

Countrywide Home Loans' underwriting standards are primarily intended to evaluate the value and adequacy of the mortgaged property as collateral for the proposed mortgage loan and the borrower's credit standing and repayment ability. On a case by case basis, Countrywide Home Loans may determine that, based upon compensating factors, a prospective borrower not strictly qualifying under the underwriting risk category guidelines described below warrants an underwriting exception. Compensating factors may include low loan-to-value ratio, low debt-to-income ratio, stable employment, time in the same residence or other factors.

* * * * *

After obtaining all applicable employment, credit and property information, Countrywide Home Loans uses a debt-to-income ratio to assist in determining whether the prospective borrower has sufficient monthly income available to support the payments of principal and interest on the mortgage loan in addition to other monthly credit obligations. ... The maximum monthly debt-to-income ratio varies depending upon a borrower's credit grade and documentation level (as described below) but does not generally exceed 50%. Variations in the monthly debt-to-income ratios limit are permitted based on compensating factors.

Countrywide Home Loans' underwriting standards are applied in accordance with applicable federal and state laws and regulations and require an independent appraisal of the mortgaged property prepared on a Uniform Residential Appraisal Report (Form 1004) or other appraisal form as applicable to the specific mortgaged property type. Each appraisal includes a market data analysis based on recent sales of comparable homes in the area and, where deemed appropriate, replacement cost analysis based on the current cost of constructing a similar home and generally is required to have been made not earlier than 180 days prior to the date of origination of the mortgage loan. *Every independent appraisal is reviewed by a representative of Countrywide Home Loans before the loan is funded*, and an additional review appraisal is generally performed in

33

COMPLAINT

EXHIBIT 1 -43-

connection with appraisals not provided by Landsafe Appraisals, Inc., a wholly owned subsidiary of Countrywide Home Loans.

*See* Registration Statement filed by CWHEQ on Form S-3/A on August 4, 2005 (at S-25-26) (emphasis added).

113. The Prospectus Supplement filed August 30, 2005 contained the following misleading statements:

The underwriting process is intended to assess the applicant's credit standing and repayment ability, and the value and adequacy of the real property security as collateral for the proposed loan. Exceptions to the sponsor's underwriting guidelines will be made when compensating factors are present. These factors include the borrower's employment stability, favorable credit history, equity in the related property, and the nature of the underlying first mortgage loan.

* * * * *

Full appraisals are generally performed on all home equity loans. These appraisals are determined on the basis of a sponsor-approved, independent third-party, fee-based appraisal completed on forms approved by Fannie Mae or Freddie Mac. For certain home equity loans that had at origination a credit limit between $100,000 and $250,000, determined by the FICO score of the borrower, a drive-by evaluation is generally completed by a state licensed, independent third-party, professional appraiser on forms approved by either Fannie Mae or Freddie Mac. The drive-by evaluation is an exterior examination of the premises by the appraiser to determine that the property is in good condition. The appraisal is based on various factors, including the market value of comparable homes and the cost of replacing the improvements, and generally must have been made not earlier than 180 days before the date of origination of the mortgage loan. For certain home equity loans with credit limits between $100,000 and $250,000, determined by the FICO score of the borrower, Countrywide may have the related mortgaged property appraised electronically. The minimum and maximum loan amounts for home equity loans are generally $7,500 (or, if smaller, the state-allowed maximum) and $1,000,000, respectively. Borrowers may draw under the home equity loans in minimum amounts of $250 and maximum amounts up to the remaining available credit, in each case after giving effect to all prior draws and payments on the credit line. The minimum amount for draws does not apply to borrowers that are Access Card holders.

After obtaining all applicable income, liability, asset, employment, credit, and property information, the sponsor generally uses a debt-to-income ratio to assist in determining whether the prospective borrower has sufficient monthly income available to support the payments on the home equity loan in addition to any senior mortgage loan payments (including

34

COMPLAINT

EXHIBIT 1 -44-

1   any escrows for property taxes and hazard insurance premiums) and other
2   monthly credit obligations. ... Based on this, the maximum monthly debt-
    to-income ratio is 45%. Variations in the monthly debt-to-income ratios
3   limits are permitted based on compensating factors. The sponsor currently
    offers home equity loan products that allow maximum combined loan-to-
4   value ratios up to 100%.

5   *See* Prospectus Supplement for CWHEQ Revolving Home Equity Loan Trust, Series 2005-D, filed on

6   Form 424B5 on Aug. 30, 2005 (at S-20-21).

7       **C.    CWHEQ REVOLVING HOME EQUITY LOAN TRUST, SERIES 2005-E**

8           114.    The Offering Documents prepared and filed by Defendants in connection with the

9   Certificates issued by this Issuing Trust were: (a) a Registration Statement and Prospectus, dated August

10  4, 2005; and (b) a Prospectus Supplement filed August 30, 2005.

11          115.    The misleading statements in the August 4, 2005 Registration Statement are set forth

12  above in ¶ 112.

13          116.    The Prospectus Supplement filed August 30, 2005 contained the following misleading

14  statements:

15      The underwriting process is intended to assess the applicant's credit standing
        and repayment ability, and the value and adequacy of the real property
16      security as collateral for the proposed loan. Exceptions to the sponsor's
        underwriting guidelines will be made when compensating factors are present.
17      These factors include the borrower's employment stability, favorable credit
        history, equity in the related property, and the nature of the underlying first
18      mortgage loan.

19                                  * * * * *

20      Full appraisals are generally performed on all home equity loans. These
        appraisals are determined on the basis of a sponsor-approved, independent
21      third-party, fee-based appraisal completed on forms approved by Fannie
22      Mae or Freddie Mac. For certain home equity loans that had at origination
        a credit limit between $100,000 and $250,000, determined by the FICO
23      score of the borrower, a drive-by evaluation is generally completed by a
24      state licensed, independent third-party, professional appraiser on forms
        approved by either Fannie Mae or Freddie Mac. The drive-by evaluation is
25      an exterior examination of the premises by the appraiser to determine that
        the property is in good condition. The appraisal is based on various
26      factors, including the market value of comparable homes and the cost of
        replacing the improvements, and generally must have been made not
27      earlier than 180 days before the date of origination of the mortgage loan.
28      For certain home equity loans with credit limits between $100,000 and
        $250,000, determined by the FICO score of the borrower, Countrywide

                                          35
                                      COMPLAINT

EXHIBIT 1   -45-

may have the related mortgaged property appraised electronically. The minimum and maximum loan amounts for home equity loans are generally $7,500 (or, if smaller, the state-allowed maximum) and $1,000,000, respectively. Borrowers may draw under the home equity loans in minimum amounts of $250 and maximum amounts up·to the remaining available credit, in each case after giving effect to all prior draws and payments on the credit line. The minimum amount for draws does not apply to borrowers that are Access Card holders.

After obtaining all applicable income, liability, asset, employment, credit, and property information, the sponsor generally uses a debt-to-income ratio to assist in determining whether the prospective borrower has sufficient monthly income available to support the payments on the home equity loan in addition to any senior mortgage loan payments (including any escrows for property taxes and hazard insurance premiums) and other monthly credit obligations. … [T]he maximum monthly debt-to-income ratio is 45%. Variations in the monthly debt-to-income ratios limits are permitted based on compensating factors. The sponsor currently offers home equity loan products that allow maximum combined loan-to-value ratios up to 100%.

*See* Prospectus Supplement for CWHEQ Revolving Home Equity Loan Trust, Series 2005-E, filed on Form 424B5 on Aug. 30,·2005 (at S-21-22).

### D. CWABS REVOLVING HOME EQUITY LOAN TRUST, SERIES 2004-Q

117. The Offering Documents prepared and filed by Defendants in connection with the Certificates issued by this Issuing Trust were: (a) a Registration Statement and Prospectus, dated October 18, 2004; and (b) a Prospectus Supplement filed November 22, 2004.

118. The October 18, 2004 Registration Statement contained the following misleading statements:

> *Credit Blemished Mortgage Loans*. The following is a description of the underwriting procedures customarily employed by the Seller [defined as Countrywide Home Loans, Inc. at page S-3] with respect to credit blemished mortgage loans. The Seller produces its credit blemished mortgage loans through its Consumer Markets, Full Spectrum Lending, Correspondent Lending and Wholesale Lending Divisions. ***Prior to the funding of any credit blemished mortgage loan, the Seller underwrites the related mortgage loan in accordance with the underwriting standards established by the Seller***. In general, the mortgage loans are underwritten centrally·by a specialized group of underwriters who are familiar with the unique characteristics of credit blemished mortgage loans. In general, the Seller does not purchase any credit blemished mortgage loan that it has not itself underwritten.

The Seller's underwriting standards are primarily intended to evaluate the value and adequacy of the mortgaged property as collateral for the proposed mortgage loan and the borrower's credit standing and repayment ability. On a case by case basis, the Seller may determine that, based upon compensating factors, a prospective borrower not strictly qualifying under the underwriting risk category guidelines described below warrants an underwriting exception. Compensating factors may include low loan-to-value ratio, low debt-to-income ratio, stable employment and time in the same residence.

After obtaining all applicable employment, credit and property information, the Seller uses a debt-to-income ratio to assist in determining whether the prospective borrower has sufficient monthly income available to support the payments of principal and interest on the mortgage loan in addition to other monthly credit obligations. ... The maximum monthly debt-to-income ratio varies depending upon a borrower's credit grade and documentation level (as described below) but does not generally exceed 60%. Variations in the monthly debt-to-income ratios limit are permitted based on compensating factors.

*See* Registration Statement filed by CWABS on Form S-3/A on Oct. 18, 2004 (at S-18-20) (emphasis added).

119.   The November 22, 2004 Prospectus Supplement contained the following misleading statements:

Underwriting standards are applied by or on behalf of a lender to evaluate the borrower's credit standing and repayment ability, and the value and adequacy of the related Property as collateral. In general, a prospective borrower applying for a loan is required to fill out a detailed application designed to provide to the underwriting officer pertinent credit information, including the principal balance and payment history with respect to any senior mortgage, if any. The applicable prospectus supplement may specify whether that credit information will be verified by the seller, but if it does not, the credit information supplied by the borrower will be verified by the related seller. As part of the description of the borrower's financial condition, the borrower generally is required to provide a current list of assets and liabilities and a statement of income and expenses, as well as an authorization to apply for a credit report which summarizes the borrower's credit history with local merchants and lenders and any record of bankruptcy. In most cases, an employment verification is obtained from an independent source (typically the borrower's employer) which verification reports, among other things, the length of employment with that organization and the borrower's current salary. If a prospective borrower is self-employed, the borrower may be required to submit copies of signed tax returns. The borrower may also be required to authorize verification of deposits at financial institutions where the borrower has demand or savings accounts.

<div align="center">37</div>

In determining the adequacy of the property to be used as collateral, an appraisal will generally be made of each property considered for financing. The appraiser is generally required to inspect the property, issue a report on its condition and, if applicable, verify construction, if new, has been completed. The appraisal is generally based on the market value of comparable homes, the estimated rental income (if considered applicable by the appraiser) and the cost of replacing the home. The value of the property being financed, as indicated by the appraisal, must be such that it currently supports, and is anticipated to support in the future, the outstanding loan balance.

Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral. Under those standards, a prospective borrower must generally demonstrate that the ratio of the borrower's monthly housing expenses (including principal and interest on the proposed mortgage loan and, as applicable, the related monthly portion of property taxes, hazard insurance and mortgage insurance) to the borrower's monthly gross income and the ratio of total monthly debt to the monthly gross income (the "debt-to-income" ratios) are within acceptable limits. The maximum acceptable debt-to-income ratio, which is determined on a loan-by-loan basis varies depending on a number of underwriting criteria, including the Loan-to-Value Ratio, loan purpose, loan amount and credit history of the borrower. In addition to meeting the debt-to-income ratio guidelines, each prospective borrower is required to have sufficient cash resources to pay the down payment and closing costs. Exceptions to Countrywide Home Loans' underwriting guidelines may be made if compensating factors are demonstrated by a prospective borrower.

*See* Prospectus Supplement for CWABS Revolving Home Equity Loan Trust, Series 2004-Q (Form 424B5), at S-23 (Nov. 22, 2004).

E.   CWABS REVOLVING HOME EQUITY LOAN TRUST, SERIES 2004-R

120.   The Offering Documents prepared and filed by Defendants in connection with the Certificates issued by this Issuing Trust were: (a) a Registration Statement and Prospectus, dated October 18, 2004; and (b) a Prospectus Supplement filed December 21, 2004.

121.   The misleading statements in the October 18, 2004 Registration Statement are set forth above in ¶ 118.

122.   The December 21, 2004 Prospectus Supplement contained the following misleading statements:

COMPLAINT

EXHIBIT 1 -48-

Underwriting standards are applied by or on behalf of a lender to evaluate the borrower's credit standing and repayment ability, and the value and adequacy of the related Property as collateral. In general, a prospective borrower applying for a loan is required to fill out a detailed application designed to provide to the underwriting officer pertinent credit information, including the principal balance and payment history with respect to any senior mortgage, if any. The applicable prospectus supplement may specify whether that credit information will be verified by the seller, but if it does not, the credit information supplied by the borrower will be verified by the related seller. As part of the description of the borrower's financial condition, the borrower generally is required to provide a current list of assets and liabilities and a statement of income and expenses, as well as an authorization to apply for a credit report which summarizes the borrower's credit history with local merchants and lenders and any record of bankruptcy. In most cases, an employment verification is obtained from an independent source (typically the borrower's employer) which verification reports, among other things, the length of employment with that organization and the borrower's current salary. If a prospective borrower is self-employed, the borrower may be required to submit copies of signed tax returns. The borrower may also be required to authorize verification of deposits at financial institutions where the borrower has demand or savings accounts.

In determining the adequacy of the property to be used as collateral, an appraisal will generally be made of each property considered for financing. The appraiser is generally required to inspect the property, issue a report on its condition and, if applicable, verify construction, if new, has been completed. The appraisal is generally based on the market value of comparable homes, the estimated rental income (if considered applicable by the appraiser) and the cost of replacing the home. The value of the property being financed, as indicated by the appraisal, must be such that it currently supports, and is anticipated to support in the future, the outstanding loan balance.

*See* Prospectus Supplement for CWABS Revolving Home Equity Loan Trust, Series 2004-R (Form 424B5), at S-23 (Dec. 21, 2004).

F.      **CWABS ASSET-BACKED CERTIFICATES TRUST 2006-24**

123.    The Offering Documents prepared and filed by Defendants in connection with the Certificates issued by this Issuing Trust were: (a) a Registration Statement and Prospectus, dated August 8, 2006; and (b) a Prospectus Supplement filed January 4, 2007.

124.    The August 8, 2006 Registration Statement contained the following misleading statements:

39

COMPLAINT

EXHIBIT 1  -49-

Credit Blemished Mortgage Loans. The following is a description of the underwriting procedures customarily employed by Countrywide Home Loans with respect to credit blemished mortgage loans. .... **Prior to the funding of any credit blemished mortgage loan, Countrywide Home Loans underwrites the related mortgage loan in accordance with the underwriting standards established by Countrywide Home Loans**. In general, the mortgage loans are underwritten centrally by a specialized group of underwriters who are familiar with the unique characteristics of credit blemished mortgage loans. In general, Countrywide Home Loans does not purchase any credit blemished mortgage loan that it has not itself underwritten.

Countrywide Home Loans' underwriting standards are primarily intended to evaluate the value and adequacy of the mortgaged property as collateral for the proposed mortgage loan and the borrower's credit standing and repayment ability. On a case by case basis, Countrywide Home Loans may determine that, based upon compensating factors, a prospective borrower not strictly qualifying under the underwriting risk category guidelines described below warrants an underwriting exception. Compensating factors may include low loan-to-value ratio, low debt-to-income ratio, stable employment, time in the same residence or other factors.

\* \* \* \* \*

After obtaining all applicable employment, credit and property information, Countrywide Home Loans uses a debt-to-income ratio to assist in determining whether the prospective borrower has sufficient monthly income available to support the payments of principal and interest on the mortgage loan in addition to other monthly credit obligations. The maximum monthly debt-to-income ratio varies depending upon a borrower's credit grade and documentation level (as described below) but does not generally exceed 55%. Variations in the monthly debt-to-income ratios limit are permitted based on compensating factors.

*See* Registration Statement filed by CWABS on Form S-3/A on Aug. 8, 2006 (at S-38-39) (emphasis added).

125.   The January 4, 2007 Prospectus Supplement contained the following misleading statements:

*Credit-Blemished Mortgage Loans*. The following is a description of the underwriting procedures customarily employed by Countrywide Home Loans with respect to credit-blemished mortgage loans. Countrywide Home Loans has been originating first lien credit-blemished mortgage loans since 1995. ... **Prior to the funding of any credit-blemished mortgage loan, Countrywide Home Loans underwrites the related mortgage loan in accordance with the underwriting standards established by Countrywide Home Loans**. In general, the mortgage loans

40

COMPLAINT

EXHIBIT 1  -50-

are underwritten centrally by a specialized group of underwriters who are familiar with the unique characteristics of credit-blemished mortgage loans. In general, Countrywide Home Loans does not purchase any credit-blemished mortgage loan that it has not itself underwritten.

Countrywide Home Loans' underwriting standards are primarily intended to evaluate the value and adequacy of the mortgaged property as collateral for the proposed mortgage loan and the borrower's credit standing and repayment ability. On a case by case basis, Countrywide Home Loans may determine that, based upon compensating factors, a prospective borrower not strictly qualifying under the underwriting risk category guidelines described below warrants an underwriting exception. Compensating factors may include low loan-to-value ratio, low debt-to-income ratio, stable employment, time in the same residence or other factors.

\* \* \* \* \*

After obtaining all applicable employment, credit and property information, Countrywide Home Loans uses a debt-to-income ratio to assist in determining whether the prospective borrower has sufficient monthly income available to support the payments of principal and interest on the mortgage loan in addition to other monthly credit obligations. … The maximum monthly debt-to-income ratio varies depending upon a borrower's credit grade and documentation level (as described below) but does not generally exceed 55%. Variations in the monthly debt-to-income ratios limit are permitted based on compensating factors.

Countrywide Home Loans' underwriting standards are applied in accordance with applicable federal and state laws and regulations and require an independent appraisal of the mortgaged property prepared on a Uniform Residential Appraisal Report (Form 1004) or other appraisal form as applicable to the specific mortgaged property type. Each appraisal includes a market data analysis based on recent sales of comparable homes in the area and, where deemed appropriate, replacement cost analysis based on the current cost of constructing a similar home and generally is required to have been made not earlier than 180 days prior to the date of origination of the mortgage loan. *Every independent appraisal is reviewed by a representative of Countrywide Home Loans before the loan is funded,* and an additional review appraisal is generally performed in connection with appraisals not provided by Landsafe Appraisals, Inc., a wholly owned subsidiary of Countrywide Home Loans.

*See* Prospectus Supplement for CWABS Asset-Backed Certificates Trust 2006-24, filed on Form 424B5 on January 4, 2007 (at S-39-40) (emphasis added).

### G. CWABS ASSET-BACKED CERTIFICATES TRUST 2007-2

126.   The Offering Documents prepared and filed by Defendants in connection with the

41

1    Certificates issued by this Issuing Trust were: (a) a Registration Statement and Prospectus, dated August

2    8, 2006; and (b) a Prospectus Supplement filed March 2, 2007.

3         127.    The misleading statements in the August 8, 2006 Registration Statement are set forth

4    above in ¶ 124.

5         128.    The March 2, 2007 Prospectus Supplement contained the following misleading

6    statements:

> *Credit-Blemished Mortgage Loans.* The following is a description of the
> underwriting procedures customarily employed by Countrywide Home
> Loans with respect to credit-blemished mortgage loans. Countrywide
> Home Loans has been originating first lien credit-blemished mortgage
> loans since 1995. .... ***Prior to the funding of any credit-blemished***
> ***mortgage loan, Countrywide Home Loans underwrites the related***
> ***mortgage loan in accordance with the underwriting standards***
> ***established by Countrywide Home Loans.*** In general, the mortgage loans
> are underwritten centrally by a specialized group of underwriters who are
> familiar with the unique characteristics of credit-blemished mortgage
> loans. In general, Countrywide Home Loans does not purchase any credit-
> blemished mortgage loan that it has not itself underwritten.
>
> Countrywide Home Loans' underwriting standards are primarily intended
> to evaluate the value and adequacy of the mortgaged property as collateral
> for the proposed mortgage loan and the borrower's credit standing and
> repayment ability. On a case by case basis, Countrywide Home Loans may
> determine that, based upon compensating factors, a prospective borrower
> not strictly qualifying under the underwriting risk category guidelines
> described below warrants an underwriting exception. Compensating
> factors may include low loan-to-value ratio, low debt-to-income ratio,
> stable employment, time in the same residence or other factors.
>
> After obtaining all applicable employment, credit and property
> information, Countrywide Home Loans uses a debt-to-income ratio to
> assist in determining whether the prospective borrower has sufficient
> monthly income available to support the payments of principal and interest
> on the mortgage loan in addition to other monthly credit obligations. ...
> The maximum monthly debt-to-income ratio varies depending upon a
> borrower's credit grade and documentation level (as described below) but
> does not generally exceed 55%. Variations in the monthly debt-to-income
> ratios limit are permitted based on compensating factors.
>
> Countrywide Home Loans' underwriting standards are applied in
> accordance with applicable federal and state laws and regulations and
> require an independent appraisal of the mortgaged property prepared on a
> Uniform Residential Appraisal Report (Form 1004) or other appraisal
> form as applicable to the specific mortgaged property type. Each appraisal

includes a market data analysis based on recent sales of comparable homes in the area and, where deemed appropriate, replacement cost analysis based on the current cost of constructing a similar home and generally is required to have been made not earlier than 180 days prior to the date of origination of the mortgage loan. *Every independent appraisal is reviewed by a representative of Countrywide Home Loans before the loan is funded*, and an additional review appraisal is generally performed in connection with appraisals not provided by Landsafe Appraisals, Inc., a wholly owned subsidiary of Countrywide Home Loans.

*See* Prospectus Supplement for CWABS Asset-Backed Certificates Trust 2007-2, filed on Form 424B5 on March 2, 2007 (at S-40) (emphasis added).

## H.   CWABS ASSET-BACKED CERTIFICATES TRUST 2007-6

129.   The Offering Documents prepared and filed by Defendants in connection with the Certificates issued by this Issuing Trust were: (a) a Registration Statement and Prospectus, dated August 8, 2006; and (b) a Prospectus Supplement filed April 3, 2007.

130.   The misleading statements in the August 8, 2006 Registration Statement are set forth above in ¶ 124.

131.   The April 3, 2007 Prospectus Supplement contained the following misleading statements:

*Credit-Blemished Mortgage Loans.* The following is a description of the underwriting procedures customarily employed by Countrywide Home Loans with respect to credit-blemished mortgage loans. Countrywide Home Loans has been originating first lien credit-blemished mortgage loans since 1995. …. *Prior to the funding of any credit-blemished mortgage loan, Countrywide Home Loans underwrites the related mortgage loan in accordance with the underwriting standards established by Countrywide Home Loans.* In general, the mortgage loans are underwritten centrally by a specialized group of underwriters who are familiar with the unique characteristics of credit-blemished mortgage loans. In general, Countrywide Home Loans does not purchase any credit-blemished mortgage loan that it has not itself underwritten.

Countrywide Home Loans' underwriting standards are primarily intended to evaluate the value and adequacy of the mortgaged property as collateral for the proposed mortgage loan and the borrower's credit standing and repayment ability. On a case by case basis, Countrywide Home Loans may determine that, based upon compensating factors, a prospective borrower not strictly qualifying under the underwriting risk category guidelines described below warrants an underwriting exception. Compensating factors may include low loan-to-value ratio, low debt-to-income ratio, stable employment, time in the same residence or other factors.

43

COMPLAINT

EXHIBIT 1   -53-

\* \* \* \* \*

> After obtaining all applicable employment, credit and property information, Countrywide Home Loans uses a debt-to-income ratio to assist in determining whether the prospective borrower has sufficient monthly income available to support the payments of principal and interest on the mortgage loan in addition to other monthly credit obligations. ... The maximum monthly debt-to-income ratio varies depending upon a borrower's credit grade and documentation level (as described below) but does not generally exceed 55%. Variations in the monthly debt-to-income ratios limit are permitted based on compensating factors.

> Countrywide Home Loans' underwriting standards are applied in accordance with applicable federal and state laws and regulations and require an independent appraisal of the mortgaged property prepared on a Uniform Residential Appraisal Report (Form 1004) or other appraisal form as applicable to the specific mortgaged property type. Each appraisal includes a market data analysis based on recent sales of comparable homes in the area and, where deemed appropriate, replacement cost analysis based on the current cost of constructing a similar home and generally is required to have been made not earlier than 180 days prior to the date of origination of the mortgage loan. *Every independent appraisal is reviewed by a representative of Countrywide Home Loans before the loan is funded,* and an additional review appraisal is generally performed in connection with appraisals not provided by Landsafe Appraisals, Inc., a wholly owned subsidiary of Countrywide Home Loans.

*See* Prospectus Supplement for CWABS Asset-Backed Certificates Trust 2007-6, filed on Form 424B5 on April 3, 2007 (at S-39-40) (emphasis added).

## I.   CWABS ASSET-BACKED CERTIFICATES TRUST 2007-BC2

132.   The Offering Documents prepared and filed by Defendants in connection with the Certificates issued by this Issuing Trust were: (a) a Registration Statement and Prospectus, dated April 24, 2007; and (b) a Prospectus Supplement filed April 30, 2007.

133.   The April 24, 2007 Registration Statement contained the following misleading statements:

> Credit Blemished Mortgage Loans. The following is a description of the underwriting procedures customarily employed by Countrywide Home Loans with respect to credit blemished mortgage loans. ... *Prior to the funding of any credit blemished mortgage loan, Countrywide Home Loans underwrites the related mortgage loan in accordance with the underwriting standards established by Countrywide Home Loans.* In general, the mortgage loans are underwritten centrally by a specialized group of underwriters who are familiar with the unique characteristics of credit blemished mortgage loans. In general, Countrywide Home Loans does not

44

COMPLAINT

EXHIBIT 1  -54-

purchase any credit blemished mortgage loan that it has not itself underwritten.

Countrywide Home Loans' underwriting standards are primarily intended to evaluate the value and adequacy of the mortgaged-property as collateral for the proposed mortgage loan and the borrower's credit standing and repayment ability. On a case by case basis, Countrywide Home Loans may determine that, based upon compensating factors, a prospective borrower not strictly qualifying under the underwriting risk category guidelines described below warrants an underwriting exception.

Compensating factors may include low loan-to-value ratio, low debt-to-income ratio, stable employment, time in the same residence or other factors. ...

After obtaining all applicable employment, credit and property information, Countrywide Home Loans uses a debt-to-income ratio to assist in determining whether the prospective borrower has sufficient monthly income available to support the payments of principal and interest on the mortgage loan in addition to other monthly credit obligations. ... The maximum monthly debt-to-income ratio varies depending upon a borrower's credit grade and documentation level (as described below) but does not generally exceed 50%. Variations in the monthly debt-to-income ratios limit are permitted based on compensating factors.

Countrywide Home Loans' underwriting standards are applied in accordance with applicable federal and state laws and regulations and require an independent appraisal of the mortgaged property prepared on a Uniform Residential Appraisal Report (Form 1004) or other appraisal form as applicable to the specific mortgaged property type. Each appraisal includes a market data analysis based on recent sales comparable homes in the area and, where deemed appropriate, replacement cost analysis based on the current cost of constructing a similar home and generally is required to have been made not earlier than 180 days prior to the date of origination of the mortgage loan.

*See* Registration Statement filed by CWABS on Form S-3/A on April 24, 2007 (at S-40-41) (emphasis added).

134. The April 30, 2007 Prospectus Supplement contained the following misleading statements:

**The Originators**

The Mortgage Loans will be acquired by the Depositor from the Sellers. The Mortgage Loans were originated by Countrywide Home Loans or acquired from various other originators (each an "***Originator***"). Set forth below are the originators of more than 10% of the Initial Mortgage Loans in a loan group and the approximate percentage of those Initial Mortgage

45

COMPLAINT

EXHIBIT 1  -55-

Loans (by Initial Cut-off Date Principal Balance) originated by each such originator:

**Underwriting Standards**

*Credit-Blemished Mortgage Loans.* The Mortgage Loans will have been originated in accordance with the underwriting guidelines of the Originators for credit blemished mortgage loans, which will be referred to in this prospectus supplement as the underwriting guidelines. Generally, under the underwriting guidelines, the Originator reviews the applicant's source of income, calculates the amount of income from sources indicated on the loan application or similar documentation, reviews the credit history of the applicant, calculates the debt service-to-income ratio to determine the applicant's ability to repay the loan, reviews the type and use of the property being financed and reviews the property. The underwriting guidelines generally require that mortgage loans be underwritten in a standardized procedure which complies with applicable federal and state laws and regulations and requires the Originator's underwriters to be satisfied that the value of the property being financed, as indicated by an appraisal and a review of the appraisal currently supports the outstanding loan balance.

The underwriting guidelines of the Originators are more flexible than the standards generally acceptable to Freddie Mac and Fannie Mae with regard to the borrower's credit standing and repayment ability.

The underwriting guidelines are primarily intended to assess the value of the mortgaged property and to evaluate the adequacy of the mortgaged property as collateral for the Mortgage Loan. In addition to the foregoing, the Originator considers, among other things, a mortgagor's credit history, repayment ability and debt service-to-income ratio, as well as the type and use of the mortgaged property. The Mortgage Loans, in most cases, bear higher rates of interest than mortgage loans that are originated in accordance with Fannie Mae and Freddie Mac standards, which is likely to result in rates of delinquencies and foreclosures that are higher, and that may be substantially higher, than those experienced by portfolios of mortgage loans underwritten in a more traditional manner.

Each applicant completes an application which includes information with respect to the applicant's liabilities, income, credit history, employment history and personal information. The Mortgage Loans may have been underwritten using a full, limited or stated income documentation program. The underwriting guidelines generally require a credit report on each applicant from a credit reporting company. The report typically contains information relating to matters such as credit history with local and national merchants and lenders, installment debt payments and any record of defaults, bankruptcies, repossessions or judgments. In evaluating the credit quality of a borrower, the Originator typically utilizes the Credit Bureau Risk Score of that borrower. The "**Credit Bureau Risk Score**" is

46

a statistical credit score generated by models developed by a third party and made available to mortgage lenders through three national credit bureaus. The models were derived by analyzing data on consumers in order to establish patterns which are believed to be indicative of the borrower's probability of default. The Credit Bureau Risk Score is based on a borrower's historical credit data, including, among other things, payment history, delinquencies on accounts, levels of outstanding indebtedness, length of client history, types of credit, and bankruptcy experience. Credit Bureau Risk Scores range from approximately 250 to approximately 900, with higher scores indicating an individual with a more favorable credit history compared to an individual with a lower score. Credit Bureau Risk Scores, however, were not developed specifically for use in connection with mortgage loans, but for consumer loans in general. Therefore, a Credit Bureau Risk Score does not take into consideration the effect of mortgage loan characteristics on the probability of repayment by the borrower.

The property that is to secure a mortgage loan generally is appraised by a qualified independent appraiser. These appraisers inspect and appraise the subject property and verify that the property is in acceptable condition. Following each appraisal, the appraiser prepares a report which typically includes a market value analysis based on recent sales of comparable homes in the area and, when deemed appropriate, replacement cost analysis based on the current cost of constructing a similar home. Generally, all appraisals are required to conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation and are generally on forms acceptable to Fannie Mae and Freddie Mac. The underwriting guidelines generally require a review of the appraisal by a qualified employee of the Originator or by an appraiser retained by the Originator.

As a result of the Originators' underwriting criteria, changes in the values of mortgaged properties may have a greater effect on the delinquency, foreclosure and loss experience on the Mortgage Loans than these changes would be expected to have on mortgage loans that are originated in a more traditional manner. No assurance can be given that the values of the related mortgaged properties have remained or will remain at the levels in effect on the dates of origination of the Mortgage Loans. In addition, there can be no assurance that the value of a mortgaged property estimated in any appraisal or review is equal to the actual value of that mortgaged property at the time of that appraisal or review.

*Re-Underwriting of Mortgage Loans by Countrywide Home Loans*

Countrywide Home Loans reviewed the Mortgage Loans to determine whether they were underwritten generally in accordance with the related Originator's underwriting guidelines or reasonable exceptions thereto. In the course of such review, Countrywide Home Loans assigned to each Mortgage Loan a credit grade category which the Countrywide Home

47

COMPLAINT

EXHIBIT 1  -57-

Loans employs in its own underwriting guidelines for credit blemished mortgage loans to grade the likelihood that the mortgagor will satisfy the repayment conditions of the mortgage loans. In general, Countrywide Home Loans assigns a credit grade category by evaluating a borrower's consumer credit history, mortgage history, time since bankruptcy, and time since foreclosure or notice of default. The credit grade categories establish guidelines for determining maximum allowable loan-to-value ratios, debt-to-income ratios and loan amounts for a given mortgage loan. A summary of the Countrywide Home Loans credit grade categories is set forth below. Because the credit grade categories were developed by Countrywide Home Loans for use in its own origination programs and because Countrywide Home Loans imposes additional restrictions on loan-to-value ratios, debt-to-income ratios, and loan amounts depending on, but not limited to, the occupancy status of the mortgaged property, the type of mortgaged property and the documentation program, the assignment of a credit grade category to a Mortgage Loan was in part a subjective decision.

*See* Prospectus Supplement for CWABS Asset-Backed Certificates Trust 2007-BC2, filed on Form 424B5 on April 30, 2007 (at S-35-36).

### J.   CWABS ASSET-BACKED CERTIFICATES TRUST 2007-8

135.   The Offering Documents prepared and filed by Defendants in connection with the Certificates issued by this Issuing Trust were: (a) a Registration Statement and Prospectus, dated April 24, 2007; and (b) a Prospectus Supplement dated June 4, 2007.

136.   The misleading statements in the April 24, 2007 Registration Statement are set forth above in ¶ 133.

137.   The June 4, 2007 Prospectus Supplement contained the following misleading statements:

*Credit-Blemished Mortgage Loans.* The following is a description of the underwriting procedures customarily employed by Countrywide Home Loans with respect to credit-blemished mortgage loans. Countrywide Home Loans has been originating first lien credit-blemished mortgage loans since 1995. .... ***Prior to the funding of any credit-blemished mortgage loan, Countrywide Home Loans underwrites the related mortgage loan in accordance with the underwriting standards established by Countrywide Home Loans.*** In general, the mortgage loans are underwritten centrally by a specialized group of underwriters who are familiar with the unique characteristics of credit-blemished mortgage loans. In general, Countrywide Home Loans does not purchase any credit-blemished mortgage loan that it has not itself underwritten.

48

COMPLAINT

EXHIBIT 1  -58-

Countrywide Home Loans' underwriting standards are primarily intended to evaluate the value and adequacy of the mortgaged property as collateral for the proposed mortgage loan and the borrower's credit standing and repayment ability. On a case by case basis, Countrywide Home Loans may determine that, based upon compensating factors, a prospective borrower not strictly qualifying under the underwriting risk category guidelines described below warrants an underwriting exception. Compensating factors may include low loan-to-value ratio, low debt-to-income ratio, stable employment, time in the same residence or other factors.

After obtaining all applicable employment, credit and property information, Countrywide Home Loans uses a debt-to-income ratio to assist in determining whether the prospective borrower has sufficient monthly income available to support the payments of principal and interest on the mortgage loan in addition to other monthly credit obligations. ... The maximum monthly debt-to-income ratio varies depending upon a borrower's credit grade and documentation level (as described below) but does not generally exceed 55%. Variations in the monthly debt-to-income ratios limit are permitted based on compensating factors.

Countrywide Home Loans' underwriting standards are applied in accordance with applicable federal and state laws and regulations and require an independent appraisal of the mortgaged property prepared on a Uniform Residential Appraisal Report (Form 1004) or other appraisal form as applicable to the specific mortgaged property type. Each appraisal includes a market data analysis based on recent sales of comparable homes in the area and, where deemed appropriate, replacement cost analysis based on the current cost of constructing a similar home and generally is required to have been made not earlier than 180 days prior to the date of origination of the mortgage loan. *Every independent appraisal is reviewed by a representative of Countrywide Home Loans before the loan is funded*, and an additional review appraisal is generally performed in connection with appraisals not provided by Landsafe Appraisals, Inc., a wholly owned subsidiary of Countrywide Home Loans.

*See* Prospectus Supplement for CWABS Asset-Backed Certificates Trust 2007-8, filed on Form 424B5 on June 4, 2007 (at S-41-42) (emphasis added).

### K.   CWABS ASSET-BACKED CERTIFICATES TRUST 2007-10

138.   The Offering Documents prepared and filed by Defendants in connection with the Certificates issued by this Issuing Trust were: (a) a Registration Statement and Prospectus, dated April 24, 2007; and (b) a Prospectus Supplement filed July 3, 2007.

139.   The misleading statements in the April 24, 2007 Registration Statement are set forth above in ¶ 133.

49

COMPLAINT

EXHIBIT 1  -59-

140. The July 3, 2007 Prospectus Supplement contained the following misleading statements:

*Credit-Blemished Mortgage Loans*. The following is a description of the underwriting procedures customarily employed by Countrywide Home Loans with respect to credit-blemished mortgage loans. Countrywide Home Loans has been originating first lien credit blemished mortgage loans since 1995. .... *Prior to the funding of any credit-blemished mortgage loan, Countrywide Home Loans underwrites the related mortgage loan in accordance with the underwriting standards established by Countrywide Home Loans*. In general, the mortgage loans are underwritten centrally by a specialized group of underwriters who are familiar with the unique characteristics of credit-blemished mortgage loans. In general, Countrywide Home Loans does not purchase any credit-blemished mortgage loan that it has not itself underwritten.

Countrywide Home Loans' underwriting standards are primarily intended to evaluate the value and adequacy of the mortgaged property as collateral for the proposed mortgage loan and the borrower's credit standing and repayment ability. On a case by case basis, Countrywide Home Loans may determine that, based upon compensating factors, a prospective borrower not strictly qualifying under the underwriting risk category guidelines described below warrants an underwriting exception. Compensating factors may include low loan-to-value ratio, low debt-to-income ratio, stable employment, time in the same residence or other factors.

After obtaining all applicable employment, credit and property information, Countrywide Home Loans uses a debt-to-income ratio to assist in determining whether the prospective borrower has sufficient monthly income available to support the payments of principal and interest on the mortgage loan in addition to other monthly credit obligations. ... The maximum monthly debt-to-income ratio varies depending upon a borrower's credit grade and documentation level (as described below) but does not generally exceed 55%. Variations in the monthly debt-to-income ratios limit are permitted based on compensating factors.

Countrywide Home Loans' underwriting standards are applied in accordance with applicable federal and state laws and regulations and require an independent appraisal of the mortgaged property prepared on a Uniform Residential Appraisal Report (Form 1004) or other appraisal form as applicable to the specific mortgaged property type. Each appraisal includes a market data analysis based on recent sales of comparable homes in the area and, where deemed appropriate, replacement cost analysis based on the current cost of constructing a similar home and generally is required to have been made not earlier than 180 days prior to the date of origination of the mortgage loan. *Every independent appraisal is reviewed by a representative of Countrywide Home Loans before the loan is funded*, and an additional review appraisal is generally performed in connection with appraisals not provided by Landsafe Appraisals, Inc., a wholly owned subsidiary of Countrywide Home Loans.

50

COMPLAINT

EXHIBIT 1 -60-

1 | *See* Prospectus Supplement for CWABS Asset-Backed Certificates Trust 2007-10, filed on Form 424B5

2 | on July 3, 2007 (at S-41-42) (emphasis added).

3 | **L.    CWALT ALTERNATIVE LOAN TRUST 2005-J1**

4 | 141.    The Offering Documents prepared and filed by Defendants in connection with the

5 | Certificates issued by this Issuing Trust were: (a) a Registration Statement and Prospectus, dated

6 | September 23, 2004; and (b) a Prospectus Supplement filed February 1, 2005.

7 | 142.    The September 23, 2004 Registration Statement contained the following misleading

8 | statements:

9 |

10 | All of the mortgage loans in the trust fund will have been originated or acquired by [Countrywide Home Loans] in accordance with its credit,

11 | appraisal and underwriting standards. [Countrywide Home Loans]'

12 | underwriting standards are applied in accordance with applicable federal and state laws and regulations.

13 | * * * * *

14 | [Countrywide Home Loans]' underwriting standards are applied by or on

15 | behalf of [Countrywide Home Loans] to evaluate the prospective borrower's credit standing and repayment ability and the value and

16 | adequacy of the mortgaged property as collateral. Under those standards, a prospective borrower must generally demonstrate that the ratio of the

17 | borrower's monthly housing expenses (including principal and interest on the proposed mortgage loan and, as applicable, the related monthly portion

18 | of property taxes, hazard insurance and mortgage insurance) to the borrower's monthly gross income and the ratio of total monthly debt to the

19 | monthly gross income and the ratio of total monthly debt to the monthly gross income (the "debt-to-income" ratios) are within acceptable limits.

20 | The maximum acceptable debt-to-income ratio, which is determined on a loan-by-loan basis varies depending on a number of underwriting criteria,

21 | including the Loan-to-Value Ratio, loan purpose, loan amount and credit history of the borrower. In addition to meeting the debt-to-income ratio

22 | guidelines, each prospective borrower is required to have sufficient cash resources to pay the down payment and closing costs. Exceptions to

23 | [Countrywide Home Loans]' underwriting guidelines may be made if

24 | compensating factors are demonstrated by a prospective borrower.

25 |

26 | *See* Registration Statement filed by CWALT on Form S-3/A on Sept. 23, 2004 (at S-18-20) (brackets in

27 | original).

28 | 143.    The February 1, 2005 Prospectus Supplement contained the following misleading

51

COMPLAINT

EXHIBIT 1  -61-

statements:

[All of the newly originated mortgage loans] were originated by Countrywide Home Loans, Inc. ("Countrywide Home Loans") or acquired by Countrywide Home Loans from correspondent lenders using Countrywide Home Loans' underwriting guidelines. ... A portion of the mortgage loans in the trust fund consists of seasoned collateral previously originated or acquired by Countywide Home Loans in accordance with credit, appraisal and underwriting standards acceptable to Countrywide Home Loans.

\* \* \* \* \*

Except with respect to mortgage loans originated pursuant to its Streamlined Documentation Program ... Countrywide Home Loans obtains appraisals from independent appraisers or appraisal services for properties that are to secure mortgage loans. Such appraisers inspect and appraise the proposed mortgaged property and verify that such property is in acceptable condition. Following each appraisal, the appraiser prepares a report which includes a market data analysis based on recent sales of comparable homes in the area and, when deemed appropriate, a replacement cost analysis based on the current cost of constructing a similar home. All appraisals are required to conform to FNMA or FHLMC appraisal standards then in effect. *Every independent appraisal is reviewed by a Countrywide underwriter before the loan is approved.*

*See* Prospectus Supplement for CWALT Alternative Loan Trust 2005-J1 (Form 424B5), at S-74, S-76 (Feb. 1, 2005) (emphasis added).

M.   **CWALT ALTERNATIVE LOAN TRUST 2005-40CB**

144.   The Offering Documents prepared and filed by Defendants in connection with the Certificates issued by this Issuing Trust were: (a) a Registration Statement and Prospectus, dated July 25, 2005; and (b) a Prospectus Supplement filed August 29, 2005.

145.   The July 25, 2005 Registration Statement contained the following misleading statements:

All of the Mortgage Loans in the trust fund will have been originated or acquired by [Countrywide Home Loans] in accordance with its credit, appraisal and underwriting standards. [Countrywide Home Loans]' underwriting standards are applied in accordance with applicable federal and state laws and regulations.

\* \* \* \* \*

[Countrywide Home Loans]' underwriting standards are applied by or on behalf of [Countrywide Home Loans] to evaluate the prospective

52

COMPLAINT

EXHIBIT 1 -62-

borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral. Under those standards, a prospective borrower must generally demonstrate that the ratio of the borrower's monthly housing expenses (including principal and interest on the proposed mortgage loan and, as applicable, the related monthly portion of property taxes, hazard insurance and mortgage insurance) to the borrower's monthly gross income and the ratio of total monthly debt to the monthly gross income (the "debt-to-income" ratios) are within acceptable limits. The maximum acceptable debt-to-income ratio, which is determined on a loan-by-loan basis varies depending on a number of underwriting criteria, including the Loan-to-Value Ratio, loan purpose, loan amount and credit history of the borrower. In addition to meeting the debt-to-income ratio guidelines, each prospective borrower is required to have sufficient cash resources to pay the down payment and closing costs. Exceptions to [Countrywide Home Loans]' underwriting guidelines may be made if compensating factors are demonstrated by a prospective borrower.

*See* Registration Statement filed by CWALT on Form S-3/A on July 25, 2005 (at S-18-19).

146. The August 29, 2005 Prospectus Supplement contained the following misleading statements:

All of the mortgage loans in the trust fund will have been originated or acquired by Countrywide Home Loans in accordance with its credit, appraisal and underwriting standards.

\* \* \* \* \*

Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral. Under those standards, a prospective borrower must generally demonstrate that the ratio of the borrower's monthly housing expenses (including principal and interest on the proposed mortgage loan and, as applicable, the related monthly portion of property taxes, hazard insurance and mortgage insurance) to the borrower's monthly gross income and the ratio of total monthly debt to the monthly gross income (the "debt-to income" ratios) are within acceptable limits. The maximum acceptable debt-to-income ratio, which is determined on a loan-by-loan basis varies depending on a number of underwriting criteria, including the Loan-to-Value Ratio, loan purpose, loan amount and credit history of the borrower. In addition to meeting the debt-to-income ratio guidelines, each prospective borrower is required to have sufficient cash resources to pay the down payment and closing costs. Exceptions to Countrywide Home Loans' underwriting guidelines may be made if compensating factors are demonstrated by a prospective borrower.

\* \* \* \* \*

Except with respect to mortgage loans originated pursuant to its Streamlined Documentation Program and 43 Initial Mortgage Loans ... whose values were confirmed with a Fannie Mae proprietary automated valuation model, Countrywide Home Loans obtains appraisals from independent appraisers or appraisal services for properties that are to secure mortgage loans. The appraisers inspect and appraise the proposed mortgaged property and verify that the property is in acceptable condition. Following each appraisal, the appraiser prepares a report which includes a market data analysis based on recent sales of comparable homes in the area and, when deemed appropriate, a replacement cost analysis based on the current cost of constructing a similar home. All appraisals are required to conform to Fannie Mae or Freddie Mac appraisal standards then in effect.

*See* Prospectus Supplement for CWALT Alternative Loan Trust 2005-40CB (Form 424B5), at S-24-26 (Aug. 29, 2005).

### N.   CHL MORTGAGE PASS-THROUGH TRUST 2006-HYB1

147.   The Offering Documents prepared and filed by Defendants in connection with the Certificates issued by this Issuing Trust were: (a) a Registration Statement and Prospectus, dated July 25, 2005; and (b) a Prospectus Supplement filed January 31, 2006.

148.   The July 25, 2005 Registration Statement contained the following misleading statements:

All of the mortgage loans in the trust fund will have been originated or acquired by [Countrywide Home Loans] in accordance with its credit, appraisal and underwriting standards.

* * * * *

[Countrywide Home Loans]' underwriting standards are applied by or on behalf of [Countrywide Home Loans] to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral. Under those standards, a prospective borrower must generally demonstrate that the ratio of the borrower's monthly housing expenses (including principal and interest on the proposed mortgage loan and, as applicable, the related monthly portion of property taxes, hazard insurance and mortgage insurance) to the borrower's monthly gross income and the ratio of total monthly debt to the monthly gross income (the "debt-to income" ratios) are within acceptable limits. The maximum acceptable debt-to-income ratio, which is determined on a loan-by-loan basis varies depending on a number of underwriting criteria, including the Loan-to-Value Ratio, loan purpose, loan amount and credit history of the borrower. In addition to meeting the debt-to-income ratio guidelines, each prospective borrower is required to

COMPLAINT

EXHIBIT 1  -64-

> have sufficient cash resources to pay the down payment and closing costs. Exceptions to [Countrywide Home Loans]' underwriting guidelines may be made if compensating factors are demonstrated by a prospective borrower.

*See* Registration Statement filed by CWMBS on Form S-3 on July 25, 2005 (at S-20).

149.  The January 31, 2006 Prospectus Supplement contained the following misleading statements:

> [Certain Mortgage Loans] were originated by Countrywide Home Loans in accordance with its credit, appraisal and underwriting standards. Countrywide Home Loans has been originating mortgage loans since 1969. Countrywide Home Loans' underwriting standards are applied in accordance with applicable federal and state laws and regulations.

<p style="text-align:center">* * * * *</p>

> Except with respect to mortgage loans originated pursuant to its Streamlined Documentation Program ... Countrywide Home Loans obtains appraisals from independent appraisers or appraisal services for properties that are to secure mortgage loans. The appraisers inspect and appraise the proposed mortgaged property and verify that the property is in acceptable condition. Following each appraisal, the appraiser prepares a report which includes a market data analysis based on recent sales of comparable homes in the area and, when deemed appropriate, a replacement cost analysis based on the current cost of constructing a similar home. All appraisals are required to conform to Fannie Mae or Freddie Mac appraisal standards then in effect.

*See* Prospectus Supplement for CHL Mortgage Pass-Through Trust 2006-HYB1, filed on Form 424B5 on Jan. 31, 2006 (at S-64, S-66).

## O.  DEFENDANTS MISREPRESENTED THAT COUNTRYWIDE ORIGINATED LOANS IN COMPLIANCE WITH ITS UNDERWRITING GUIDELINES

150.  In representing that Countrywide adhered to its underwriting guidelines and standards when originating the loans underlying the Certificates purchased by ABP, Defendants' statements, as set forth in ¶¶ 108 to 149, were materially false and misleading.  Defendants failed to disclose that Countrywide in fact systematically ignored its own underwriting guidelines, as well as underwriting standards imposed by state and federal law, in issuing the mortgages pooled into the Issuing Trusts. Specifically:

(a)     In contravention of Countrywide's underwriting guidelines, Countrywide did not "evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral", and Countrywide systematically ignored borrowers' repayment ability and the value and adequacy of the underlying collateral.

(b)     In contravention of Countrywide's underwriting guidelines, Countrywide employees did not require borrowers to "generally demonstrate that the ratio of the borrower's monthly housing expenses (including principal and interest on the proposed mortgage loan and, as applicable, the related monthly portion of property taxes, hazard insurance and mortgage insurance) to the borrower's monthly gross income and the ratio of total monthly debt to the monthly gross income (the 'debt-to-income' ratios) are within acceptable limits." Instead, Countrywide's employees extended loans even where income, occupation and other information was missing. If the information that was provided was patently incorrect, Countrywide ignored the deficiencies and failed to conduct verifications when the means to do so were readily available. Countrywide employees coached borrowers to misstate their income on loan applications to qualify for mortgage loans under Countrywide's underwriting standards, thereby circumventing the underwriting guidelines. Countrywide employees circumvented the underwriting guidelines by converting loans requiring full documentation into low-documentation or no-documentation loans. In this way, Countrywide was able to steer applicants to NINA and SISA loans in situations where the borrowers could not qualify for full documentation loans based on their actual incomes.

(c)     In contravention of Countrywide's underwriting guidelines, Countrywide approved loans based on false and optimistic metrics. Countrywide steered borrowers to more expensive loans that exceeded the borrowers' ability to repay by approving borrowers based on introductory and one-off "teaser rates", despite Countrywide's knowledge that the borrowers would not be able to afford the "fully indexed rate" when the teaser rate expired.

(d)     In contravention of Countrywide's underwriting guidelines, Countrywide allowed non-qualifying borrowers to be approved for loans under "exceptions" to Countrywide's underwriting standards, even though there were no "compensating factors" that could possibly justify such an exception. Countrywide incentivized its employees to liberally apply exceptions to Countrywide's

- 56 -

1 underwriting policies, and created specific procedures to systematically override or alter the

2 recommendations of Countrywide's CLUES underwriting system that was meant to weed out non-

3 qualifying loans.

**P.    DEFENDANTS MISREPRESENTED THAT COUNTRYWIDE ORIGINATED LOANS IN COMPLIANCE WITH PROPER APPRAISAL METHODS**

151.   In representing that Countrywide adhered to proper appraisal methods when originating the loans underlying the Certificates purchased by ABP, Defendants' statements, as set forth in ¶¶ 108 to 149, were materially false and misleading.  Specifically:

(a)    Contrary to the statements that Countrywide's underwriting standards were "primarily intended to evaluate the value and adequacy of the mortgaged property as collateral for the proposed mortgage loan" and to evaluate "the borrower's credit standing and repayment ability", Countrywide subordinated proper appraisals to the goal of originating and securitizing as many mortgage loans as it could.   As alleged herein, Countrywide systematically ignored borrowers' repayment ability and the value and adequacy of mortgaged property used as collateral.

(b)    Contrary to Defendants' statements, Countrywide did not use "market data analysis based on recent sales of comparable homes in the area, where deemed appropriate, replacement cost analysis based on the current costs of constructing a similar home" or "originator-approved, independent third-party, fee-based appraisal[s] completed on forms approved by Fannie Mae or Freddie Mac." Instead, as alleged herein, Countrywide systematically inflated appraisals for properties used as collateral for mortgage loans underlying the Issuing Trusts.  These inflated appraisals did not conform to USPAP and were not market data analyses of comparable homes in the area or analyses of the cost of construction of a comparable home.

(c)    The statements concerning the average LTV ratio of mortgages included in the Issuing Trusts and the maximum LTV ratio of mortgages included in the Issuing Trusts were false and misleading.  Each Prospectus Supplement referenced and incorporated into each Registration Statement described the LTV ratio of the mortgages pooled into the Issuing Trusts.  The LTV ratio of mortgages in the trust was described as equal to: (1) the principal balance of the mortgage loan at the date of origination, divided by; (2) the collateral value of the related mortgaged property, where the "collateral

value" was the lesser of either the appraised value based on an appraisal made for Countrywide by an independent fee appraiser at the time of the origination of the related mortgage loan, or the sales price of the mortgaged property at the time of origination.  Each Prospectus Supplement then provided an average LTV ratio of the mortgage loans included in the Issuing Trusts and a disclosure concerning the maximum LTV ratio of mortgage loans included in the Issuing Trusts.  Because incorrect and/or inflated appraisal values were obtained for the collateral supporting the mortgage loans pooled into each Issuing Trust, the average and maximum LTV ratios disclosed in the Prospectus Supplements were all false and misleading.

## VII.  BECAUSE OF THE ABANDONMENT BY COUNTRYWIDE OF ITS UNDERWRITING GUIDELINES AND STANDARDS, AS WELL AS PROPER APPRAISAL METHODS, PLAINTIFF ABP HAS SUFFERED LOSSES ON ITS PURCHASES OF CERTIFICATES

152.  As a result of the multiple and material misrepresentations contained in the Offering Documents, ABP has suffered significant losses on its purchases of Certificates.  The mortgage loans in the pools held by the Issuing Trusts and underlying ABP's Certificates have suffered escalating default rates and mounting foreclosures, resulting in across-the-board ratings downgrades and other negative actions by the rating agencies, as described below.

### A.  CWALT LOANS

153.  Based on the delinquencies, defaults and foreclosures on the underlying mortgage loans, ratings agencies downgraded the certificates issued pursuant to CWALT's Registration Statements on November 16, 2007, May 28, 2008, August 25, 2008, August 26, 2008, February 2, 2009, June 25, 2009, July 24, 2009, February 2, 2010 and March 10, 2010.

154.  Plaintiff purchased Certificates issued by CWALT Alternative Loan Trust 2005-J1, when they were rated Aaa by Moody's, but the Certificates have since been downgraded four times and are currently rated B3.  As of August 2010, of the pool of mortgage loans underlying the Certificates issued by the trust, 4.69% of the loans are delinquent by more than 90 days and 0.71% of the loans are in foreclosure.  At this time of filing of this Complaint, the Certificates were trading at approximately 95 cents in the dollar.

155.  Plaintiff purchased Certificates issued by CWALT Alternative Loan Trust 2005-40CB, when they were rated Aaa by Moody's but the Certificates have since been downgraded five times and

58

EXHIBIT 1   -68-

1  are currently rated Caa2. As of August 2010, of the pool of mortgages loans underlying the Certificates

2  issued by this trust, 11.4% of the loans are delinquent by more than 90 days and 4.49% of the loans are

3  in foreclosure. At the time of filing of this Complaint, the Certificates were trading at just

4  approximately 83 cents in the dollar.

5       **B.    CWABS LOANS**

6       156. As a result of the delinquencies, defaults and foreclosures on the underlying mortgage

7  loans, the rating agencies downgraded the certificates issued pursuant to CWABS' Registration

8  Statements on July 12, 2007, November 12, 2007, August 20, 2008, August 25, 2008, August 26, 2008,

9  November 19, 2008, February 13, 2009, May 22, 2009 and February 24, 2010.

10      157. Plaintiff purchased Certificates issued by CWABS' Revolving Home Equity Loan Trust,

11  Series 2004-R, when they were rated Aaa by Moody's, but the Certificates have since been downgraded

12  nine times and are currently rated Ca. At the time of filing of this Complaint, the Certificates were

13  trading at just approximately 41 cents in the dollar.

14      158. Plaintiff purchased Certificates issued by CWABS' Revolving Home Equity Loan Trust,

15  Series 2004-R, when they were rated Aaa by Moody's, but the Certificates have since been downgraded

16  nine times and are currently rate Ca. At the time of filing of this Complaint, the Certificates were

17  trading at just approximately 41 cents in the dollar.

18      159. Plaintiff purchased Certificates issued by CWABS Asset-Backed Certificates Trust 2006-

19  24, when they were rated Aaa by Moody's. but the Certificates have since been downgraded three times

20  and are currently rated B3. As of August 2010, of the pool of mortgage loans underlying the Certificates

21  issued by this trust, 58.12% of the loans are delinquent by more than 90 days and 15.71% of the loans

22  are in foreclosure. At the time of filing of this Complaint, the Certificates were trading at just

23  approximately 88 cents in the dollar

24      160. Plaintiff purchased Certificates issued by CWABS Asset-Baked Certificates Trust 20-07-2,

25  when they were Aaa by Moody's but the Certificates have since been downgraded three times and are

26  currently rated B3. As of Augusut 2010, of the pool of mortgage loans underlying the Certificates

27  issued by this trust, 55.53% of the loans are delinquent by more than 90 days and 15.16% of the loans

28  are in foreclosure. At the time of filing of this Complaint, the Certificates were trading at just

1 approximately 81 cents in the dollar.

2  161. Plaintiff purchased Certificates issued by CWABS Asset-Baked Certificates Trust 2007-

3 6, when they were rated Aaa by Moody's but the Certificates have since been downgraded four times are

4 currently rated Ba2. As of August 2010, of the pool of mortgage loans underlying the Certificates

5 issued by this trust, 59.46% of the loans are delinquent by more than 90 days and 16.84% of the loans

6 are in foreclosure. At the time of filing of this Complaint, the Certificates were trading at just

7 approximately 95 cents in the dollar.

8  162. Plaintiff purchased Certificates issued by CWABS Asset-Backed Certificates Trust 2007-

9 BC2, when they were rated Aaa by Moody's, but the Certificates have since been downgraded four

10 times and are currently rated Baa3. As of August 2010, of the pool of mortgage loans underlying the

11 Certificates issued by this trust, 55.99% of the loans are delinquent by more than 90 days and 14.52% of

12 the loans are in foreclosure.

13  163. Plaintiff purchased Certificates issued by CWABS Asset-Backed Certificates Trust 2007-

14 8, when they were rated A1 by Moody's but the Certificates have since been downgraded four times and

15 are currently rated C. As of August 2010, of the pool of mortgage loans underlying the Certificates

16 issued by this trust, 50.50% of the loans are delinquent by more than 90 days and 12.26% of the loans

17 are in foreclosure. At the time of filing of this Complaint, the Certificates were trading at approximately

18 90 cents in the dollar

19  164. Plaintiff purchased Certificates issued by CWABS Asset-Backed Certificates Trust 2007-

20 10, when they were rated Aaa by Moody's, but the Certificates have since been downgraded twice and

21 are currently rated B3. As of August 2010, of the pool of mortgage loans underlying the Certificates

22 issued by this trust, 51.39% of the loans are delinquent by more than 90 days and 11.55% of the loans

23 are in foreclosure. At the time of filing of this Complaint, the Certificates were trading at just

24 approximately 78 cents in the dollar.

25  **C.**  **CWMBS LOANS**

26  165. As a result of the delinquencies, defaults and foreclosures on the underlying mortgage

27 loans set forth below, ratings agencies such as S&P downgraded Certificates issued pursuant to

28 CWMBS' Registration Statements on November 16, 2007, March 17, 2008, May 1, 2008, May 28,

1   2008, October 15, 2008, November 11, 2008, March 9, 2009, March 30, 2009 and July 24, 2009.

2   166.   As of August 2008, of the pool of mortgages underlying the Certificates issued by
3   CWMBS during fiscal year 2005, 6.62% of these mortgages are delinquent by more than 60 days and
4   5.41% are delinquent by more than 90 days.  This has risen from 3.97% and 3.11%, respectively, since
5   January 2008.  2.28% of these loans are in foreclosure.

6   167.   As of August 2008, of the pool of mortgages underlying the Certificates issued by
7   CWMBS during fiscal year 2006, 9.70% of these mortgages are delinquent by more than 60 days and
8   8.07% are delinquent by more than 90 days.  This has risen from 6.59% and 5.22%, respectively, since
9   January 2008.  3.63% of these loans are in foreclosure.

10   168.   As of August 2008, of the pool of mortgages underlying the Certificates issued by
11   CWMBS during fiscal year 2007, 3.73% of these mortgages are delinquent by more than 60 days and
12   3.02% are delinquent by more than 90 days.  This has risen from 1.41% and 0.96%, respectively, since
13   January 2008.  1.22% of these loans are in foreclosure.

14   **D.   CWHEQ LOANS**

15   169.   The mortgage loans issued by CWHEQ have also suffered deteriorating delinquency rates.
16   As such, CWHEQ's Issuing Trusts have also been downgraded by the ratings agencies.  For example,
17   S&P downgraded Certificates issued pursuant to CWHEQ's Registration Statements on, *inter alia*, June
18   27, 2008, August 25, 2008, August 26, 2008, October 10, 2008, February 19, 2009, April 30, 2009, June
19   16, 2009 and October 14, 2009.

20   **VIII.   THE UNDERWRITER DEFENDANTS DID NOT PERFORM ADEQUATE DUE DILIGENCE**

21   170.   In their capacity as underwriters of these offerings, each of the Underwriter Defendants had
22   an obligation to conduct due diligence regarding the accuracy and completeness of the Offering
23   Documents prior to their dissemination to investors and prior to consummation of the offerings.   In
24   connection with that due diligence process, the Underwriter Defendants had access to various sources of
25   information that, as described below, should have alerted them to Countrywide's systematic and
26   widespread abandonment of its underwriting guidelines and its touted appraisal methods.   The
27   Underwriter Defendants were thus supposed to play a "gatekeeper" role for public investors like

28

61

1  Plaintiff ABP, who did not have access to non-public information through which to test the assertions in

2  the Offering Documents. However, as set forth below, the Underwriter Defendants failed to discharge

3  their obligations. As concluded in a March 2008 Policy Statement on Financial Market Developments

4  by the President's Working Group on Financial Markets, "[although market participants had economic

5  incentives to conduct due diligence . . . the steps they took were insufficient."

6      171. Many, if not all, of the Underwriter Defendants received due diligence reports from

7  external firms, including, specifically, Clayton Holdings, Inc. ("Clayton") and the Bohan Group

8  ("Bohan"), when they underwrote offerings for the Issuing Defendants. The Underwriter Defendants

9  hired Clayton or Bohan to review whether the loans to be included in a particular RMBS offering

10  complied with the law and met the lending standards that mortgage companies, such as Countrywide,

11  said that they were using.

12      172. Clayton provides "services to the leading buyers and sellers of, and investors in, residential

13  and commercial loan portfolios and securities . . . includ[ing] major capital markets firms, banks and

14  lending institutions, including the largest MBS issuers/dealers." Clayton's Form 10-K filed March 14,

15  2008. Indeed, "[d]uring 2007, 2006 and 2005, [Clayton] worked with each of the 10 largest non-agency

16  MBS underwriters, as ranked by *Inside MBS & ABS*, which accounted for 70%, 73% and 73% of total

17  underwriting volume during those respective periods." *Id.* Additionally, Clayton has specifically

18  identified Defendant Deutsche Bank as a client for its underwriting due diligence services. Bohan is a

19  private company that also provides underwriting due diligences services, with offices in New York and

20  California.

21      173. In June 2007, the New York Attorney General, Andrew Cuomo ("NYAG"), subpoenaed

22  documents from both Clayton and Bohan related to their due diligence efforts on behalf of the

23  investment banks that underwrote substantial amounts of RMBS. The NYAG, along with

24  Massachusetts, Connecticut and the SEC (all of which also subpoenaed documents) are investigating

25  whether investment banks held back information they should have provided in the disclosures that

26  accompanied the RMBS that they offered for sale to investors.

27      174. On January 27, 2008, Clayton revealed that it had entered into an agreement with the

28  NYAG for immunity from civil and criminal prosecution in the State of New York in exchange for

COMPLAINT

EXHIBIT 1  -72-

1  agreeing to provide additional documents and testimony regarding its due diligence reports, including

2  copies of the actual reports provided to its clients. Both THE NEW YORK TIMES and THE WALL STREET

3  JOURNAL ran articles describing the nature of the NYAG's investigation and Clayton's testimony. THE

4  WALL STREET JOURNAL reported that the NYAG's investigation is focused on the fact that "the broad

5  language written in prospectuses about the risky nature of these securities changed little in recent years,

6  even as due-diligence reports noted that the number of exception loans backing the securities was

7  rising." According to THE NEW YORK TIMES article, Clayton is "the nation's largest provider of

8  mortgage due diligence services to investment banks" and it "communicated daily with bankers putting

9  together mortgage securities." THE NEW YORK TIMES also reported that Clayton told the NYAG "that

10  starting in 2005, it saw a significant deterioration of lending standards and a parallel jump in lending

11  exceptions" and "some investment banks directed Clayton to halve the sample of loans it evaluated in

12  each portfolio."

13     175.  On March 17, 2008, in an article entitled "Sub-prime Mortgage Watchdogs Kept on

14  Leash", the LOS ANGELES TIMES reported that Clayton and Bohan employees (including, specifically,

15  eight former reviewers who were interviewed for the article) "raised plenty of red flags about flaws [in

16  subprime home loans] so serious that mortgages should have been rejected outright – such as borrowers'

17  incomes that seemed inflated or documents that looked fake – but the problems were glossed over,

18  ignored or stricken from reports." Moreover, while underwriters, such as the Underwriter Defendants,

19  earlier in the decade would have asked Clayton to review 25%-40% of loans in a pool that was going to

20  be securitized, by 2006 the typical percentage of loans reviewed for due diligence purposes was just

21  10%.

22               **FIRST CAUSE OF ACTION**

23            **(Violation of Section 11 of the Securities Act)**

24     176.  Plaintiff repeats and realleges each and every allegation above as if set forth fully herein

25  only to the extent, however, that such allegations do not allege fraud, scienter or the intent of Defendants

26  to defraud Plaintiff. This cause of action is predicated upon Defendants' *strict liability* for making false

27  and materially misleading statements in the Registration Statements.

28     177.  This cause of action is brought pursuant to Section 11 of the Securities Act against the

COMPLAINT

EXHIBIT 1  -73-

1  Individual Defendants and the Issuing and Underwriter Defendants.

2      178.   The Registration Statements (including the Prospectuses and Prospectus Supplements

3  incorporated by reference therein) for the Certificate offerings were materially inaccurate and

4  misleading, contained untrue statements of material facts, omitted to state other facts necessary to make

5  the statements not misleading, and omitted to state material facts required to be stated therein.

6      179.  The Individual Defendants and the Issuing and Underwriter Defendants of the Certificates

7  are strictly liable to Plaintiff for the misstatements and omissions.

8      180.   The Individual Defendants signed CWALT's, CWABS', CWMBS' and CWHEQ's

9  Registration Statements as detailed in ¶ 53 above.

10      181.   Defendant CSC, an affiliate of CFC, acted as an underwriter in the sale of the Issuing

11  Trusts' Certificates, and helped to draft and disseminate the Offering Documents for the Certificates.

12  Defendant CSC was an underwriter for the specific Issuing Trusts that are identified in ¶ 57 above.

13      182.   Defendant Deutsche Bank acted as an underwriter in the sale of the Issuing Trusts'

14  Certificates, and helped to draft and disseminate the Offering Documents for the Certificates.  Defendant

15  Deutsche Bank was an underwriter for the specific Issuing Trusts that are identified in ¶ 57 above.

16      183.  Defendant UBS acted as an underwriter in the sale of the Issuing Trusts' Certificates, and

17  helped to draft and disseminate the Offering Documents for the Certificates.  Defendant UBS was an

18  underwriter for the specific Issuing Trusts that are identified in ¶ 57 above.

19      184.  Defendant RBS acted as an underwriter in the sale of the Issuing Trusts' Certificates, and

20  helped to draft and disseminate the Offering Documents for the Certificates.  Defendant RBS was an

21  underwriter for the specific Issuing Trusts that are identified in ¶ 57 above.

22      185.  Defendant Barclays acted as an underwriter in the sale of the Issuing Trusts' Certificates,

23  and helped to draft and disseminate the Offering Documents for the Certificates.  Defendant Barclays

24  was an underwriter for the specific Issuing Trusts that are identified in ¶ 57 above.

25      186.   The Individual Defendants and the Issuing and Underwriter Defendants issued and

26  disseminated, caused to be issued and disseminated, and participated in the issuance and dissemination

27  of material misstatements to the investing public which were contained in the Prospectuses and

28  Prospectus Supplements, which misrepresented or failed to disclose, inter alia, the facts set forth above.

1    187.  The Individual Defendants and the Issuing and Underwriter Defendants owed to Plaintiff

2    the duty to make a reasonable and diligent investigation of the statements contained in the Registration

3    Statements at the time they became effective to ensure that such statements were true and correct and

4    that there was no omission of material facts required to be stated in order to make the statements

5    contained therein not misleading.   The Individual Defendants and the Issuing and Underwriter

6    Defendants knew, or in the exercise of reasonable care should have known, of the material

7    misstatements and omissions contained in or omitted from the Registration Statements as set forth

8    herein.  As such, the Individual Defendants and the Issuing and Underwriter Defendants are liable.

9    188.  By reason of the conduct herein alleged, each of the Individual Defendants and the Issuing

10   and Underwriter Defendants violated Section 11 of the Securities Act.

11   189.  Plaintiff acquired the Certificates pursuant and/or traceable to the Registration Statements.

12   190.  At the time it obtained its Certificates, Plaintiff did so without knowledge of the facts

13   concerning the misstatements or omissions alleged herein.

14   191.  Plaintiff has sustained damages.  The value of the Certificates has declined substantially,

15   subsequent to, and due to, the Individual Defendants' and the Issuing and Underwriter Defendants'

16   violations.

17   192.  By virtue of the foregoing, Plaintiff is entitled to damages under Section 11, as measured

18   by the provisions of Section 11(e), jointly and severally from each of the Individual Defendants and the

19   Issuing and Underwriter Defendants.

20   ## SECOND CAUSE OF ACTION

21   **(Violation of Section 12(a)(2) of the Securities Act)**

22   193.  Plaintiff repeats and realleges each and every allegation contained above as if fully set forth

23   herein.

24   194.  This cause of action is brought pursuant to Section 12(a)(2) of the Securities Act against

25   the Issuing and Underwriter Defendants.

26   195.  The Issuing and Underwriter Defendants promoted and sold the Certificates pursuant to the

27   defective Prospectuses and Prospectus Supplements.

28   196. The Prospectuses and Prospectus Supplements contained untrue statements of material

65

COMPLAINT

EXHIBIT 1  -75-

1  facts, omitted to state other facts necessary to make the statements made not misleading, and concealed

2  and failed to disclose material facts.

3      197.  The Issuing and Underwriter Defendants owed to Plaintiff the duty to make a reasonable

4  and diligent investigation of the statements contained in the Prospectuses and Prospectus Supplements,

5  to ensure that such statements were true and that there was no omission to state a material fact required

6  to be stated in order to make the statements contained therein not misleading.  The Issuing and

7  Underwriter Defendants knew of, or in the exercise of reasonable care should have known of, the

8  misstatements and omissions contained in the Prospectuses and Prospectus Supplements as set forth

9  above.

10      198.  Plaintiff purchased or otherwise acquired Certificates pursuant to and/or traceable to the

11  defective Prospectuses and Prospectus Supplements.  Plaintiff did not know, or in the exercise of

12  reasonable diligence could not have known, of the untruths and omissions contained in the Prospectuses

13  and Prospectus Supplements.

14      199. By reason of the conduct alleged herein, the Issuing and Underwriter Defendants violated

15  Section 12(a)(2) of the Securities Act.  Accordingly, Plaintiff, which purchased the Certificates pursuant

16  to and/or traceable to the Prospectuses and Prospectus Supplements sustained material damages in

17  connection with their purchases of the Certificates.  Plaintiff has the right to rescind and recover the

18  consideration paid for their Certificates, and hereby elects to rescind and tender its Certificates to the

19  Issuing and the Underwriter Defendants.

## THIRD CAUSE OF ACTION

### (Violation of Section 15 of the Securities Act)

22      200.  Plaintiff repeats and realleges each and every allegation contained above as if fully set forth

23  herein.

24      201.  This count is asserted against CFC, CSC, CCM, CHL and the Individual Defendants and is

25  based upon Section 15 of the Securities Act.

26      202.  Each of CFC, CSC, CCM, CHL and the Individual Defendants by virtue of its control,

27  ownership, offices, directorship, and specific acts was, at the time of the wrongs alleged herein and as

28  set forth herein, a controlling person of the Issuing Defendants within the meaning of Section 15 of the

66

COMPLAINT

EXHIBIT 1  -76-

1  Securities Act. CFC, CSC, CCM and CHL and the Individual Defendants had the power and influence

2  and exercised the same to cause the Issuing Defendants to engage in the acts described herein.

3      203. CFC's, CSC's, CCM's, CHL's and the Individual Defendants' control, ownership and

4  position made them privy to and provided them with knowledge of the material facts concealed from

5  Plaintiff.

6      204. By virtue of the conduct alleged herein, CFC, CSC, CCM, CHL and the Individual

7  Defendants are liable for the aforesaid wrongful conduct and are liable to Plaintiff for damages suffered

8  as a result.

9                    **FOURTH CAUSE OF ACTION**

10          **(Untrue or Misleading Statements in the Sale of Securities**
            **Cal. Corporations Code §§ 25401, 25501, 25504)**

11     205. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set

12  forth herein.

13     206. The Individual Defendants and the Issuing and Underwriter Defendants committed a

14  primary violation of Sections 25401 and 25501 of the California Corporations Code by selling the

15  Certificates to Plaintiff ABP by means of the Offering Documents, which contained untrue statements of

16  material fact and/or omissions of material fact necessary in order to make the statements in the Offering

17  Documents not misleading.

18     207. Each of CFC, CSC, CCM, CHL and the Individual Defendants is liable under Section

19  25504 of the California Corporations Code because it directly and/or indirectly controlled the Issuing

20  Defendants by virtue of its ownership, offices, directorship, and specific acts at the time of the wrongs

21  alleged herein. CFC, CSC, CCM and CHL and the Individual Defendants had the power and influence

22  and exercised the same to cause the Issuing Defendants to engage in the acts described herein in

23  violation of Sections 25401 and 25501.

24     208. Additionally, each of the Individual Defendants is liable under Section 25504 as a principal

25  executive officer or director of the Issuing Defendants at the time of their violation of Sections 25401

26  and 25501.

27

28

COMPLAINT

EXHIBIT 1  -77-

## FIFTH CAUSE OF ACTION

**(Negligent Misrepresentation**
**Cal. Civil Code §§ 1572 et seq. and 1709 et seq., and Common Law)**

209. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

210. As alleged above, Defendants made untrue or misleading representations, including, among others, that Countrywide originated loans in compliance with its underwriting guidelines, and that Countrywide originated loans in compliance with proper appraisal methods.

211. In making the representations referred to above, the Defendants intended to induce Plaintiff to rely on those representations in making its decision to purchase the Certificates. Defendants expected that Plaintiff would rely on those representations in deciding whether to purchase the Certificates. Defendants also knew that the facts regarding Countrywide's compliance with its underwriting standards were exclusively within Defendants' knowledge.

212. When the Defendants made these representations, they had no reasonable ground for believing them to be true.

213. Plaintiff reasonably and justifiably relied on the representations described above in analyzing and deciding to purchase the Certificates. Had Defendants not made the false and misleading representations, Plaintiff would not have purchased the Certificates.

214. When it purchased the Certificates, Plaintiff did not know about the untrue and misleading statements alleged herein.

215. Defendants had a duty to provide Plaintiff complete, accurate, and timely information regarding the underlying mortgage loans and the securitization of these loans. Defendants breached their duty to provide such information to Plaintiff.

216. As a direct and proximate result of the negligent misrepresentations by Defendants, Plaintiff was damaged in an amount to be proved at trial.

//
//
//
//

1    **PRAYER FOR RELIEF**

2        WHEREFORE, Plaintiff prays for relief and judgment against Defendants, as follows:

3        1.     For rescission;

4        2.     For an award of compensatory damages against Defendants in favor of Plaintiff for

5    damages sustained as a result of Defendants' wrongdoing;

6        3.     For an award to Plaintiff of its costs and disbursements in this suit, including reasonable

7    attorneys' fees and expert fees; and

8        4.     For such other relief as the Court deems just and proper.

9    Dated: August 18, 2010

10                                       BLECHER & COLLINS, P.C.
                                         MAXWELL M. BLECHER
11                                       MARYANN R. MARZANO

12                                       By: _____

13                                           MARYANN R. MARZANO

14                                                and

15                                       GRANT & EISENHOFER P.A.
                                         JAY W. EISENHOFER
16                                       GEOFFREY C. JARVIS
                                         HUNG G. TA
17                                       DEBORAH A. ELMAN

18                                       By: _____
                                             JAY W. EISENHOFER
19                                           Attorneys for Plaintiff
                                         STICHTING PENSIOENFONDS ABP
20

21

22

23

24

25

26

27

28

                                         69
                                      COMPLAINT
EXHIBIT 1  -79-



## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury.

Dated:  August 18, 2010

BLECHER & COLLINS, P.C.
MAXWELL M. BLECHER
MARYANN R. MARZANO


By: _____
MARYANN R. MARZANO

and

GRANT & EISENHOFER P.A.
JAY W. EISENHOFER
GEOFFREY C. JARVIS
HUNG G. TA
DEBORAH A. ELMAN

By: _____
JAY W. EISENHOFER
Attorneys for Plaintiff
STICHTING PENSIOENFONDS ABP

---

70
COMPLAINT

EXHIBIT 1  -80-

**CM-010**

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| Maxwell M. Blecher  (SBN 026202)<br>Maryann R. Marzano  (SBN 96867)<br>BLECHER & COLLINS, P.C.<br>515 South Figueroa Street, Suite 1750<br>Los Angeles, California 90071-3334<br>TELEPHONE NO.: (213) 622-4222   FAX NO.: (213) 622-1656<br>ATTORNEY FOR *(Name):* Plaintiff STICHTING PENSIOENFONDS ABP | **FILED**<br>SUPERIOR COURT OF CALIFORNIA<br>COUNTY OF LOS ANGELES<br><br>AUG 18 2010<br><br>John A. Clarke, Executive Officer/Clerk<br>By_____ Deputy<br>RUGENA LOPEZ |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
STREET ADDRESS: 111 North Hill Street
MAILING ADDRESS:
CITY AND ZIP CODE: Los Angeles, CA 90012
BRANCH NAME: Central District

| CASE NAME:  Stichting Pensioenfonds ABP v. Countrywide Financial Corporation, et al. |
|---|

| CIVIL CASE COVER SHEET | Complex Case Designation | CASE NUMBER: **BC444033** |
|---|---|---|
| [X] Unlimited  (Amount demanded exceeds $25,000)   [ ] Limited (Amount demanded is $25,000 or less) | [ ] Counter   [ ] Joinder<br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 3.402) | JUDGE:<br>DEPT: |

*Items 1-6 below must be completed (see instructions on page 2).*

1. Check one box below for the case type that best describes this case:

**Auto Tort**
- [ ] Auto (22)
- [ ] Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
- [ ] Asbestos (04)
- [ ] Product liability (24)
- [ ] Medical malpractice (45)
- [ ] Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
- [ ] Business tort/unfair business practice (07)
- [ ] Civil rights (08)
- [ ] Defamation (13)
- [ ] Fraud (16)
- [ ] Intellectual property (19)
- [ ] Professional negligence (25)
- [ ] Other non-PI/PD/WD tort (35)

**Employment**
- [ ] Wrongful termination (36)
- [ ] Other employment (15)

**Contract**
- [ ] Breach of contract/warranty (06)
- [ ] Rule 3.740 collections (09)
- [ ] Other collections (09)
- [ ] Insurance coverage (18)
- [ ] Other contract (37)

**Real Property**
- [ ] Eminent domain/Inverse condemnation (14)
- [ ] Wrongful eviction (33)
- [ ] Other real property (26)

**Unlawful Detainer**
- [ ] Commercial (31)
- [ ] Residential (32)
- [ ] Drugs (38)

**Judicial Review**
- [ ] Asset forfeiture (05)
- [ ] Petition re: arbitration award (11)
- [ ] Writ of mandate (02)
- [ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400-3.403)**
- [ ] Antitrust/Trade regulation (03)
- [ ] Construction defect (10)
- [ ] Mass tort (40)
- [X] Securities litigation (28)
- [ ] Environmental/Toxic tort (30)
- [ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
- [ ] Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
- [ ] RICO (27)
- [ ] Other complaint *(not specified above)* (42)

**Miscellaneous Civil Petition**
- [ ] Partnership and corporate governance (21)
- [ ] Other petition *(not specified above)* (43)

2. This case [X] is [ ] is not   complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [X] Large number of separately represented parties   d. [X] Large number of witnesses
   b. [X] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve   e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   c. [X] Substantial amount of documentary evidence   f. [ ] Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply):* a. [X] monetary b. [ ] nonmonetary; declaratory or injunctive relief c. [ ] punitive

4. Number of causes of action *(specify):*

5. This case [ ] is [X] is not   a class action suit.

6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: 8/18/10

Maryann R. Marzano
_____   ►   _____
(TYPE OR PRINT NAME)                              (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

---

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev. July 1, 2007]

**CIVIL CASE COVER SHEET**

Legal Solutions Plus

Cal. Rules of Court, rules 2.30, 3.220, 3.400-3.403, 3.740;
Cal. Standards of Judicial Administration, std. 3.10

EXHIBIT

| SHORT TITLE: Stichting Pensioenfonds ABP v. Countrywide Financial Corporation, et al. | CASE NUMBER BC444033 |
|---|---|

## CIVIL CASE COVER SHEET ADDENDUM AND STATEMENT OF LOCATION
### (CERTIFICATE OF GROUNDS FOR ASSIGNMENT TO COURTHOUSE LOCATION)

**This form is required pursuant to LASC Local Rule 2.0 in all new civil case filings in the Los Angeles Superior Court.**

**Item I.** Check the types of hearing and fill in the estimated length of hearing expected for this case:

JURY TRIAL? [X] YES   CLASS ACTION? [ ] YES   LIMITED CASE? [ ] YES   TIME ESTIMATED FOR TRIAL 15 [ ] HOURS/ [X] DAYS

**Item II.** Select the correct district and courthouse location (4 steps – If you checked "Limited Case", skip to Item III, Pg. 4):

**Step 1:** After first completing the Civil Case Cover Sheet Form, find the main civil case cover sheet heading for your case in the left margin below, and, to the right in Column A, the Civil Case Cover Sheet case type you selected.

**Step 2:** Check **one** Superior Court type of action in Column B below which best describes the nature of this case.

**Step 3:** In Column **C**, circle the reason for the court location choice that applies to the type of action you have checked.
For any exception to the court location, see Los Angeles Superior Court Local Rule 2.0.

---

### Applicable Reasons for Choosing Courthouse Location (See Column C below)

1. Class Actions must be filed in the County Courthouse, Central District.
2. May be filed in Central (Other county, or no Bodily Injury/Property Damage).
3. Location where cause of action arose.
4. Location where bodily injury, death or damage occurred.
5. Location where performance required or defendant resides.
6. Location of property or permanently garaged vehicle.
7. Location where petitioner resides.
8. Location wherein defendant/respondent functions wholly.
9. Location where one or more of the parties reside.
10. Location of Labor Commissioner Office.

**Step 4:** Fill in the information requested on page 4 in Item III; complete Item IV. Sign the declaration.

| | A<br>Civil Case Cover Sheet<br>Category No. | B<br>Type of Action<br>(Check only one) | C<br>Applicable Reasons -<br>See Step 3 Above |
|---|---|---|---|
| **Auto Tort** | Auto (22) | [ ] A7100  Motor Vehicle - Personal Injury/Property Damage/Wrongful Death | 1., 2., 4. |
| | Uninsured Motorist (46) | [ ] A7110  Personal Injury/Property Damage/Wrongful Death – Uninsured Motorist | 1., 2., 4. |
| **Other Personal Injury/Property Damage/Wrongful Death Tort** | Asbestos (04) | [ ] A6070  Asbestos Property Damage | 2. |
| | | [ ] A7221  Asbestos - Personal Injury/Wrongful Death | 2. |
| | Product Liability (24) | [ ] A7260  Product Liability (not asbestos or toxic/environmental) | 1., 2., 3., 4., 8. |
| | Medical Malpractice (45) | [ ] A7210  Medical Malpractice - Physicians & Surgeons | 1., 2., 4. |
| | | [ ] A7240  Other Professional Health Care Malpractice | 1., 2., 4. |
| | Other Personal Injury Property Damage Wrongful Death (23) | [ ] A7250  Premises Liability (e.g., slip and fall) | 1., 2., 4. |
| | | [ ] A7230  Intentional Bodily Injury/Property Damage/Wrongful Death (e.g., assault, vandalism, etc.) | 1., 2., 4. |
| | | [ ] A7270  Intentional Infliction of Emotional Distress | 1., 2., 3. |
| | | [ ] A7220  Other Personal Injury/Property Damage/Wrongful Death | 1., 2., 4. |
| **Non-Personal Injury/Property Damage/Wrongful Death Tort** | Business Tort (07) | [ ] A6029  Other Commercial/Business Tort (not fraud/breach of contract) | 1., 2., 3. |
| | Civil Rights (08) | [ ] A6005  Civil Rights/Discrimination | 1., 2., 3. |
| | Defamation (13) | [ ] A6010  Defamation (slander/libel) | 1., 2., 3. |
| | Fraud (16) | [ ] A6013  Fraud (no contract) | 1., 2., 3. |

LACIV 109 (Rev. 01/07)
LASC Approved 03-04

**CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION**

EXHIBIT 1 -82-

LASC, rule 2.0
Page 1 of 4
LA-4B1

| | |
|---|---|
| SHORT TITLE: Stichting Pensioenfonds ABP v. Countrywide Financial Corporation, et al. | CASE NUMBER |

*Non-Personal Injury/Property Damage/Wrongful Death Tort (Cont'd.)*

| A<br>Civil Case Cover Sheet Category No. | | B<br>Type of Action<br>(Check only one) | C<br>Applicable Reasons<br>- See Step 3 Above |
|---|---|---|---|
| Professional Negligence (25) | ☐ | A6017 Legal Malpractice | 1., 2., 3. |
| | ☐ | A6050 Other Professional Malpractice (not medical or legal) | 1., 2., 3. |
| Other (35) | ☐ | A6025 Other Non-Personal Injury/Property Damage tort | 2., 3. |

**Employment**

| | | | |
|---|---|---|---|
| Wrongful Termination (36) | ☐ | A6037 Wrongful Termination | 1., 2., 3. |
| Other Employment (15) | ☐ | A6024 Other Employment Complaint Case | 1., 2., 3. |
| | ☐ | A6109 Labor Commissioner Appeals | 10. |

**Contract**

| | | | |
|---|---|---|---|
| Breach of Contract/ Warranty (06) (not insurance) | ☐ | A6004 Breach of Rental/Lease Contract (not Unlawful Detainer or wrongful eviction) | 2., 5. |
| | ☐ | A6008 Contract/Warranty Breach -Seller Plaintiff (no fraud/negligence) | 2., 5. |
| | ☐ | A6019 Negligent Breach of Contract/Warranty (no fraud) | 1., 2., 5. |
| | ☐ | A6028 Other Breach of Contract/Warranty (not fraud or negligence) | 1., 2., 5. |
| Collections (09) | ☐ | A6002 Collections Case-Seller Plaintiff | 2., 5., 6. |
| | ☐ | A6012 Other Promissory Note/Collections Case | 2., 5. |
| Insurance Coverage (18) | ☐ | A6015 Insurance Coverage (not complex) | 1., 2., 5., 8. |
| Other Contract (37) | ☐ | A6009 Contractual Fraud | 1., 2., 3., 5. |
| | ☐ | A6031 Tortious Interference | 1., 2., 3., 5. |
| | ☐ | A6027 Other Contract Dispute(not breach/insurance/fraud/negligence) | 1., 2., 3., 8. |

**Real Property**

| | | | |
|---|---|---|---|
| Eminent Domain/Inverse Condemnation (14) | ☐ | A7300 Eminent Domain/Condemnation Number of parcels _____ | 2. |
| Wrongful Eviction (33) | ☐ | A6023 Wrongful Eviction Case | 2., 6. |
| Other Real Property (26) | ☐ | A6018 Mortgage Foreclosure | 2., 6. |
| | ☐ | A6032 Quiet Title | 2., 6. |
| | ☐ | A6060 Other Real Property (not eminent domain, landlord/tenant, foreclosure) | 2., 6. |

**Unlawful Detainer**

| | | | |
|---|---|---|---|
| Unlawful Detainer - Commercial (31) | ☐ | A6021 Unlawful Detainer-Commercial (not drugs or wrongful eviction) | 2., 6. |
| Unlawful Detainer - Residential (32) | ☐ | A6020 Unlawful Detainer-Residential (not drugs or wrongful eviction) | 2., 6. |
| Unlawful Detainer - Drugs (38) | ☐ | A6022 Unlawful Detainer-Drugs | 2., 6. |

**Judicial Review**

| | | | |
|---|---|---|---|
| Asset Forfeiture (05) | ☐ | A6108 Asset Forfeiture Case | 2., 6. |
| Petition re Arbitration (11) | ☐ | A6115 Petition to Compel/Confirm/Vacate Arbitration | 2., 5. |

**CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION**

EXHIBIT 1

| SHORT TITLE: Stichting Pensioenfonds ABP v. Countrywide Financial Corporation, et al. | | CASE NUMBER | |
|---|---|---|---|

| | A<br>Civil Case Cover Sheet<br>Category No. | B<br>Type of Action<br>(Check only one) | C<br>Applicable Reasons -<br>See Step 3 Above |
|---|---|---|---|
| **Judicial Review (Cont'd.)** | Writ of Mandate<br><br>(02) | ☐ A6151 Writ - Administrative Mandamus | 2., 8. |
| | | ☐ A6152 Writ - Mandamus on Limited Court Case Matter | 2. |
| | | ☐ A6153 Writ - Other Limited Court Case Review | 2. |
| | Other Judicial Review<br>(39) | ☐ A6150 Other Writ / Judicial Review | 2., 8. |
| **Provisionally Complex Litigation** | Antitrust/Trade Regulation (03) | ☐ A6003 Antitrust/Trade Regulation | 1., 2., 8. |
| | Construction Defect (10) | ☐ A6007 Construction defect | 1., 2., 3. |
| | Claims Involving Mass Tort (40) | ☐ A6006 Claims Involving Mass Tort | 1., 2., 8. |
| | Securities Litigation (28) | ☒ A6035 Securities Litigation Case | 1., 2., (8.) |
| | Toxic Tort Environmental (30) | ☐ A6036 Toxic Tort/Environmental | 1., 2., 3., 8. |
| | Insurance Coverage Claims from Complex Case (41) | ☐ A6014 Insurance Coverage/Subrogation (complex case only) | 1., 2., 5., 8. |
| **Enforcement of Judgment** | Enforcement of Judgment<br><br>(20) | ☐ A6141 Sister State Judgment | 2., 9. |
| | | ☐ A6160 Abstract of Judgment | 2., 6. |
| | | ☐ A6107 Confession of Judgment (non-domestic relations) | 2., 9. |
| | | ☐ A6140 Administrative Agency Award (not unpaid taxes) | 2., 8. |
| | | ☐ A6114 Petition/Certificate for Entry of Judgment on Unpaid Tax | 2., 8. |
| | | ☐ A6112 Other Enforcement of Judgment Case | 2., 8., 9. |
| **Miscellaneous Civil Complaints** | RICO (27) | ☐ A6033 Racketeering (RICO) Case | 1., 2., 8. |
| | Other Complaints (Not Specified Above)<br><br>(42) | ☐ A6030 Declaratory Relief Only | 1., 2., 8. |
| | | ☐ A6040 Injunctive Relief Only (not domestic/harassment) | 2., 8. |
| | | ☐ A6011 Other Commercial Complaint Case (non-tort/non-complex) | 1., 2., 8. |
| | | ☐ A6000 Other Civil Complaint (non-tort/non-complex) | 1., 2., 8. |
| **Miscellaneous Civil Petitions** | Partnership Corporation Governance (21) | ☐ A6113 Partnership and Corporate Governance Case | 2., 8. |
| | Other Petitions (Not Specified Above)<br><br>(43) | ☐ A6121 Civil Harassment | 2., 3., 9. |
| | | ☐ A6123 Workplace Harassment | 2., 3., 9. |
| | | ☐ A6124 Elder/Dependent Adult Abuse Case | 2., 3., 9. |
| | | ☐ A6190 Election Contest | 2. |
| | | ☐ A6110 Petition for Change of Name | 2., 7. |
| | | ☐ A6170 Petition for Relief from Late Claim Law | 2., 3., 4., 8. |
| | | ☐ A6100 Other Civil Petition | 2., 9. |

LACIV 109 (Rev. 01/07)
LASC Approved 03-04

**CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION**

LASC, rule 2.0
Page 3 of 4

EXHIBIT 1 -84

| SHORT TITLE: Stichting Pensioenfonds ABP v. Countrywide Financial Corporation, et al. | CASE NUMBER |
|---|---|

**Item III. Statement of Location:** Enter the address of the accident, party's residence or place of business, performance, or other circumstance indicated in Item II., Step 3 on Page 1, as the proper reason for filing in the court location you selected.

| REASON: CHECK THE NUMBER UNDER COLUMN C WHICH APPLIES IN THIS CASE | ADDRESS: |
|---|---|
| ☐1. ☐2. ☐3. ☐4. ☐5. ☐6. ☐7. [X]8. ☐9. ☐10. | Countrywide Financial Corporaiton (CFC) 4500 Park Granada |
| CITY: Calabasas | STATE: CA | ZIP CODE: 91302 | |

**Item IV.** *Declaration of Assignment*: I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that the above-entitled matter is properly filed for assignment to the <u>LOS ANGELES COUNTY SUPERIOR</u> courthouse in the <u>Stanley Mosk</u> District of the Los Angeles Superior Court (Code Civ. Proc., § 392 et seq., and LASC Local Rule 2.0, subds. (b), (c) and (d)).

Dated: <u>August 18, 2010</u>

(SIGNATURE OF ATTORNEY/FILING PARTY)

MARYANN B. MARZANO, ESQ.

---

**PLEASE HAVE THE FOLLOWING ITEMS COMPLETED AND READY TO BE FILED IN ORDER TO PROPERLY COMMENCE YOUR NEW COURT CASE:**

1. Original Complaint or Petition.

2. If filing a Complaint, a completed Summons form for issuance by the Clerk.

3. Civil Case Cover Sheet form CM-010.

4. Complete Addendum to Civil Case Cover Sheet form LACIV 109 (Rev 01/07), LASC Approved 03-04.

5. Payment in full of the filing fee, unless fees have been waived.

6. Signed order appointing the Guardian ad Litem, JC form FL-935, if the plaintiff or petitioner is a minor under 18 years of age, or if required by Court.

7. Additional copies of documents to be conformed by the Clerk. Copies of the cover sheet and this addendum must be served along with the summons and complaint, or other initiating pleading in the case.

---

# FILED
LOS ANGELES SUPERIOR COURT ⊃. 20

FILE STAMP
SEP 0 2 2010
JOHN A. CLARKE, CLERK

BY PAULA BARRERAS, DEPUTY

NOTICE SENT TO:

Blecher, Maxwell M., Esq.
Blecher & Collins, PC
515 South Figueroa Street, Suite 1750
Los Angeles          CA   90071

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

| | CASE NUMBER |
|---|---|
| STICHTING PENSIOENFONDS ABP Plaintiff(s), VS. COUNTRYWIDE FINANCIAL CORP ET Defendant(s). | BC444033 |
| | **NOTICE OF CASE MANAGEMENT CONFERENCE** |

TO THE PLAINTIFF(S)/ATTORNEY(S) FOR PLAINTIFF(S) OF RECORD:

You are ordered to serve this notice of hearing on all parties/attorneys of record forthwith, and meet and confer with all parties/attorneys of record about the matters to be discussed no later than 30 days before the Case Management Conference.

Your Case Management Conference has been scheduled for _October 14, 2010_ at _8:30 am_ in _Dept. 20_ at 111 North Hill Street, Los Angeles, California 90012.

**NOTICE TO DEFENDANT:    THE SETTING OF THE CASE MANAGEMENT CONFERENCE DOES NOT EXEMPT THE DEFENDANT FROM FILING A RESPONSIVE PLEADING AS REQUIRED BY LAW.**

Pursuant to California Rules of Court, rules 3.720-3.730, a completed Case Management Statement (Judicial Council form # CM-110) must be filed at least **15 calendar days** prior to the Case Management Conference. The Case Management Statement may be filed jointly by all parties/attorneys of record or individually by each party/attorney of record. You must be familiar with the case and be fully prepared to participate effectively in the Case Management Conference.

At the Case Management Conference, the Court may make pretrial orders including the following, but not limited to, an order establishing a discovery schedule; an order referring the case to Alternative Dispute Resolution (ADR); an order reclassifying the case; an order setting subsequent conference and the trial date; or other orders to achieve the goals of the Trial Court Delay Reduction Act (Gov. Code, section 68600 et seq.)

Notice is hereby given that if you do not file the Case Management Statement or appear and effectively participate at the Case Management Conference, the Court may impose sanctions pursuant to LASC Local Rule 7.13, Code of Civil Procedure sections 177.5, 575.2, 583.150, 583.360 and 583.410, Government Code Section 68608 (b), and California Rules of Court 2.2 et seq.

Date: _September 2, 2010_

**KEVIN C. BRAZILE**

Judicial Officer

## CERTIFICATE OF SERVICE

I, the below named Executive Officer/Clerk of the above-entitled court, do hereby certify that I am not a party to the cause herein, and that on this date I served the Notice of Case Management Conference upon each party or counsel named above:

[ ] by depositing in the United States mail at the courthouse in Los Angeles, California, one copy of the original filed herein in a separate sealed envelope to each address as shown above with postage thereon fully prepaid.

[ ] by personally giving the party notice upon filing the complaint.

Date: _September 2, 2010_

John A. Clarke, Executive Officer/Clerk

by _____, Deputy Clerk

EXHIBIT 1  -86-

LACIV 132 (Rev. 09/07)
LASC Approved 10-03

Cal. Rules of Court, rule 3.720-3.730
LASC Local Rules, Chapter Seven



EXHIBIT 1   -87-

1  BLECHER & COLLINS, P.C.
   MAXWELL M. BLECHER (State Bar #26202)
2  MARYANN R. MARZANO (State Bar #96867)
   515 South Figueroa Street, Suite 1750
3  Los Angeles, California 90071-3334
   Telephone: (213) 622-4222
4  Facsimile: (213) 622-1656
   E-mail: mblecher@blechercollins.com
5  E-mail: mmarzano@blechercollins.com
6  GRANT & EISENHOFER, P.A.
   JAY W. EISENHOFER (*Pro Hac Vice Application* pending)
7  GEOFFREY C. JARVIS (*Pro Hac Vice Application* pending)
   HUNG G. TA (*Pro Hac Vice Application* pending)
8  DEBORAH A. ELMAN (*Pro Hac Vice Application* pending)
   485 Lexington Avenue, 29th Floor
9  New York, New York  10017
   Telephone: (646) 722-8500
10 Facsimile: (646) 722-8501

11 Attorneys for Plaintiff
   STICHTING PENSIOENFONDS ABP
12

**FILED**
SUPERIOR COURT OF CALIFORNIA
COUNTY OF LOS ANGELES

SEP 0 8 2010

John A. Clarke, Executive Officer/Clerk
By _____, Deputy
GLORIETTA ROBINSON

13              SUPERIOR COURT OF THE STATE OF CALIFORNIA

14                        COUNTY OF LOS ANGELES

15

16  STICHTING PENSIOENFONDS ABP,        | Case No. BC 444033

17              Plaintiff,

18       vs.                             NOTICE OF CASE MANAGEMENT
                                         CONFERENCE
19  COUNTRYWIDE FINANCIAL
    CORPORATION; COUNTRYWIDE HOME        DATE:   October 14, 2010
20  LOANS, INC; CWALT, INC.; CWMBS, INC.; TIME:   8:30 a.m.
    CWABS, INC.; CWHEQ, INC;            DEPT.:  20
21  COUNTRYWIDE CAPITAL MARKETS;
    COUNTRYWIDE SECURITIES
22  CORPORATION; BANK OF AMERICA
    CORP.; NB HOLDINGS CORPORATION;
23  DEUTSCHE BANK SECURITIES INC.; UBS
    SECURITIES, LLC; GREENWICH CAPITAL
24  MARKETS, INC. A.K.A. RBS GREENWICH
    CAPITAL; BARCLAYS CAPITAL INC.;
25  STANFORD L. KURLAND; DAVID A.
    SPECTOR; ERIC P. SIERACKI; N. JOSHUA
26  ADLER; RANJIT KRIPALANI; JENNIFER S.
    SANDEFUR; and DAVID A. SAMBOL,
27
               Defendants.
28

                                          1

1   TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

2   PLEASE TAKE NOTICE that the Court has set a Case Management Conference

3   for October 14, 2010 at 8:30 a.m. in Department 20 before the Honorable Kevin C.

4   Brazile. A copy of the Court's Order and Notice of the Case Management Conference is

5   attached hereto as Exhibit A. Please note that the parties must file with the Court a

6   completed Case Management Statement at least 15 calendar days before the Case

7   Management Conference, and meet and confer to discuss the case no later than 30 days

8   before the October 14, 2010 Case Management Conference.

9   Dated: September 8, 2010                    BLECHER & COLLINS, P.C.
                                                MAXWELL M. BLECHER
10                                              MARYANN R. MARZANO

11                                                      and

12
                                                GRANT & EISENHOFER P.A.
13                                              JAY W. EISENHOFER
                                                GEOFFREY C. JARVIS
14                                              HUNG G. TA
                                                DEBORAH A. ELMAN
15

16

17                                              By: _____

18                                                  MARYANN R. MARZANO
                                                    Attorneys for Plaintiff
19                                              STICHTING PENSIOENFONDS ABP

20  #43503

21

22

23

24

25

26

27

28

2

NOTICE OF CASE MANAGEMENT CONFERENCE EXHIBIT 1 -89-

ExA

EXHIBIT 1  -90-

CONFORMED COPY
OF ORIGINAL FILED
Los Angeles Superior Court

SEP 02 2009

John A. Clarke, Executive Officer/Clerk
By CARMEN GOMEZ, Deputy
P BARRERAS

NOTICE SENT TO:

Blecher, Maxwell M., Esq.
Blecher & Collins, PC
515 South Figueroa Street, Suite 1750
Los Angeles          CA   90071

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

| | |
|---|---|
| STICHTING PENSIOENFONDS ABP <br> Plaintiff(s), <br> VS. <br><br> COUNTRYWIDE FINANCIAL CORP ET <br> Defendant(s). | **CASE NUMBER** <br><br> BC444033 <br><br> **NOTICE OF CASE** <br> **MANAGEMENT CONFERENCE** |

**TO THE PLAINTIFF(S)/ATTORNEY(S) FOR PLAINTIFF(S) OF RECORD:**

You are ordered to serve this notice of hearing on all parties/attorneys of record forthwith, and meet and confer with all parties/attorneys of record about the matters to be discussed no later than 30 days before the Case Management Conference.

Your Case Management Conference has been scheduled for _October 14, 2010_ at _8:30 am_ in _Dept. 20_ at 111 North Hill Street, Los Angeles, California 90012.

**NOTICE TO DEFENDANT:**    **THE SETTING OF THE CASE MANAGEMENT CONFERENCE DOES NOT EXEMPT THE DEFENDANT FROM FILING A RESPONSIVE PLEADING AS REQUIRED BY LAW.**

Pursuant to California Rules of Court, rules 3.720-3.730, a completed Case Management Statement (Judicial Council form # CM-110) must be filed at least 15 **calendar days** prior to the Case Management Conference. The Case Management Statement may be filed jointly by all parties/attorneys of record or individually by each party/attorney of record. You must be familiar with the case and be fully prepared to participate effectively in the Case Management Conference.

At the Case Management Conference, the Court may make pretrial orders including the following, but not limited to, an order establishing a discovery schedule; an order referring the case to Alternative Dispute Resolution (ADR); an order reclassifying the case; an order setting subsequent conference and the trial date; or other orders to achieve the goals of the Trial Court Delay Reduction Act (Gov. Code, section 68600 et seq.)

Notice is hereby given that if you do not file the Case Management Statement or appear and effectively participate at the Case Management Conference, the Court may impose sanctions pursuant to LASC Local Rule 7.13, Code of Civil Procedure sections 177.5, 575.2, 583.150, 583.360 and 583.410, Government Code Section 68608 (b), and California Rules of Court 2.2 et seq.

Date: _September 2, 2010_

KEVIN C. BRAZILE
Judicial Officer

## CERTIFICATE OF SERVICE

I, the below named Executive Officer/Clerk of the above-entitled court, do hereby certify that I am not a party to the cause herein, and that on this date I served the Notice of Case Management Conference upon each party or counsel named above:

[  ] by depositing in the United States mail at the courthouse in Los Angeles, California, one copy of the original filed herein in a separate sealed envelope to each address as shown above with postage thereon fully prepaid.

[  ] by personally giving the party notice upon filing the complaint.

Date: _September 2, 2010_

John A. Clarke, Executive Officer/Clerk

by _____, Deputy Clerk

LACIV 132 (Rev. 09/07)

Cal. Rules of Court, rule 3.720-3.730



EXHIBIT 1  -91-

1

2   STATE OF CALIFORNIA          )

3   COUNTY OF LOS ANGELES        )

4        I am employed in the County of Los Angeles, State of California.  I am over the
    age of 18 and not a party to the within action; my business address is 515 South Figueroa
5   Street, Suite 1750, Los Angeles, California 90071-3334.  On September 8, 2010, I served
    the within:
6
                 **NOTICE OF CASE MANAGEMENT CONFERENCE**
7
    on all interested parties in this action as follows:
8
9   **BY MAIL:**  by placing a true copy thereof in envelopes addressed to each of the persons
    named below at the addresses shown below:
10
                        **SEE ATTACHED SERVICE LIST**
11
    and by then sealing and placing said envelopes for collection at a designated location at
12  Blecher & Collins's offices at 515 South Figueroa Street, Suite 1750, Los Angeles,
    California 90071-3334 during designated hours, for mailing on the above date, following
13  ordinary business practices.

14       I am readily familiar with the firm's practice for the collection and processing of
    correspondence for mailing with the United States Postal Service; pursuant to that
15  practice, envelopes placed for collection at designated locations during designated hours
    are deposited with the United States Postal Service with first class postage thereon fully
16  prepaid on that same day in the ordinary course of business.  I am aware that on motion of
    party served, service is presumed invalid if postal cancellation date or postage meter date
17  is more than 1 day after date of deposit for mailing in affidavit.

18
    ☐ (Federal)          I declare under penalty of perjury that the foregoing is true and
19                       correct, and that I am employed in the office of a member of the bar
                         of this Court at whose direction the service was made.
20
    ☒ (State)            I declare under penalty of perjury under the laws of the State of
21                       California and the United States of America that the foregoing is true
                         and correct.
22
         Executed on September 8, 2010, at Los Angeles, California.
23

24

25                                              Jennie González

26

27

28

---

3

1
2

### SERVICE LIST
### ABP v. COUNTRYWIDE, et al.

3

| | |
|---|---|
| David Priebe, Esq.<br>DLA Piper LLP (US)<br>2000 University Avenue<br>East Palo Alto, CA 94303<br>Tel: (650) 833-2056 (Direct)<br>     (650) 833-2000 (Office)<br>Fax: (650) 833-2001<br>Cell: (408) 759-0388<br>Attorneys for Defendant ERIC P. SIERACKI | Michael C. Tu, Esq.<br>Orrick, Herrington & Sutcliffe LLP<br>777 S. Figueroa Street, Suite 3200<br>Los Angeles, CA 90017-5855<br>Tel: (213) 629-2020<br>Fax: (213) 612-2499<br>Attorneys for Defendant DAVID A.<br>SAMBOL |
| Christopher G. Caldwell, Esq.<br>Eric Pettit, Esq.<br>Caldwell Leslie & Proctor, PC<br>1000 Wilshire Boulevard, Suite 600<br>Los Angeles, CA 90017<br>Tel: (213) 629-9040<br>Fax: (213) 629-9022<br>Attorneys for Defendant STANFORD L.<br>KURLAND | Jennifer M. Sepic, Esq.<br>BINGHAM McCUTCHEN LLP<br>355 S. Grand Avenue, Suite 4400<br>Los Angeles, CA 90071-3106<br>Tel: (213) 680-6400<br>Fax: (213) 680-6499<br>Attorneys for Defendant DAVID SPECTOR |
| Joshua G. Hamilton, Esq.<br>PAUL HASTINGS<br>515 S. Flower Street, 25th Floor<br>Los Angeles, CA 90071<br>Tel: (213) 683-6000<br>Fax: (213) 627-0705<br>Attorneys for Defendants<br>RANJIT KRIPALANI and<br>JENNIFER S. SANDEFUR | Dean Kitchens, Esq.<br>GIBSON DUNN & CRUTCHER LLP<br>333 South Grand Avenue<br>Los Angeles, California 90071-3197<br>Tel: (213) 229-7416<br>Fax: (213) 229-6416<br>E-mail: Dkitchens@gibsondunn.com<br>Attorneys for Defendants DEUTSCHE<br>BANK SECURITIES, INC.; UBS<br>SECURITIES, LLC; GREENWICH<br>CAPTIAL MARKETS, INC. and<br>BARCLAYS CAPITAL INC. |

4

EXHIBIT 1   -93-

# EXHIBIT 2

# EXHIBIT 2

1    Lloyd Winawer (State Bar No. 157823)
     *lwinawer@goodwinprocter.com*
2    **GOODWIN PROCTER LLP**
     10250 Constellation Boulevard, 21st Floor
3    Los Angeles, CA 90067
     Telephone: 310-788-5177
4    Facsimile: 310-286-0992

5    Brian C. Devine (State Bar No. 222240)
     *bdevine@goodwinprocter.com*
6    **GOODWIN PROCTER LLP**
     53 State Street
7    Boston, MA 02109-2802
     Telephone: 617-570-1000
8    Facsimile: 617-523-1231

9    *Attorneys for Defendants*
     Countrywide Financial Corp.,
10   Countrywide Home Loans, Inc., CWALT, Inc.,
     CWMBS, Inc., CWABS, Inc., CWHEQ, Inc.,
11   Countrywide Capital
     Markets, Countrywide Securities Corp., and N.
12   Joshua Adler

13              **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

14                 **FOR THE COUNTY OF LOS ANGELES**

15         **CENTRAL DISTRICT, CENTRAL CIVIL WEST DIVISION**

| | |
|---|---|
| 16   STICHTING PENSIOENFONDS ABP, | Case No. BC444033 |
| 17              Plaintiff, | **NOTICE OF FILING OF NOTICE OF REMOVAL** |
|               v. | |
| 18   COUNTRYWIDE FINANCIAL | |
|      CORPORATION; COUNTRYWIDE HOME | |
| 19   LOANS, INC.; CWALT, INC.; CWMBS, INC.; | Dept:     20 |
|      CWABS, INC.; CWHEQ, INC.; COUNTRYWIDE | Judge:    Hon. Kevin C. Brazile |
| 20   CAPITAL MARKETS; COUNTRYWIDE | |
|      SECURITIES CORPORATION; BANK OF | Complaint Filed: August 18, 2010 |
| 21   AMERICA CORP.; NB HOLDINGS | |
|      CORPORATION; DEUTSCHE BANK | |
| 22   SECURITIES INC.; UBS SECURITIES, LLC; | |
|      GREENWICH CAPITAL MARKETS, INC. | |
| 23   A.K.A. RBS GREENWICH CAPITAL; | |
|      BARCLAYS CAPITAL INC.; STANFORD L. | |
| 24   KURLAND; DAVID A. SPECTOR; ERIC P. | |
|      SIERACKI; N. JOSHUA ADLER; RANJIT | |
| 25   KRIPALANI; JENNIFER S. SANDEFUR; and | |
|      DAVID A. SAMBOL, | |
| 26 | |
| 27              Defendants. | |
| 28 | |

*(left margin, vertical text)* Goodwin Procter LLP / 10250 Constellation Blvd., 21ˢᵗ Floor / Los Angeles, California 90067

1   TO PLAINTIFF STICHTING PENSIOENFONDS ABP AND ITS ATTORNEYS OF RECORD:

2       PLEASE TAKE NOTICE that on September 29, 2010, defendants Countrywide Financial

3   Corporation, Countrywide Home Loans, Inc., CWALT, Inc., CWMBS, Inc., CWABS, Inc.,

4   CWHEQ, Inc., Countrywide Capital Markets, Countrywide Securities Corporation and N. Joshua

5   Adler (collectively, the "Countrywide Defendants"),[1] pursuant to federal law, filed with the Clerk of

6   the United States District Court for the Central District of California a Notice of Removal (the

7   "Notice of Removal") pursuant to 28 U.S.C. §§ 1334(b) and 1452(a).  A true and accurate copy of

8   the Notice of Removal is attached hereto as Exhibit A to this Notice and is served and filed herewith.

9                                                     Respectfully submitted,

10

11   Dated:  September 29, 2010                By

                                                      Lloyd Winawer (State Bar No. 157823)
12                                                    *lwinawer@goodwinprocter.com*
                                                      10250Constellation Blvd. 21st Fl.
13                                                    Los Angeles, California 90067
                                                      Tel.:  310.788.5100
14                                                    Fax:  310.286.0992

15                                                    Brian C. Devine (State Bar No. 222240)
                                                      *bdevine@goodwinprocter.com*
16                                                    **GOODWIN PROCTER LLP**
                                                      53 State Street
17                                                    Boston, MA 02109-2802
                                                      Telephone:  617-570-1000
18                                                    Facsimile:  617-523-1231

19                                                    *Of Counsel:*

20                                                    Brian E. Pastuszenski
                                                      Inez Friedman-Boyce
21
                                                      *Counsel for the Countrywide Defendants*
22

23

24   _____

     [1]      The other, separately represented defendants in this matter are Bank of America Corp.; NB
25   Holdings Corp.; Deutsche Bank Securities, Inc.; UBS Securities, LLC; Greenwich Capital Markets,
     Inc. A.K.A. RBS Greenwich Capital; Barclays Capital, Inc.; Stanford L. Kurland; David A. Spector;
26   Eric P. Sieracki; Ranjit Kripalani; Jennifer S. Sandefur; and David A. Sambol.  These defendants
     have consented to the removal of this matter and have authorized Defendants to represent that they
27   are concurrently filing a Notice of Consent to Removal with the Clerk of the United States District
     Court for the Central District of California.
28

Goodwin Procter LLP
10250 Constellation Blvd., 21st Floor
Los Angeles, California 90067

1

| | |
|---|---|
| 1 | <u>**PROOF OF SERVICE**</u> |
| 2 | I am employed in the County of Los Angeles, State of California. I am over the age of 18 |
| 3 | and not a party to the within action. My business address is 10250 Constellation Blvd., Los Angeles, CA 90067. |
| 4 | On **September 29, 2010**, I served the following documents by placing a true copy thereof in |
| 5 | a sealed envelope(s) on the persons below as follows: |
| 6 | **NOTICE OF FILING OF NOTICE OF REMOVAL** |

<div style="text-align:left; writing-mode:vertical-lr;">
Goodwin Procter LLP<br>
10250 Constellation Blvd, 21st Floor<br>
Los Angeles, California 90067
</div>

| | | |
|---|---|---|
| 7 | Maxwell M. Blecher | Counsel for Plaintiff: *Stichting* |
| 8 | Maryann R. Marzano<br>**BLECHER & COLLINS, P.C.** | *Pensioenfonds ABP*<br>Tel. 213-622-4222 |
| 9 | 515 South Figueroa Stree, Suite 1750<br>Los Angeles, CA 90071 | Fax. 213-622-1656<br>mblecher@blechercollins.com<br>mmarzano@blechercollins.com |
| 10 | Jay W. Eisenhofer | |
| 11 | Geoffrey C. Jarvis<br>Hung G. Ta | Tel: 646-722-8500 |
| 12 | Deborah A. Elman<br>**GRANT & EISENHOFER, P.A.** | Fax: 646-722-8501 |
| 13 | 485 Lexington Avenue, 29th Floor<br>New York, NY 10017 | |
| 14 | Christopher G. Caldwell | *Attorneys for Defendant:* |
| 15 | Eric Pittit<br>**CALDWELL LESLIE AND PROCTOR** | **Stanford L. Kurland** |
| 16 | 1000 Wilshire Blvd Suite 600<br>Los Angeles, CA 90017 | Tel : 213-629-9040<br>Fax: 213-629-9022 |
| 17 | | caldwell@caldwell-leslie.com<br>epittit@caldwell-leslie.com |
| 18 | Jennifer M. Sepic | *Attorneys for Defendant:* |
| 19 | **BINGHAM MCCUTCHEN LLP**<br>355 South Grand Avenue Suite 4400 | **David A. Spector** |
| 20 | Los Angeles, CA 90071 | Tel: 213-680-6400<br>Fax: 213-680-6499 |
| 21 | | jennifer.sepic@bingham.com |
| 22 | Joshua G. Hamilton<br>**PAUL HASTINGS JANOFSKY AND WALKE** | *Attorneys for Defendants:*<br>**Ranjit Kripalani,** |
| 23 | **LLP**<br>515 South Flower Street 25th Fl | **Jennifer S. Sandefur,** |
| 24 | Los Angeles, CA 90071-2228 | Tel: 213-683-6000<br>Fax: 213-627-0705 |
| 25 | | joshuahamilton@paulhastings.com |
| 26 | Michael C. Tu<br>**ORRICK HERRINGTON AND SUTCLIFFE** | *Attorneys for Defendant:*<br>**David A. Sambol** |
| 27 | 777 South Figueroa Street Suite 3200<br>Los Angeles, CA 90017 | Tel: 213-629-2020 |
| 28 | | Fax: 213-612-2499<br>mtu@orrick.com |

| | |
|---|---|
| David A. Priebe<br>Jeffrey B. Coopersmith<br>**DLA PIPER LLP**<br>2000 University Avenue<br>East Palo Alto, CA 94303 | *Attorneys for Defendant:*<br>**Eric P. Sieracki**<br><br>Tel: 650-833-2000<br>Fax: 650-833-2001<br>david.priebe@dlapiper.com |
| Dean Kitchens<br>**GIBSON DUNN & CRUTCHER LLP**<br>333 South Grand Avenue<br>Los Angeles, CA 90071 | *Attorneys for Defendants:*<br>**Deutsche Bank Securities, Inc.,**<br>**UBS Securities, LLC,**<br>**Greenwich Capital Markets, Inc., and**<br>**Barclays Capital, Inc.**<br><br><br>Tel: 213-229-7416<br>Fax: 213-229-6416<br>dkitchens@gibsondunn.com |

☑       (OVERNIGHT DELIVERY) I deposited in a box or other facility regularly maintained by Federal Express , an express service carrier, or delivered to a courier or driver authorized by said express service carrier to receive documents, a true copy of the foregoing document in sealed envelopes or packages designated by the express service carrier, addressed as stated above, with fees for overnight delivery paid or provided for.

I declare under penalty of perjury that I am employed in the office of a member of the bar of this Court at whose direction this service was made and that the foregoing is true and correct.

Executed on **September 29, 2010,** at Los Angeles, California.

| | |
|---|---|
| Britani N. Selzler | |
| (Type or print name) | (Signature) |

Goodwin Procter LLP<br>10250 Constellation Blvd., 21st Floor<br>Los Angeles, California 90067

2

1

## PROOF OF SERVICE

2        I am employed in the County of Los Angeles, State of California.  I am over the age of 18 and not a party to the within action.  My business address is 10250
3   Constellation Blvd., Los Angeles, CA  90067.

4        On **September 29, 2010**, I served the following documents by placing a true copy thereof in a sealed envelope(s) on the persons below as follows:

5

**COUNTRYWIDE DEFENDANTS' NOTICE OF REMOVAL**

6

| | |
|---|---|
| Maxwell M. Blecher<br>Maryann R. Marzano<br>**BLECHER & COLLINS, P.C.**<br>515 South Figueroa Stree, Suite 1750<br>Los Angeles, CA 90071 | Counsel for Plaintiff: *Stichting*<br>*Pensioenfonds ABP*<br>Tel. 213-622-4222<br>Fax. 213-622-1656<br>mblecher@blechercollins.com<br>mmarzano@blechercollins.com |
| Jay W. Eisenhofer<br>Geoffrey C. Jarvis<br>Hung G. Ta<br>Deborah A. Elman<br>**GRANT & EISENHOFER, P.A.**<br>485 Lexington Avenue, 29th Floor<br>New York, NY 10017 | Tel: 646-722-8500<br>Fax: 646-722-8501 |
| Christopher G. Caldwell<br>Eric Pittit<br>**CALDWELL LESLIE AND PROCTOR**<br>1000 Wilshire Blvd Suite 600<br>Los Angeles, CA 90017 | *Attorneys for Defendant:*<br>**Stanford L. Kurland**<br><br>Tel : 213-629-9040<br>Fax: 213-629-9022<br>caldwell@caldwell-leslie.com<br>epittit@caldwell-leslie.com |
| Jennifer M. Sepic<br>**BINGHAM MCCUTCHEN LLP**<br>355 South Grand Avenue Suite 4400<br>Los Angeles, CA 90071 | *Attorneys for Defendant:*<br>**David A. Spector**<br><br>Tel: 213-680-6400<br>Fax: 213-680-6499<br>jennifer.sepic@bingham.com |
| Joshua G. Hamilton<br>**PAUL HASTINGS JANOFSKY AND WALKER LLP**<br>515 South Flower Street 25th Fl<br>Los Angeles, CA 90071-2228 | *Attorneys for Defendants:*<br>**Ranjit Kripalani,**<br>**Jennifer S. Sandefur,**<br><br>Tel: 213-683-6000<br>Fax: 213-627-0705<br>joshuahamilton@paulhastings.com |
| Michael C. Tu<br>**ORRICK HERRINGTON AND SUT-CLIFFE LLP**<br>777 South Figueroa Street Suite 3200<br>Los Angeles, CA 90017 | *Attorneys for Defendant:*<br>**David A. Sambol**<br><br>Tel: 213-629-2020<br>Fax: 213-612-2499<br>mtu@orrick.com |

7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

| | |
|---|---|
| David A. Priebe<br>Jeffrey B. Coopersmith<br>**DLA PIPER LLP**<br>2000 University Avenue<br>East Palo Alto, CA 94303 | *Attorneys for Defendant:*<br>**Eric P. Sieracki**<br><br>Tel: 650-833-2000<br>Fax: 650-833-2001<br>david.priebe@dlapiper.com |
| Dean Kitchens<br>**GIBSON DUNN & CRUTCHER LLP**<br>333 South Grand Avenue<br>Los Angeles, CA 90071 | *Attorneys for Defendants:*<br>**Deutsche Bank Securities, Inc.,<br>UBS Securities, LLC,<br>Greenwich Capital Markets, Inc., and<br>Barclays Capital, Inc.**<br><br><br>Tel: 213-229-7416<br>Fax: 213-229-6416<br>dkitchens@gibsondunn.com |

☑  (OVERNIGHT DELIVERY) I deposited in a box or other facility regularly maintained by Federal Express , an express service carrier, or delivered to a courier or driver authorized by said express service carrier to receive documents, a true copy of the foregoing document in sealed envelopes or packages designated by the express service carrier, addressed as stated above, with fees for overnight delivery paid or provided for.

I declare under penalty of perjury that I am employed in the office of a member of the bar of this Court at whose direction this service was made and that the foregoing is true and correct.

Executed on **September 29, 2010,** at Los Angeles, California.

_____          _____
Britani N. Selzler
(Type or print name)                              (Signature)

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge George King and the assigned discovery Magistrate Judge is Fernando M. Olguin.

The case number on all documents filed with the Court should read as follows:

## CV10- 7275 GHK (FMOx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

================================================================

### NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

[X] **Western Division**
312 N. Spring St., Rm. G-8
Los Angeles, CA 90012

[ ] **Southern Division**
411 West Fourth St., Rm. 1-053
Santa Ana, CA 92701-4516

[ ] **Eastern Division**
3470 Twelfth St., Rm. 134
Riverside, CA 92501

Failure to file at the proper location will result in your documents being returned to you.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**CONFORM COPY**

**I (a) PLAINTIFFS** (Check box if you are representing yourself ☐)

Stichting Pensioenfonds ABP,

**DEFENDANTS:** Countrywide Financial Corporation; Countrywide Home Loans, Inc.; CWALT, Inc.; CWMBS, Inc.; CWABS, Inc., CWHEQ, Inc.; Countrywide Capital Markets; Countrywide Securities Corporation; Bank of America Corp.; NB Holdings Corporation; Deutsche Bank Securities Inc.; UBS Securities, LLC; Greenwich Capital Markets, Inc. A.K.A. RBS Greenwich Capital; Barclays Capital Inc.; Stanford L. Kurland; David A. Spector; Eric P. Sieracki; N. Joshua Adler; Ranjit Kripalani; Jennifer S. Sandefur and David A. Sambol;

**(b)** Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)

Maxwell M. Blecher (SBN: 26202)  mblecher@blechercollins.com

**BLECHER & COLLINS, P.C.**

515 South Figueroa Street, Suite 1750, Los Angeles, CA 90071

Tel: 213-622-4222  /  Fax: 213-622-1656

Attorneys (If Known)  Lloyd Winawer (SBN: 157823)

lwinawer@goodwinprocter.com

**GOODWIN PROCTER LLP**

10250 Constellation Boulevard, 21st Floor

Los Angeles, CA 90067

Tel:  310-788-5100  /Fax:  310-286-0992

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff

☐ 2 U.S. Government Defendant

☐ 3 Federal Question (U.S. Government Not a Party)

☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

'Other – See Attached

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only (Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place Business in this State | ☐ 4 | ☐ 4 of |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place Business in Another State | ☐ 5 | ☐ 5 of |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☐ 1 Original Proceeding  ☒ 2 Removed from State Court  ☐ 3 Remanded from Appellate Court  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from another district (specify):  ☐ 6 Multi-District Litigation  ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☒ Yes  ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☐ Yes ☒ No     ☒ **MONEY DEMANDED IN COMPLAINT: $**

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 530 General | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 535 Death Penalty | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | | ☐ 385 Property Damage Product Liability | ☐ 540 Mandamus/ Other | ☐ 740 Railway Labor Act |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Fed. Employers' Liability | **BANKRUPTCY** | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | | ☐ 340 Marine | ☐ 22 Appeal 28 USC 158 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 480 Consumer Credit | ☐ 151 Medicare Act | ☐ 345 Marine Product Liability | ☐ 423 Withdrawal 28 USC 157 | **FORFEITURE / PENALTY** | **PROPERTY RIGHTS** |
| ☐ 490 Cable/Sat TV | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 350 Motor Vehicle | **CIVIL RIGHTS** | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 810 Selective Service | | ☐ 355 Motor Vehicle Product Liability | ☐ 441 Voting | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☒ 850 Securities/Commodities/ Exchange | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 360 Other Personal Injury | ☐ 442 Employment | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 160 Stockholders' Suits | ☐ 362 Personal Injury- Med Malpractice | ☐ 443 Housing/Acco- mmodations | | **SOCIAL SECURITY** |
| ☐ 890 Other Statutory Actions | ☐ 190 Other Contract | ☐ 365 Personal Injury- Product Liability | ☐ 444 Welfare | ☐ 630 Liquor Laws | ☐ 61 HIA (1395ff) |
| ☐ 891 Agricultural Act | ☐ 195 Contract Product Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 445 American with Disabilities – Employment | ☐ 640 R.R.& Truck | ☐ 862 Black Lung (923) |
| ☐ 892 Economic Stabilization Act | ☐ 196 Franchise | | | ☐ 650 Airline Regs | ☐ 863 DIWC/DIWW 405(g) |
| ☐ 893 Environmental Matters | **REAL PROPERTY** | **IMMIGRATION** | ☐ 446 American with Disabilities – Other | ☐ 660 Occupational Safety /Health | ☐ 864 SSID Title XVI |
| ☐ 894 Energy Allocation Act | ☐ 210 Land Condemnation | ☐ 462 Naturalization Application | ☐ 440 Other Civil Rights | ☐ 690 Other | ☐ 865 RSI (405(g)) |
| ☐ 895 Freedom of Info. Act | ☐ 220 Foreclosure | ☐ 463 Habeas Corpus- Alien Detainee | | | **FEDERAL TAX SUITS** |
| ☐ 900 Appeal of Fee Determi- nation Under Equal Access to Justice | ☐ 230 Rent Lease & Ejectment | ☐ 465 Other Immigration Actions | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 240 Torts to Land | | | | ☐ 871 IRS-Third Party 26 USC 7609 |
| | ☐ 245 Tort Product Liability | | | | |
| | ☐ 290 All Other Real Property | | | | |

**CV10 7275**

**FOR OFFICE USE ONLY:**   Case Number:

CV-71 (05/08)                              **CIVIL COVER SHEET**                              Page 1 of 2

American LegalNet, Inc.
www.FormsWorkflow.com

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☒ No ☐ Yes

If yes, list case number(s):

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☐ No ☒ Yes

If yes, list case number(s): 2:10-CV-00302-MRP (MAN) (Pfaelzer, J.)

Civil cases are deemed related if a previously filed case and the present case:

(Check all boxes that apply) ☒ A. Arise from the same or closely related transactions, happenings, or events; or

☒ B. Call for determination of the same or substantially related or similar questions of law and fact; or

☒ C. For other reasons would entail substantial duplication of labor if heard by different judges; or

☐ D. Involve the same patent, trademark or copyright, _and_ one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named plaintiff resides.
☐ Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
| --- | --- |
| | The Netherlands |

(b) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named defendant resides.
☐ Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
| --- | --- |
| Los Angeles County; Ventura County | Connecticut; Delaware; New York; North Carolina |

(c) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** claim arose.
   **Note: In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
| --- | --- |
| | Multiple Counties |

**\* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties**
Note: In land condemnation cases, use the location of the tract of land involved

X. SIGNATURE OF ATTORNEY (OR PRO PER): [signature]    Date September 29, 2010

Lloyd Winawer (State Bar No. 157823)

**Notice to Counsel/Parties:** The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3 -1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
| --- | --- | --- |
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |

American LegalNet, Inc.
www.FormsWorkflow.com

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## Attachment A

### (Explanation of Section II)

As set out in the accompanying removal papers, this case is removed on the basis of bankruptcy jurisdiction pursuant to 28 U.S.C. §§ 1334(b), 1441, 1446 and 1452.