1 | Lloyd Winawer (SBN 157823)
  | *lwinawer@goodwinprocter.com*
2 | GOODWIN PROCTER LLP
  | 10250 Constellation Boulevard, 21st Flr.
3 | Los Angeles, CA 90067-6221
  | Telephone: 310-788-5100
4 | Facsimile: 310-286-0992

5 | *Attorneys for Defendants*
  | Countrywide Financial Corporation,
6 | Countrywide Home Loans, Inc.,
  | CWALT, Inc., CWMBS, Inc., CWABS,
7 | Inc., CWHEQ, Inc., Countrywide Capital
  | Markets, Countrywide Securities Corp.,
8 | and N. Joshua Adler

9 | **UNITED STATES DISTRICT COURT**

10 | **CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| STICHTING PENSIOENFONDS ABP, | Case No. CV 10-07275-MRP (MANx) |
| Plaintiff, | **COUNTRYWIDE DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S MOTION TO REMAND THIS ACTION TO CALIFORNIA STATE COURT** |
| v. | |
| COUNTRYWIDE FINANCIAL CORPORATION; COUNTRYWIDE HOME LOANS, INC.; CWALT, INC.; CWMBS, INC.; CWABS, INC.; CWHEQ, INC.; COUNTRYWIDE CAPITAL MARKETS; COUNTRYWIDE SECURITIES CORPORATION; BANK OF AMERICA CORP.; NB HOLDINGS CORPORATION; DEUTSCHE BANK SECURITIES INC.; UBS SECURITIES, LLC; GREENWICH CAPITAL MARKETS, INC. A.K.A. RBS GREENWICH CAPITAL; BARCLAYS CAPITAL INC.; STANFORD L. KURLAND; DAVID A. SPECTOR; ERIC P. SIERACKI; N. JOSHUA ADLER; RANJIT KRIPALANI; JENNIFER S. SANDEFUR; and DAVID A. SAMBOL, | Date: December 20, 2010 Time: 11:00 a.m. Courtroom: 12 Judge: Hon. Mariana R. Pfaelzer |
| Defendants. | |

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................. 1

ARGUMENT ......................................................................................... 3

I.  REMOVAL WAS PROPER UNDER "RELATED TO" BANKRUPTCY

    JURISDICTION….. ..................................................................... 3

    A.  CHL's Contractual Right To Indemnification "Could

        Conceivably" Affect American Home's Bankruptcy Estate ................... 4

    B.  American Home's Liquidation Plan Does Not Preclude Jurisdiction .... 9

II. DEFENDANTS WERE NOT REQUIRED TO REMOVE TO THE SAME

    DISTRICT WHERE THE BANKRUPTCY IS PENDING ........................... 14

III. THE EQUITABLE CONSIDERATIONS WEIGH AGAINST REMAND .. 17

CONCLUSION ................................................................................... 23

COUNTRYWIDE DEFENDANTS' OPPOSITION
TO PLAINTIFF'S MOTION TO REMAND                    Case No. CV 10-07275-MRP (MANx)

# **TABLE OF AUTHORITIES**

**Page(s)**

## CASES

*Air Cargo, Inc. Litig. Trust v. i2 Tech., Inc. & Mercer Mgmt. Consulting, Inc.(In re Air Cargo, Inc.)*,
   401 B.R. 178 (Bankr. D. Md. 2008) ...................................................11

*Appatek Indus., Inc. v. Biolab, Inc.*,
   2010 WL 731366 (M.D.N.C. Feb. 25, 2010) ...........................................18, 19

*Belcufine v. Aloe*,
   112 F.3d 633 (3d Cir. 1997)...................................................................8

*Brown v. Affiliated Computer Servs., Inc.*,
   2008 WL 2856854 (W.D. Wash. July 21, 2008) ...........................................21

*Celotex Corp. v. Edwards*,
   514 U.S. 300 (1995)...........................................................................15

*Citigroup, Inc. v. Pac. Inv. Mgmt. Co., LLC*,
   296 B.R. 505 (C.D. Cal. 2003) ...........................................................7, 21

*City of Ann Arbor Emp. Ret. Sys. v. Citigroup Mortg. Loan Trust, Inc.*,
   572 F. Supp. 2d 314 (E.D.N.Y. 2008) .................................................7, 9, 16

*Cook v. Cook*,
   220 B.R. 918 (Bankr. E.D. Mich. 1997) ...............................................16, 17

*Cross Media Mktg. Corp. v. Cab Mktg., Inc. (In re Cross Media Mktg.)*,
   367 B.R. 435 (Bankr. S.D.N.Y. 2007)...................................................11

*Fed. Home Loan Bank of Seattle v. Deutsche Bank Secs., Inc.*,
   2010 WL 3512503 (W.D. Wash. Sept. 1, 2010).....................................7, 11, 16

*Harker v. Wells Fargo Bank, N.A.* (*In re Krause*),
   414 B.R. 243 (Bankr. S.D. Ohio 2009)...............................................15, 16, 17

*Hendricks v. Detroit Diesel Corp.*,
   2009 WL 4282812 (N.D. Cal. Nov. 25, 2009) ...........................................7, 21

*In re Boston Reg'l Med. Ctr., Inc.*,
   410 F.3d 100 (1st Cir. 2005).............................................................2, 10, 11

*In re Federal-Mogul Global, Inc.*,
   300 F.3d 368 (3d Cir. 2002)................................................................8

*In re Fietz*,
   852 F.2d 455 (9th Cir. 1988) .......................................................... *passim*

*In re Pegasus Gold Corp.*,
   394 F.3d 1189 (9th Cir. 2005) ...........................................................9, 10, 12

ii

*In re Resorts Int'l, Inc.*,
   372 F.3d 154 (3d Cir. 2004)..........................................................................9, 10

*In re Wrenn Assoc., Inc.*,
   2004 WL 1746117 (Bankr. D.N.H. July 26, 2004) ......................................18

*Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*,
   2008 WL 4449508 (N.D. Tex. Sept. 30, 2008) ...................................13, 16, 22

*Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*,
   594 F.3d 383 (5th Cir. 2010) ...............................................................7, 8, 9

*Maine State Ret. Sys. v. Countrywide Fin. Corp.*,
   No. 10-CV-00302-MRP (MANx) (C.D. Cal. Jan. 14, 2010) .................. *passim*

*Mass. Bricklayers & Masons Trust Funds v. Deutsche Alt-A Secs., Inc.*,
   399 B.R. 119 (E.D.N.Y. 2009) ............................................................7, 9, 16

*Maya, LLC v. Cytodyn of N.M., Inc. (In re Cytodyn of N.M., Inc.)*,
   374 B.R. 733 (Bankr. C.D. Cal. 2007).........................................................21

*McCarthy v. Prince*,
   230 B.R. 414, 418 (BAP 9th Cir. 1999) .......................................................21

*Noletto v. Nationsbanc Mortg. Corp.*,
   244 B.R. 845 (Bankr. S.D. Ala. 2000).................................................15, 16, 17

*Pac. Life Ins. Co. v. J.P. Morgan Chase & Co.*,
   2003 WL 22025158 (C.D. Cal. June 30, 2003) ...........................................7, 17

*Pacor, Inc. v. Higgins*,
   743 F.2d 984 (3d Cir. 1984)..................................................................... *passim*

*Parke v. Cardsystems Solutions, Inc.*,
   2006 WL 2917604 (N.D. Cal. Oct. 11, 2006) .......................................4, 18, 21

*SenoRx v. Coudert Bros., LLP*,
   2007 WL 1520966 (N.D. Cal. May 24, 2007)............................................ *passim*

*Sizzler USA Rest., Inc. v. Belair & Evans LLP (In re Sizzler Rests. Int'l Inc.)*,
   262 B.R. 811 (Bankr. C.D. Cal. 2000).............................................................8

*Williams v. Shell Oil Co.*,
   169 B.R. 684 (Bankr. S.D. Cal. 1994) .....................................................17, 21

**STATUTES**

28 U.S.C. § 1334...........................................................................................3, 4

28 U.S.C. § 1334(b) .........................................................................3, 14, 15, 16

28 U.S.C. § 1334(e) ...................................................................................16, 17

28 U.S.C. § 1334(e)(1) .............................................................................. *passim*

iii

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

28 U.S.C. § 1446(a) ..................................................................................14

28 U.S.C. § 1452 .................................................................................3, 4, 17

28 U.S.C. § 1452(a) ...........................................................................14, 16

28 U.S.C. § 1452(b) ..................................................................................17

iv

# PRELIMINARY STATEMENT

This Court has jurisdiction over this case, which was properly removed from California state court, because it affects the administration of a bankruptcy proceeding pending in a United States bankruptcy court.  More specifically, on August 18, 2010, Plaintiff Stichting Pensioenfonds ABP ("Plaintiff") filed a complaint in Los Angeles Superior Court alleging violations of the federal securities laws and California law arising out of its purchase of mortgage-backed securities ("MBS") issued in 14 public offerings by subsidiaries of Countrywide Financial Corporation.  Eleven of those MBS offerings are also included in the complaint filed in *Maine State Ret. Sys. v. Countrywide Fin. Corp.*, No. 10-CV-00302-MRP (MANx) (C.D. Cal. Jan. 14, 2010), a putative MBS class action also pending before this Court.  The mortgage loans underlying the securities in this action (the "Action") include loans that defendant Countrywide Home Loans, Inc. ("CHL") purchased from American Home Mortgage Corporation ("American Home").  American Home has filed for bankruptcy.  The filing of this Action automatically triggered a contractual right to indemnification from American Home.  In the Ninth Circuit, a district court has jurisdiction over a case if it is "related to" a bankruptcy in the sense that its outcome could "conceivably have any effect" on the bankruptcy estate.  *In re Fietz*, 852 F.2d 455, 457 (9th Cir. 1988).  Because CHL's contractual right to indemnification against defense costs and potential liability in this Action will affect CHL's *pro rata* share of the assets available for distribution in American Home's bankruptcy (and reduce the assets available for distribution to other creditors), this Action affects the administration of the American Home bankruptcy. This Court thus has "related to" bankruptcy jurisdiction over this matter.[1]

Plaintiff's motion to remand is ill-considered and fails for three principal

---

[1] "Countrywide Defendants" refers to Defendants Countrywide Financial Corporation, Countrywide Homes Loans, Inc., CWALT, Inc., CWMBS, Inc., CWABS, Inc., CWHEQ, Inc., Countrywide Capital Markets, Countrywide Securities Corporation and N. Joshua Adler.

reasons:

First, Plaintiff's argument that the Ninth Circuit's "conceivable effect" standard does not apply here, and that a supposed "close nexus" text applies instead, is plainly wrong. Plaintiff argues that the bankruptcy court's confirmation of American Home's Plan of Liquidation ("Plan of Liquidation" or "Plan") means that "related to" bankruptcy jurisdiction exists only if this Action has a "close nexus" to the implementation, execution, or consummation of the Plan. The "close nexus" test, however, is limited to situations where a debtor seeks to *reorganize* its business and continue operating after bankruptcy, and where its plan of *reorganization* has been confirmed. After a reorganization plan has been confirmed and the debtor continues its business outside the bankruptcy process, fewer proceedings implicating the debtor will be "related to" the bankruptcy filing, and a narrower scope of federal court jurisdiction may then be appropriate. Here, however, American Home is liquidating, not reorganizing. As such, the debtor exists for the sole purpose of converting its assets to cash for distribution to creditors, and *all proceedings* that affect the process of distributing those assets to creditors are thus "related to" the administration of the debtor's bankruptcy. In other words, because American Home's bankruptcy is governed by a plan of liquidation, the broader "conceivable effect" test remains applicable. *See In re Boston Reg'l Med. Ctr., Inc.*, 410 F.3d 100, 106 (1st Cir. 2005). In any event, because CHL's indemnification claim will affect the assets available for distribution to other creditors, it would have a "close nexus" to the execution and implementation of American Home's Plan of Liquidation even if the "close nexus" standard applied, which it does not.

Second, citing 28 U.S.C. 1334(e)(1), Plaintiff incorrectly argues that the only federal court that could have "related to" bankruptcy jurisdiction is the District of Delaware, where the American Home bankruptcy is pending. That section vests in the bankruptcy court exclusive jurisdiction over all "property . . . of the debtor." Plaintiff's constricted interpretation of Section 1334(e)(1), however, has been

rejected by all but one court to have considered the issue.  To the contrary, courts have strictly limited Section 1334(e)(1) to cases involving ownership of or rights to a specific item of property of a debtor.  This is not such a case.  Plaintiff also ignores 28 U.S.C. § 1334(b), which provides that *each* of the district courts has jurisdiction over all civil proceedings "related to" bankruptcy cases.

Third, Plaintiff has not identified any basis for equitably remanding this action.  All of the equitable factors considered by courts in the Ninth Circuit favor retaining jurisdiction here:  given the magnitude of CHL's indemnification rights against American Home, this Action could have substantial effects on the bankruptcy estate; issues of federal law, not state law, predominate; this Court is well-equipped to adjudicate any state law issues that may arise; removal does not offend principles of comity; Plaintiff's right to a jury trial is fully protected and available in this Court; and Plaintiff has suffered no prejudice from removal, especially in light of this Court's deep experience with matters relating to Countrywide generally and to Countrywide-related MBS specifically (including the *Maine State Ret. Sys. v. Countrywide Fin. Corp.* putative class action).

In short, this Court has "related to" bankruptcy jurisdiction.  Accordingly, Plaintiff's motion to remand should be denied.

## ARGUMENT

## I.   REMOVAL WAS PROPER UNDER "RELATED TO" BANKRUPTCY JURISDICTION.

As Plaintiff itself acknowledges (Mot. at 11), 28 U.S.C. § 1452 permits the "[r]emoval of claims related to bankruptcy cases."  More specifically, "[a] party may remove any claim or cause of action in a civil action . . . to the district court for the district where such civil action is pending, if such district court has jurisdiction of such claim or cause of action under section 1334."  *Id.*  In turn, 28 U.S.C. § 1334 provides that federal "district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11 [the U.S. Bankruptcy

1    Code], or arising in or *related to* cases under title 11" (emphasis added).  The

2    present Action is "related to" American Home's bankruptcy because it triggered

3    American Home's contractual indemnification obligations to CHL, and those

4    obligations will affect the administration of American Home's bankruptcy estate.

5    **A.    CHL's Contractual Right To Indemnification "Could**
     **Conceivably" Affect American Home's Bankruptcy Estate.**

6

7         The Ninth Circuit has adopted an expansive definition of "related to"

8    bankruptcy jurisdiction under Sections 1334 and 1452.  In *In re Fietz*, 852 F.2d 455,

9    457 (9th Cir. 1988), the Court of Appeals held that "the test for determining whether

10   a civil proceeding is related to bankruptcy is whether *the outcome of the proceeding*

11   *could conceivably have any effect on the estate being administered in bankruptcy*."

12   *Id.* (citing *Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir. 1984)) (emphasis in

13   original).  Such "proceeding need not necessarily be against the debtor or against

14   the debtor's property." *Id.*  Rather, "[a]n action is related to bankruptcy if the

15   outcome could alter the debtor's rights, liabilities, options, or freedom of action

16   (either positively or negatively) and which in any way impacts upon the handling

17   and administration of the bankruptcy estate." *Id.*; *accord Pacor*, 743 F.2d at 994

18   (noting that bankruptcy jurisdiction is "broad," "pervasive").  As the district court

19   explained in *Parke v. Cardsystems Solutions, Inc.*, 2006 WL 2917604, at *3 (N.D.

20   Cal. Oct. 11, 2006), "[u]nder *Fietz*, even a remote relationship [with the bankruptcy

21   proceeding] confers 'related to' jurisdiction under Section 1452."  Here, the

22   indemnification obligations arising out of this proceeding will increase American

23   Home's "liabilities" and thus will "impact upon" the administration of its estate.

24        More specifically, the relationship between this Action and the American

25   Home bankruptcy is clear, direct, and significant.  Plaintiff's primary allegation in

26   this Action is that Defendants misstated the quality of the mortgage loans

27   underlying 14 offerings of MBS. *See, e.g.*, Compl. ¶¶ 107-149.  One of these MBS

28   offerings, issued by CHL Mortgage Pass-Through Trust 2006-HYB1 (the "2006-

1   HYB1 Trust"), was backed in part by loans originated by American Home and

2   purchased by CHL.  *See* Ex. 1 (2006-HYB1 Trust Prospectus Supplement) at S-26.[2]

3   The loans represented more than half of the original principal balance of the loans in

4   the 2006-HYB1 Trust (approximately $700 million out of $1.18 billion).  *See id.*

5   CHL purchased those loans from American Home pursuant to a Mortgage Loan

6   Purchase and Interim Servicing Agreement dated November 26, 2003 (the

7   "Purchase Agreement").  *See* Ex. 3.  In Article III of that Purchase Agreement,

8   American Home made numerous representations and warranties to CHL regarding

9   the quality of the loans underlying the 2006-HYB1 Trust.  *See id.* at 9-18.[3]  In

10  addition, in Section 3.4 of the Purchase Agreement, American Home explicitly

11  agreed to indemnify CHL for any and all losses, judgments, costs, or defense

12  expenses incurred as a result of any proceeding—like this Action—alleging that the

13  credit characteristics of the loans that American Home sold to CHL (and that now

14  back the MBS that Plaintiff bought) were not accurately represented.  *Id.* at 19.

15  Section 3.4 of the Purchase Agreement provides that:

16      In addition to the repurchase obligations set forth in Section 3.3, the Seller

17      shall defend and indemnify the Purchaser and hold it harmless against any

18      losses, damages, penalties, fines, forfeitures, judgments and any related costs

19      including, without limitation, reasonable and necessary legal fees, resulting

---

[2] All exhibit references are to the Declaration of Brian C. Devine, which is filed concurrently herewith.

[3] For example, American Home represented and warranted to CHL, among other things, that: (1) "each Mortgage Loan . . . was underwritten in accordance with the [stated] credit underwriting guidelines" and "the proper, prudent and customary practices in the mortgage origination and servicing business"; (2) "[t]here are no circumstances or conditions with respect to the Mortgage . . . that can reasonably be expected to cause private institutional investors to regard the Mortgage Loan as an unacceptable investment, cause the Mortgage Loan to become delinquent, or adversely affect the value or marketability of the Mortgage Loan"; (3) the loan files contain information that "is complete, true and correct"; (4) all laws "have been complied with in all material respects"; (5) "[t]here is no default" in any loan sold; (6) each appraisal "represents the fair market value of the Mortgaged Property"; and (7) "[n]o error, omission, misrepresentation, negligence, [or] fraud . . . has taken place on the part of the Seller or any other person, including . . . the Mortgagor . . . or any other party involved in the origination of the Mortgage Loan."  *Id.*

1    from any claim, demand, defense or liability based upon or arising out of any

2    act or omission on the part of the Seller in receiving, processing, funding or

3    servicing any Mortgage Loan, or from any assertion based on, grounded upon

4    or resulting from a breach or alleged breach of any of the Seller's

5    representations and warranties contained in this Article III.

6  *Id.* at 19.  As such, the filing of this Action automatically triggered these

7  indemnification rights.

8        Given this contractual indemnification obligation, it cannot reasonably be

9  disputed that the outcome of this Action "could conceivably have any effect" on the

10  administration of American Home's bankruptcy estate.  *Fietz*, 852 F.2d at 457;

11  *Pacor*, 743 F.2d at 994.  This Action and CHL's resulting indemnification claim

12  will directly impact the assets available for distribution to American Home's

13  creditors:  CHL's indemnification claim will increase CHL's *pro rata* share of the

14  assets available for distribution, which will in turn reduce the assets available for

15  distribution to other similarly situated creditors.  And, that claim for indemnification

16  will increase as the Countrywide Defendants incur further costs in connection with

17  their forthcoming motion to dismiss.  If the case proceeds to discovery, summary

18  judgment, and trial, CHL's indemnification claim will grow substantially.  And, if

19  this matter is resolved in a way that requires a payment to Plaintiff, CHL's

20  indemnification claim would further increase by the amount attributable to the loans

21  originated by American Home.  Thus, this Action will "alter the debtor's rights,

22  liabilities, options, or freedom of action (either positively or negatively)," and is

23  "related to" American Home's bankruptcy under the *Fietz/Pacor* test.  *Fietz*, 852

24  F.2d at 457; *Pacor*, 743 F.2d at 994.

25        Courts have repeatedly upheld "related to" bankruptcy jurisdiction based on

26  written indemnification agreements between a defendant and a debtor just like the

27  one in this case.  In fact, American Home's indemnification obligations to other

28  issuers of MBS have been held to confer "related to" bankruptcy jurisdiction over

1   other *MBS cases originally filed in state court.*  For instance, in *City of Ann Arbor*

2   *Emp. Ret. Sys. v. Citigroup Mortg. Loan Trust, Inc.*, 572 F. Supp. 2d 314, 317-19

3   (E.D.N.Y. 2008), a securities action involving MBS backed by loans originated by

4   American Home, the court held that "this matter is related to the AHM bankruptcy

5   proceedings and removal was proper." *Id.* at 319.  Applying the "conceivable

6   effect" test, the court explained that "where the defendant in the allegedly related

7   action has a contractual claim for indemnification against the debtor," "[a]n impact

8   on the debtor estate sufficient to invoke federal jurisdiction has been found." *Id.* at

9   317.  Likewise, in *Mass. Bricklayers & Masons Trust Funds v. Deutsche Alt-A*

10  *Secs., Inc.*, 399 B.R. 119, 123 (E.D.N.Y. 2009), the court held that "this case is

11  sufficiently related to the AHM Bankruptcy so as to support federal jurisdiction and

12  denial of the motion to remand."  Noting "the broad scope of 'related to' bankruptcy

13  jurisdiction" under the "conceivable effect" test, the court concluded that "removal

14  is supported by AHM's agreement to indemnify Defendants." *Id.*[4]

15      Many other courts also have confirmed that "contractual indemnification

16  rights may give rise to 'related to' jurisdiction." *Lone Star Fund V (U.S.), L.P. v.*

17  *Barclays Bank PLC*, 594 F.3d 383, 386-87 (5th Cir. 2010).[5]  This is because a

18  ────────────────────────────

19  [4] *Accord Fed. Home Loan Bank of Seattle v. Deutsche Bank Secs., Inc.*, 2010 WL 3512503, at *5-6 (W.D. Wash. Sept. 1, 2010) (given "Defendants' indemnification agreement with AHM," "this Court agrees . . . that 'related to' federal bankruptcy

20  jurisdiction exists over this action").  *FHLB Seattle* was ultimately remanded on equitable grounds because the case was brought solely under Washington state law,

21  "implicate[d] only state law," and was "substantially similar" to ten other purely state law actions filed by the same plaintiff that had been remanded to state court.

22  *Id.*  Here, this Action principally asserts federal law claims and 11 of the 14 MBS deals in this Action are the same as those included in the *Maine State* MBS class

23  action case already pending before this Court.  *See also infra*, at 17-22 (absence of basis for equitable remand).

24  [5] *Accord Hendricks v. Detroit Diesel Corp.*, 2009 WL 4282812, at *4-5 (N.D. Cal.

25  Nov. 25, 2009) ("[s]ince *Pacor*, several courts have held that a case is 'related to' a bankruptcy action where . . . there is an indemnification agreement between the

26  defendant in the case and the bankruptcy debtor"); *Citigroup, Inc. v. Pac. Inv. Mgmt. Co., LLC*, 296 B.R. 505, 508 (C.D. Cal. 2003) ("courts have held that a

27  defendant's claim against a debtor for contractual indemnity gives rise to 'related to' bankruptcy jurisdiction"); *Pac. Life Ins. Co. v. J.P. Morgan Chase & Co.*, 2003 WL

28  22025158, at *1 (C.D. Cal. June 30, 2003) ("[t]his case is 'related to' the WorldCom bankruptcy" because "Defendants have written indemnification agreements with

1    "Plaintiff's success or failure to recover from the [Defendant] will either positively

2    or negatively affect the bankruptcy estate."  *SenoRx v. Coudert Bros., LLP*, 2007

3    WL 1520966, at *1-2 (N.D. Cal. May 24, 2007).

4          Plaintiff argues that CHL's indemnification claim against American Home is

5    insufficient to support removal because it is "contingent," "a mere precursor to a

6    potential third party claim," and since American Home is a non-party, "will have no

7    effect on American Home's bankruptcy case without the intervention of another

8    lawsuit."  Mot. at 14, 16 (citing *In re Federal-Mogul Global, Inc.*, 300 F.3d 368,

9    382 (3d Cir. 2002)).  This is plainly incorrect.  Unlike the defendant in *Federal-*

10   *Mogul*, CHL is not asserting a contingent, common law claim for contribution that

11   would require a second lawsuit to establish American Home's indemnification

12   obligation and CHL's right to recover.  300 F.3d at 382.  Rather, because CHL's

13   indemnification rights are contractual, they are *automatic* and *unconditional*.  As

14   *Pacor* held, common law third-party indemnification claims have "no effect on

15   administration of the estate" until "[the] third party action is actually brought and

16   tried," because a separate lawsuit is required to establish the right to collect from the

17   debtor under a tort contribution theory.  743 F.2d at 995-96.  Not so here.  Written

18   indemnification agreements—like the agreement at issue here—"give rise to . . .

19   *automatic liability* on the part of the estate" as soon as a judgment is entered or

20   costs are incurred.  *Id.* (emphasis added); *accord Lone Star*, 594 F.3d at 387

21   (distinguishing the "tort contribution principles" at issue in *Federal-Mogul* from

22   "contractual indemnification rights" that "give rise to 'related to' jurisdiction").

23   Plaintiff ignores this distinction entirely.

24

25   WorldCom"); *Sizzler USA Rest., Inc. v. Belair & Evans LLP (In re Sizzler Rests. Int'l Inc.)*, 262 B.R. 811, 818-19 (Bankr. C.D. Cal. 2000) ("courts have routinely

26   found suits between non-debtors to be related to the bankruptcy, where the debtor is contractually obligated to indemnify the non-debtor defendant"); *Belcufine v. Aloe*,

27   112 F.3d 633, 636 (3d Cir. 1997) ("existence of this indemnification claim . . . could conceivably have an effect on the bankruptcy estate and therefore satisfied the

28   'related to' test").

1    In short, there is nothing else that CHL needs to do to enforce its contractual

2    right to indemnification.  As Plaintiff concedes, CHL timely filed a proof of claim

3    in the bankruptcy action, expressly invoking American Home's "Indemnification

4    Obligations" under the Purchase Agreement.  Ex. 2 (Proof of Claim) at 4; Mot. at 8,

5    15.  The final calculation of that claim will depend in part on the outcome of this

6    Action—it *already encompasses* the defense costs and any potential judgment that

7    CHL may incur in this case with respect to the 2006-HYB1 Trust.  *See* Ex. 2 at 5-6.

8    As soon as the complaint in this Action was filed, the indemnification provisions of

9    the Purchase Agreement triggered an "automatic creation of liability" against

10   American Home, without the need for any additional litigation.  *Pacor*, 743 F.2d at

11   995.  Thus, just as in *City of Ann Arbor*, *Mass. Bricklayers*, *Lone Star*, and many

12   other cases, "the outcome of th[is] proceeding could conceivably have any effect on

13   the estate being administered in bankruptcy," and removal was therefore proper

14   under this Court's "related to" bankruptcy jurisdiction.  *Fietz*, 852 F.2d at 457.

15       **B.    American Home's Liquidation Plan Does Not Preclude Jurisdiction.**

16   Plaintiff wrongly argues that the confirmation of American Home's Plan of

17   Liquidation constrains the scope of "related to" bankruptcy jurisdiction here.  *See*

18   Mot. at 2, 11-16.  Citing *In re Pegasus Gold Corp.*, 394 F.3d 1189 (9th Cir. 2005),

19   and *In re Resorts Int'l, Inc.*, 372 F.3d 154 (3d Cir. 2004), Plaintiff contends that the

20   *Fietz/Pacor* "conceivable effect" test does not apply and that "the inquiry is 'whether

21   there is a close nexus to the bankruptcy plan or proceeding sufficient to uphold

22   bankruptcy court jurisdiction over the matter.'"  Mot. at 12 (quoting *Pegasus Gold*,

23   394 F.3d at 1194).  This argument is meritless.

24       First, the "close nexus" test is inapplicable where a debtor is liquidating and

25   not reorganizing.  *Pegasus Gold* and *Resorts Int'l* involved *reorganization* plans

26   that had been confirmed; here, however, American Home's bankruptcy is governed

27   by a plan of *liquidation*.  Ex. 4 ("Amended Chapter 11 Plan of Liquidation," Feb.

28

1   18, 2009); *Pegasus Gold*, 394 F.3d at 1192; *Resorts Int'l*, 372 F.3d at 157.[6]   That is

2   a critical distinction.  As the Court of Appeals held in *In re Boston Reg'l Med. Ctr.,*

3   *Inc.*, 410 F.3d 100, 106 (1st Cir. 2005), there is an "important[] reason for

4   distinguishing between liquidating plans and true reorganization plans" in the post-

5   confirmation context.  *Pegasus Gold* and *Resorts Int'l*, the Court explained, are

6   based on "the premise that a reorganized debtor is emancipated by the confirmation

7   of a reorganization plan.  It emerges from bankruptcy and enters the marketplace in

8   its reincarnated form," "just like any other corporation."  *Boston Reg'l Med. Ctr.,*

9   *Inc* , 410 F.3d at 106.  Thus, "[g]iven the broad sweep of related to jurisdiction,

10   applying the general [*Fietz/Pacor*] rule without qualification after the confirmation

11   of a reorganization plan easily could result in the bankruptcy court retaining

12   jurisdiction of all cases affecting the reorganized debtor for many years thereafter,"

13   creating "the specter of endless bankruptcy jurisdiction."  *Id*.  In other words, "once

14   confirmation has occurred, fewer proceedings are actually related to the underlying

15   bankruptcy case."  *Id*.  It therefore "makes good sense" to "limit[] the scope of post-

16   confirmation jurisdiction" in the reorganization context, because "as the corporation

17   moves on, the connection attenuates."  *Id*. at 106-07.

18        "This justification," however, "is absent in the case of a liquidating plan."  *Id*.

19   at 107.  Unlike "a reorganized debtor [that] is attempting to make a go of its

20   business," a liquidating debtor's "sole purpose is to wind up its affairs, convert its

21   assets to cash, and pay creditors a pro rata dividend.  By definition, it has no

22   authority to reenter the marketplace."  *Id*. at 106-07.  Thus, because "a liquidating

23   debtor exists for the singular purpose of executing an order of the bankruptcy court,"

24   "[a]ny litigation involving such a debtor thus relates much more directly to a

25   _____

26   [6] Although the *Pegasus Gold* opinion ambiguously describes the plan at issue as a
    "liquidating/reorganizing plan," 394 F.3d at 1192, other public sources make clear
    that only certain assets were liquidated, and the debtor's three largest U.S. gold
27   mines were transferred to a reorganized company—Apollo Gold Corporation—that
    emerged from bankruptcy and continued operations in the marketplace.  *See* Ex. 5
28   (*Mining*, The Globe and Mail, Dec. 23, 1998) at B4.

1   proceeding under title 11." *Id.* at 107.  As in *Boston Reg'l Med. Ctr.*, "this case is a

2   paradigmatic example:  [CHL's] success or lack of success in [this litigation] will

3   directly impact the amount of the liquidating dividend eventually paid to [American

4   Home's] creditors.  That is a matter intimately connected with the efficacy of the

5   bankruptcy proceeding." *Id.*  There is no risk of "endless bankruptcy jurisdiction,"

6   and no "need to curtail the reach of related to jurisdiction in the post-confirmation

7   context." *Id.* at 106.

8       In short, "there is much less reason to depart from the general [*Fietz/Pacor*]

9   rule for related to jurisdiction where a claim involves a liquidating plan." *Id.*

10  Accordingly, in cases involving liquidation plans, the broad "compass of related to

11  jurisdiction persists undiminished after plan confirmation." *Id.* at 107; *accord Air

12  Cargo, Inc. Litig. Trust v. i2 Tech., Inc. & Mercer Mgmt. Consulting, Inc.(In re Air

13  Cargo, Inc.)*, 401 B.R. 178, 187-88 (Bankr. D. Md. 2008) ("a post-confirmation civil

14  proceeding is far more likely to be 'related to' the underlying bankruptcy case when

15  the debtor is being liquidated"); *Cross Media Mktg. Corp. v. Cab Mktg., Inc. (In re

16  Cross Media Mktg.)*, 367 B.R. 435, 444 (Bankr. S.D.N.Y. 2007) (concluding that

17  post-confirmation jurisdiction existed because confirmed plan "is a liquidation

18  plan").

19      Indeed, at least one other court has held that "related to" bankruptcy

20  jurisdiction existed under the *Fietz/Pacor* test after the confirmation of American

21  Home's liquidation plan based on American Home's indemnification obligations to

22  other MBS issuers. *See FHLB Seattle*, 2010 WL 3512503, at *5-6 (Sept. 1, 2010);

23  Pl.'s Mot. Ex. D (Order Confirming Plan of Liquidation, Feb. 23, 2009) at 53.[7]

---

[7] Plaintiff argues that *Fietz* "appl[ied] the close nexus test," because the plan at issue
had already been confirmed.  Mot. at 13.  Nothing could be further from the truth.
As Plaintiff appears to concede just one page earlier in its brief, *Fietz* adopted the
*Pacor* "conceivable effect" test without restriction.  In fact, the Ninth Circuit
explicitly stated that "we therefore adopt the *Pacor* definition," "the *Pacor* definition
best represents Congress's intent," and "[w]e reject any limitation on this definition;
to the extent that other circuits may limit jurisdiction where the *Pacor* decision
would not, we stand by *Pacor*." *Fietz*, 852 F.2d at 457.

Second, this Court would have jurisdiction over this Action even if the "close nexus" test of *Pegasus Gold* did apply (which it does not). As Plaintiff itself notes, the "close nexus" test is satisfied if the related litigation affects "the interpretation, implementation, consummation, execution, or administration of the confirmed plan." Mot. at 12-13 (quoting *Pegasus Gold*, 394 F.3d at 1194). Here, the *entire purpose* of the confirmed Plan of Liquidation is to allocate and distribute American Home's assets to its creditors. Thus, because the size and scope of CHL's indemnification claim will directly impact the *pro rata* share distributed to CHL under the plan, and in turn, the amount of assets available for distribution to other creditors under the plan, it directly affects the "implementation," "execution," and "administration" of the plan.

Plaintiff similarly argues that this Action will not affect the American Home bankruptcy because the Plan "provide[s] for the liquidation of Defendant CHL's claims according to a protocol set forth in the plan." Mot. at 15. More specifically, Plaintiff asserts that CHL's claim against American Home falls under Article 7 of the Plan, "Estimation and Allowance of EPD/Breach Claims," which establishes a protocol for the estimation of breach of warranty and early payment default claims. Mot. at 9; Ex. 4 (Amended Plan) at 46-49.[8]

The plain language of the Plan, however, confirms that Plaintiff is wrong. Article 7 of the Plan unequivocally states that it applies only to *breach of warranty* and *loan repurchase* claims based on early payment defaults, not to *contractual indemnification* claims. Ex. 4 at 5, 8-9, 46-47. The Plan's Disclosure Statement also confirms that the Article 7 protocol was not intended to cover indemnification claims. The Disclosure Statement explains that the purpose of the protocol is to

---

[8] Plaintiff submitted an Amended Plan of Liquidation dated November 25, 2008. That plan was superseded by the Amended Plan of Liquidation dated February 18, 2009, which was the plan confirmed by the bankruptcy court. *See* Pl.'s Mot. Ex. D; Ex. 4. For present purposes, however, there are no substantive differences in the relevant provisions of the November 25, 2008 plan and the February 18, 2009 plan.

resolve claims arising out of "put rights," *i.e.*, rights given to buyers of loans that
"permitted the buyer . . . to 'put' the loans back to the Debtors if the Debtors
breached certain seller representations and warranties . . . or if the borrower
defaulted in payment within a specified period of time . . . after sale of the loan."
Pl.'s Mot. Ex. B at 88-96.

Here, however, CHL is not seeking to force American Home to repurchase
any loans.  CHL also is not claiming that American Home breached any of its
representations or warranties.  Instead, through its indemnification claim pursuant to
the Purchase Agreement, CHL is simply seeking payment of its litigation costs and
other amounts incurred in connection with the defense of this Action.  This right to
indemnification from American Home is separate, independent, and—by the very
terms of the indemnification provision itself—"*[i]n addition to* the repurchase
obligations set forth in [the Purchase Agreement]."  Ex. 3 (Purchase Agreement) at
19 (emphasis added).  And, contrary to the claims that are subject to the Article 7
protocol, CHL's right to indemnification does not require it to prove or assert that
American Home breached any of its representations or warranties, or that any loan
experienced an early payment default.  Rather, CHL's right to indemnification is
triggered by any "claim" or "assertion" by a *third party* (here, the Plaintiff) of an act
or omission by American Home in connection with the processing, funding, or
servicing of the loans it sold or an "*alleged* breach" of a representation or warranty.
*Id.* at 19 (emphasis added).  This contractual right to indemnification is "automatic"
(*Pacor*, 743 F.2d at 995), and does not require the assertion or proof of a breach that
the claims subject to the protocol would require.  For precisely this reason, the court
in *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 2008 WL 4449508, at *3-4
(N.D. Tex. Sept. 30, 2008), held that the plaintiff in that case had "fail[ed] to
establish how all of Defendants' claims against New Century would be included in
the ['EPD/Breach Claim'] protocol," and "Defendants have pointed out how certain
claims are excluded from the protocol."

1    In sum, because the Plan entitles CHL to "receive its Pro Rata share of the

2   Net Distributable Assets of the applicable Estate," Ex. 4 (Amended Plan) at 35, the

3   outcome of this Action will affect American Home's bankruptcy estate and the

4   implementation and execution of the Plan.  Federal "related to" bankruptcy

5   jurisdiction exists, and remand should be denied.

6   **II.   DEFENDANTS WERE NOT REQUIRED TO REMOVE TO THE
        SAME DISTRICT WHERE THE BANKRUPTCY IS PENDING.**

7

8    Plaintiff incorrectly argues (Mot. at 17-20) that 28 U.S.C. § 1334(e)(1)

9   required this action to be removed to the District of Delaware (where American

10   Home's bankruptcy is pending).  This argument misconstrues Section 1334(e)(1),

11   which is limited to "*in rem*" actions, and also ignores the broad removal authority

12   provided by Section 1452(a).

13    Section 1452(a) governs removal of claims related to bankruptcy cases, and

14   provides in pertinent part:

15    A party may remove any claim or cause of action in a civil action . . .

16    *to the district court for the district where such civil action is pending,*

17    if such district court has jurisdiction of such claim or cause of action

18    under section 1334 of this title.

19   28 U.S.C. § 1452(a) (emphasis added).[9]  In turn, Section 1334(b) provides that the

20   district courts generally have jurisdiction over cases "related to" bankruptcy

21   proceedings:

22    Except as provided in subsection (e)(2), and notwithstanding any Act

23    of Congress that confers exclusive jurisdiction on a court or courts

24    other than the district courts, *the district courts* shall have original but

25    not exclusive jurisdiction of all civil proceedings arising under title

26

27   [9] In addition, 28 U.S.C. § 1446(a) requires defendants desiring to remove any civil action from a state court to file a notice of removal in the district court of the United

28   States for the district and division within which such action is pending.

1    11, or arising in or *related to cases under title 11.*

2    28 U.S.C. § 1334(b) (emphasis added).  Under Section 1334(b), "'Congress

3    intended to grant comprehensive jurisdiction to the [federal] bankruptcy courts so

4    that they might deal efficiently and expeditiously with all matters connected with the

5    bankruptcy estate.'"  *SenoRx*, 2007 WL 1520966, at *1 (quoting *Celotex Corp. v.*

6    *Edwards,* 514 U.S. 300, 308 (1995)).  Courts have held "the 'related to' language of

7    Section 1334(b) must be read to give district courts . . . jurisdiction over more than

8    simple proceedings involving the property of the debtor or the estate."  *Id.*

9    Section 1334(e)(1) provides that the district court for the district in which a

10   bankruptcy is pending has exclusive jurisdiction "of all the property, wherever

11   located, of the debtor as of the commencement of such case, and of property of the

12   estate."  28 U.S.C. § 1334(e)(1).  Contrary to Plaintiff's overbroad reading of this

13   statute, all courts but one have held that Section 1334(e)(1) is limited to proceedings

14   concerning rights in or disposition of a *specific item of property* owned by a debtor.

15   *See, e.g.*, *Harker v. Wells Fargo Bank, N.A.* (*In re Krause*), 414 B.R. 243, 254-56

16   (Bankr. S.D. Ohio 2009) (proceedings seeking to impose liability on Wells Fargo

17   entities, including enjoining them from making misrepresentations, do not concern a

18   specific item of property of debtor's estate); *Noletto v. Nationsbanc Mortg. Corp.*,

19   244 B.R. 845, 850-54 (Bankr. S.D. Ala. 2000) (proceedings seeking to impose

20   liability on various corporations for actions taken in violation of Bankruptcy Code

21   have nothing to with specific property of debtor).

22   This Action, however, has absolutely nothing to do with any specific asset or

23   other item of American Home's property.  *See Krause*, 414 B.R. at 254-56; *Noletto*,

24   244 B.R at 850-54.  Rather, this case concerns Plaintiff's allegations of disclosure

25   violations arising of its purchase of MBS issued by subsidiaries of Countrywide.

26   Plaintiff does not seek to take possession of, or adjudicate any ownership or other

27   rights in, any asset of American Home.

28   Moreover, federal district courts in districts outside the District of Delaware

1   have held that jurisdiction was proper over actions removed to those courts as

2   "related to" American Home's pending bankruptcy pursuant to Sections 1452(a) and

3   1334(b). *See Mass. Bricklayers*, 399 B.R. at 120, 123 (Eastern District of New

4   York); *City of Ann Arbor*, 572 F. Supp. 2d at 315, 318-19 (Eastern District of New

5   York); *FHLB Seattle*, 2010 WL 3512503, at *5-6 (Western District of Washington);

6   *cf. Lone Star*, 2008 WL 4449508, at *3, 5 (removal to Northern District of Texas,

7   despite New Century bankruptcy pending in Delaware). Indeed, courts have

8   specifically held that the broader reading of Section 1334(e)(1) that Plaintiff asserts

9   here would give Section 1452(a) "virtually no meaning" and ultimately "would

10   leave bankruptcy courts in gridlock." *Krause*, 414 B.R. at 255; *Noletto*, 244 B.R. at

11   854.

12        Plaintiff cites only one case that it claims supports its overly expansive

13   reading of Section 1334(e)(1), *Cook v. Cook*, 220 B.R. 918 (Bankr. E.D. Mich.

14   1997). *Cook*, however, is an outlier and wrongly decided, and its reasoning and

15   holding have been rejected as unsound by the courts in *Krause* and *Noletto*. In

16   *Cook*, the court held that Section 1334(e) precluded a debtor from invoking Section

17   1452(a) to remove a matter filed in a state court not located within the district in

18   which the debtor's bankruptcy case was pending. *Id.* at 920, 923. The *Cook* court

19   ruled this way even though it acknowledged that its holding was "hard to square"

20   with Section 1334(b), which vests jurisdiction broadly in "the district courts"

21   generally. *Cook*, 220 B.R. at 923.[10] In addition to being "hard to square" with

22   Section 1334(b), the courts in both *Noletto* and *Krause* held that the *Cook* opinion

23   was fundamentally illogical and would render the grant of district court jurisdiction

24   

25   ───────────────

25   [10] The court in *Cook* dismissed the debtor's argument that an expansive reading of
    Section 1334(e)(1) would leave the debtor without the right to remove the state
26   court proceeding in which it had been named. The bankruptcy court noted that the
    debtor could seek to *change the venue of its bankruptcy case* to the district in which
27   the state court case had been brought, permitting removal in that district then. *Cook*,
    220 B.R. at 920. Of course, here, the Countrywide Defendants have no ability to
28   transfer the venue of American Home's bankruptcy case.

1   in Section 1452 surplusage.  *Noletto*, 244 B.R. at 851-52; *Krause*, 414 B.R. at 255-

2   56.  As the *Noletto* court noted, "[i]f § 1334(e) gave exclusive jurisdiction over all

3   proceedings involving estate property to the 'home court,' then most bankruptcy

4   proceedings pending in an 'outpost' district could not be removed.  Section 1452's

5   limited applicability 'to the district court for the district where such civil action is

6   pending' would rarely have any meaning because only one district would have

7   jurisdiction, the 'home court' district."  *Id.* at 851; *accord Krause*, 414 B.R. at 255-

8   56 (concurring with *Noletto*).[11]  For the reasons articulated in *Krause* and *Noletto*,

9   and because this case does not involve an *in rem* proceeding of any sort, this Court

10   should ignore *Cook*.

**III.    THE EQUITABLE CONSIDERATIONS WEIGH AGAINST REMAND.**

12         Plaintiff next argues that the Court should remand this case on equitable

13   grounds under 28 U.S.C. § 1452(b), which "has been understood to permit remand

14   based on general fairness and reasonableness considerations."  *Pac. Life Ins. Co.*,

15   2003 WL 22025158, at *2 (denying equitable remand).  In this case, however, all

16   considerations of fairness, reasonableness, efficiency, and common sense weigh in

17   favor of this Court retaining jurisdiction and this case proceeding in federal court.

18         Courts in the Ninth Circuit consider the following non-exclusive factors in

19   determining whether to exercise their discretion to equitably remand a case:  (1) the

20   effect of the action on the administration of the bankruptcy estate; (2) the extent to

21   which issues of state law predominate; (3) the difficulty of applicable state law;

22   (4) comity; (5) the relatedness of the action to the bankruptcy case; (6) any jury trial

23   right; and (7) prejudice to plaintiffs from removal.  *SenoRx*, 2007 WL 1520966, at

24   *2 (citing *Williams v. Shell Oil Co.*, 169 B.R. 684, 692-93 (Bankr. S.D. Cal.

---

[11] Furthermore, if *Cook*'s expansive interpretation of Section 1334(e) applied, as Plaintiff suggests, then Plaintiff's own *state* court action should also be dismissed for want of jurisdiction.  *Cook*, 220 B.R. at 920, 923 & n.3 (remanding, but noting the state court also lacks jurisdiction over property of bankruptcy estate).

1   1994).[12]  All seven factors lead to the same conclusion:  equitable remand should be
2   denied.

3       First, with respect to factors one and five, the potential effect of this Action
4   on the American Home bankruptcy estate is significant.  As detailed above, the
5   duration, scope, and outcome of this case will have a direct impact on the assets
6   available for distribution to American Home's creditors.  Although Plaintiff has not
7   pled the precise dollar amount of its alleged damages or the volume of MBS issued
8   by the 2006-HYB1 Trust that it purchased, it is reasonable to assume that the
9   combination of defense costs and any potential resolution of this Action could result
10  in a substantial indemnification claim against American Home totaling many
11  millions of dollars.  Thus, because "[t]he large amount of money at stake in this
12  litigation has the potential to greatly reduce the bankruptcy estate and constitutes a
13  significant potential liability for the debtor," "the resolution of this case will have a
14  significant effect on the bankruptcy estate."  *SenoRx*, 2007 WL 1520966, at *3
15  (denying equitable remand).  That alone is sufficient reason to deny equitable
16  remand and retain the case in federal court.  *See Appatek Indus., Inc. v. Biolab, Inc.*,
17  2010 WL 731366, at *3 (M.D.N.C. Feb. 25, 2010) (denying equitable remand where
18  "a damages award or equitable remedy of the sort contemplated by the parties will
19  directly alter the estate's assets by hundreds of thousands of dollars"); *In re Wrenn
20  Assoc., Inc.*, 2004 WL 1746117, at *7, 9 (Bankr. D.N.H. July 26, 2004) (denying
21  equitable remand because the related case "will impact the accounts receivable
22

23  ───────────────
   [12] Plaintiff lists seven additional factors that it contends the Court should consider.
   *See* Mot. at 21.  Although the Court has discretion to consider other equitable
24  factors, these other factors are typically afforded less weight than the primary
   factors analyzed here.  *See, e.g., Parke*, 2006 WL 2917604, at *4 (equitable remand
25  granted because "[m]ost significantly here, plaintiffs' putative-action exclusively
   involves issues of state law").  In any event, none of the additional factors suggested
26  by Plaintiff requires equitable remand here, and most of them (*e.g.*, the presence of
   related state court proceedings, the burden on the bankruptcy court's docket, the
27  substance of an asserted "core" proceeding, the feasibility of severing the state law
   claims from "core" bankruptcy matters, the likelihood of forum shopping) are
28  clearly inapplicable.

1   owed to the Debtor . . . and ultimately the distribution of assets to all creditors of the

2   bankruptcy estate," thereby "affect[ing] the administration of the Debtor's estate").[13]

3        With respect to the second factor, it is clear that issues of *federal* law—not

4   California state law—predominate in this Action.  In effect, this is an individual opt-

5   out case from *Maine State Ret. Sys. v. Countrywide Fin. Corp.*, No. 10-CV-00302-

6   MRP (MANx) (C.D. Cal., Jan. 14, 2010), a *federal* class action pending in this

7   Court that asserts *federal* securities law claims regarding numerous MBS offerings

8   issued and sold by the Countrywide Defendants.  Here, 11 of the 14 MBS offerings

9   at issue were also at issue in the most recent amended complaint in *Maine State*.

10  *See* Ex. 6 (July 13, 2010 *Maine State* Amended Complaint).[14]  Like *Maine State*,

11  Counts 1-3 of the Complaint allege violations of Sections 11, 12, and 15 of the

12  federal Securities Act of 1933.  *See* Compl. ¶¶ 176-204; Ex. 6 ¶¶ 194-235.  Like

13  *Maine State*, Plaintiff's primary allegation is that the Countrywide Defendants made

14  false statements in MBS offering documents filed with the Securities and Exchange

15  Commission regarding the underwriting and appraisal standards used to originate

16  the mortgage loans underlying the MBS.  In fact, much of Plaintiff's Complaint here

17  parrots the substantive allegations in *Maine State*.  For example:

| *ABP Complaint* | *Maine State Amended Complaint* |
| --- | --- |
| ¶ 8:  "Countrywide had engaged in a wholesale and systematic abandonment of its underwriting guidelines, thereby granting mortgage loans to borrowers | ¶ 6:  "[T]he guidelines were systematically disregarded to include borrowers who did not meet the aforementioned criteria." |

[13] Plaintiff argues repeatedly that the 2006-HYB1 Trust is only one of the 14 MBS offerings at issue in this case, and that CHL is only one of the Defendants.  *See* Mot. at 2, 7, 23.  But that misses the point.  To determine the propriety of equitable remand, the relevant issue is the potential effect of this action *on the American Home bankruptcy estate*, not the relative prominence of the 2006-HYB1 Trust compared to other MBS offerings in this Action that were not backed by American Home loans.  *See Appatek*, 2010 WL 731366, at *3 (important factor is whether "the disposition of this case may well have an effect on the bankruptcy"); *SenoRx*, 2007 WL 1520966, at *3 (denying equitable remand where case has a "significant effect on the bankruptcy estate").

[14] As the Court is well aware, the Court recently dismissed *Maine State* in its entirety on standing and statute of limitations grounds, and ordered plaintiffs to amend their complaint within 30 days.  *See* Ex. 7 (Nov. 4, 2010 Order of Dismissal).

| | |
|---|---|
| who did not satisfy the eligibility criteria as described in the Offering Documents." | |
| ¶ 97: "For example, since at least 2005, loan officers from all of Countrywide's origination divisions were permitted to (i) hire appraisers of their own choosing, (ii) discard appraisals that did not support loan qualification, and (iii) substitute more favorable appraisals by replacing appraisers when necessary to obtain a more favorable LTV so as to qualify a loan for approval." | ¶ 133: "For example, since at least 2005, loan officers from all of Countrywide's origination divisions were permitted to (i) hire appraisers of their own choosing, (ii) discard appraisals that did not support loan qualification, and (iii) substitute more favorable appraisals by replacing appraisers when necessary to obtain a more favorable LTV so as to qualify a loan for approval." |
| ¶ 150: "Defendants failed to disclose that Countrywide in fact systematically ignored its own underwriting guidelines, as well as underwriting standards imposed by state and federal law, in issuing the mortgages pooled into the Issuing Trusts." | ¶ 163: "Defendants failed to disclose that Countrywide in fact systematically ignored underwriting standards imposed by state and federal law in issuing the mortgages pooled into the Issuing Trusts." |
| ¶ 93: "As many as 15% to 20% of the loans generated each day at the Company's Structured Loan Desks were run through the EPS and very few were ever rejected." | ¶ 130: "As many as 15% to 20% of the loans generated each day at the Company's Structured Loan Desks were run through the Exception Processing System and very few were ever rejected." |
| ¶ 150: "In contravention of Countrywide's underwriting guidelines, Countrywide employees did not require borrowers to 'generally demonstrate that the ratio of the borrower's monthly housing expenses . . . to the borrower's monthly gross income and the ratio of total monthly debt to the monthly gross income (the 'debt-to-income' ratios) are within acceptable limits.'" | ¶ 163: "Countrywide's underwriting standards did not require that a borrower 'generally demonstrate that the ratio of the borrower's monthly housing expenses . . . to the borrower's monthly gross income and the ratio of total monthly debt to the monthly gross income (the 'debt-to-income' ratios) are within acceptable limits.'" |
| ¶ 150: "Countrywide employees coached borrowers to misstate their income on loan applications to qualify for mortgage loans under Countrywide's underwriting standards." | ¶ 163: "[Countrywide] [c]oach[ed] borrowers to misstate their income on loan applications to qualify for mortgage loans under Countrywide's underwriting standards. . . ." |

*See* Compl. ¶¶ 8, 93, 97, 150; Ex. 6 ¶¶ 6, 130, 133, 163; *see also* Appendix A.

Given Plaintiff's Securities Act claims and the relationship between this case and *Maine State*, issues of federal law plainly will predominate. Indeed, Plaintiff itself concedes that state law issues are not so predominant as to require this Court to abstain from exercising its proper jurisdiction and remand the case to state court.

1   *See* Mot. at 25 (characterizing this factor as "neutral").[15]

2   With respect to the third factor, Plaintiff itself says that there are no unsettled

3   or difficult issues of state law that weigh in favor of remand.  *See id.*  Moreover,

4   federal courts generally, and this Court specifically, are well-equipped and well-

5   positioned to adjudicate the state law claims in this case in an efficient and effective

6   manner.  Indeed, claims under the same common law and statutory causes of action

7   are being asserted in another Countrywide-related case currently pending before this

8   Court, *Centaur Classic Conv. Arb. Fund L.P. v. Countrywide Fin. Corp.*, No. 10-

9   CV-05699-MRP (MANx) (filed July 30, 2010), and were extensively litigated

10  before this Court in yet another Countrywide-related case, *Argent Classic Conv.*

11  *Arb. Fund L.P. v. Countrywide Fin. Corp.*, No. 07-07097-MRP (MANx) (filed Oct.

12  30, 2007).  Given its expertise and experience, there can be little doubt that this

13  Court will be able to resolve Plaintiff's state law claims without difficulty.

14  With respect to the fourth factor, Plaintiff again concedes that comity does not

15  require remand.  *See* Mot. at 25 (characterizing comity as "neutral").  There is good

16  reason for that.  The California state court system does not have a strong interest in

17  adjudicating cases where an out-of-state—and out-of-country—Plaintiff alleges

18  violations of the *federal* securities laws based on *nationwide* MBS offerings,

19  particularly since the state law issues involved are neither novel nor complicated.

20  *See SenoRx*, 2007 WL 1520966, at *3 ("comity does not favor remand" where "case

21  involves relatively straightforward state law claims").  In fact, given the presence of

22  federal securities claims and concurrent jurisdiction over them, cases like this are

23

24  ─────────────────

[15] All of the authorities cited in Plaintiff's brief as granting equitable remand are

25  cases where the plaintiff alleged *only* state law claims.  *See Citigroup, Inc.*, 296 B.R. at 508 (C.D. Cal. 2003) (equitable remand granted where plaintiff alleged only state

26  law claims); *Maya, LLC v. Cytodyn of N.M., Inc. (In re Cytodyn of N.M., Inc.)*, 374 B.R. 733, 739 (Bankr. C.D. Cal. 2007) (same); *Brown v. Affiliated Computer Servs.,*

27  *Inc.*, 2008 WL 2856854, at *2 (W.D. Wash. July 21, 2008) (same); *Parke*, 2006 WL 2917604, at *4 (same); *McCarthy v. Prince*, 230 B.R. 414, 418 (BAP 9th Cir. 1999)

28  (same); *accord Hendricks*, 2009 WL 4282812, at *8; *Williams*, 169 B.R. at 693.

1    routinely litigated in federal court without running afoul of comity principles.  This

2    factor therefore favors retaining the case in federal court.

3          With respect to the sixth factor, the existence of a right to jury trial, Plaintiff

4    argues that this factor favors remand "[t]o the extent Defendants at a later stage

5    assert that this action should be transferred to a bankruptcy court," which would

6    render a jury trial unavailable.  Mot. at 24.  The Countrywide Defendants have not

7    sought transfer to bankruptcy court, and it is pure speculation to suggest that they

8    will do so later.  Rather, the Action should remain in this Court, where Plaintiff will

9    have the same right to a jury trial as it would in state court.  Thus, this factor also

10   favors retaining the case in federal court.

11         Finally, Plaintiff will suffer no prejudice from removal.  There is no

12   geographic prejudice or inconvenience—both this Court and the state court are

13   located in Los Angeles.  There also will be no duplication of effort or wasted

14   resources—this case is in its infancy and was removed before any motions to

15   dismiss or responsive pleadings were filed.  Nor will there be any substantive

16   unfairness to Plaintiff from proceeding in federal court.  To the contrary, given its

17   extensive experience in numerous Countrywide-related securities cases—especially

18   the similar legal and factual issues relating to MBS currently being considered by

19   this Court in *Maine State*—this Court has unique expertise that will ensure fairness

20   to all parties and greatly enhance the efficiency of this litigation (through

21   coordination of discovery, for example).  Plaintiff, moreover, points to no specific

22   prejudice from removal—it argues only that it would prefer to be in state court.  *See*

23   Mot. at 24-25.  Standing alone, of course, that is insufficient to support remand.  As

24   the district court held in *Lone Star*, 2008 WL 4449508, at *5, "[t]hat [plaintiffs] will

25   not litigate their claims in their chosen forum does not constitute legal prejudice."

26   In short, all seven equitable factors weigh against remand, and in favor of this Court

27   retaining jurisdiction.

28

COUNTRYWIDE DEFENDANTS' OPPOSITION            22
TO PLAINTIFF'S MOTION TO REMAND                              Case No. CV 10-07275-MRP (MANx)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CONCLUSION

For all of the above reasons, the Countrywide Defendants respectfully request that the Court deny Plaintiff's motion to remand in its entirety.

Dated:  November 22, 2010          **GOODWIN PROCTER LLP**


/s/ Brian E. Pastuszenski
Brian E. Pastuszenski (*pro hac vice*)
Lloyd Winawer (State Bar No. 157823)
Inez H. Friedman-Boyce (*pro hac vice*)
Brian C. Devine (State Bar No. 222240)

*Counsel for Defendants*
Countrywide Financial Corp., Countrywide
Home Loans, Inc., CWALT, Inc., CWMBS, Inc.,
CWABS, Inc., CWHEQ, Inc., Countrywide
Capital Markets, Countrywide Securities
Corp., N. Joshua Adler

## APPENDIX A

| ABP COMPLAINT | MAINE STATE AMENDED COMPLAINT |
|---|---|
| ¶ 10:  "Various state attorneys general . . . brought lawsuits and/or initiated investigations against Countrywide based on its lending, underwriting and appraisal practices for mortgage loans." | ¶ 109:  "[N]umerous attorneys general have initiated investigations into Countrywide's lending practices and also have alleged that Countrywide systematically departed from the underwriting standards it professed to use to originate residential loans." |
| ¶ 59:  "[E]ach of the Registration Statements issued by CWALT and CWMBS represented that: 'All of the mortgage loans in the trust fund will have been originated or acquired by Countrywide Home Loans in accordance with its credit, appraisal and underwriting standards.  Countrywide Home Loans' underwriting standards are applied in accordance with applicable federal and state laws and regulations.'" | ¶ 162:  "Each Registration Statement filed by CWALT and CWMBS . . . contained the following language concerning the underwriting standards by which the mortgages pooled into CWALT and CWMBS Offerings were originated: 'All of the mortgage loans in the trust fund have been originated or acquired by Countrywide Home Loans in accordance with its credit, appraisal and underwriting standards . . . . Countrywide Home Loans' underwriting standards are applied in accordance with applicable federal and state laws and regulations.'" |
| ¶ 59:  "Each of the Registration Statements issued by CWABS and CWHEQ similarly indicated the importance of loan underwriting, expressing their compliance with 'applicable federal and state laws and regulations.'" | ¶ 178:  "Each Registration Statement . . . issued by CWABS and CWHEQ contained the following language . . . : 'Countrywide Home Loans' underwriting standards are applied in accordance with applicable federal and state laws and regulations. . .'" |
| ¶ 68:  "One way by which Countrywide abandoned its underwriting guidelines was to systematically disregard and/or affirmatively manipulate the income, assets and employment status of borrowers seeking mortgage loans, in order to qualify these borrowers for | ¶ 101:  "[C]ontrary to the representations in the Registration Statements and Prospectus Supplements, it has now been revealed that Countrywide's loan originators systemically disregarded and/or manipulated the income, assets and |

## APPENDIX A

| ABP COMPLAINT | MAINE STATE AMENDED COMPLAINT |
|---|---|
| mortgages.  In many instances, this was accomplished by inflating borrowers' stated income, or facilitating income inflation by encouraging ineligible borrowers to resort to 'no documentation loans' and 'stated income loans', as described further below." | employment status of borrowers seeking mortgage loans in order to qualify these borrowers for mortgages that were then pooled and used as collateral for the MBS sold to Plaintiffs.  In many instances, this was done by inflating borrowers' stated income, or facilitating income inflation by encouraging ineligible borrowers to resort to 'no documentation loans' and 'stated income loans.'" |
| ¶ 75:  "According to an April 6, 2008 article entitled, 'A Road Not Taken by Lenders,' authored by Gretchen Morgenson of the New York Times, even though Countrywide had the right to verify stated income on an application through the Internal Revenue Service ('IRS') (and this check took less than one day to complete), Countrywide verified income with the IRS of only 3% to 5% of all loans that Countrywide made in 2006." | ¶ 132:  "According to another confidential source identified in the Securities Complaint, and confirmed by an April 6, 2008 article in *The New York Times*, even though Countrywide had the right to verify stated income on an application through the Internal Revenue Service ('IRS') (and this check took less than one day to complete), income was verified with the IRS on only 3%-5% of all loans funded by Countrywide in 2006." |
| ¶ 76:  "Beginning in 2005, to supplement an employee's judgment as to whether or not a potential borrower's income was 'reasonable', Countrywide required its employees to utilize a website, www.salary.com, in order to determine if the borrower's stated income was indeed reasonable." | ¶ 111:  "Furthermore, to supplement an employee's judgment as to whether or not a potential borrower's income was 'reasonable', Countrywide required its employees to utilize a website, www.salary.com.  Even if the stated salary was outside of the range provided by the website, Countrywide employees could still approve the loan." |
| ¶ 77:  "Unsurprisingly, as a result of these departures from Countrywide's underwriting guidelines, the Illinois Attorney General found that | ¶ 111:  "[A]ccording to the First Illinois AG Complaint: (1) a Countrywide employee estimated that approximately 90% of all reduced documentation loans |

2

## APPENDIX A

| ABP COMPLAINT | MAINE STATE AMENDED COMPLAINT |
|---|---|
| approximately 90% of all reduced documentation loans sold out of one Chicago office had inflated incomes." | sold out of a Chicago office had inflated incomes. . . ." |
| ¶ 79:  "According to Zachary, loans were being canceled at prime regional operations centers as full documentation loans and transferred to the sub-prime operations center in Plano, Texas, as SISA or NINA loans.  Thus, rather than denying an applicant based on the information revealed in the original mortgage application, Countrywide pretended that it did not see the disqualifying information (such as insufficient income or assets) and, instead, allowed applicants to apply for a no documentation loan, implicitly encouraging them to lie on these renewed applications." | ¶ 140:  "According to Zachary . . . loans were being canceled at the prime regional operations center as full documentation loans and transferred to the sub-prime operations center in Plano, Texas, as stated asset, stated income ('SISA') loans, a 'low-doc' loan, or no income, no assets ('NINA') loans, a 'no-doc' loan. . . .  Thus, rather than denying an applicant based on the information revealed in the original mortgage application, Countrywide pretended that it did not see the disqualifying information, such as insufficient income or assets, and, instead, allowed applicants to apply for a no documentation loan, implicitly encouraging them to lie on these renewed applications." |
| ¶ 81:  "Mozilo went on to write that he had '*personally observed a serious lack of compliance within our origination system as it relates to documentation and generally a deterioration in the quality of loans originated versus the pricing of those loan* [sic].'"  (Emphasis in original.) | ¶ 105:  "Angelo Mozilo, Countrywide's CEO, noted in an April 13, 2006 email that he had 'personally observed a serious lack of compliance within our origination system as it relates to documentation and generally a deterioration in the quality of loans originated versus the pricing of those loan [*sic*].'" |
| ¶ 80:  "In the SEC Action against Mozilo, Sambol and Sieracki, the SEC alleges that a quality control audit at Countrywide Bank revealed that *fifty percent* of the stated income loans | ¶ 105:  "For example, '[o]n June 2, 2006, Sambol received an email reporting on the results of a quality control audit at Countrywide Bank that showed that 50% of the stated income |

3

## APPENDIX A

| ABP COMPLAINT | MAINE STATE AMENDED COMPLAINT |
|---|---|
| audited by the bank showed a variance in income from the borrowers' IRS filings of greater than ten percent.  Of those, 69% had an income variance of *greater than 50%.*"  (Emphasis in original.) | loans audited by the bank showed a variance in income from the borrowers' IRS filings of greater than 10%.  Of those, 69% had an income variance of greater than 50%.'" |
| ¶ 82:  "According to MBIA, the analysis revealed that *almost 90%* of defaulted or delinquent loans in at least one pool of Countrywide securitizations showed material discrepancies."  (Emphasis in original.) | ¶ 137:  "Significantly, 'MBIA's re-underwriting review . . . revealed that almost 90% of defaulted or delinquent loans in the Countrywide Securitizations show material discrepancies.'" |
| ¶ 84:  "In a December 13, 2007 memo that was sent to Mozilo in his capacity as Countrywide's chairman of the board, Countrywide's enterprise risk assessment officer noted that: 'Countrywide had reviewed limited samples of first- and second-trust-deed mortgages originated by Countrywide Bank during the fourth quarter of 2006 and the first quarter of 2007 in order to get a sense of the quality of file documentation and underwriting practices, and to assess compliance with internal policies and procedures.  The review resulted in . . . the finding that *borrower repayment capacity was not adequately assessed by the bank during the underwriting process* for home equity loans.  *More specifically, debt-to-income (DTI) ratios did not consider the impact of principal [negative] amortization or an increase in interest.*'"  (Emphasis in original.) | ¶ 105:  "A December 13, 2007 internal Countrywide memorandum reveals: 'Countrywide had reviewed limited samples of first- and second-trust-deed mortgages originated by Countrywide Bank during the fourth quarter of 2006 and the first quarter of 2007 in order to get a sense of the quality of file documentation and underwriting practices, and to assess compliance with internal policies and procedures.  The review resulted in . . . the finding that borrower repayment capacity was not adequately assessed by the bank during the underwriting process for home equity loans.  More specifically, debt-to-income (DTI) ratios did not consider the impact of principal [negative] amortization or an increase in interest.'" |

4

## APPENDIX A

| ABP COMPLAINT | MAINE STATE AMENDED COMPLAINT |
|---|---|
| ¶ 94:  "According to the complaint filed in the SEC Action, in May 2005, Defendant Sambol was personally warned by a senior risk management employee that exceptions were being made on terms 'more aggressive' than Countrywide's guidelines, and that increased defaults would cause repurchase and indemnification requests to rise and the performance of Countrywide-issued RMBS to deteriorate." | ¶ 105:  "According to the SEC Complaint, the senior risk management employee explained to Sambol 'that exceptions are generally done at terms more aggressive than our guidelines . . . [and] warned [Sambol] that increased defaults would cause repurchase and indemnification requests to rise and the performance of Countrywide-issued MBS to deteriorate.'" |
| ¶ 104:  "[T]he *Zachary* action . . . alleges that Landsafe . . . was encouraged to inflate the value of appraised homes by as much as 6% in order to allow the borrower to 'roll up' the closing costs of the mortgage . . . putting the home buyer 'upside down' on the home immediately after purchasing it.  It also put RMBS investors such as ABP at risk because they were unaware of the true value of the underlying real estate assets." | ¶ 142:  "According to Zachary, the appraiser was being strongly encouraged to inflate appraisal values by as much as 6% to allow the homeowner to 'roll up' all closing costs . . . [which] put the buyer 'upside down' on the home immediately after purchasing it. . . .  It also put the lender and secondary market investor at risk because they were unaware of the true value of their asset." |
| ¶ 105:  "In *Zaldana* . . . plaintiffs describe a process whereby KB Home paid Countrywide to make loans with subsidized initial payments to KB Home borrowers.  This allowed KB Home to prop up the ostensible sales price of the houses and sell to buyers who would not otherwise be able to afford or qualify for the monthly mortgage payments.  In turn, Countrywide had its Landsafe appraisers ignore the subsidies and appraise the houses at the full stated | ¶ 143:  "The Zaldana Complaint described a process whereby KB Home paid Countrywide to make loans with subsidized initial payments to KB Home borrowers, thereby allowing KB to prop up the ostensible sales prices of KB Homes and sell to buyers who would not otherwise be able to afford or qualify for the monthly mortgage payments.  In turn, Countrywide would have its appraisers ignore the subsidies in order to appraise the home at the full |

5

## APPENDIX A

| ABP COMPLAINT | MAINE STATE AMENDED COMPLAINT |
|---|---|
| sales price, thereby inflating the actual value of the house." | stated sales price, thereby inflating the actual value of the home. . . ." |
| ¶¶ 109, 112, 115, 118: "[The CWHEQ offering documents] contained the following misleading statements:<br><br>Credit Blemished Mortgage Loans.  The following is a description of the underwriting procedures customarily employed by Countrywide Home Loans with respect to credit blemished mortgage loans. . . .  Prior to the funding of any credit blemished mortgage loan, Countrywide Home Loans underwrites the related mortgage loan in accordance with the underwriting standards established by Countrywide Home Loans.  In general, the mortgage loans are underwritten centrally by a specialized group of underwriters who are familiar with the unique characteristics of credit blemished mortgage loans.  In general, Countrywide Home Loans does not purchase any credit blemished mortgage loan that it has not itself underwritten.<br><br>Countrywide Home Loans' underwriting standards are primarily intended to evaluate the value and adequacy of the mortgaged property as collateral for the proposed mortgage loan and the borrower's credit standing and repayment ability.  On a case by case basis, Countrywide Home Loans may determine that, based upon compensating factors, a prospective borrower not strictly qualifying under | ¶ 164: "[The CWHEQ offering documents] contained the following language concerning the underwriting standards . . . :<br><br>Credit Blemished Mortgage Loans.  The following is a description of the underwriting procedures customarily employed by Countrywide Home Loans with respect to credit blemished mortgage loans. . . .  Prior to the funding of any credit blemished mortgage loan, Countrywide Home Loans underwrites the related mortgage loan in accordance with the underwriting standards established by Countrywide Home Loans.  In general, the mortgage loans are underwritten centrally by a specialized group of underwriters who are familiar with the unique characteristics of credit blemished mortgage loans.  In general, Countrywide Home Loans does not purchase any credit blemished mortgage loan that it has not itself underwritten.<br><br>Countrywide Home Loans' underwriting standards are primarily intended to evaluate the value and adequacy of the mortgaged property as collateral for the proposed mortgage loan and the borrower's credit standing and repayment ability.  On a case by case basis, Countrywide Home Loans may determine that, based upon compensating factors, a prospective |

## APPENDIX A

| ABP COMPLAINT | MAINE STATE AMENDED COMPLAINT |
|---|---|
| the underwriting risk category guidelines described below warrants an underwriting exception.  Compensating factors may include low loan-to-value ratio, low debt-to-income ratio, stable employment, time in the same residence or other factors. . . .<br><br>After obtaining all applicable employment, credit and property information, Countrywide Home Loans uses a debt-to-income ratio to assist in determining whether the prospective borrower has sufficient monthly income available to support the payments of principal and interest on the mortgage loan in addition to other monthly credit obligations. . . .  The maximum monthly debt-to-income ratio varies depending upon a borrower's credit grade and documentation level (as described below) but does not generally exceed 50%.  Variations in the monthly debt-to-income ratios limit are permitted based on compensating factors." | borrower not strictly qualifying under the underwriting risk category guidelines described below warrants an underwriting exception.  Compensating factors may include low loan-to-value ratio, low debt-to-income ratio, stable employment, time in the same residence or other factors. . . .<br><br>After obtaining all applicable employment, credit and property information, Countrywide Home Loans uses a debt-to-income ratio to assist in determining whether the prospective borrower has sufficient monthly income available to support the payments of principal and interest on the mortgage loan in addition to other monthly credit obligations. . . .  The maximum monthly debt-to-income ratio varies depending upon a borrower's credit grade and documentation level (as described below) but does not generally exceed 50%.  Variations in the monthly debt-to-income ratios limit are permitted based on compensating factors." |
| ¶¶ 110, 113, 116, 119:  "[The CWHEQ Prospectus Supplements] contained the following misleading statements:<br><br>The underwriting process is intended to assess the applicant's credit standing and repayment ability, and the value and adequacy of the real property security as collateral for the proposed loan.  Exceptions to the applicable originator's underwriting guidelines will be made when compensating factors are present. | ¶¶ 165-167:  "[The CWHEQ offering documents] contained material misstatements of fact . . . :<br><br>The underwriting process is intended to assess the applicant's credit standing and repayment ability, and the value and adequacy of the real property security as collateral for the proposed loan.  Exceptions to the applicable originator's underwriting guidelines will be made when compensating [f]actors are |

LIBA/2133174.2

## APPENDIX A

| ABP COMPLAINT | MAINE STATE AMENDED COMPLAINT |
|---|---|
| These factors include the borrower's employment stability, favorable credit history, equity in the related property, and the nature of the underlying first mortgage loan. . . . | present.  These factors include the borrower's employment stability, favorable credit history, equity in the related property, and the nature of the underlying first mortgage loan. . . . |
| After obtaining all applicable income, liability, asset, employment, credit, and property information, the applicable originator generally uses a debt-to-income ratio to assist in determining whether the prospective borrower has sufficient monthly income available to support the payments on the home equity loan in addition to any senior mortgage loan payments (including any escrows for property taxes and hazard insurance premiums) and other monthly credit obligations. . . .  [T]he maximum monthly debt-to-income ratio is 45%.  Variations in the monthly debt-to-income ratios limits are permitted based on compensating factors.  The originators currently offer home equity loan products that allow maximum combined loan-to-value ratios up to 100%." | After obtaining all applicable income, liability, asset, employment, credit, and property information, the applicable originator generally uses a debt-to-income ratio to assist in determining whether the prospective borrower has sufficient monthly income available to support the payments on the home equity loan in addition to any senior mortgage loan payments (including any escrows for property taxes and hazard insurance premiums) and other monthly credit obligations. . . .  [T]he maximum monthly debt-to-income ratio is 45%.  Variations in the monthly debt-to-income ratios limits are permitted based on compensating factors.  The originators currently offer home equity loan products that allow maximum combined loan-to-value ratios up to 100%." |
| ¶ 150:  "Countrywide steered borrowers to more expensive loans that exceeded the borrowers' ability to repay by approving borrowers based on introductory and one-off 'teaser rates', despite Countrywide's knowledge that the borrowers would not be able to afford the 'fully indexed rate' when the teaser rate expired." | ¶ 167:  "Countrywide[] . . . disregarded a borrowers' [sic] ability to pay by . . . [s]teering borrowers to more expensive loans that exceeded their borrowing capacity . . . [and] [a]pproving borrowers based on 'teaser rates' for loans despite knowing that the borrower would not be able to afford the 'fully indexed rate' when the adjustable rate adjusted." |

8

## APPENDIX A

| ABP COMPLAINT | MAINE STATE AMENDED COMPLAINT |
|---|---|
| ¶ 150:  "Defendants failed to disclose that Countrywide in fact systematically ignored its own underwriting guidelines, as well as underwriting standards imposed by state and federal law, in issuing the mortgages pooled into the Issuing Trusts." | ¶ 163:  "Defendants failed to disclose that Countrywide in fact systematically ignored underwriting standards imposed by state and federal law in issuing the mortgages pooled into the Issuing Trusts." |
| ¶ 150:  "In contravention of Countrywide's underwriting guidelines, Countrywide employees did not require borrowers to 'generally demonstrate that the ratio of the borrower's monthly housing expenses . . . to the borrower's monthly gross income and the ratio of total monthly debt to the monthly gross income (the 'debt-to-income' ratios) are within acceptable limits.'  Instead, Countrywide's employees extended loans even where income, occupation and other information was missing. . . . Countrywide employees coached borrowers to misstate their income on loan applications to qualify for mortgage loans under Countrywide's underwriting standards, thereby circumventing the underwriting guidelines." | ¶ 163:  "Countrywide's underwriting standards did not require that a borrower 'generally demonstrate that the ratio of the borrower's monthly housing expenses . . . to the borrower's monthly gross income and the ratio of total monthly debt to the monthly gross income (the 'debt-to-income' ratios) are within acceptable limits.'  Instead, Countrywide's underwriting included the following practices . . . :  Coaching borrowers to misstate their income on loan applications to qualify for mortgage loans under Countrywide's underwriting standards. . . ." |

9