COPY

1  Maxwell M. Blecher (SBN 26202)
   mblecher@blechercollins.com
2  Maryann R. Marzano (SBN 96867)
   mmarzano@blechercollins.com
3  BLECHER & COLLINS, P.C.
   515 South Figueroa St., Ste. 1750
4  Los Angeles, CA 90071
   Telephone: (213) 622-4222
5  Facsimile: (213) 622-1656

6  Jay W. Eisenhofer, Esq. (*admitted pro hac vice*)
   jeisenhofer@gelaw.com
7  Geoffrey C. Jarvis, Esq. (*admitted pro hac vice*)
   gjarvis@gelaw.com
8  Hung G. Ta, Esq. (*admitted pro hac vice*)
   hta@gelaw.com
9  Deborah A. Elman, Esq. (*admitted pro hac vice*)
   delman@gelaw.com
10 GRANT & EISENHOFER P.A.
   485 Lexington Avenue
11 New York, New York 10017
   Telephone: (646) 722-8500
12 Facsimile: (646) 722-8501

13 *Attorneys for Plaintiff Stichting Pensioenfonds ABP*

14                **UNITED STATES DISTRICT COURT**

15    **CENTRAL DISTRICT OF CALIFORNIA –WESTERN DIVISION**

16

17  STICHTING PENSIOENFONDS ABP,      )   Case No. CV 10-07275-MRP (MANx)
                                       )
18                      *Plaintiff*    )   **FIRST AMENDED COMPLAINT**
                                       )
19          v.                         )
                                       )   **DEMAND FOR JURY TRIAL**
20  COUNTRYWIDE FINANCIAL             )
21  CORPORATION; COUNTRYWIDE          )
    HOME LOANS, INC.; CWALT, INC.;    )   Honorable Mariana R. Pfaelzer
22  CWMBS, INC.; CWABS, INC.; CWHEQ,  )
    INC.; COUNTRYWIDE CAPITAL         )
23  MARKETS; COUNTRYWIDE              )
24  SECURITIES CORPORATION; BANK OF   )
    AMERICA CORP.; NB HOLDINGS        )
25  CORPORATION;                      )
                                       )
26                                     )
    (Caption continued on next page)  )
27                                     )
                                       )
28  _____  )

1  DEUTSCHE BANK SECURITIES INC.;       )
2  UBS SECURITIES, LLC; GREENWICH       )
   CAPITAL MARKETS, INC. A.K.A. RBS     )
3  GREENWICH CAPITAL; BARCLAYS          )
   CAPITAL INC.; ANGELO R. MOZILO;      )
4  STANFORD L. KURLAND; DAVID A.        )
   SPECTOR; ERIC P. SIERACKI; N.        )
5  JOSHUA ADLER; RANJIT KRIPALANI;      )
6  JENNIFER S. SANDEFUR; and DAVID A.   )
   SAMBOL,                              )
7                                       )
8                      *Defendants*.    )
                                        )
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FIRST AMENDED COMPLAINT                          Case No. CV 10-07275-MRP (MANx)

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

SUMMARY OF ALLEGATIONS .................................................................... 2

JURISDICTION AND VENUE ......................................................................... 6

PARTIES .............................................................................................................. 7

SUBSTANTIVE ALLEGATIONS .................................................................. 13

I.      THE SECURITIZATION PROCESS GENERALLY ............................. 13

II.     THE COUNTRYWIDE SECURITIZATIONS AND ABP'S
        INVESTMENTS IN THE CERTIFICATES ............................................. 16

III.    IMPORTANT FACTORS IN THE DECISION OF INVESTORS
        SUCH AS ABP TO INVEST IN THE CERTIFICATES ......................... 21

IV.     COMMENCING IN 2003, COUNTRYWIDE KNOWINGLY
        ENGAGED IN WIDESPREAD AND SYSTEMATIC
        ABANDONMENT OF ITS UNDERWRITING GUIDELINES AND
        STANDARDS WHEN ORIGINATING MORTGAGES ......................... 25

        A.    COUNTRYWIDE ABANDONED ITS UNDERWRITING GUIDELINES BY
              ADOPTING A "MATCHING" STRATEGY TO KEEP PACE WITH
              COMPETITORS .............................................................................. 28

        B.    COUNTRYWIDE ABANDONED ITS UNDERWRITING GUIDELINES BY
              DELIBERATELY IGNORING OR MANIPULATING THE BORROWER'S
              ABILITY AND WILLINGNESS TO REPAY THE LOAN ............................. 31

        C.    COUNTRYWIDE DEPARTED FROM ITS UNDERWRITING
              GUIDELINES BY USING FALSE METRICS TO ASSESS ITS
              BORROWERS' ABILITY TO REPAY ................................................... 36

        D.    COUNTRYWIDE CREATED A PERMISSIVE CULTURE BY WHICH
              UNDERWRITING "EXCEPTIONS" WERE LIBERALLY ISSUED TO
              BORROWERS, FOR EXAMPLE, BY ALLOWING EMPLOYEES TO
              IGNORE AND OVER-RIDE THE RECOMMENDATIONS OF
              COUNTRYWIDE'S HIGHLY TOUTED CLUES UNDERWRITING
              PROGRAM ...................................................................................... 39

i

V.  COUNTRYWIDE SYSTEMATICALLY FAILED TO OBTAIN APPRAISALS IN ACCORDANCE WITH INDUSTRY APPROVED APPRAISAL STANDARDS ........................................................ 44

VI.  THE CREDIT RATINGS ASSIGNED TO COUNTRYWIDE'S CERTIFICATES MATERIALLY MISREPRESENTED THE CREDIT RISK OF THE CERTIFICATES ................................................ 47

VII.  COUNTRYWIDE FAILED TO ENSURE THAT TITLE TO THE UNDERLYING MORTGAGE LOANS WAS EFFECTIVELY TRANSFERRED ........................................................................ 51

VIII.  COUNTRYWIDE KNOWINGLY CHERRY-PICKED THE HIGHEST QUALITY LOANS FOR ITS OWN PORTFOLIO AND SOLD ONLY THE RISKIEST LOANS TO PLAINTIFF AND OTHER INVESTORS ........................................................................ 54

IX.  DEFENDANTS' MATERIAL MISSTATEMENTS AND OMISSIONS IN THE OFFERING DOCUMENTS ...................................... 55

A.  DEFENDANTS MADE FALSE AND MISLEADING STATEMENTS REGARDING COUNTRYWIDE'S UNDERWRITING GUIDELINES ............. 55

B.  DEFENDANTS MADE FALSE AND MISLEADING STATEMENTS REGARDING COUNTRYWIDE'S USE OF EXCEPTIONS ........................ 59

C.  DEFENDANTS MADE UNTRUE STATEMENTS AND OMISSIONS REGARDING APPRAISALS AND LTV RATIOS ...................................... 61

D.  DEFENDANTS MATERIALLY MISREPRESENTED THE ACCURACY OF THE CREDIT RATINGS ASSIGNED TO THE CERTIFICATES ............. 68

E.  DEFENDANTS MATERIALLY MISREPRESENTED COUNTRYWIDE'S TRANSFER OF GOOD TITLE TO THE MORTGAGE LOANS TO THE ISSUING TRUSTS ................................................................................ 70

F.  DEFENDANTS MATERIALLY MISREPRESENTED THAT THEY DID NOT CHERRY-PICK MORTGAGE LOANS FOR INCLUSION IN COUNTRYWIDE'S SECURITIZATIONS ................................................ 72

X.  DEFENDANTS KNEW THAT THE OFFERING DOCUMENTS CONTAINED MATERIAL MISSTATEMENTS AND OMISSIONS .... 73

ii

XI.   PLAINTIFF ABP HAS SUFFERED LOSSES ON ITS PURCHASES OF CERTIFICATES .................................................................. 76

    A.   CWABS LOANS ................................................................. 76

    B.   CWMBS LOANS ................................................................ 78

    C.   CWHEQ LOANS ............................................................... 78

    D.   CWALT LOANS ................................................................. 79

XII.   THE UNDERWRITER DEFENDANTS DID NOT PERFORM ADEQUATE DUE DILIGENCE .......................................... 79

XIII.   THE LIABILITY OF THE CONTROL PERSON DEFENDANTS ........ 83

    A.   DEFENDANT CFC ............................................................. 83

    B.   DEFENDANT CCM ............................................................ 85

    C.   DEFENDANT MOZILO ...................................................... 86

    D.   DEFENDANT SAMBOL ...................................................... 87

XIV.   THE LIABILITY OF BANK OF AMERICA AS THE SUCCESSOR-IN-INTEREST TO COUNTRYWIDE ....................................... 89

CAUSES OF ACTION ................................................................. 93

    FIRST CAUSE OF ACTION
      (VIOLATION OF SECTION 10(B) OF THE EXCHANGE ACT AND RULE 10B-5) ................................................................. 93

    SECOND CAUSE OF ACTION
      (VIOLATION OF SECTION 20(A) OF THE EXCHANGE ACT) ............ 94

    THIRD CAUSE OF ACTION
      (COMMON-LAW FRAUD) ................................................. 95

    FOURTH CAUSE OF ACTION
      (AIDING AND ABETTING FRAUD) ................................... 96

    FIFTH CAUSE OF ACTION
      (FALSE STATEMENTS FOR THE PURPOSE OF INDUCING THE PURCHASE OR SALE OF A SECURITY CAL. CORPORATIONS CODE §§ 25400(D) AND 25500) ................................................ 97

SIXTH CAUSE OF ACTION
  (VIOLATION OF SECTION 11 OF THE SECURITIES ACT) ..................... 98

SEVENTH CAUSE OF ACTION
  (VIOLATION OF SECTION 12(A)(2) OF THE SECURITIES ACT).......... 100

EIGHTH CAUSE OF ACTION
  (VIOLATION OF SECTION 15 OF THE SECURITIES ACT) ................... 101

NINTH CAUSE OF ACTION
  (UNTRUE OR MISLEADING STATEMENTS IN THE SALE OF
  SECURITIES CAL. CORPORATIONS CODE §§ 25401, 25501, 25504). 102

TENTH CAUSE OF ACTION
  (NEGLIGENT MISREPRESENTATION  CAL. CIVIL CODE §§ 1572 ET
  SEQ. AND 1709 ET SEQ., AND COMMON LAW).................................. 103

PRAYER FOR RELIEF ............................................................................... 104

DEMAND FOR JURY TRIAL ..................................................................... 104

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

FIRST AMENDED COMPLAINT                Case No. CV 10-07275-MRP (MANx)

## **INTRODUCTION**

Plaintiff Stichting Pensioenfonds ABP ("ABP"), by its undersigned counsel, brings this action pursuant to Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. § 240.10b-5 ("Rule 10b-5"), and Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a); Sections 11, 12(a)(2) and 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§77k, 77l(a)(2), and 77o; the California Corporate Securities Act; the California Civil Code; and the common law. This action is brought against Defendants Countrywide Financial Corporation ("CFC"); Countrywide Home Loans, Inc. ("CHL"); CWALT, Inc. ("CWALT"); CWMBS, Inc. ("CWMBS"); CWABS, Inc. ("CWABS"); CWHEQ, Inc. ("CWHEQ"); Countrywide Capital Markets ("CCM"); Countrywide Securities Corporation ("CSC"); Bank of America Corp. ("Bank of America"); NB Holdings Corporation ("NB Holdings"); Deutsche Bank Securities Inc. ("Deutsche Bank"); UBS Securities, LLC ("UBS"); Greenwich Capital Markets, Inc. a.k.a. RBS Greenwich Capital ("RBS"); Barclays Capital Inc. ("Barclays"); Stanford L. Kurland ("Kurland"); David A. Spector ("Spector"); Eric P. Sieracki ("Sieracki"); N. Joshua Adler ("Adler"); Ranjit Kripalani ("Kripalani"); Jennifer S. Sandefur ("Sandefur"); David A. Sambol ("Sambol") and Angelo R. Mozilo ("Mozilo") (collectively, the "Defendants"). Plaintiff makes the allegations in this Complaint based upon personal knowledge as to matters concerning Plaintiff and its own acts, and upon information and belief as to all other matters. This information is derived from the investigation by Plaintiff's counsel, which has included a review and analysis of annual reports and publicly filed documents, press releases, news articles, analysts' statements, conference call transcripts and presentations, and transcripts from speeches and remarks given by Defendants. Based on the foregoing, Plaintiff believes that substantial additional evidentiary

1

support exists for the allegations herein, which Plaintiff will find after a reasonable opportunity for discovery.

## SUMMARY OF ALLEGATIONS

1.    This action arises out of ABP's purchases of certain residential mortgage-backed securities ("RMBS"), as evidenced in the form of "Certificates", during the period from December 2004 through June 2007, in reliance on the false and misleading statements that were made by Defendants. Plaintiff reasonably and justifiably relied on these untrue statements and omissions of material information in deciding to purchase the Certificates. The Certificates are "securities" within the meaning of the California Corporate Securities Act, the Securities Act of 1933 and the Securities Exchange Act of 1934.

2.    As a result of these material misrepresentations and omissions, ABP purchased securities that were far riskier than represented, backed by mortgages worth significantly less than represented, that had been made to borrowers who were dramatically less creditworthy than had been represented.    As a consequence, ABP has suffered losses of hundreds of millions of dollars on its purchases of Certificates.

3.    The securities acquired by ABP were collateralized against mortgages made by Defendant CFC and its wholly owned subsidiary, Defendant CHL (collectively "Countrywide" or the "Company").    Until its collapse, Countrywide was one of the largest mortgage lenders in the United States, responsible for originating and/or servicing more than 18% of residential mortgages nationally.  In 2005 and 2006 alone, Countrywide originated in excess of $850 billion in home loans throughout the country.

4.    Countrywide did not, however, hold the mortgage loans that it originated.    Rather, taking advantage of an unprecedented boom in the securitization industry, Countrywide pooled many of the mortgage loans that it

2

originated and deposited the loans into special-purpose entities or "trusts" that were created by Countrywide and its affiliates.  These pools of mortgage loans were then securitized into RMBS and sold by the trusts to investors in the form of Certificates.  Underwriters, including the Underwriter Defendants (as defined herein) named in this action, assisted the trusts in making these sales.

5.     The Certificates entitled investors to receive monthly distributions of interest and principal on cash flows from the mortgages held by the trusts.  The Certificates issued by each trust were divided into several classes (or "tranches") that had different seniority, priorities of payment, exposure to default, and interest payment provisions.  Rating agencies, such as Moody's Investors Service, Inc. ("Moody's"), Standard & Poor's Corporation ("S&P") and Fitch, Inc. ("Fitch"),[1] rated the investment quality of all tranches of Certificates based upon information provided by the Defendants about the quality of the mortgages in each mortgage pool and the seniority of the Certificate among the various Certificates issued by each trust.  These ratings, in part, determined the price at which these Certificates were offered to investors.  At the time of purchase, the Certificates acquired by ABP were rated A or above, with the vast majority having been rated AAA.

6.     In selling the Certificates, the Defendants prepared and filed with the Securities and Exchange Commission ("SEC") certain registration statements (the "Registration Statements"), prospectuses (the "Prospectuses") and prospectus supplements (the "Prospectus Supplements" and together with the Registration Statements and Prospectuses the "Offering Documents").  In these Offering Documents, Defendants repeatedly assured investors that the mortgages underlying the Certificates were originated in accordance with Countrywide's

---

[1] Moody's, Fitch and S&P are approved by the SEC as "Nationally Recognized Statistical Rating Organizations" and provide credit ratings that are used to distinguish the creditworthiness of different securities under the federal securities laws.

FIRST AMENDED COMPLAINT                              Case No. CV 10-07275-MRP (MANx)

underwriting guidelines and standards, and assured investors of the strength of these underwriting guidelines and standards.   In addition, in the Offering Documents, Defendants repeatedly assured investors as to the soundness of the appraisals used to arrive at the value of the underlying properties and, specifically, that the real estate collateralizing the loans had been subjected to objective and independent real estate appraisals that complied with the Uniform Standards of Professional Appraisal ("USPAP").

7.   As it turns out, Defendants made false and misleading representations in the Offering Documents.  Specifically, Countrywide knowingly made false statements that it had followed its underwriting guidelines and standards when originating the mortgage loans.   In fact, as set forth below, Countrywide had engaged in a wholesale and systematic abandonment of its underwriting guidelines, thereby granting mortgage loans to borrowers whom it knew did not satisfy the eligibility criteria as described in the Offering Documents.   In addition, the mortgages underlying the Certificates had been extended based on collateral appraisals that were not performed in accordance with USPAP, so that the value of the underlying properties had been overstated, thereby exposing investors such as ABP to additional losses in the event of foreclosure.

8.   Countrywide's practices, including the subjects of the false statements, misrepresentations and omissions in the Offering Documents, have been and continue to be the target of multiple state and federal investigations and proceedings.  In June 2009, the SEC filed a civil suit (the "SEC Action") against three former top Countrywide executives: Angelo Mozilo, former chairman of the board and chief executive officer; David Sambol, chief operating officer and president; and Eric Sieracki, chief financial officer.  *Securities and Exchange Commission v. Mozilo*, No. 2:09-cv-03994-JFW-MAN (C.D. Cal.).  According to the SEC, these three individuals defrauded investors by falsely claiming that

4

1   Countrywide underwrote low-risk mortgages at a time when the company was

2   getting into increasingly risky parts of the lending business, including "subprime"

3   mortgages – those made to less creditworthy borrowers.   The SEC further

4   asserted that Mozilo engaged in insider trading of Countrywide stock.   On

5   October 15, 2010, the SEC announced that Mozilo agreed to pay a record $22.5

6   million penalty, the largest ever paid by a public company's senior executive in

7   an SEC settlement.   Mozilo also agreed to $45 million in disgorgement of ill-

8   gotten gains to settle the SEC's disclosure violation and insider trading charges

9   against him, for a total financial settlement of $67.5 million that will be returned

10   to harmed investors.   Sambol and Sieracki agreed to pay $520,000 and $130,000

11   in civil penalties, respectively. The SEC has also made available Countrywide

12   internal documents and testimony given by Countrywide's former executives in

13   connection with the SEC Action, revealing the role that these individuals played

14   in Countrywide's continued wholesale and systematic abandonment of its

15   underwriting guidelines.

16         9.    The U.S. Attorney's Office is also investigating Countrywide for

17   criminal violations and, according to an April 2010 article in THE WALL STREET

18   JOURNAL, has stepped up the pace of its investigation, calling witnesses before a

19   grand jury.   Additionally, various state attorneys general, including those from

20   California, Connecticut, Florida, Illinois, and Indiana, have brought lawsuits

21   and/or initiated investigations against Countrywide based on its lending,

22   underwriting and appraisal practices for mortgage loans.   The Florida Attorney

23   General investigated Countrywide for "unfair and deceptive trade practices",

24   including the Company's sales and marketing tactics and its subprime loan

25   underwriting, and whether Countrywide put borrowers "into mortgages that in the

26   first place they couldn't afford or loans with rates that were not what they were

27   advertising or that were misleading."   On October 6, 2008, Countrywide

28   announced that it had settled the fraud claims brought by 11 states, including

FIRST AMENDED COMPLAINT                    Case No. CV 10-07275-MRP (MANx)

1  California and Illinois, for an estimated **$8.4 billion**, which, according to the

2  California Attorney General, is likely the largest settlement of allegations of

3  predatory lending.

4       10.   Furthermore, on June 7, 2010 Countrywide agreed to pay $108

5  million to settle charges brought by the Federal Trade Commission (the "FTC")

6  that it collected excessive fees from cash-strapped borrowers who were struggling

7  to keep their homes. According to the complaint filed by the FTC, Countrywide's

8  loan-servicing operation deceived homeowners who were behind on their

9  mortgage payments into paying inflated fees after many of the homeowners had

10  taken out loans originated or funded by Countrywide's lending arm, including

11  subprime or "nontraditional" mortgages such as payment option adjustable rate

12  mortgages, interest-only mortgages, and loans made with little or no income or

13  asset documentation.

14  **JURISDICTION AND VENUE**

15       11.   The claims asserted herein arise under Sections 10(b) and 20(a) of

16  the Exchange Act, 15 U.S.C. §§ 78j(b), 78t(a), and Rule 10b-5 promulgated

17  thereunder by the SEC, 17 C.F.R. § 240.10b-5; Sections 11, 12(a)(2) and 15 of

18  the Securities Act, 15 U.S.C. §§ 77k, 77l(a)(2), and 77o; the California Corporate

19  Securities Act; the California Civil Code and common law.

20       12.   This Court has jurisdiction over the subject matter of this action

21  pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, Section 22 of the

22  Securities Act, 15 U. S. C. § 77v, and 28 U.S.C. §§ 1331, 1337(a) and 1367.

23       13.   Venue is proper in this District pursuant to Section 27 of the

24  Exchange Act, Section 22 of the Securities Act, and 28 U. S. C. § 1391(b), (c) and

25  (d). Many of the acts and omissions charged herein, including the preparation

26  and dissemination of materially false and misleading statements in the

27  Registration Statements and the Prospectus Supplements, occurred in substantial

28  part in the Central District of California. Additionally, Countrywide maintained

FIRST AMENDED COMPLAINT                  Case No. CV 10-07275-MRP (MANx)

1   its corporate headquarters and principal executive offices in this District.
2   Furthermore, Defendants CFC and CHL, and many of their affiliated entities,
3   maintained their principal executive offices in this District, and each of the
4   Underwriter Defendants (as defined herein) conducts business and/or is
5   headquartered in this District.

6                                    **PARTIES**

7   **Plaintiff**

8        14.   Plaintiff ABP is an independent administrative pension fund
9   established under the laws of the Kingdom of The Netherlands.  ABP serves as
10  the pension fund for public employees in the governmental and education sectors
11  in The Netherlands.  With assets amounting to nearly €220 billion, ABP is one of
12  the three largest pension funds in the world.

13  **Defendants**

14       15.   Defendant CFC is a Delaware corporation with its principal
15  executive offices located at 4500 Park Granada, Calabasas, California.  Until its
16  acquisition by Bank of America, CFC was a public company listed on the New
17  York Stock Exchange, and one of the largest mortgage lenders in the United
18  States.  CFC is a holding company which, through its subsidiaries, is engaged in
19  mortgage lending and other real estate finance-related businesses, including
20  mortgage banking, banking and mortgage warehouse lending, dealing in
21  securities and insurance underwriting.   The Company operates through five
22  business segments: Mortgage Banking, which originates, purchases, sells and
23  services non-commercial mortgage loans nationwide; Banking, which takes
24  deposits and invests in mortgage loans and home equity lines of credit; Capital
25  Markets, which operates an institutional broker-dealer that primarily specializes
26  in trading and underwriting RMBS; Insurance, which offers property, casualty,
27  life and disability insurance as an underwriter and as an insurance agency; and
28

FIRST AMENDED COMPLAINT                           Case No. CV 10-07275-MRP (MANx)

1  Global Operations, which licenses and supports technology to mortgage lenders

2  in the United Kingdom.

3      16.    According to Defendant CFC's 2007 Form 10-K, Defendant CFC

4  also "operate[s] an institutional broker-dealer that primarily specializes in trading

5  and underwriting MBS" known as CSC.  The financial results of CSC are set

6  forth in the Capital Markets Segment of Defendant CFC's financial statements.

7  Defendant CFC further stated in its 2007 Form 10-K that it was "ranked fourth

8  among Non-Agency MBS Underwriters" for 2007, but that its underwriting

9  activities had tapered off towards the latter half of 2007 due to issues in the

10  market.

11      17.    In January 2008, CFC was acquired by Defendant Bank of America

12  for $4.1 billion.

13      18.    Defendant CHL is a New York corporation, with its principal place

14  of business at 4500 Park Granada, Calabasas, California, the same location as

15  CFC, and is a direct wholly-owned subsidiary of CFC.  Until the acquisition of

16  Countrywide by Bank of America, CHL was the wholly-owned subsidiary of

17  CFC operating in Countrywide's Mortgage Banking business division.  CHL

18  originated, purchased, sold and serviced mortgage loans.  As discussed below,

19  CHL acted as the "seller" of the mortgage loans underlying the Certificates

20  purchased by Plaintiff ABP.

21      19.    Defendant CCM is a direct wholly-owned subsidiary of CFC.

22  CCM's principal executive offices are located at 4500 Park Granada, Calabasas,

23  California, the same location as CFC.  CCM operates through its two main

24  wholly-owned  subsidiaries,  Defendant  CSC  and  Countrywide  Servicing

25  Exchange.  According to Defendant CFC's Form 10-K, "Capital Markets [CCM]

26  participates in both competitive bid and negotiated underwritings and performs

27  underwriting services for CHL, Countrywide Bank and third parties."  The

28

FIRST AMENDED COMPLAINT                    Case No. CV 10-07275-MRP (MANx)

1  financial results of CCM are set forth in the Capital Markets Segment of

2  Defendant CFC's financial statements.

3       20.    Defendant Bank of America is a successor to Defendant CFC,

4  having de facto merged with CFC, as described more fully *infra*, ¶¶ 223 to 236.

5  Also, as a result of the de facto merger, CSC, CHL and CCM likewise are now

6  part of Bank of America.

7       21.    Defendant NB Holdings is one of the shell entities used to effectuate

8  the merger between Bank of America and CFC, and is a successor to Defendant

9  CHL.  On July 3, 2008, Defendant CHL completed the sale of substantially all of

10  its assets to NB Holdings.

11       22.    Defendant CWALT is a Delaware corporation and a limited purpose

12  financing subsidiary of CFC.  CWALT's principal executive offices are located at

13  4500 Park Granada, Calabasas, California, the same location as CFC.

14       23.    Defendant CWMBS is a Delaware corporation and a limited purpose

15  financing subsidiary of CFC.  CWMBS' principal executive offices are located at

16  4500 Park Granada, Calabasas, California, the same location as CFC.

17       24.    Defendant CWABS is a Delaware corporation and a limited purpose

18  financing subsidiary of CFC.  CWABS' principal executive offices are located at

19  4500 Park Granada, Calabasas, California, the same location as CFC.

20       25.    Defendant CWHEQ is a Delaware corporation and a limited purpose

21  financing subsidiary of CFC.  CWHEQ's principal executive offices are located

22  at 4500 Park Granada, Calabasas, California, the same location as CFC.

23       26.    Defendant CSC, an affiliate of CFC, acted as an underwriter, within

24  the meaning of the Securities Act, 15 U.S.C. §77b(a)(11) and the Exchange Act,

25  15 U.S.C. §78c(a)(20), for the Certificates identified in ¶ 55 below, and drafted

26  and disseminated the Prospectus Supplements pursuant to which the Certificates

27  were sold to ABP.

28

9

27.     Defendant Deutsche Bank is an SEC registered broker-dealer, principally located at 60 Wall Street, New York, New York 10005. Deutsche Bank acted as an underwriter, within the meaning of the Securities Act, 15 U.S.C. §77b(a)(11) and the Exchange Act, 15 U.S.C. §78c(a)(20), for the Certificates identified in ¶ 55 below, and drafted and disseminated various Prospectus Supplements pursuant to which Certificates were sold to ABP.

28.     Defendant UBS is an SEC registered broker-dealer, principally located at 1285 Avenue of the Americas, 19th Floor, New York, New York 10019. UBS acted as an underwriter, within the meaning of the Securities Act, 15 U.S.C. §77b(a)(11) and the Exchange Act, 15 U.S.C. §78c(a)(20), for the Certificates identified in ¶ 55 below, and drafted and disseminated various Prospectus Supplements pursuant to which Certificates were sold to ABP.

29.     Defendant RBS is an SEC registered broker-dealer, principally located at 600 Steamboat Road, Greenwich, Connecticut 06830. RBS acted as an underwriter, within the meaning of the Securities Act, 15 U.S.C. §77b(a)(11) and the Exchange Act, 15 U.S.C. §78c(a)(20), for the Certificates identified in ¶ 55 below, and drafted and disseminated various Prospectus Supplements pursuant to which Certificates were sold to ABP.

30.     Defendant Barclays is an SEC registered broker-dealer, principally located at 200 Park Avenue, New York, New York 10166. Barclays acted as an underwriter, within the meaning of the Securities Act, 15 U.S.C. §77b(a)(11) and the Exchange Act, 15 U.S.C. §78c(a)(20), for the Certificates identified in ¶ 55 below, and drafted and disseminated the Prospectus Supplements pursuant to which the Certificates were sold to ABP.

31.     Defendant Kurland was, at all relevant times, the Chief Executive Officer ("CEO"), President and Chairman of the Board of Directors for CWALT, CWMBS and CWABS. Defendant Kurland signed: CWALT's September 23, 2004 and July 25, 2005 Registration Statements; CWMBS' July 25, 2005

FIRST AMENDED COMPLAINT                    Case No. CV 10-07275-MRP (MANx)

1  Registration Statement; CWABS' October 18, 2004, February 21, 2006 and

2  August 8, 2006 Registration Statements; and CWHEQ's December 17, 2004 and

3  August 4, 2005 Registration Statements.  Defendant Kurland was concurrently

4  the Executive Vice President and Chief Operating Officer ("COO") of Defendant

5  CFC.

6       32.   Defendant Spector was, at relevant times, Vice President and a

7  member of the Board of Directors for CWALT, CWMBS, CWABS and

8  CWHEQ.  Defendant Spector signed: CWALT's September 23, 2004 and July

9  25, 2005 Registration Statements; CWMBS' July 25, 2005 Registration

10 Statement; CWABS' October 18, 2004, February 21, 2006, and August 8, 2006

11 Registration Statements; and CWHEQ's December 17, 2004 and August 4, 2005

12 Registration Statements.   Defendant Spector was concurrently the Senior

13 Managing Director of Secondary Marketing of Defendant CFC.

14      33.   Defendant Sieracki was, at relevant times, the Executive Vice

15 President, Chief Financial Officer ("CFO"), Treasurer and member of the Board

16 of Directors for CWALT, CWMBS, and CWABS.  Defendant Sieracki signed:

17 CWALT's July 25, 2005 Registration Statement; CWMBS' July 25, 2005

18 Registration Statement; CWABS' February 21, 2006, August 8, 2006, and April

19 24, 2007 Registration Statements; and CWHEQ's August 4, 2005 Registration

20 Statement.  Defendant Sieracki was concurrently the Executive Vice President

21 and CFO of Defendant CFC.

22      34.   Defendant Adler was, at relevant times, President, CEO and a

23 member of the Board of Directors for CWALT, CWMBS, CWABS and

24 CWHEQ.  Defendant Adler signed CWABS' April 24, 2007 Registration

25 Statement.

26      35.   Defendant Kripalani was, at relevant times, a member of CWALT's,

27 CWMBS', CWABS' and CWHEQ's Board of Directors.  Defendant Kripalani

28

11

signed CWABS' April 24, 2007 Registration Statement. Defendant Kripalani was concurrently the Senior Managing Director of Defendant CCM.

36. Defendant Sandefur was, at relevant times, a member of CWALT's, CWMBS', CWABS' and CWHEQ's Board of Directors. Defendant Sandefur signed CWABS' April 24, 2007 Registration Statement. Defendant Sandefur was concurrently the Senior Managing Director and Treasurer of Defendant CHL.

37. Defendant Sambol was, at relevant times, President, CEO and a member of the Board of Directors for CWHEQ. Sambol also was the mastermind of Countrywide's mortgage-backed securities business. Defendant Sambol signed CWHEQ's January 10, 2007, March 2, 2007 and April 17, 2007 Registration Statements. Defendant Sambol was concurrently the President and COO of Defendant CFC.

38. Defendant Mozilo is the co-founder of CFC and served on CFC's Board of Directors from 1969 to July 1, 2008. Mozilo also served as the Chairman of CFC's board of directors from March 1999 and in various other executive positions since CFC's inception, including President from March 2000 through December 2003, and CEO from February 1998 to July 1, 2008. He was a member of CFC's Executive Strategy Committee, which, from its creation in 2005, was responsible for establishing and evaluating Countrywide's overall strategic direction and governing its annual planning process. Mozilo also served on CFC's Credit Committee and Finance Committee and, as CEO and Chairman of CFC's board, directly oversaw the Ethics and Asset/Liability Committees. Mozilo resigned from all of the above positions on July 1, 2008. Mozilo resides in Thousand Oaks, California.

39. Defendants Kurland, Spector, Sieracki, Adler, Kripalani, Sandefur and Sambol are collectively referred to hereinafter as the "Individual Defendants."

40.   Defendants CWALT, CWMBS, CWABS and CWHEQ, and CFC are collectively referred to herein as the "Issuing Defendants."

41.   Defendants CFC, CCM, CSC, Deutsche Bank, UBS, RBS, and Barclays are collectively referred to herein as the "Underwriter Defendants."

42.   The Issuing Defendants and Underwriter Defendants are collectively referred to herein as the "Issuing and Underwriter Defendants."

## SUBSTANTIVE ALLEGATIONS

### I.   THE SECURITIZATION PROCESS GENERALLY

43.   Traditionally, the process for extending mortgage loans to borrowers involved a lending institution (the loan originator) making a loan to a home buyer in exchange for a promise, documented in the form of a promissory note, by the home buyer to repay the principal and interest on the loan.  The loan originator obtained a lien against the home as collateral in the event the home buyer defaulted on its obligation.  Under this simple model, the loan originator held the promissory note until it matured, and was exposed to the risk that the borrower might fail to repay the loan.  As such, the loan originator had a financial incentive to ensure that the borrower had the financial wherewithal to repay the promissory note, and that the underlying property had sufficient value to enable the originator to recover its principal and interest in the event that the borrower defaulted.

44.   Beginning in the 1990s, however, banks and other mortgage lending institutions increasingly used securitization to finance the extension of mortgage loans to borrowers.  Under the securitization process, after a loan originator issues a mortgage to a borrower, the loan originator sells the mortgage to a third-party financial institution.  By selling the mortgage, the loan originator not only obtains fees, but receives the proceeds from the sale of the mortgage up front, and thereby has new capital to issue more mortgages.  The financial institutions that purchase the mortgages then pool the mortgages together and securitize the mortgages into what are commonly referred to as residential mortgage-backed securities or

1   RMBS.   In this manner, unlike the traditional process for extending mortgage
2   loans, the loan originator is no longer subject to the risk that the borrower may
3   default; that risk is transferred with the mortgages to investors who purchase the
4   RMBS.

5       45.   The securitization of residential mortgage loans, and the creation of
6   RMBS collateralized against these loans, typically follows the same structure and
7   pattern in every transaction.   First, a loan originator, such as a mortgage lender or
8   bank, originates the underlying residential mortgage loan.   After a loan has been
9   made, a "sponsor" or "seller" (who either originated the loans itself or acquired
10  the loans from other loan originators) sells the mortgage loans to a "depositor."
11  The depositor pools these loans and deposits them into a special purpose entity or
12  trust created by the depositor.   One trust is established to hold the pool of
13  mortgages for each proposed offering.   In order to facilitate multiple offerings of
14  RMBS, a depositor sets up multiple trusts to hold the different pools of mortgages
15  that are to be securitized.   In the case of each offering, in return for the pool of
16  mortgages acquired from the depositor, the trust issues and distributes RMBS
17  certificates to the depositor.   The depositor then works with an underwriter to
18  price and sell the certificates to investors.   Thereafter, a servicer is appointed to
19  service the mortgage loans held by the trust, *i.e.*, to collect the mortgage payments
20  from the borrower in the form of principal and interest, and to remit them to the
21  trust for administration and distribution to the RMBS investors.   The diagram
22  below illustrates the typical structure of a securitization:

23
24
25
26
27
28

14



46.     In selling the certificates to investors, the depositor and underwriters disseminate to investors various disclosure or offering documents describing the certificates being sold.    The offering documents comprise: (1) a "shelf" registration statement (under SEC Rule 415, an issuer may file one registration statement covering several offerings of securities made during a period of up to three years after the filing of the registration statement); (2) a "base" prospectus; and (3) a "prospectus supplement."   Because a depositor will create multiple trusts to hold different pools of mortgages for multiple offerings of RMBS (as described above), the depositor files one shelf registration statement and one base prospectus that apply to multiple trusts that the depositor proposes to establish. With respect to each specific trust, however, the depositor also files a prospectus supplement that applies only to that particular trust.   Thus, for any given offering of securities, the relevant offering documents will typically be a shared registration statement and shared base prospectus, as well as an individual, trust-specific prospectus supplement.

47.     Each investor who purchases an RMBS certificate is entitled to receive monthly payments of principal and interest from the trust.   The order of

priority of payment to each investor, the interest rate to be paid to each investor, and other payment rights accorded to each investor, including the speed of principal repayment, depend on which class or tranche of certificates the investor purchases.

48.     The highest or senior tranche is the first to receive its share of the mortgage payments and is also the last to absorb any losses should mortgage borrowers become delinquent or default on their mortgages.  Accordingly, these senior tranches receive the highest investment rating by the rating agencies, usually AAA.    After the senior tranche, the middle tranches (referred to as mezzanine tranches) next receive their share of the proceeds.  These mezzanine tranches are generally rated from AA to BB by the rating agencies.  The process of distributing the mortgage proceeds continues down the tranches through to the bottom tranches, referred to as equity tranches.  This process is repeated each month and all investors receive the payments owed to them so long as the mortgage borrowers are current on their mortgages.

## II.    THE COUNTRYWIDE SECURITIZATIONS AND ABP'S INVESTMENTS IN THE CERTIFICATES

49.     In the case of Countrywide's securitizations, the transactions among the originator/sponsor/seller, depositor, trusts and underwriters were not arms-length transactions, as CFC controlled nearly all the entities.

50.     CFC set up each of the Defendants CWALT, CWMBS, CWABS, and CWHEQ to act as the depositor.  In their role as the depositors, Defendants CWALT, CWMBS, CWABS and CWHEQ then set up numerous issuing trusts for the issuance of RMBS.  In this case, the trusts established by CWALT, CWMBS, CWABS and CWHEQ from which ABP purchased the Certificates in question were:

- CWABS Revolving Home Equity Loan Trust, Series 2004-Q
- CWABS Revolving Home Equity Loan Trust, Series 2004-R

16

- CWHEQ Revolving Home Equity Loan Trust, Series 2005-A
- CWALT Alternative Loan Trust 2005-J1
- CWALT Alternative Loan Trust 2005-40CB
- CWHEQ Revolving Home Equity Loan Trust, Series 2005-D
- CWHEQ Revolving Home Equity Loan Trust, Series 2005-E
- CHL Mortgage Pass-Through Trust 2006-HYB1
- CWABS Asset-Backed Certificates Trust 2006-24
- CWABS Asset-Backed Certificates Trust 2007-2
- CWABS Asset-Backed Certificates Trust 2007-6
- CWABS Asset-Backed Certificates Trust 2007-BC2
- CWABS Asset-Backed Certificates Trust 2007-8
- CWABS Asset-Backed Certificates Trust 2007-10
- CWABS Asset-Backed Certificates Trust 2007-11

(collectively, the "Issuing Trusts").

51.    In connection with their role as depositors, Defendants CWALT, CWMBS, CWABS and CWHEQ prepared and filed with the SEC numerous shelf registration statements.  This process was directed at all material times by CFC. For purposes of this action, the Certificates purchased by ABP are traceable to the following Registration Statements prepared and filed by Defendants CWALT, CWMBS, CWABS and CWHEQ:

### CWALT

| Registration Statement | Date Filed | Amount Registered |
|---|---|---|
| 333-117949 | September 23, 2004 | $ 24,126,942,035 |
| 333-125902 | July 25, 2005 | $45,335,287,290 |

FIRST AMENDED COMPLAINT                              Case No. CV 10-07275-MRP (MANx)

### CWMBS

| Registration Statement | Date Filed | Amount Registered |
|---|---|---|
| 333-125963 | July 25, 2005 | $40,742,304,251 |
| 333-131662 | March 6, 2006 | $60,846,662,430 |

### CWABS

| Registration Statement | Date Filed | Amount Registered |
|---|---|---|
| 333-118926 | October 18, 2004 | $60,598,485,932 |
| 333-135846 | August 8, 2006 | $ 58,102,953,923 |
| 333-140960 | April 24, 2007 | $113,336,555,700 |

### CWHEQ

| Registration Statement | Date Filed | Amount Registered |
|---|---|---|
| 333-121378 | December 17, 2004 | $20,000,000,000 |
| 333-126790 | August 4, 2005 | $30,572,949,813 |

52. By preparing the above Registration Statements, each of Defendants CWALT, CWMBS, CWABS and CWHEQ was an "issuer" within the meaning of the Securities Act, 15 U.S.C. §77b(a)(4) and the Exchange Act, 15 U.S.C. §78c(a)(8), of the Certificates traceable to the above Registration Statements. Each of the above Registration Statements was signed by the Individual Defendants.

18

53.  At the time of filing, each Registration Statement contained an illustrative form of a prospectus supplement that would be used in the offering of the Certificates.  At the effective date of the offering of the Certificates, the Underwriter Defendants prepared and filed a final Prospectus Supplement with the SEC containing a description of the mortgage pool underlying the Certificates and the underwriting standards by which the mortgages were originated.  The Underwriter Defendants then marketed and sold the Certificates pursuant to these Prospectus Supplements.

54.  Finally, after the Certificates were sold, CHL acted as the servicer of the mortgages held by the Issuing Trusts.

55.  The following chart summarizes and identifies (1) each Issuing Trust that issued and sold the Certificates purchased by ABP, (2) the dates of the Registration Statements and Prospectus Supplements pursuant to which the Certificates were issued and sold, and (3) the identities of the depositor, the underwriters, and the sponsor/seller for each issuance.

| Amended Registration Statement Date | Issuing Trust | Prospectus Supplement Date of Filing | Depositor | Underwriter(s) | Sponsor / Seller |
|---|---|---|---|---|---|
| 9/23/2004 | Alternative Loan Trust 2005-J1 | 2/1/2005 | CWALT | CSC | CHL |
| 10/18/04 | CWABS Revolving Home Equity Loan Trust, Series 2004-Q | 11/22/2004 | CWABS | CSC | CHL |
| | CWABS Revolving Home Equity Loan Trust, Series 2004-R | 12/21/2004 | CWABS | CSC | CHL |

FIRST AMENDED COMPLAINT

Case No. CV 10-07275-MRP (MANx)

| Amended Registration Statement Date | Issuing Trust | Prospectus Supplement Date of Filing | Depositor | Underwriter(s) | Sponsor / Seller |
|---|---|---|---|---|---|
| 12/17/04 | CWHEQ Revolving Home Equity Loan Trust, Series 2005-A | 2/22/2005 | CWHEQ | CSC/UBS | CHL |
| 7/25/2005 | Alternative Loan Trust 2005-40CB | 8/29/2005 | CWALT | CSC | CHL |
| 7/25/2005 | CHL Mortgage Pass-Through Trust 2006-HYB1 | 1/31/2006 | CWMBS | CSC | CHL |
| 8/4/2005 | CWHEQ Revolving Home Equity Loan Trust, Series 2005-D | 8/30/2005 | CWHEQ | CSC | CHL |
| | CWHEQ Revolving Home Equity Loan Trust, Series 2005-E | 8/30/2005 | CWHEQ | CSC | CHL |
| 8/8/2006 | CWABS Asset-Backed Certificates Trust 2006-24 | 1/4/2007 | CWABS | CSC/RBS | CHL |
| | CWABS Asset-Backed Certificates Trust 2007-2 | 3/2/2007 | CWABS | CSC/RBS | CHL |
| | CWABS Asset-Backed Certificates Trust 2007-6 | 4/3/2007 | CWABS | CSC/RBS | CHL |

20

| Amended Registration Statement Date | Issuing Trust | Prospectus Supplement Date of Filing | Depositor | Underwriter(s) | Sponsor / Seller |
|---|---|---|---|---|---|
| 4/24/2007 | CWABS Asset-Backed Certificates Trust 2007-BC2 | 4/30/2007 | CWABS | CSC | CHL |
| | CWABS Asset-Backed Certificates Trust 2007-8 | 6/4/2007 | CWABS | CSC/Lehman/ RBS | CHL |
| | CWABS Asset-Backed Certificates Trust 2007-10 | 7/3/2007 | CWABS | CSC/ Barclays/ Deutsche Bank | CHL |
| | CWABS Asset-Backed Certificates Trust 2007-11 | 7/3/2007 | CWABS | CSC/HSBC/ Merrill | CHL |

## III.   IMPORTANT FACTORS IN THE DECISION OF INVESTORS SUCH AS ABP TO INVEST IN THE CERTIFICATES

56.     In purchasing the Certificates, ABP, like other investors, attached critical importance to: (a) the underwriting standards used to originate the loans underlying the Certificates; (b) the appraisal methods used to value the properties securing the underlying mortgage loans; (c) the ratings assigned to the Certificates; and (d) the ability of the Issuing Trusts to establish legal title to the underlying loans.

57.     Sound underwriting was critically important to ABP because the ability of Countrywide's borrowers to repay principal and interest was the fundamental basis upon which the investments in the Certificate were valued.

FIRST AMENDED COMPLAINT                                    Case No. CV 10-07275-MRP (MANx)

Reflecting the importance of the underwriting standards, each of the Offering Documents contained representations concerning the standards purportedly used to underwrite the mortgages held by the Issuing Trusts. For example, each of the Registration Statements issued by CWALT and CWMBS represented that: "All of the mortgage loans in the trust fund will have been originated or acquired by Countrywide Home Loans in accordance with its credit, appraisal and underwriting standards. Countrywide Home Loans' underwriting standards are applied in accordance with applicable federal and state laws and regulations." Each of the Registration Statements issued by CWABS and CWHEQ similarly indicated the importance of loan underwriting, expressing their compliance with "applicable federal and state laws and regulations."[2]

58. Independent and accurate real estate appraisals were also critically important to investors such as ABP because they ensured that the mortgage loans underlying the Certificates were not under-collateralized, thereby protecting RMBS investors in the event a borrower defaulted on a loan. As such, by allowing RMBS investors to assess the degree to which a mortgage loan was adequately collateralized, accurate appraisals provided investors such as ABP with a basis for assessing the price and risk of the Certificates.

59. One measure that uses the appraisal value to assess whether mortgage loans are under-collateralized is the loan-to-value ("LTV") ratio. The LTV ratio is a mathematical calculation that expresses the amount of a mortgage

---

[2] *See, e.g.,* Registration Statement filed by CWABS on Form S-3/A on February 21, 2006 (at S-38) ("Prior to the funding of any credit blemished mortgage loan, Countrywide Home Loans underwrites the related mortgage loan *in accordance with the underwriting standards established by Countrywide Home Loans.* In general, the mortgage loans are underwritten centrally by a specialized group of underwriters who are familiar with the unique characteristics of credit blemished mortgage loans. In general, Countrywide Home Loans does not purchase any credit blemished mortgage loan that it has not itself underwritten.") (emphasis added).

FIRST AMENDED COMPLAINT                    Case No. CV 10-07275-MRP (MANx)

as a percentage of the total value of the property, as obtained from the appraisal. For example, if a borrower seeks to borrow $900,000 to purchase a house worth $1,000,000, the LTV ratio is $900,000/$1,000,000, or 90%. If, however, the appraised value of the house is artificially increased to $1,200,000, the LTV ratio drops to just 75% ($900,000/$1,200,000).

60.    From a lender's perspective, the higher the LTV ratio, the riskier the loan, because it indicates the borrower has a lower equity stake, and a borrower with a lower equity stake in a property has less to lose if s/he defaults on the loan. Worse, particularly in an era of falling housing prices, a high LTV ratio creates the heightened risk that, should the borrower default, the amount of the outstanding loan may *exceed* the value of the property.

61.    Real estate appraisals are governed by USPAP, which are the generally accepted standards for professional appraisal practice in North America promulgated by the Appraisal Standards Board of the Appraisal Foundation, as authorized by Congress. With respect to real estate appraisals, USPAP requires the following:

> An appraiser must perform assignments with impartiality, objectivity, and independence, and without accommodation of personal interests.
>
> In appraisal practice, an appraiser must not perform as an advocate for any party or issue.
>
> An appraiser must not accept an assignment that includes the reporting of predetermined opinions and conclusions.
>
> * * * * *
>
> It is unethical for an appraiser to accept an assignment, or to have a compensation arrangement for an assignment, that is contingent on any of the following:
>
> 1.    the reporting of a predetermined result (e.g., opinion of value);

2.     a direction in assignment results that favors the cause of the client;

3.     the amount of a value opinion;

4.     the attainment of a stipulated result; or

5.     the occurrence of a subsequent event directly related to the appraiser's opinions and specific to the assignment's purpose.

62.    Reflecting the importance of independent and accurate real estate appraisals to investors such as ABP, the Offering Documents contained extensive disclosures concerning the value of the collateral underlying the mortgages pooled in the Issuing Trusts, and the appraisal methods by which such values were obtained. Each Prospectus Supplement also reported the average LTV ratios of the mortgage loans pooled in the Issuing Trusts.

63.    The rating assigned to each of the Certificates was another important factor in ABP's decision to purchase the Certificates. ABP and other investors relied on the ratings as an indicator of the safety and likelihood of default of the mortgage loans underlying a particular Certificate. Consistent with its conservative corporate investment guidelines, ABP purchased the Certificates because they all were rated AAA or were otherwise investment grade.

64.    Finally, in purchasing the Certificates, ABP relied on the ability of each of the Issuing Trusts to be able to show that it in fact had legal title to the underlying mortgage loans. ABP would never have purchased any of the Certificates if there was any doubt as to whether the Issuing Trusts had legal title to any of the mortgage loans pooled for each offering.

FIRST AMENDED COMPLAINT            Case No. CV 10-07275-MRP (MANx)

IV.   **COMMENCING IN 2003, COUNTRYWIDE KNOWINGLY ENGAGED IN WIDESPREAD AND SYSTEMATIC ABANDONMENT OF ITS UNDERWRITING GUIDELINES AND STANDARDS WHEN ORIGINATING MORTGAGES**

65.   Because its loan-origination guidelines were ostensibly designed to ensure that loans would perform over time, Countrywide knew that the rigorousness of its guidelines – and its adherence to those guidelines – would materially affect the risk of investing in the Certificates.   Throughout Countrywide's expansion, Defendant Mozilo consistently represented that Countrywide would not sacrifice its strict and disciplined underwriting standards. Indeed, in January 2004, Mozilo publicly declared during a call with analysts that the Company's objective was to double its share of the national market for all mortgage loans to 30%, without compromising loan quality, stating that Countrywide would target the safest borrowers in the market in order to maintain its commitment to quality.  According to Mozilo, "*going for 30% mortgage share here is totally unrelated to quality of loans we go after … .  There will be no compromise in that as we grow market share.  Nor is there a necessity to do that.*" (emphasis added).

66.   During a March 15, 2005 conference call with analysts, when questioned about Countrywide's strategy for increasing market share, Mozilo responded by assuring Countrywide's shareholders as follows:

> Your question is 30 percent, is that realistic, the 30 percent [market share] goal that we set for ourselves in 2008? . . . Is it achievable? Absolutely  .  .  .  .  But I will say this to you, that *under no circumstances will Countrywide ever sacrifice sound lending and margins for the sake of getting to that 30 percent market share.* (emphasis added)

67.   Other senior Countrywide officers reiterated that the Company had not strayed from its underwriting standards, and would not do so in the future. For example, in an April 2005 conference call with analysts, Defendant Sieracki,

1   Countrywide's CFO, responded as follows to a question about whether
2   Countrywide had changed its underwriting protocols: "I think [Fair Isaac
3   Corporation ("FICO") credit scores, combined loan-to-value ratios, and debt-to-
4   income ratios] will remain . . . 'consistent with the first quarter and most of what
5   we did in 2004. We don't see any change in our protocol relative to the volume
6   [of] loans that we're originating."

7       68.   In subsequent years, Countrywide continued to assure investors that
8   the Company's underwriting procedures and credit risk management remained
9   highly rigorous.  For example, in its 2005 10-K, filed with the SEC on February
10  28, 2006, and subsequent SEC filings, Countrywide represented that:

11      *[Countrywide] ensure[s] . . . ongoing access to the secondary*
        *mortgage market by consistently producing quality mortgages and*
12      *servicing those mortgages at levels that meet or exceed secondary*
13      *mortgage market standards* . . . . [W]e have a major focus on ensuring
        the quality of our mortgage loan production and we make significant
14      investments in personnel and technology in this regard. (emphasis
15      added)

16      69.   As has now come to light, however, and contrary to Defendants'
17  representations in the Offering Documents, Countrywide knowingly engaged in a
18  systematic departure from its underwriting standards when originating the
19  mortgages underlying the Certificates purchased by ABP.  In order to achieve its
20  publicly vaunted and aggressive market share goals, and in order to profit from
21  the unprecedented housing boom at the beginning of the last decade, Countrywide
22  entered into a deliberate and calculated scheme of originating large numbers of
23  mortgage loans, regardless of the borrower's ability to pay, and then quickly
24  flipping these loans at a profit on the secondary market.  Under this scheme,
25  Countrywide intentionally and aggressively marketed mortgage loans to
26  borrowers with poor credit histories and who were thus at a heightened risk of
27  default.  Because such mortgage loans did not comply with Countrywide's
28  internal underwriting guidelines, Countrywide expediently abandoned its

FIRST AMENDED COMPLAINT                    Case No. CV 10-07275-MRP (MANx)

underwriting guidelines. The different ways by which Countrywide abandoned its underwriting guidelines have now been detailed extensively in numerous governmental investigations and private lawsuits.[3]

70. First, Countrywide abandoned its underwriting guidelines by internally adopting a "matching" strategy, under which Countrywide approved any mortgage product feature that was offered by a competitor. Under this matching strategy, Countrywide adopted mortgage product features offered by competitors regardless of whether those features constituted prudent underwriting. By mixing and matching the worst features of mortgage products from different competitors, Countrywide ensured a rush to the lowest common denominator, resulting in composite mortgage products that became the most aggressive within the industry, as further described below.

71. Second, Countrywide abandoned its underwriting guidelines by systematically disregarding and/or affirmatively manipulating the reported income, assets and employment status of borrowers seeking mortgage loans, in order to qualify these borrowers for mortgages. In many instances, this was accomplished by inflating borrowers' stated income, or facilitating income inflation by encouraging ineligible borrowers to resort to "no documentation loans" and "stated income loans", as described further below.

---

[3] *See, e.g., The People of the State of California v. Countrywide Financial Corporation, et al.*, No. LC081846. Similar actions have been filed in the States of Illinois and Connecticut. The allegations in these actions have been confirmed by investigations in other states such as Florida, Indiana, Washington and West Virginia, which revealed the nationwide scope of Countrywide's departures from the underwriting standards set forth in each Registration Statement and Supplemental Prospectus.

In addition, an FBI investigation of Countrywide has revealed further misconduct. *See, e.g.,* "FBI Investigates Countrywide – U.S. Scrutinizes Filings on Financial Strength, Loan Quality for Fraud" THE WALL STREET JOURNAL (March 8, 2008).

72.     Third, Countrywide departed from its underwriting guidelines by approving loans based on false affordability metrics, for example, the borrower's ability to make loan repayments based on low, introductory "teaser" interest rates. Countrywide deliberately omitted any assessment of the borrower's ability to make repayments once the interest rate reset to a higher rate, at the expiration of the teaser interest rate period.

73.     Fourth, Countrywide departed from its underwriting guidelines by implementing specific procedures by which employees – from the underwriter level up to regional vice presidents – were authorized to liberally make "exceptions" and issue loans even though the loans did not pass muster under Countrywide's underwriting guidelines.   Thus, Countrywide employees were specifically authorized to override any recommendation by Countrywide's "CLUES" underwriting system denying a loan, and even to change the terms of a loan suggested by CLUES.

74.     Because of the scheme described above, Countrywide was able to vastly expand the volume of its loan origination.   Between 2004 and 2006, Countrywide's total loan production increased, from $363 billion to $468 billion. In its 2006 annual report, Countrywide boasted that "[w]hile the overall residential loan production market in the United States has tripled in size since 2000, from $1.0 trillion to $2.9 trillion at the end of 2006, Countrywide has grown nearly three times faster, going from $62 billion in loan originations in 2000 to $463 billion in 2006."

A.     **COUNTRYWIDE ABANDONED ITS UNDERWRITING GUIDELINES BY ADOPTING A "MATCHING" STRATEGY TO KEEP PACE WITH COMPETITORS**

75.     Countrywide's "matching strategy," also known as the "supermarket strategy," was a key driver of the Company's wholesale abandonment of its underwriting guidelines.  Under this strategy, Countrywide committed to offering

28

any product and/or underwriting guideline if it was available from at least one competitor, which Countrywide defined broadly to include subprime lenders. Consequently, if Countrywide did not offer a product offered by a competitor, its production division invoked the matching strategy to add the product to Countrywide's menu of product offerings.   For example, if Countrywide's minimum FICO score for a product was 600, but a competitor's minimum score was 560, the production division invoked the matching strategy to reduce Countrywide's minimum required FICO score to 560.

76.   Internal documents and testimony provided in the SEC Action confirm that Countrywide knew its matching strategy was causing the Company to abandon prudent underwriting.   Specifically, John McMurray ("McMurray"), Countrywide's former Chief Risk Officer, gave explicit and alarming warnings to Defendants Sambol and Mozilo and other executives about the financial risks of Countrywide's origination practices, and recommended the implementation of stricter origination guidelines.

77.   In a June 2005 email to Defendant Sambol concerning guideline expansion and the company's growing credit risks, McMurray addressed the matching strategy and explained that "because the matching process includes comparisons to a variety of lenders, our [guidelines] will be a composite of the outer boundaries across multiple lenders[,]" and that because comparisons were only made to competitor guidelines where they were more aggressive and not used where they are less aggressive, Countrywide's *"composite guides [sic] are likely among the most aggressive in the industry."*

78.   McMurray repeatedly explained his view and the risks of the matching strategy to others within Countrywide, including Defendant Sambol, but these concerns were ignored.   McMurray explained that Countrywide's matching strategy ensured that Countrywide was the most aggressive originator in the market because "if you match one lender on – on one – on certain guidelines or

FIRST AMENDED COMPLAINT                                   Case No. CV 10-07275-MRP (MANx)

for certain products and then you match a separate lender on a different product
or a different set of guidelines, then in my view the composite of that – of that
two-step match would be more – would be more aggressive than either one of
those competitor reference points viewed in isolation."

79.    In a November 2, 2006 email that was forwarded to Defendant
Sambol, McMurray further warned that, when the composite matching strategy
"is done across multiple lenders, across products and across guidelines, the
composite set of guidelines will be the most aggressive credit in the market."  The
effect of this was that "our credit policy is ceded, on both a product-by-product as
well as item-by-item basis, to the most aggressive lenders in the market."
McMurray questioned whether *"we want to effectively cede our policy and is this
approach 'saleable' for a risk perspective to those constituents who may worry
about our risk profile*?"  Again, Sambol ignored these concerns and Countrywide
continued to implement its matching strategy.

80.    McMurray later testified in the SEC Action that the matching
strategy at Countrywide was a "corporate principle and practice that had a
profound effect on credit policy" at Countrywide.  In his testimony, McMurray
referred to his own handwritten notes from November 3, 2006, which showed that
he had discussed, with Defendant Sambol, McMurray's concern that he would be
blamed personally for loan products that McMurray *"never advocated and often
recommended against."*  In his notes, McMurray indicated that he discussed with
Sambol concerns about the "company's risk philosophy … [and] *'can't say no'
culture, pressure from matching and no brokering policies*."

81.    Countrywide never disclosed to Plaintiff or other investors that it had
a matching strategy that was causing the Company to cede its credit policy to the
most aggressive lenders in the market.  Countrywide's executives knew – and
kept it a secret – that the quality of loans originated by Countrywide was
deteriorating, and would continue to worsen.  Countrywide's internal emails

FIRST AMENDED COMPLAINT                                    Case No. CV 10-07275-MRP (MANx)

1   confirm that the matching strategy was not disclosed to anyone outside
2   Countrywide.  In a February 11, 2007 email to Sambol, McMurray stated that he
3   doubted Countrywide's composite matching strategy "would play well with
4   regulators, investors, rating agencies, etc. *To some, this approach might seem like*
5   *we've simply ceded our risk standards and balance sheet to whoever has the most*
6   *liberal guidelines*."   Information that Countrywide was actually the most
7   aggressive lender in the industry would have been extremely material to Plaintiff
8   and other investors.   According to Christopher Brendler, an analyst for Stifel
9   Nicholas who covered Countrywide commencing in January 2006 and was
10  deposed in the SEC Action, disclosure of the "matching strategy" "would have
11  been a very disturbing" because "to know that [Countrywide was] basically
12  seeking out the most aggressive policies and underwriting guidelines of [its]
13  competitors without consideration for other factors" meant that Countrywide was
14  "essentially creating a worst of the worst."

15          **B.      COUNTRYWIDE ABANDONED ITS UNDERWRITING GUIDELINES BY**
                **DELIBERATELY IGNORING OR MANIPULATING THE BORROWER'S**
16              **ABILITY AND WILLINGNESS TO REPAY THE LOAN**
17

18          82.     As represented in the Offering Documents, Countrywide's
19  underwriting guidelines were primarily intended to assess the ability and
20  willingness of the borrower to repay the mortgage loan, apart from the adequacy
21  of the mortgaged property as collateral for the loan.   Accordingly, Countrywide's
22  underwriting guidelines required the consideration of, among other things, the
23  borrower's assets, liabilities, income, employment history and credit history.
24  These items of information were used to calculate the borrower's debt-to-income
25  ratio, *i.e.*, the ratio of the borrower's total monthly credit obligations to the
26  borrower's gross monthly income.

27          83.     Notwithstanding these explicit requirements in its underwriting
28  guidelines, Countrywide extended numerous loans even though the borrower's

---

31