information was not provided, or even if it was, where that information was patently false and Countrywide's underwriters knew that the borrower was misrepresenting her or his income, occupation and other information, and was engaged in outright mortgage fraud. In many cases, Countrywide's employees actively assisted in the misrepresentation of income, occupation and other information.

84. These practices were most evident with respect to Countrywide's underwriting of the so-called stated asset, stated income ("SISA") loans, *i.e.*, a "low-doc" loan; and the no income, no assets ("NINA") loans, *i.e.*, a "no-doc" loan. Under the SISA program, the borrower's income and assets were simply stated in the loan application but not documented. Employment was verbally confirmed and income was supposed to be roughly consistent with incomes earned in the type of job claimed by the borrower. NINA loans allowed a borrower to simply state her/his income without providing any documentation or proof of this income.

85. With respect to SISA loans, Countrywide's employees deliberately omitted to take any steps to verify income information even though the means for such verification were readily available. According to an April 6, 2008 article entitled, "A Road Not Taken by Lenders," authored by Gretchen Morgenson of the NEW YORK TIMES, even though Countrywide had the right to verify stated income on an application through the Internal Revenue Service ("IRS") (and this check took less than one day to complete), Countrywide verified income with the IRS on only 3% to 5% of all loans that Countrywide made in 2006. In other situations, if a potential borrower applying for a SISA loan provided a bank name, address and account number for asset verification, it was the practice at Countrywide not to verify the bank balance.

86. Not only did Countrywide employees fail to verify income and other information, Countrywide employees circumvented Countrywide's guidelines by

affirmatively facilitating mortgage fraud by borrowers. According to a lawsuit filed by the Illinois Attorney General on June 25, 2008, with respect to reduced documentation loans, the only check on fraudulent income was a "reasonableness standard" allegedly employed by Countrywide. Early on, Countrywide employees were required only to use their judgment in deciding whether or not the stated income seemed reasonable. Beginning in 2005, to supplement an employee's judgment as to whether or not a potential borrower's income was "reasonable", Countrywide required its employees to utilize a website, www.salary.com, in order to determine if the borrower's stated income was indeed reasonable. The website, however, provides only a range of salaries based on the zip code and stated job title of the loan applicant.

87.    Many employees knew ahead of time the range of salaries that www.salary.com would provide for a particular job and, therefore, knew by how much they could overstate a borrower's income. Countrywide's loan officers typically explained to potential borrowers that "with your credit score of X, for this house, and to make Y payment, Z is the income that you need to make." After such advice, the borrower would state that she or he made Z amount of income. In this manner, Countrywide's loan officers affirmatively assisted loan applicants in submitting loan applications with *false income amounts*, so that applicants could get loans under false pretenses. Unsurprisingly, as a result of these departures from Countrywide's underwriting guidelines, the Illinois Attorney General found that approximately 90% of all reduced documentation loans sold out of one Chicago office had inflated incomes.

88.    Because of the ease with which SISA loans could be manipulated to secure approval, as described above, Countrywide employees routinely converted full documentation loan applications into SISA loan applications. In a May 7, 2007 letter to the Office of Thrift Supervision, Countrywide itself admitted that it engaged in a practice whereby, if Countrywide received proper income

1   documentation (*i.e.*, a W-2 form) demonstrating that the borrower did ***not*** qualify

2   for a loan, the loan was submitted as a SISA loan so as to obtain approval of the

3   loan.

4       89.   This practice is also detailed in a complaint filed by Mark Zachary

5   ("Zachary"), a former Regional Vice President of Countrywide KB Homes

6   Loans, Inc. ("CWKB"), in an action filed on January 17, 2008, styled *Zachary v.*

7   *Countrywide Financial Corporation,* No. 4:08-cv-00214 (S.D. Tex.).  According to

8   Zachary, loans were being canceled at prime regional operations centers as full

9   documentation loans and transferred to the sub-prime operations center in Plano,

10  Texas, as SISA or NINA loans.  Rather than denying an applicant based on the

11  information revealed in the original mortgage application, Countrywide pretended

12  that it did not see the disqualifying information (such as insufficient income or

13  assets) and, instead, allowed applicants to apply for a no documentation loan and,

14  according to Zachary, encouraged them to lie on these renewed applications.

15      90.   Numerous other sources confirm the extent by which Countrywide

16  departed from its underwriting guidelines by allowing and/or facilitating

17  misrepresentations by borrowers as to their income, occupation and other vital

18  information.  Countrywide's Quality Control group performed an audit ("4506

19  Audit") for the 10-month period ended on April 30, 2006, comparing the stated

20  income from a borrower's loan application to the income reported by that borrower

21  to the IRS.  The 4506 Audit revealed that ***fifty percent*** of the stated income loans

22  audited by the bank showed a variance in income from the borrowers' IRS filings

23  of greater than ten percent.  Of those, 69% had an income variance of ***greater than***

24  ***50%***.

25      91.   The results of the 4506 Audit were known by Countrywide

26  management, as they were reported to the Credit Risk Committee, Countrywide's

27  Chief Risk Officer, and Defendant Sambol, then head of loan production.

28  Additionally, Sambol shared the results of the audit with Mozilo, as reflected in a

34

1   June 1, 2006 email in which Mozilo stated "In a discussion with both Stan
2   [Kurland] and Dave [Sambol] it came to my attention that the *majority of pay*
3   *options being originated by us both wholesale and retail are based upon stated*
4   *income*. There is also some evidence that the information that the borrower is
5   providing us relative to their income does not match up with IRS records."
6   (emphasis added)

7       92.   Countrywide's facilitation of mortgage fraud by borrowers is also
8   confirmed by an arbitration commenced by the Mortgage Guaranty Insurance
9   Corporation ("MGIC"), an insurer of mortgage lenders against borrower defaults,
10  against Countrywide.   MGIC filed an arbitration demand against Countrywide
11  seeking to exercise its right to refuse to pay insurance claims on stated-income
12  loans on which the borrowers defaulted, claiming that Countrywide's
13  representations regarding the loans were "riddled with materially false
14  information."   To support its demand, MGIC hired investigators to find
15  representative examples of Countrywide's fraud, which MGIC described in its
16  complaint.   In one example ("MGIC Certificate No. 25797915"), a borrower's
17  application listed his occupation as a dairy foreman with a monthly stated income
18  of $10,500. With those credentials, the borrower qualified for a $350,000 primary
19  residence mortgage loan with a reported debt-to-income ratio of 43.26%. After the
20  borrower defaulted and Countrywide submitted a claim to MGIC, the insurer
21  investigated the claim and uncovered the fact that, the borrower was actually a
22  dairy milker earning only $1,100 per month, with a debt-to-income ratio of
23  403.40%, nearly ten times higher than what was represented by Countrywide. In
24  addition, the borrower was not purchasing the home as a primary residence.

25      93.   Similarly, in connection with a lawsuit filed by MBIA Insurance
26  Corporation ("MBIA") against Countrywide on September 30, 2008, MBIA
27  commissioned an analysis of pools of loans that it alleges it had been fraudulently
28  induced to insure. *MBIA Ins. Corp. v. Countrywide*, No. 08/602825 (N.Y. Sup.

35

1   Ct., filed Sept. 30, 2008). According to MBIA, the analysis revealed that *almost*
2   *90%* of defaulted or delinquent loans in at least one pool of Countrywide
3   securitizations showed material discrepancies.

4      94.   In a June 30, 2008 NBC Nightly News report, one former
5   Countrywide loan officer said that he had observed Countrywide supervisors
6   stand by and watch as loan officers entered fictitious income figures into
7   Countrywide's system until the borrower was approved for a loan. A borrower
8   stated in the same report that a Countrywide loan officer advised her to claim she
9   made more than twice her actual income when completing her own loan
10   application.

    **C.   COUNTRYWIDE DEPARTED FROM ITS UNDERWRITING GUIDELINES BY USING FALSE METRICS TO ASSESS ITS BORROWERS' ABILITY TO REPAY**

14      95.   Another widespread method by which Countrywide departed from
15   its underwriting practices was to assess borrowers' ability to pay based on false
16   metrics, so that the loan applications would pass muster.

17      96.   In an effort to increase the fees that it received, Countrywide steered
18   borrowers to loans with the highest interest rates and the most fees, while
19   concealing less expensive loan products that those customers could afford.
20   Among other products, Countrywide originated and sold adjustable rate
21   mortgages ("ARMs") with low initial or "teaser" interest rates. The "teaser" rate,
22   typically 1%-1.25%, only applied to the loan for the first month. Once the teaser
23   rate expired, the interest rate on the ARM reverted to a fully indexed rate.

24      97.   The fully indexed rate can change over time and is dependent on
25   fluctuations in the current value of the chosen rate index, such as the 11th District
26   Cost of Funds Index ("COFI"), the 12 Month Treasury Average Index or the
27   London Interbank Offer Rate. The fully indexed rate is calculated by adding the
28   current value of the rate index (which fluctuates monthly) to a margin agreed to

FIRST AMENDED COMPLAINT           Case No. CV 10-07275-MRP (MANx)

by the borrower.  The margin remains static for the life of the loan.  The margin on Countrywide loans could be as high as 4%.  Thus, if the Countrywide ARM identifies the rate index as COFI (which was at 2.8% in July 2008) and the margin as 4%, then once the cap or "teaser rate" has expired, the borrower will be subject to an interest rate equal to the fully indexed rate, or 6.8%, for that month.

98.    In the case of "option ARMs", the borrower had the option of making monthly payments as though the interest rate had not changed, thereby making only a "minimum" payment that was based on the teaser rate of 1% to 1.25% as opposed to the fully indexed rate of 6.8%.  This meant that the borrower was making payments that were less than the amount of interest accruing on the loan after the teaser rate had already expired.  The unpaid interest that accrued while the borrower was making the payment based on the teaser rate was tacked on to the principal (a process known as negative amortization).  Once the principal hit 115% of the original loan, the borrower's monthly payment immediately was raised to a level that would pay off the new balance (original principal plus the unpaid interest) of the loan.  This resulted in borrowers experiencing "payment shock" after the interest-only payment period expired.

99.    In order to ensure that mortgage products such as these ARMs and option ARMs passed muster, Countrywide engaged in the practice of approving the loans based on the borrower's ability to pay the teaser rate, as opposed to the fully indexed rate, and steered customers to "hybrid" ARMS.  Hybrid ARMS have a fixed interest rate for a period of 2, 3, 5, 7, or 10 years, and then an adjustable interest rate for the remaining loan term.  In the fourth quarter of 2006 alone, almost 60% of the borrowers who obtained subprime hybrid ARMs from Countrywide would not have qualified at the fully indexed rate, and 25% of the borrowers would not have qualified for any other Countrywide product, according to the Company's May 7, 2007 letter to the Office of Thrift Supervision.

37

100.   As a result of these underwriting practices, the number of ARM loans originated by Countrywide increased dramatically.   According to the January 27, 2011 Final Report of the National Commission on the Causes of the Financial and Economic Crisis in the United States ("The FCIC Report"), the volume of option ARMs retained on Countrywide's balance sheet continued to increase, growing from $5 billion in 2004 to $26 billion in 2005 and peaking in 2006 at $33 billion.   Meanwhile, the FCIC Report also states that the percentage of Countrywide's option ARMs that were negatively amortizing grew from just 1% in 2004 to 53% in 2005 and then to more than 90% by 2007.

101.   At all relevant times, Defendants were well aware of this practice of approving loans based on these false affordability metrics, and of the dangers posed by these ARM products.   Defendants were acutely aware of the likely crisis when the time came for the interest rates to reset and the borrowers experienced "payment shock."

102.   On August 1, 2005, Mozilo wrote an e-mail to Defendant Kurland and another executive stating that *"when the loan resets in five years there will be an enormous payment shock and if the borrower is not sufficiently sophisticated to truly understand this consequence then the bank will be dealing with foreclosure in potentially a deflated real estate market. This would be both a financial and reputational catastrophe."* (emphasis added)

103.   Ten months later, Mozilo reiterated his same concerns regarding the likely fate of Countrywide's ARMs.   According to the SEC, on June 1, 2006, Mozilo wrote an e-mail to Defendant Sambol and other executives expressing his concern that borrowers *"are going to experience a payment shock which is going to be difficult if not impossible for them to manage."* (emphasis added) He recommended that the Company deal with these issues expeditiously, stating that *"[w]e know or can reliably predict what's going to happen in the next couple of years."* (emphasis added)

FIRST AMENDED COMPLAINT                                    Case No. CV 10-07275-MRP (MANx)

104.   Countrywide has since admitted the degree to which it departed from prudent underwriting guidelines in originating ARMs.  In a December 13, 2007 memo that was sent to Mozilo, Countrywide's enterprise risk assessment officer noted that:

> Countrywide had reviewed limited samples of first- and second-trust-deed mortgages originated by Countrywide Bank during the fourth quarter of 2006 and the first quarter of 2007 in order to get a sense of the quality of file documentation and underwriting practices, and to assess compliance with internal policies and procedures. The review resulted in . . . the finding that ***borrower repayment capacity was not adequately assessed by the bank during the underwriting process*** for home equity loans. ***More specifically, debt-to-income (DTI) ratios did not consider the impact of principal [negative] amortization or an increase in interest.*** (emphasis in original).

105.   In a September 3, 2007 article entitled "Countrywide's Confident Tone Turned to Crisis," the LOS ANGELES TIMES reported that Countrywide tightened its lending standards in the summer of 2007 in order to ensure that borrowers could afford loans at the fully indexed rate (as opposed to just the teaser rate).  And, according to a December 28, 2007 LOS ANGELES TIMES article, "Prime Loans Seeing Rise in Defaults," Countrywide admitted that, had those guidelines been in effect during the relevant time period, "it would have rejected 89% of the option ARM loans it made in 2006, amounting to $64 billion, and $74 billion, or 83%, of those it made in 2005."

**D.    COUNTRYWIDE CREATED A PERMISSIVE CULTURE BY WHICH UNDERWRITING "EXCEPTIONS" WERE LIBERALLY ISSUED TO BORROWERS, FOR EXAMPLE, BY ALLOWING EMPLOYEES TO IGNORE AND OVER-RIDE THE RECOMMENDATIONS OF COUNTRYWIDE'S HIGHLY TOUTED CLUES UNDERWRITING PROGRAM**

106.   Countrywide departed from its underwriting guidelines by allowing "exception" loans to be made even though the exceptions were not justified under Countrywide's underwriting guidelines.  Although Countrywide's underwriting

1    guidelines allowed for exceptions to be made, such exceptions could be made
2    only when "compensating factors" were present.   Compensating factors were
3    defined to include the borrower's employment stability, favorable credit history,
4    and equity in the property.

5        107.   Instead of requiring employees to clearly document the process by
6    which exceptions were made, Countrywide created a high-pressure environment
7    that drove the origination of loans.   Furthermore, Countrywide implemented
8    specific procedures for bypassing the underwriting guidelines and liberally
9    granting exceptions.

10       108.   Countrywide's CLUES computer underwriting system generated a
11   loan analysis report that rated the borrower's creditworthiness and indicated
12   whether a proposed loan complied with Countrywide's underwriting standards.
13   Based on this analysis, the CLUES report would recommend that a loan be
14   approved, declined, or be referred for a further, manual analysis by a
15   Countrywide underwriter.   However, Countrywide employees were specifically
16   authorized to override any recommendation by CLUES denying a loan, by
17   obtaining the approval of a supervisor.   Countrywide employees were also
18   authorized to change the terms of loan as suggested by CLUES.   As a result,
19   Countrywide employees at every level were authorized to liberally make
20   exceptions to Countrywide's underwriting standards.

21       109.   If all else failed, Countrywide employees could also submit a request
22   for an exception to Countrywide's Structured Loan Desk in Plano, Texas, a
23   department set up specifically for the purpose of granting underwriting
24   exceptions.   Commencing in late 2004, the Structured Loan Desk employed
25   software called the Exception Processing System or EPS in order to obtain
26   approval for loans that should have been rejected by Countrywide's underwriting
27   standards.   The objectives of EPS were to approve virtually every borrower and
28   loan profile, especially high risk borrowers.   Consequently, as many as 15% to

FIRST AMENDED COMPLAINT                          Case No. CV 10-07275-MRP (MANx)

20% of the loans generated each day at the Company's Structured Loan Desk were run through EPS and very few were ever rejected.

110.  The orders to liberally grant underwriting exceptions came straight from senior management, as reflected in emails released in the SEC Action. These emails and other documents show that concerns about deteriorating underwriting standards were trumped by the understanding that Countrywide could off-load the risks by simply securitizing the loans in question.  Thus, on February 13, 2005 Defendant Sambol sent an e-mail which stated that the *"purpose of the [Structured Loan Desk] and our pricing philosophy"* was that *"we should be willing to price virtually any loan that we reasonably believe we can sell, securitize, without losing money, even if other tenders can't or won't do the deal*." (emphasis added)

111. In a July 28, 2005 email sent by Defendant Spector to Countrywide's managing directors and Secondary Markets senior executives, including Defendant Adler, Spector provided an update on Countrywide's exceptions strategy "going forward":

> As indicated in a previous note, when we first started the SLD [Structured Loan Desk], the intent was to be able to offer at least one option for borrowers who wanted exceptions to our underwriting guides. The thought was that we would offer borrower exceptions in our two major loan programs: 30-year fixed rate and 5/1 ARMs. In addition, both of these programs were set up for Alt A and as such we could price and sell under these programs. *While this process seemed to have worked well in the past, we have been recently seeing increased demand from Production for exceptions on all products in general and Pay Option loans in particular.*
>
> *             *             *
>
> In addition, Production has been expressing frustration that we were only offering major exceptions for 5/1 ARMs and 30-year fixed rates. As such, to the *widest extent possible, we are going to start allowing exceptions on all requests, regardless of loan programs, for loans less than $3million effective immediately*. The pricing methodology

we will use will be similar to that which we use for 30-year fixed rates and 5-1 Hybrids. *We will assume securitization in all cases.* (emphasis added)

112. Similarly, in a deposition provided in connection with the SEC Action, Defendant Adler confirmed that the Secondary Markets Structured Loan Desk did not review loans from an underwriting point of view, but reviewed them for their securitization potential only:

Q. Do you know whether Countrywide sometimes originated loans that were considered to be exceptions to its underwriting guidelines?

A. We did.

Q. To your knowledge, was there a process by which such loans were approved?

&ast; &ast; &ast;

THE WITNESS: There generally was, yes.

Q. And what is your understanding of that process?

A. Well, I was -- I was at the tail end of that process. There was -- we had guidelines, we had kind of core guidelines, and then we had these shadow guidelines, which were the kind of the second tier guideline, if you will. And then there was this third tier which would come to me. But essentially there were -- the tiering of guidelines related to the kind of the exception process. And there was an underwriting, they called it, Structured Loan Desk process in the divisions where loans would get referred to the Structured Loan Desk if they were outside, I believe, of kind of the core guidelines. And then if those loans were outside of even the shadow guidelines, then they would be referred to Secondary Marketing to determine if the loan could be sold given the exception that was being asked for.

&ast; &ast; &ast;

Q. Was one of the criteria for granting exceptions at the Secondary Loan Desk in Secondary Marketing whether or not the loan could be sold into the secondary market?

A. *That was the only criteria that we followed.*

42

113.   Other Countrywide officers knew and warned of the dangers of liberally granting exceptions to Countrywide's underwriting standards where there was no basis for doing so.   On May 22, 2005, John McMurray, Countrywide's then-Chief Risk Officer, warned Defendant Sambol that the loans originated as exceptions to Countrywide's stated origination guidelines were likely to experience higher default rates. He stated that *"exceptions are generally done at terms more aggressive than our guidelines"* and recommended that *"[g]iven the expansion in guidelines and the growing likelihood that the real estate market will cool, this seems like an appropriate juncture to revisit our approach to exceptions."* (emphasis added)

114.   These practices were also troublesome to many Countrywide employees, a significant number of which made efforts to report the improper conduct to authorities.   The FCIC Final Report stated that Countrywide had approximately 5,000 internal referrals of potentially fraudulent activity in its mortgage business in 2005, 10,000 in 2006 and 20,000 in 2007, according to Francisco San Pedro, the former senior vice president of special investigations at the company.   However, it filed only 855 suspicious activity reports in 2005, 2,895 in 2006, and 2,261 in 2007.[4]

115.   Despite being aware of the fact that the persistent issuance of exception loans was likely to result in higher default rates, Countrywide continued to aggressively grant them.   In a June 28, 2005 presentation, the Corporate Credit Risk Committee revealed to senior executives, including Defendant Sieracki, that nonconforming exceptions loans accounted for an astounding **40%** of all Countrywide loan originations.

---

[4] Suspicious activity reports, also known as SARs, are reports filed by FDIC-insured banks and their affiliates to the Financial Crimes Enforcement Network (FinCEN), a bureau within the Treasury Department that administers money-laundering laws, working with law enforcement to combat financial crimes.

FIRST AMENDED COMPLAINT                                        Case No. CV 10-07275-MRP (MANx)

## V. COUNTRYWIDE SYSTEMATICALLY FAILED TO OBTAIN APPRAISALS IN ACCORDANCE WITH INDUSTRY APPROVED APPRAISAL STANDARDS

116. Not only did Countrywide systematically abandon its underwriting guidelines, Countrywide also departed from USPAP when obtaining appraisals for the properties securing the mortgages underlying the Certificates.

117. According to Countrywide's "Subprime Appraisal Requirements", virtually every loan needed to be accompanied by at least one independent appraisal performed by an appraiser working through Countrywide's subsidiary, Landsafe Appraisals, Inc. ("Landsafe"), or a secondary appraisal from an "approved appraisal company", including eAppraiseIT.com, Lender Services Inc. and LandAmerica Lender Services.

118. Notwithstanding Countrywide's "Subprime Appraisal Requirements", the appraisals obtained by Countrywide underwriters were not independent. For example, since at least 2005, loan officers from all of Countrywide's origination divisions were permitted to (i) hire appraisers of their own choosing, (ii) discard appraisals that did not support loan qualification, and (iii) replace appraisers when necessary to obtain a more favorable LTV so as to qualify a loan for approval. Countrywide loan officers were allowed to lobby appraisers to assign particular values to a property in order to support the closing of a loan. In fact, Countrywide intimidated appraisers in order to hit the appraisals that Countrywide needed to support the making of a mortgage loan. By employing these practices, Countrywide methodically and deliberately enlisted appraisers in its scheme to inflate appraisals, which resulted in the issuance of low-quality, high-risk loans.

119. Numerous appraisers have confirmed that the inflation of appraisals was commonplace. For example, the owner of a small residential real estate appraisal firm in Illinois – who was approved and/or utilized by CHL and other originators in approximately 200 transactions – stated that mortgage brokers

would call him and say "I need this number." This appraiser also stated that he was frequently threatened with, "either give us this home value or you will never do business for us again."

120.   An independent appraiser from Florida, who was approved by CHL and other originators, stated that she was told by brokers and/or lenders that: "WE NEED THIS NUMBER, OR YOU WILL NEVER WORK FOR US AGAIN." In order to stay in business, she gave the valuations the broker or lender demanded, even if it required driving 20 miles away to identify a "comparable" sale that could be used to justify the appraisal. During the relevant period, this appraiser completed more than 100 appraisals for Defendant CHL and other originators that were inflated.

121.   A real estate appraiser in Las Vegas stated that when the Las Vegas market had peaked, Defendant CHL required appraisers to come up with real estate appraisals reflecting escalating values or it would blackball them. This appraiser conducted over 300 appraisals that in his opinion were inflated for CHL and other originators. According to this appraiser, typically the appraisals demanded by CHL were 15% to 25% over the actual market.

122.   Another independent appraiser stated that CHL in-house or outside loan officers demanded inflated numbers from him in Compton and Watts, California. The officers told him to either give them the appraisal numbers they wanted or that he would be "done" and that he would be blackballed by every lender doing business in California. According to this appraiser, he completed over 100 inflated appraisals just for CHL and one other originator. In some cases he was appraising houses for $100,000 more than they were worth in such dangerous neighborhoods that he never even got out of his car, but simply drove by and took pictures of the house and gave the broker or the lender the number that was demanded.

45

123. Apart from these numerous accounts from appraisers, multiple lawsuits have been filed against Countrywide and its appraisal subsidiary, Landsafe, as well as several of the "approved appraisal companies", alleging that the appraisals obtained were inflated.

124. On June 25, 2008 and July 24, 2008, shareholders of Fannie Mae and Freddie Mac, respectively, commenced derivative actions on behalf of those companies against, among others, Countrywide, Landsafe and eAppraiseIT.com. *See Agnes v. Raines,* No. 1:08-cv-01093-RJL (D.D.C.) (Fannie Mae) and *Adams Family Trust v. Syron,* No. 1:08-cv-00773-LMB-TCB (E.D. Va.) (Freddie Mac). In both actions, the plaintiff shareholders assert that Fannie and Freddie were harmed by purchasing from Countrywide portfolios of mortgage loans that had been made to borrowers based on artificially high and unjustified appraisals for the underlying real estate.

125. In the *Zachary* action, Zachary (a former employee of the Countrywide and KB Homes joint venture, CWKB) alleges that Landsafe – the only appraiser employed by CWKB to appraise the homes on behalf of the joint venture – was encouraged to inflate the value of appraised homes by as much as 6% in order to allow the borrower to "roll up" the closing costs of the mortgage. This practice resulted in the actual home value being less than the mortgaged amount, putting the home buyer "upside down" on the home immediately after purchasing it. It also put RMBS investors such as ABP at risk because they were unaware of the true value of the underlying real estate assets. The same practice is also described in *Zaldana, et al. v. KB Home, et al.,* No. CV 08-3399 (EDL) (N.D. Ca.), a class action brought on behalf of purchasers of houses built by KB Home. The plaintiffs in this action describe a process whereby KB Home paid Countrywide to make loans with subsidized initial payments to KB Home borrowers. This allowed KB Home to prop up the ostensible sales price of the houses and sell to buyers who would not otherwise be able to afford or qualify for

46

1  the monthly mortgage payments.   In turn, Countrywide had its Landsafe

2  appraisers ignore the subsidies and appraise the houses at the full stated sales

3  price, thereby inflating the actual value of the house.

4      126. In *Capitol West Appraisals, LLC v. Countrywide Financial Corp.*,

5  No. 2:08-cv-01520 (W.D. Wash.), *Clark v. Countrywide Home Loans, Inc.*, No.

6  2:09-cv-00036 (W.D. Wash.) and *Johnson v. KB Home*, No. 2:09-cv-00972-FJM

7  (D. Ariz.) – putative class actions filed on behalf of real estate appraisers and

8  homeowners nationwide – the plaintiffs allege that Countrywide engaged in

9  widespread appraisal-related misconduct by inflating the value of properties in

10  order to support the loans that it wished to make.   The plaintiffs in *Clark* allege

11  that Countrywide often required the borrower to have the property appraised by

12  its affiliates, LandSafe, Inc. and LandSafe Appraisal Services, Inc. These

13  lawsuits allege that this conduct violated the federal law requiring an in-house or

14  "staff appraiser" at a bank – as opposed to an independent contractor – to "be

15  independent of the lending, investment, and collection functions and not

16  involved, except as an appraiser, in the federally related transaction, and have no

17  direct or indirect interest, financial or otherwise, in the property."

18      127. In a stunning admission of its flagrant departure from proper

19  appraisal methods, since the end of 2007, Countrywide has tightened its standards

20  for appraisals it will accept.   For example, in a fall 2007 letter to its "Valued

21  Business Partner[s]," Countrywide provided "additional appraisal due diligence

22  controls" in soft markets "in an effort to make decisions based on accurate current

23  market values and trends."

## VI.   THE CREDIT RATINGS ASSIGNED TO COUNTRYWIDE'S CERTIFICATES MATERIALLY MISREPRESENTED THE CREDIT RISK OF THE CERTIFICATES

26      128. The AAA and otherwise investment grade credit ratings of the

27  Certificates were an important factor in Plaintiff ABP's decision to purchase the

28  Certificates.   Because Plaintiff is a conservative institutional investor, it

FIRST AMENDED COMPLAINT                Case No. CV 10-07275-MRP (MANx)

purchased only investment grade Certificates, the vast majority of which were rated AAA.

129.   Investment grade securities are understood by investors to be stable, secure and safe.  A rating of AAA denotes high credit quality, and is the same rating as those typically assigned to bonds backed by the full faith and credit of the United States Government, such as treasury bills. Historically, before 2007, investments with AAA ratings had an expected cumulative loss rate of less than 0.5 percent, with an annual loss rate of close to zero.  According to Standard and Poor's, the default rate on all investment grade corporate bonds (including AA, A and BBB) from 1981 to 2007, for example, averaged about .094% per year and was not higher than 0.41% in any year.

130.   The Defendants well understood (and banked on) the importance that purchasers of mortgage-backed securities attached to credit ratings.  In most cases, the purchasers were institutional investors such as ABP who did not have the knowledge, means or wherewithal to independently analyze the mortgage pools underlying any particular offering to verify for themselves that the ratings were accurately determined.

131.   Accordingly, Defendants featured the ratings prominently in the Offering Documents and discussed at length the ratings assigned to the Certificates, and the bases for the ratings.  Each Prospectus Supplement stated that the issuance of each tranche of the Certificates was conditioned on the assignment of particular, investment-grade ratings, and listed the ratings in a chart.   Almost all the Certificates purchased by Plaintiff were AAA-rated securities, and the remainder were also investment grade.

132.   Unbeknownst to ABP and other investors, at all relevant times, Defendants knew that the ratings were not reliable because those ratings were bought and paid for, and were supported by, flawed information provided by

Defendants to the rating agencies.   In fact, Countrywide manipulated the rating agencies to obtain the desired ratings for the Certificates.

133.  Specifically, the ratings of the Certificates were significantly compromised by the misinformation provided by Countrywide to the rating agencies.   Among other matters, Countrywide did not disclose to the rating agencies that the Company had abandoned its underwriting standards by, among other things, adopting a "matching" policy; manipulating the assets, liabilities, income and other important information concerning a borrower; using false metrics to qualify a borrower; and aggressively using exceptions to qualify borrowers.  Countrywide did not disclose that, in obtaining appraisals to value the underlying collateral, it used inflated appraisals that departed from industry approved standards.  Countrywide did not otherwise disclose its knowledge of the pervasive fraud that affected the mortgages underlying the Certificates.

134.  Apart from supplying incomplete and false information to the rating agencies, Countrywide also manipulated its relationship with the rating agencies in order to achieve the desired ratings.  The rating agencies received enormous revenues from the issuers who paid them for rating their securities.  Because the desired rating of a securitized product was the starting point for any securities offering, the rating agencies were actively involved in helping Countrywide structure the products to achieve the requested rating.  As a result, the rating agencies essentially worked backwards, starting with Countrywide's target rating and then working toward a structure that would yield the desired rating.  Among other things, the rating agencies instructed Countrywide on how much "credit enhancement" to provide to each tranche of the Certificates, in order to secure the desired ratings.

135.  In this manner, Countrywide was able to manipulate the rating agencies to achieve the inflated ratings it desired.   Through repeated communications with the rating agencies, Countrywide effectively was able to

1   reverse engineer aspects of the ratings models and then modify the structure of an

2   offering to improve the ratings without actually improving the underlying credit

3   quality.

4        136.   In a 2008 Report entitled "Summary Report of Issues Identified in

5   the Commission Staff's Examinations of Select Credit Rating Agencies", the SEC

6   confirms that the issuers and the rating agencies worked together so that securities

7   would receive the highest ratings:

> [T]ypically, if the analyst concludes that the capital structure of the
> RMBS does not support the desired ratings, this preliminary
> conclusion would be conveyed to the arranger. The arranger could
> accept that determination and have the trust issue the securities with
> the proposed capital structure and the lower rating or adjust the
> structure to provide the requisite credit enhancement for the senior
> tranche to get the desired highest rating. Generally, arrangers aim for
> the largest possible senior tranche, i.e., to provide the least amount of
> credit enhancement possible, since the senior tranche -- as the highest
> rated tranche -- pays the lowest coupon rate of the RMBS' tranches
> and, therefore, costs the arranger the least to fund.

16       137.   The rating process was further compromised by the practice of

17  "rating shopping." Countrywide did not pay for the credit rating agencies'

18  services until after the agencies submitted a preliminary rating.  Essentially, this

19  practice created bidding wars in which the issuers would hire the agency that was

20  providing the highest rating for the lowest price.  The credit rating agencies were

21  only paid if they delivered the desired investment grade ratings, and only in the

22  event that the transaction closed with those ratings.   "Ratings shopping"

23  jeopardized both the integrity and independence of the rating process.

24       138.   As a result, the Certificates were not worthy of the investment grade

25  ratings given to them, as evidenced most clearly by the fact that many of the

26  Certificates – all initially awarded investment grade ratings (mostly AAA) – have

27  now been downgraded to junk, a vast number of the underlying loans have been

28  foreclosed upon, and the remaining underlying loans are suffering from crippling

50

1  deficiencies and face serious risks of default.  The collective downgrade of AAA-

2  rated Certificates indicates that the ratings set forth in the Offering Documents

3  were false, unreliable and inflated.

4      139.  By including and endorsing the AAA and other investment grade

5  ratings contained in the Offering Documents, Defendants falsely represented that

6  they actually believed that the ratings were an accurate reflection of the credit

7  quality of the Certificates.

8  **VII.  COUNTRYWIDE FAILED TO ENSURE THAT TITLE TO THE**
   **UNDERLYING MORTGAGE LOANS WAS EFFECTIVELY**
9  **TRANSFERRED**

10     140.  A fundamental aspect of the mortgage securitization process is that

11 the issuing trust for each offering must obtain good title to the mortgage loans

12 comprising the pool for that offering.  This is necessary in order for the holders of

13 the RMBS to be legally entitled to enforce the mortgage loans in the event of

14 default.  Two documents relating to each mortgage loan must be validly

15 transferred to the trust as part of the securitization process – a promissory note

16 and a security instrument (either a mortgage or a deed of trust).

17     141.  The rules for these transfers are governed by the law of the state

18 where the property is located, by the terms of the pooling and servicing

19 agreement ("PSA") for each securitization, and by the law governing the issuing

20 trust (with respect to matters of trust law).  In general, state laws and the PSAs

21 require the promissory note and security instrument to be transferred by

22 indorsement, in the same way that a check can be transferred by indorsement, or

23 by sale.  In addition, state laws generally require that the trustee of the issuing

24 trust have physical possession of the original, manually signed promissory note in

25 order for the loan to be enforceable by the trustee against the borrower in the

26 event of a default by the borrower.

27     142.  In order to preserve the bankruptcy-remote status of the issuing trusts

28 in RMBS transactions, the notes and security instruments are generally not

directly transferred from the mortgage loan originator to the trust.  Rather, the notes and security instruments are initially transferred from the originator to the depositor, either directly or via one or more special-purpose entities.  After this initial transfer to the depositor, the depositor transfers the notes and security interests to the issuing trust for the particular securitization.  Each of these transfers must be valid under applicable state law in order for the trust to have good title to the mortgage loans.

143.  To ensure that the trust qualifies as a tax-free real estate mortgage investment conduit ("REMIC"), the PSA generally requires the transfers to the trust to be completed within a strict time limit after formation of the trust.  Furthermore, the applicable trust law in each state generally requires strict compliance with the trust documents, including the PSA, so that failure to comply strictly with the timeliness, indorsement, physical delivery and other requirements of the PSA with respect to the transfers of the notes and security instruments means that the transfers would be void and the trust would not have good title to the mortgage loans.

144.  The Offering Documents for the Certificates represented in substance that the Issuing Trust for the respective offering had obtained good title to the mortgage loans comprising the pool underlying the offering.  However, in actual fact, Countrywide routinely and systematically failed to comply with the requirements of applicable state laws and the PSAs for valid transfers of the notes and security instruments.  This has come to light as a result of recent foreclosure proceedings in connection with mortgage loans securitized by Countrywide.

145.  For example, in *Kemp v. Countrywide Home Loans, Inc.*, Bkrtcy. No. 08-18700 (D.N.J.), Countrywide sought to prove that the Bank of New York, as trustee for an issuing trust that purportedly held Mr. Kemp's mortgage, was entitled to enforce the mortgage.  Countrywide presented testimony by Linda DeMartini, who had been employed by Countrywide Home Loans Servicing L.P.

("Countrywide Servicing"), a servicer of residential home mortgage loans, for almost ten years as of August 2009 and was then a supervisor and operational team leader for the Litigation Management Department of Countrywide Servicing. Ms. DeMartini testified that, in her extensive career in the mortgage loan servicing business of Countrywide, "I had to know about everything … ."

146. According to Ms. DeMartini, Defendant CHL originated Mr. Kemp's loan in 2006 and transferred it to the Bank of New York as trustee for the issuing trust, but Countrywide Servicing retained the original note in its own possession and never delivered it to the Bank of New York because Countrywide Servicing was the servicer for the loan. Ms. DeMartini further testified that an "allonge" to the promissory note, which purported to transfer the note to the trust by indorsement, was prepared only for purposes of the litigation in 2009, long after the purported transfer of the loan to the trust in 2006, and also was never delivered to the trustee. Ms. DeMartini testified that there was no ordinary business practice of signing an allonge at the time a note was purportedly transferred. Critically, Ms. DeMartini testified that it was standard operating procedure for the physical documents to be retained within the corporate entity, that is, Countrywide, as opposed to providing it to the relevant issuing trust. According to Ms. DeMartini, that was *the normal course of business [because] we are the servicer, [and] we're the ones that are doing all the servicing, and that would include retaining the documents.*"

147. In this manner, Countrywide routinely did not transfer the original mortgage loan documents to the issuing trusts for RMBS transactions, but rather retained the original documents itself. Consequently, Defendants failed to validly assign the promissory notes and security instruments associated with many of the mortgage loans underlying the Certificates purchased by Plaintiff ABP.

FIRST AMENDED COMPLAINT                                    Case No. CV 10-07275-MRP (MANx)

**VIII. COUNTRYWIDE KNOWINGLY CHERRY-PICKED THE HIGHEST QUALITY LOANS FOR ITS OWN PORTFOLIO AND SOLD ONLY THE RISKIEST LOANS TO PLAINTIFF AND OTHER INVESTORS**

148.   In the Prospectus Supplements, Countrywide stated that it would not select loans for securitization "in a manner intended to affect the interests of the certificateholders adversely." This was a material representation as Plaintiff and other investors relied on assurances from Countrywide that the loans included in the pools for the Certificates were high-quality loans that had low credit risk.

149.   In reality, Countrywide was acting adversely to the interests of Plaintiff and other Certificate purchasers.   Countrywide protected its own investment portfolio by choosing the best quality loans for retention, while selling the riskiest loans to secondary market investors, including Plaintiff ABP.

150.   In the SEC Action, Countrywide's former Chief Risk Officer, Clifford Rossi, testified that in general the Company attempted to cherry-pick the best loans for its own investment portfolio. Rossi stated that "the general strategy that had been provided to me from people like Carlos Garcia [Executive Managing Director of Banking and Insurance at Countrywide] and Jim Furash [President of Countrywide Bank] and that would have been conveyed back again from -- from the parent was that -- and this is when I first started there, *was that the bank was to originate and to cherry pick the better quality assets.*" (emphasis added).

151.   Defendants were aware of the Company's practice of cherry-picking the better quality loans for its own portfolio as well as the fact that it would negatively affect the secondary market securitizations. On August 2, 2005, Defendant Sambol expressed his concerns regarding the company's policy of "cherry-picking" the best loans for itself in an e-mail to Mozilo and Defendant Kurland and Carlos Garcia. He stated, "While it makes sense for us to be selective as to the loans which the Bank retains, *we need to analyze the securitization implications on what remains if the bank is only cherry-picking*

FIRST AMENDED COMPLAINT                                    Case No. CV 10-07275-MRP (MANx)

*and what remains to be securitized/sold is overly concentrated with higher risk loans*. This concern and issue gets magnified as we put a bigger percentage of our pay option production into the Bank *because the remaining production then increasingly looks like an adversely selected pool*." (emphasis added).

## IX.   DEFENDANTS' MATERIAL MISSTATEMENTS AND OMISSIONS IN THE OFFERING DOCUMENTS

152.   In light of (a) the systematic abandonment by Countrywide of its underwriting guidelines; (b) the failure by Countrywide to obtain independent and accurate property appraisals; (c) the true credit risk of the underlying mortgages; (d) the failure to properly convey legal title to the Issuing Trusts; and (e) Countrywide's policy of cherry-picking loans for securitization, all as described above, the Offering Documents disseminated by Defendants in the course of selling the Certificates contained numerous false statements and omissions, as set forth below.

### A.   DEFENDANTS MADE FALSE AND MISLEADING STATEMENTS REGARDING COUNTRYWIDE'S UNDERWRITING GUIDELINES

153.   Defendants issued Offering Documents that contained the following misrepresentations concerning Countrywide's underwriting guidelines and practices, using identical or substantially similar language:

(a)   "*[T]he mortgage loans in the trust fund will have been originated or acquired by Countrywide Home Loans in accordance with its credit, appraisal and underwriting standards. Countrywide Home Loans' underwriting standards are applied in accordance with applicable federal and state laws and regulations.* Except as otherwise provided in this prospectus supplement, the underwriting procedures are consistent with those identified under "Mortgage Loan Program — Underwriting Process" in the prospectus." (emphasis added)

The above misstatements were contained in the following Offering Documents: Registration Statement filed by CWALT on Form S-3/A on Sept. 23, 2004 (at S-

55

18-20); Prospectus Supplement for CWALT Alternative Loan Trust 2005-J1 (Form 424B5), at S-74, S-76 (Feb. 1, 2005); Registration Statement filed by CWALT on Form S-3/A on July 25, 2005 (at S-18-19); Prospectus Supplement for CWALT Alternative Loan Trust 2005-40CB (Form 424B5), at S-24 (Aug. 29, 2005); Registration Statement filed by CWMBS on Form S-3 on July 25, 2005 (at S-20); Registration Statement by CWMBS (Form S-3/A) at S-52 (March 6, 2006); Registration Statement filed by CWHEQ on Form S-3 on Dec. 17, 2004 (at S-16); CWHEQ Revolving Home Equity Loan Trust, Series 2005-A, filed on Form 424B5 on February 22, 2005 (at S-19); Registration Statement filed by CWHEQ on Form S-3/A on August 4, 2005 (at S-19); Prospectus Supplement for CHL Mortgage Pass-Through Trust 2006-HYB1, filed on Form 424B5 on Jan. 31, 2006 (at S-64); Registration Statement filed by CWABS on Form S-3/A on Aug. 8, 2006 (at S-30); Prospectus Supplement for CWABS Asset-Backed Certificates Trust 2006-24, filed on Form 424B5 on January 4, 2007 (at S-39); Prospectus Supplement for CWABS Asset-Backed Certificates Trust 2007-2, filed on Form 424B5 on March 2, 2007 (at S-39); Prospectus Supplement for CWABS Asset-Backed Certificates Trust 2007-6, filed on Form 424B5 on April 3, 2007 (at S-38); Registration Statement filed by CWABS on Form S-3/A on April 24, 2007 (at S-32); Prospectus Supplement for CWABS Asset-Backed Certificates Trust 2007-8, filed on Form 424B5 on June 4, 2007 (at S-41-42); Prospectus Supplement for CWABS Asset-Backed Certificates Trust 2007-10, filed on Form 424B5 on July 3, 2007 (at S-41-42); Prospectus Supplement for CWABS Asset-Backed Certificates Trust 2007-11, filed on Form 424B5 on July 3, 2007 (at S-41-42); Prospectus Supplement for CWABS Asset-Backed Certificates Trust 2007-BC2, filed on Form 424B5 on April 30, 2007 (at S-35).

(b)  *"Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the*

FIRST AMENDED COMPLAINT                                    Case No. CV 10-07275-MRP (MANx)

*mortgaged property as collateral. Under those standards, a prospective borrower must generally demonstrate that the ratio of the borrower's monthly housing expenses (including principal and interest on the proposed mortgage loan and, as applicable, the related monthly portion of property taxes, hazard insurance and mortgage insurance) to the borrower's monthly gross income and the ratio of total monthly debt to the monthly gross income (the "debt-to-income" ratios) are within acceptable limits.* The maximum acceptable debt-to-income ratio, which is determined on a loan-by-loan basis varies depending on a number of underwriting criteria, including the Loan-to-Value Ratio, loan purpose, loan amount and credit history of the borrower. In addition to meeting the debt-to-income ratio guidelines, each prospective borrower is required to have sufficient cash resources to pay the down payment and closing costs." (emphasis added)

The above misstatements were contained in the following Offering Documents: Prospectus Supplement for CWABS Revolving Home Equity Loan Trust, Series 2004-Q (Form 424B5), at S-23 (Nov. 22, 2004); Prospectus Supplement for CWABS Revolving Home Equity Loan Trust, Series 2004-R (Form 424B5), at S-23 (Nov. 22, 2004); Registration Statement filed by CWALT on Form S-3/A on Sept. 23, 2004 (at S-18-20); Registration Statement filed by CWALT on Form S-3/A on July 25, 2005 (at S-18-19); Prospectus Supplement for CWALT Alternative Loan Trust 2005-40CB (Form 424B5), at S-24 (Aug. 29, 2005) Statement filed by CWMBS on Form S-3 on July 25, 2005 (at S-20); Registration Statement by CWMBS (Form S-3/A) at S-53 (March 6, 2006); Registration Statement filed by CWABS on Form S-3/A on Oct. 18, 2004 (at S-47); Registration Statement filed by CWHEQ on Form S-3 on Dec. 17, 2004 (at S-25); CWHEQ Revolving Home Equity Loan Trust, Series 2005-A, filed on Form 424B5 on February 22, 2005 (at S-20); Registration Statement filed by CWHEQ on Form S-3/A on August 4, 2005 (at S-25); Prospectus Supplement for CWHEQ Revolving Home Equity Loan Trust, Series 2005-D, filed on Form 424B5 on Aug. 30, 2005 (at S-22); Prospectus Supplement for CWHEQ Revolving Home

Equity Loan Trust, Series 2005-E, filed on Form 424B5 on Aug. 30, 2005 (at S-22); Prospectus Supplement for CHL Mortgage Pass-Through Trust 2006-HYB1, filed on Form 424B5 on Jan. 31, 2006 (at 25-26); Registration Statement filed by CWABS on Form S-3/A on Aug. 8, 2006 (at S-39); Prospectus Supplement for CWABS Asset-Backed Certificates Trust 2006-24, filed on Form 424B5 on January 4, 2007 (at S-40); Prospectus Supplement for CWABS Asset-Backed Certificates Trust 2007-2, filed on Form 424B5 on March 2, 2007 (at S-40); Prospectus Supplement for CWABS Asset-Backed Certificates Trust 2007-6, filed on Form 424B5 on April 3, 2007 (at S-39); Registration Statement filed by CWABS on Form S-3/A on April 24, 2007 (at S-40-41); Prospectus Supplement for CWABS Asset-Backed Certificates Trust 2007-8, filed on Form 424B5 on June 4, 2007 (at S-42); Prospectus Supplement for CWABS Asset-Backed Certificates Trust 2007-10, filed on Form 424B5 on July 3, 2007 (at S-41-42); Prospectus Supplement for CWABS Asset-Backed Certificates Trust 2007-11, filed on Form 424B5 on July 3, 2007 (at S-42); Prospectus Supplement for CWABS Asset-Backed Certificates Trust 2007-BC2, filed on Form 424B5 on April 30, 2007 (at S-36).

154. The above statements of material fact were untrue when made because they failed to disclose that Countrywide had systematically abandoned its stated underwriting standards, as well as underwriting standards imposed by state and federal law, in issuing the mortgages pooled into the Issuing Trusts. Specifically:

(a)   In contravention of its underwriting guidelines, Countrywide systematically ignored borrowers' repayment ability and the value and adequacy of the underlying collateral.

(b)   In contravention of Countrywide's underwriting guidelines, Countrywide employees ignored borrowers' debt-to-income ratios and instead extended loans even where income, occupation and other information was

FIRST AMENDED COMPLAINT                                Case No. CV 10-07275-MRP (MANx)

1   missing.    If the information that was provided was patently incorrect,

2   Countrywide intentionally ignored the deficiencies and failed to conduct

3   verifications when the means to do so were readily available.   Countrywide

4   employees coached borrowers to misstate their income on loan applications to

5   qualify for mortgage loans under Countrywide's underwriting standards, thereby

6   circumventing the underwriting guidelines.    Countrywide employees

7   circumvented the underwriting guidelines by converting loans requiring full

8   documentation into low-documentation or no-documentation loans.   In this way,

9   Countrywide was able to steer applicants to NINA and SISA loans in situations

10   where the borrowers would not otherwise have qualified for full documentation

11   loans.

12              (c)     In contravention of its underwriting guidelines, Countrywide

13   knowingly approved loans based on false metrics, such as the borrowers' ability

14   to repay based on introductory and one-off "teaser rates", despite Countrywide's

15   knowledge that the borrowers would not be able to afford the "fully indexed rate"

16   when the teaser rate expired.

17   **B.    DEFENDANTS MADE FALSE AND MISLEADING STATEMENTS
18         REGARDING COUNTRYWIDE'S USE OF EXCEPTIONS**

19       155.   Defendants issued Offering Documents that contained the following

20   misrepresentations concerning Countrywide's policy with respect to underwriting

21   exceptions:

22       (a)    *"Exceptions to Countrywide Home Loans' underwriting*
23              *guidelines may be made if compensating factors are*
24              *demonstrated by a prospective borrower."* (emphasis added)

25   The above misstatement was contained in the following Offering Documents:

26   CWHEQ Revolving Home Equity Loan Trust, Series 2005-A, filed on Form

27   424B5 on February 22, 2005 (at S-19-20); Prospectus Supplement for CWHEQ

28   Revolving Home Equity Loan Trust, Series 2005-D, filed on Form 424B5 on

Aug. 30, 2005 (at S-20-21); CWHEQ Revolving Home Equity Loan Trust, Series 2005-E, filed on Form 424B5 on Aug. 30, 2005 (at S-21-22); Prospectus Supplement for CWABS Revolving Home Equity Loan Trust, Series 2004-Q (Form 424B5), at S-23 (Nov. 22, 2004); Registration Statement filed by CWALT on Form S-3/A on Sept. 23, 2004 (at S-18-20); Registration Statement filed by CWALT on Form S-3/A on July 25, 2005 (at S-18-19); Prospectus Supplement for CWALT Alternative Loan Trust 2005-40CB (Form 424B5), at S-25 (Aug. 29, 2005); Registration Statement filed by CWMBS on Form S-3 on July 25, 2005 (at S-20) Registration Statement by CWMBS (Form S-3/A) at S-53 (March 6, 2006); Prospectus Supplement for CWABS Revolving Home Equity Loan Trust, Series 2004-R (Form 424B5), at S-20 (Nov. 22, 2004); Registration Statement filed by CWHEQ on Form S-3 on Dec. 17, 2004 (at S-20); Registration Statement filed by CWHEQ on Form S-3/A on August 4, 2005 (at S-20); Prospectus Supplement for CHL Mortgage Pass-Through Trust 2006-HYB1, filed on Form 424B5 on Jan. 31, 2006 (at S-65); Prospectus Supplement for CWABS Asset-Backed Certificates Trust 2007-10, filed on Form 424B5 on July 3, 2007 (at S-17).

  (b)   "On a case by case basis, Countrywide Home Loans may determine that, based upon compensating factors, a prospective borrower not strictly qualifying under the underwriting risk category guidelines described below warrants an underwriting exception."

The above misstatement was contained in the following Offering Documents: Registration Statement filed by CWHEQ on Form S-3 on Dec. 17, 2004 (at S-25-26); Registration Statement filed by CWABS on Form S-3/A on Oct. 18, 2004 (at S-18-20); Registration Statement filed by CWABS on Form S-3/A on Aug. 8, 2006 (at S-38); Prospectus Supplement for CWABS Asset-Backed Certificates Trust 2006-24, filed on Form 424B5 on January 4, 2007 (at S-16); Prospectus Supplement for CWABS Asset-Backed Certificates Trust 2007-2, filed on Form 424B5 on March 2, 2007 (at S-40); Prospectus Supplement for CWABS Asset-

1   Backed Certificates Trust 2007-6, filed on Form 424B5 on April 3, 2007 (at S-

2   16); Registration Statement filed by CWABS on Form S-3/A on April 24, 2007

3   (at S-40-41); Prospectus Supplement for CWABS Asset-Backed Certificates

4   Trust 2007-8, filed on Form 424B5 on June 4, 2007 (at S-17); Registration

5   Statement filed by CWABS on Form S-3/A on Oct. 18, 2004 (at S-47);

6   Prospectus Supplement for CWABS Asset-Backed Certificates Trust 2006-24,

7   filed on Form 424B5 on January 4, 2007 (at S-40); Prospectus Supplement for

8   CWABS Asset-Backed Certificates Trust 2007-11, filed on Form 424B5 on July

9   3, 2007 (at S-17); Prospectus Supplement for CWABS Asset-Backed Certificates

10   Trust 2007-BC2, filed on Form 424B5 on April 30, 2007 (at S-15).

11       156.   The above statements of material facts were untrue when made

12   because they failed to disclose that, in order to generate increased loan volume for

13   securitizations, and in contravention of Countrywide's underwriting guidelines,

14   Countrywide allowed non-qualifying borrowers to be approved for loans under

15   "exceptions" to Countrywide's underwriting standards, even though there were

16   no "compensating factors" that could possibly justify such an exception.

17   Countrywide incentivized its employees to liberally apply exceptions to

18   Countrywide's underwriting policies, and created specific procedures and

19   implemented software to systematically override or alter the recommendations of

20   Countrywide's CLUES underwriting system that was meant to weed out non-

21   qualifying loans.

22      **C.**   **DEFENDANTS MADE UNTRUE STATEMENTS AND OMISSIONS**

23           **REGARDING APPRAISALS AND LTV RATIOS**

24       157.   The Offering Documents represented that independent appraisals

25   were prepared for each mortgaged property and that reports were prepared to

26   substantiate these appraisals.   For example, the Offering Documents for the

27   CWALT and CWMBS Certificates contained, in sum or substance, the following

28   representation:

(a) *"Countrywide Home Loans obtains appraisals from independent appraisers or appraisal services for properties that are to secure mortgage loans . . .* The appraisers inspect and appraise the proposed mortgaged property and verify that the property is in acceptable condition. *Following each appraisal, the appraiser prepares a report which includes a market data analysis based on recent sales of comparable homes in the area and, when deemed appropriate, a replacement cost analysis based on the current cost of constructing a similar home. All appraisals are required to conform to Fannie Mae or Freddie Mac appraisal standards then in effect."* (emphasis added)

The above misstatements were contained in the following Offering Documents: Prospectus Supplement for CWALT Alternative Loan Trust 2005-40CB (Form 424B5), at S-26 (Aug. 29, 2005); Prospectus Supplement for CHL Mortgage Pass-Through Trust 2006-HYB1, filed on Form 424B5 on Jan. 31, 2006 (at S-64, S-66); Prospectus Supplement for CWALT Alternative Loan Trust 2005-J1 (Form 424B5), at S-74, S-76 (Feb. 1, 2005); Registration Statement by CWMBS (Form S-3/A) at S-54 (March 6, 2006); Prospectus Supplement for CWABS Revolving Home Equity Loan Trust, Series 2004-Q (Form 424B5), at S-23 (Nov. 22, 2004); Prospectus Supplement for CWABS Revolving Home Equity Loan Trust, Series 2004-R (Form 424B5), at S-23 (Nov. 22, 2004); CWHEQ Revolving Home Equity Loan Trust, Series 2005-A, filed on Form 424B5 on February 22, 2005 (at S-22); Registration Statement filed by CWHEQ on Form S-3/A on August 4, 2005 (at S-25); Prospectus Supplement for CWHEQ Revolving Home Equity Loan Trust, Series 2005-D, filed on Form 424B5 on Aug. 30, 2005 (at S-20-21); Prospectus Supplement for CWHEQ Revolving Home Equity Loan Trust, Series 2005-E, filed on Form 424B5 on Aug. 30, 2005 (at S-21); Registration Statement filed by CWABS on Form S-3/A on Aug. 8, 2006 (at S-39); Prospectus Supplement for CWABS Asset-Backed Certificates Trust 2006-24, filed on Form 424B5 on January 4, 2007 (at S-40); Prospectus Supplement for CWABS Asset-

1   Backed Certificates Trust 2007-6, filed on Form 424B5 on April 3, 2007 (at S-

2   39); Prospectus Supplement for CWABS Asset-Backed Certificates Trust 2007-8,

3   filed on Form 424B5 on June 4, 2007 (at S-42); Prospectus Supplement for

4   CWABS Asset-Backed Certificates Trust 2007-10, filed on Form 424B5 on July

5   3, 2007 (at S-42); Prospectus Supplement for CWABS Asset-Backed Certificates

6   Trust 2007-11, filed on Form 424B5 on July 3, 2007 (at S-42); Registration

7   Statement filed by CWABS on Form S-3/A on April 24, 2007 (at S-41);

8   Prospectus Supplement for CWABS Asset-Backed Certificates Trust 2007-BC2,

9   filed on Form 424B5 on April 30, 2007 (at S-36).

10      (b)   "Countrywide Home Loans' underwriting standards are applied
             in accordance with applicable federal and state laws and

11            regulations and *require an independent appraisal of the*

12            *mortgaged property prepared on a Uniform Residential*
             *Appraisal Report (Form 1004) or other appraisal form as*

13            *applicable to the specific mortgaged property type.* Each
             appraisal includes a market data analysis based on recent sales

14            of comparable homes in the area and, where deemed

15            appropriate, replacement cost analysis based on the current cost
             of constructing a similar home and generally is required to have

16            been made not earlier than 180 days prior to the date of

17            origination of the mortgage loan. Every independent appraisal
             is reviewed by a representative of Countrywide Home Loans

18            before the loan is funded, and an additional review appraisal is

19            generally performed in connection with appraisals not provided

20            by Landsafe Appraisals, Inc., a wholly owned subsidiary of
             Countrywide Home Loans … Variations in maximum loan

21            amount limits are permitted based on compensating factors."

22            (emphasis added)

23   The above misstatements were contained in the following Offering Documents:

24   Registration Statement filed by CWHEQ on Form S-3 on Dec. 17, 2004 (at S-25-

25   26); Registration Statement by CWHEQ (Form S-3) at S-25-26 (Aug. 4, 2005);

26   Registration Statement by CWABS (Form S-3/A) at S-47-48 (Oct. 18, 2004);

27   Registration Statement by CWABS (Form S-3/A) at S-39 (Aug. 8, 2006);

28   Registration Statement by CWABS (Form S-3/A) at S-41 (April 24, 2007);

63

FIRST AMENDED COMPLAINT                          Case No. CV 10-07275-MRP (MANx)

Prospectus Supplement for CWABS Asset Backed Certificates Trust 2006-24 (Form 424B5) at S-40 (Jan. 4, 2007); Prospectus Supplement for CWABS Asset Backed Certificates Trust 2007-2 (Form 424B5) at S-40 (March 2, 2007); Prospectus Supplement for CWABS Asset Backed Certificates Trust 2007-6 (Form 424B5) at S-39 (April 3, 2007); Prospectus Supplement for CWABS Asset Backed Certificates Trust 2007-8 (Form 424B5) at S-42-43 (June 4, 2007); Prospectus Supplement for CWABS Asset-Backed Certificates Trust 2007-8, filed on Form 424B5 on June 4, 2007 (at S-42); Prospectus Supplement for CWABS Asset-Backed Certificates Trust 2007-10, filed on Form 424B5 on July 3, 2007 (at S-42); Prospectus Supplement for CWABS Asset-Backed Certificates Trust 2007-11, filed on Form 424B5 on July 3, 2007 (at S-42); Registration Statement filed by CWABS on Form S-3/A on Oct. 18, 2004 (at S-47); Prospectus Supplement for CWALT Alternative Loan Trust 2005-40CB (Form 424B5), at S-26 (Aug. 29, 2005).

158.   The above representations were materially false and misleading in that they omitted to state that: (i) Countrywide violated its stated appraisal standards and in many instances materially inflated the values of the underlying mortgaged properties used to collateralize the Certificates; (ii) the appraisers were not independent from Countrywide, and Countrywide in fact exerted pressure on appraisers to come back with pre-determined, inflated and false appraisal values; (iii) the inflated appraisals obtained by Countrywide did not conform to USPAP and were not market data analyses of comparable homes in the area or analyses of the cost of construction of a comparable home; and (iv) the forms of credit enhancement applicable to certain tranches of the Certificates were affected by the total value of the underlying properties, and thus were inaccurate as stated. Countrywide omitted to disclose that it subordinated proper appraisals to the goal of originating and securitizing as many mortgage loans as it could.

FIRST AMENDED COMPLAINT                                   Case No. CV 10-07275-MRP (MANx)

159.   The Offering Documents also provided information regarding LTV ratios, in association with various loan groupings, including by loan type and documentation level, property type and geographical location.   Using identical or substantially similar language, the Offering Documents stated that, with respect to non-conforming loans, Countrywide Home's standard guidelines:

> "generally allow Loan-to-Value Ratios at origination of up to 95% for purchase money or rate and term refinance mortgage loans with original principal balances of up to $400,000, up to 90% for mortgage loans with original principal balances of up to $650,000, up to 75% for mortgage loans with original principal balances of up to $1,000,000, up to 65% for mortgage loans with original principal balances of up to $1,500,000, and up to 60% for mortgage loans with original principal balances of up to $2,000,000."

The above misstatement was contained in the following Offering Documents: Registration Statement filed by CWALT on Form S-3/A on July 25, 2005 (at S-20); Registration Statement by CWMBS (Form S-3/A) at S-54 (March 6, 2006); Registration Statement by CWALT (Form S-3/A) at S-20 (Sep. 23, 2004); Prospectus Supplement for CHL Mortgage Pass-Through Trust 2006-HYB1 (Form 424B5) at S-66 (Jan. 21, 2006); Prospectus Supplement for CWALT Alternative Loan Trust 2005-40CB (Form 424B5) at S-26 (Aug. 29, 2005); Registration Statement by CWMBS (Form S-3/A) at S-54 (March 6, 2006); Prospectus Supplement for CWABS Asset-Backed Certificates Trust 2007-2, filed on Form 424B5 on March 2, 2007 (at S-33, S-39); Prospectus Supplement for CWABS Asset-Backed Certificates Trust 2007-6, filed on Form 424B5 on April 3, 2007 (at S-32, S-43); Prospectus Supplement for CWABS Asset-Backed Certificates Trust 2007-8, filed on Form 424B5 on June 4, 2007 (at S-36, S-46); Prospectus Supplement for CWABS Asset-Backed Certificates Trust 2007-10, filed on Form 424B5 on July 3, 2007 (at S-36, S-46); Prospectus Supplement for CWABS Asset-Backed Certificates Trust 2007-11, filed on Form 424B5 on July 3, 2007 (at S-36, S-46).

FIRST AMENDED COMPLAINT                    Case No. CV 10-07275-MRP (MANx)

160. Certain of the Offering Documents also stated that "[n]o Initial Mortgage Loans had a Loan-to-Value Ratio at origination or on the closing date of more than 100.00%" and that:

> "Countrywide Home Loans' underwriting standards permit first mortgage loans with loan-to-value ratios at origination of up to 100% and second mortgage loans with combined loan-to-value ratios at origination of up to 100% depending on the program, type and use of the property, documentation level, creditworthiness of the borrower, debt-to-income ratio and loan amount."

The above misstatements were contained in the following Offering Documents: Registration Statement filed by CWALT on Form S-3/A on July 25, 2005 (at S-21); Registration Statement by CWHEQ (Form S-3) at S-25 (Dec. 17, 2004); Registration Statement by CWHEQ (Form S-3/A) at S-25 (Aug. 4, 2005); Prospectus Supplement for CWABS Asset-Backed Certificates Trust 2007-6 at S-39 (April 3, 2007); Registration Statement filed by CWABS on Form S-3/A on Oct. 18, 2004 (at S-47); Prospectus Supplement for CWABS Revolving Home Equity Loan Trust, Series 2004-Q (Form 424B5), at S-21 (Nov. 22, 2004); Prospectus Supplement for CWABS Revolving Home Equity Loan Trust, Series 2004-R (Form 424B5), at S-21 (Nov. 22, 2004); Registration Statement filed by CWHEQ on Form S-3 on Dec. 17, 2004 (at S-25); CWHEQ Revolving Home Equity Loan Trust, Series 2005-A, filed on Form 424B5 on February 22, 2005 (at S-20); Registration Statement by CWHEQ (Form S-3) at S-25-26 (Aug. 4, 2005); Prospectus Supplement for CWHEQ Revolving Home Equity Loan Trust, Series 2005-D, filed on Form 424B5 on Aug. 30, 2005 (at 22); Prospectus Supplement for CWHEQ Revolving Home Equity Loan Trust, Series 2005-E, filed on Form 424B5 on Aug. 30, 2005 (at 22); Prospectus Supplement for CWALT Alternative Loan Trust 2005-40CB (Form 424B5), at S-25 (Aug. 29, 2005); Prospectus Supplement for CHL Mortgage Pass-Through Trust 2006-HYB1, filed on Form 424B5 on Jan. 31, 2006 (at 26); Registration Statement filed by CWABS on Form

S-3/A on Aug. 8, 2006 (at S-39); Prospectus Supplement for CWABS Asset-Backed Certificates Trust 2006-24, filed on Form 424B5 on January 4, 2007 (at 28); Prospectus Supplement for CWABS Asset-Backed Certificates Trust 2007-2, filed on Form 424B5 on March 2, 2007 (at S-41); Prospectus Supplement for CWABS Asset-Backed Certificates Trust 2007-8, filed on Form 424B5 on June 4, 2007 (at S-42); Prospectus Supplement for CWABS Asset-Backed Certificates Trust 2007-10, filed on Form 424B5 on July 3, 2007 (at S-42); Prospectus Supplement for CWABS Asset-Backed Certificates Trust 2007-11, filed on Form 424B5 on July 3, 2007 (at S-42); Registration Statement filed by CWABS on Form S-3/A on April 24, 2007 (at S-41); Prospectus Supplement for CWABS Asset-Backed Certificates Trust 2007-BC2, filed on Form 424B5 on April 30, 2007 (at 28).

161. Each Prospectus Supplement referenced and incorporated into each Registration Statement stated the average LTV ratio of the mortgage loans included in the Issuing Trusts and the maximum LTV ratio of mortgage loans included in the Issuing Trusts. The prospectus Supplements described the LTV ratio of mortgages as equal to: (1) the principal balance of the mortgage loan at the date of origination, divided by; (2) the collateral value of the related mortgaged property, where the "collateral value" was the lesser of either the appraised value based on an appraisal made for Countrywide by an independent fee appraiser at the time of the origination of the related mortgage loan, or the sales price of the mortgaged property at the time of origination.

162. All of the representations regarding LTV ratios, described above, were materially false and misleading because the underlying appraisals used to determine the LTVs were improperly performed. The actual LTV ratios for numerous mortgage loans underlying the Certificates would have exceeded 100% if the underlying properties had been appraised by an independent appraiser according to USPAP as represented in the Offering Documents.

FIRST AMENDED COMPLAINT                    Case No. CV 10-07275-MRP (MANx)

**D.   DEFENDANTS MATERIALLY MISREPRESENTED THE ACCURACY OF THE CREDIT RATINGS ASSIGNED TO THE CERTIFICATES**

163.   Defendants represented in the Offering Documents that the vast majority of the Certificates purchased by Plaintiffs were rated "AAA," signifying that the risk of loss was virtually non-existent.  Defendants represented that the remaining Certificates were also investment grade – warranting a rating of at least "A" – signifying that the risk of loss was minimal.

164.   Defendants further represented in the Offering Documents, using identical or substantially similar language, that:

> "It is a condition to the issuance of the senior certificates that they be rated AAA by Standard & Poor's, a division of The McGraw- Hill Companies, Inc. ("S&P") and "Aaa" by Moody's Investors Service, Inc. ("Moody's"). It is a condition to the issuance of the Class M, Class B-1 and Class B-2 Certificates that they be rated at least "AA", "A" and "BBB", respectively, by S&P and that they be rated at least "Aa3," "A3" and "Baa2", respectively, by Moody's.
>
> ***The ratings assigned . . . to mortgage pass-through certificates address the likelihood of the receipt of all distributions on the mortgage loans by the related certificateholders under the agreements pursuant to which the certificates are issued. S&P's ratings take into consideration the credit quality of the related mortgage pool, including any credit support providers, structural and legal aspects associated with the certificates, and the extent to which the payment stream on the mortgage pool is adequate to make the payments required by the certificates.***" (emphasis added)

The above misstatements were contained in the following Offering Documents: Registration Statement filed by CWALT on Form S-3/A on Sept. 23, 2004 (at S-55); Prospectus Supplement for CWALT Alternative Loan Trust 2005-40CB (Form 424B5), at S-59-60 (Aug. 29, 2005); Prospectus Supplement for CWALT Alternative Loan Trust 2005-J1 (Form 424B5), at S-158-59 (Feb. 1, 2005); Registration Statement filed by CWALT on Form S-3/A on July 25, 2005 (at S-55); CWHEQ Revolving Home Equity Loan Trust, Series 2005-A, filed on Form