1   424B5 on February 22, 2005 (at S-64); Prospectus Supplement for CWHEQ

2   Revolving Home Equity Loan Trust, Series 2005-D, filed on Form 424B5 on

3   Aug. 30, 2005 (at S-61); CWHEQ Revolving Home Equity Loan Trust, Series

4   2005-E, filed on Form 424B5 on Aug. 30, 2005 (at S-63); Prospectus Supplement

5   for CWABS Revolving Home Equity Loan Trust, Series 2004-Q (Form 424B5),

6   at S-64 (Nov. 22, 2004); Prospectus Supplement for CWABS Revolving Home

7   Equity Loan Trust, Series 2004-R (Form 424B5), at S-64 (Nov. 22, 2004);

8   Registration Statement filed by CWMBS on Form S-3 on July 25, 2005 (at S-54);

9   Registration Statement by CWMBS (Form S-3/A) at S-138 (March 6, 2006);

10  Registration Statement filed by CWABS on Form S-3/A on Oct. 18, 2004 (at S-

11  70); Registration Statement filed by CWHEQ on Form S-3 on Dec. 17, 2004 (at

12  S-57); Registration Statement filed by CWHEQ on Form S-3/A on August 4,

13  2005 (at S-64); Prospectus Supplement for CHL Mortgage Pass-Through Trust

14  2006-HYB1, filed on Form 424B5 on Jan. 31, 2006 (at S-122); Registration

15  Statement filed by CWABS on Form S-3/A on Aug. 8, 2006 (at S-125);

16  Prospectus Supplement for CWABS Asset-Backed Certificates Trust 2006-24,

17  filed on Form 424B5 on January 4, 2007 (at S-131); Prospectus Supplement for

18  CWABS Asset-Backed Certificates Trust 2007-2, filed on Form 424B5 on March

19  2, 2007 (at S-129); Prospectus Supplement for CWABS Asset-Backed

20  Certificates Trust 2007-6, filed on Form 424B5 on April 3, 2007 (at S-125);

21  Prospectus Supplement for CWABS Asset-Backed Certificates Trust 2007-8,

22  filed on Form 424B5 on June 4, 2007 (at S-133); Prospectus Supplement for

23  CWABS Asset-Backed Certificates Trust 2007-10, filed on Form 424B5 on July

24  3, 2007 (at S-130); Prospectus Supplement for CWABS Asset-Backed

25  Certificates Trust 2007-11, filed on Form 424B5 on July 3, 2007 (at S-132);

26  Registration Statement filed by CWABS on Form S-3/A on April 24, 2007 (at S-

27  126); Prospectus Supplement for CWABS Asset-Backed Certificates Trust 2007-

28  BC2, filed on Form 424B5 on April 30, 2007 (at S-31).

FIRST AMENDED COMPLAINT                                  Case No. CV 10-07275-MRP (MANx)

165.  By touting the ratings of the Certificates, and in making the above statements in the Offering Documents, Defendants represented that they believed that the information provided to the rating agencies to support these ratings accurately reflected Countrywide's underwriting guidelines and practices, and the specific qualities of the underlying loans.  This representation was false, because Countrywide did not disclose to the rating agencies the extent of Countrywide's improper underwriting and appraisals, and Countrywide otherwise gamed the rating agencies to ensure it obtained the highest ratings even when those ratings were not warranted.  The falsity of this representation is further evidenced by the rapid downgrades of nearly all of the Certificates within a few years of issuance.

E.   **DEFENDANTS MATERIALLY MISREPRESENTED COUNTRYWIDE'S TRANSFER OF GOOD TITLE TO THE MORTGAGE LOANS TO THE ISSUING TRUSTS**

166.  Defendants stated in each of the Offering Documents, using identical or substantially similar language, that:

> "In addition, each of the sellers will represent and warrant that, prior to the sale of the related mortgage loans to the depositor, the applicable seller had good title to the mortgage loans sold by it. . . . Under the pooling and servicing agreement, *the depositor will assign all its right, title and interest in the representations, warranties and covenants (including the sellers' repurchase or substitution obligation) to the trustee for the benefit of the certificateholders.*" (emphasis added)

The above misstatement was contained in the following Offering Documents: Registration Statement filed by CWALT on Form S-3/A on July 25, 2005 (at S-11); Registration Statement by CWALT (Form S-3/A) at S-11 (Sep. 23, 2004); Prospectus Supplement for CWALT Alternative Loan Trust 2005-J1 (Form 424B5), at S-16 (Feb. 1, 2005); Prospectus Supplement for CWALT Alternative Loan Trust 2005-40CB (Form 424B5) at S-13 (Aug. 29, 2005); Registration Statement filed by CWMBS on Form S-3 on July 25, 2005 (at S-11); Registration

FIRST AMENDED COMPLAINT                                    Case No. CV 10-07275-MRP (MANx)

Statement by CWMBS (Form S-3/A) at S-48 (March 6, 2006); Prospectus Supplement for CHL Pass-Through Trust 2006-HYB1 (Form 424B5) at S-25 (Jan. 31, 2006); Registration Statement filed by CWABS on Form S-3/A on Oct. 18, 2004 (at S-40); Prospectus Supplement for CWABS Revolving Home Equity Loan Trust, Series 2004-Q (Form 424B5), at S-47-48 (Nov. 22, 2004); Prospectus Supplement for CWABS Revolving Home Equity Loan Trust, Series 2004-R (Form 424B5), at S-48 (Nov. 22, 2004); Registration Statement filed by CWHEQ on Form S-3 on Dec. 17, 2004 (at S-22); CWHEQ Revolving Home Equity Loan Trust, Series 2005-A, filed on Form 424B5 on February 22, 2005 (at 15, 51); Registration Statement filed by CWHEQ on Form S-3/A on August 4, 2005 (at S-22); Prospectus Supplement for CWHEQ Revolving Home Equity Loan Trust, Series 2005-D, filed on Form 424B5 on Aug. 30, 2005 (at S-44-45, 15, 51); Prospectus Supplement for CWHEQ Revolving Home Equity Loan Trust, Series 2005-E, filed on Form 424B5 on Aug. 30, 2005 (at S-46, 15, 51); Registration Statement filed by CWABS on Form S-3/A on Aug. 8, 2006 (at S-33); Prospectus Supplement for CWABS Asset-Backed Certificates Trust 2006-24, filed on Form 424B5 on January 4, 2007 (at S-35); Prospectus Supplement for CWABS Asset-Backed Certificates Trust 2007-2, filed on Form 424B5 on March 2, 2007 (at S-34); Prospectus Supplement for CWABS Asset-Backed Certificates Trust 2007-6, filed on Form 424B5 on April 3, 2007 (at S-34); Prospectus Supplement for CWABS Asset-Backed Certificates Trust 2007-8, filed on Form 424B5 on June 4, 2007 (at S-37); Prospectus Supplement for CWABS Asset-Backed Certificates Trust 2007-10, filed on Form 424B5 on July 3, 2007 (at S-36, S-37); Prospectus Supplement for CWABS Asset-Backed Certificates Trust 2007-11, filed on Form 424B5 on July 3, 2007 (at S-37); Registration Statement filed by CWABS on Form S-3/A on April 24, 2007 (at S-36); Prospectus Supplement for CWABS Asset-Backed Certificates Trust 2007-BC2, filed on Form 424B5 on April 30, 2007 (at S-28).

FIRST AMENDED COMPLAINT                              Case No. CV 10-07275-MRP (MANx)

167.   These representations were false because Defendants routinely failed to physically deliver the original promissory notes and security instruments for the mortgage loans to the issuing trusts, as required by applicable state laws and the PSAs.   These representations were also false because Defendants routinely failed to execute valid indorsements of the documents at the time of the purported transfer, as also required by applicable state laws and the PSAs.   The Issuing Trusts therefore did not possess good title to many of the mortgage loans and lacked legal authority to enforce many of the mortgage loans against the borrowers in the event of default.

**F.   DEFENDANTS MATERIALLY MISREPRESENTED THAT THEY DID NOT CHERRY-PICK MORTGAGE LOANS FOR INCLUSION IN COUNTRYWIDE'S SECURITIZATIONS**

168.   The Offering Documents stated, using identical or substantially similar language, that:

> "Countrywide Home Loans *will represent and warrant to the depositor in the pooling and servicing agreement . . . the selection was not made in a manner intended to affect the interests of the certificateholders adversely*." (emphasis added)

The above misstatement was contained in the following Offering Documents: Registration Statement filed by CWALT on Form S-3/A on July 25, 2005 (at S-11); Registration Statement for CWALT (Form S-3/A) at S-11 (Sep. 23, 2004); Registration Statement for CWMBS (Form S-3/A) at S-11 (July 25, 2005); Prospectus Supplement for CWALT Alternative Loan Trust 2005-J1 (Form 424B5), at S-16 (Jan. 26, 2006); Prospectus Supplement for CWALT Alternative Loan Trust 2005-40CB (Form 424B5) at S-12 (August 29, 2005); Registration Statement by CWMBS (Form S-3/A) at S-30 (March 6, 2006); Registration Statement filed by CWABS on Form S-3/A on Oct. 18, 2004 (at S-31); Prospectus Supplement for CHL Mortgage Pass-Through Trust 2006-HYB1, filed

FIRST AMENDED COMPLAINT                              Case No. CV 10-07275-MRP (MANx)

1    on Form 424B5 on Jan. 31, 2006 (at S-25); Registration Statement filed by

2    CWABS on Form S-3/A on Aug. 8, 2006 (at S-31); Prospectus Supplement for

3    CWABS Asset-Backed Certificates Trust 2006-24, filed on Form 424B5 on

4    January 4, 2007 (at S-32); Prospectus Supplement for CWABS Asset-Backed

5    Certificates Trust 2007-2, filed on Form 424B5 on March 2, 2007 (at S-31);

6    Prospectus Supplement for CWABS Asset-Backed Certificates Trust 2007-6,

7    filed on Form 424B5 on April 3, 2007 (at S-31); Prospectus Supplement for

8    CWABS Asset-Backed Certificates Trust 2007-8, filed on Form 424B5 on June 4,

9    2007 (at S-34); Prospectus Supplement for CWABS Asset-Backed Certificates

10   Trust 2007-10, filed on Form 424B5 on July 3, 2007 (at S-33); Prospectus

11   Supplement for CWABS Asset-Backed Certificates Trust 2007-11, filed on Form

12   424B5 on July 3, 2007 (at S-34); Registration Statement filed by CWABS on

13   Form S-3/A on April 24, 2007 (at S-33).

14   169.   The above statement was false because, in actual fact, Countrywide

15   systematically and routinely cherry-picked the worst mortgage loans for inclusion

16   in Countrywide's securitizations, retaining the best loans for Countrywide's own

17   portfolio.   Countrywide thus in fact acted adversely to the interests of Plaintiff

18   and other purchasers of Certificates.

19   **X.   DEFENDANTS KNEW THAT THE OFFERING DOCUMENTS**

20   **      CONTAINED MATERIAL MISSTATEMENTS AND OMISSIONS**

21   170.   The allegations below are made in support of Plaintiff's claims under

22   the Exchange Act, sections 25400(d) and 25500 of the California Corporations

23   Code and common-law fraud and not in support of Plaintiff's Securities Act

24   claims, which are based solely on strict liability and negligence.

25   171.   As set forth above, at all relevant times, Defendants knew that the

26   Offering Documents contained material misstatements and omissions.

27   Defendants' knowledge is evidenced by, among other things, the following:

28

FIRST AMENDED COMPLAINT                    Case No. CV 10-07275-MRP (MANx)

1
2
3

  - Countrywide intentionally abandoned its underwriting guidelines by deliberately adopting a "matching" strategy to keep pace with competitors. Countrywide continued with this strategy even though certain officers warned of the sharp deterioration in Countrywide's underwriting standards. *See supra* ¶¶ 75 to 81.

4
5
6
7

  - Countrywide intentionally abandoned its underwriting guidelines by deliberately ignoring or manipulating the borrower's ability and willingness to repay a given loan. Countrywide even permitted its employees to coach borrowers to misstate their income on loan applications to qualify for mortgage loans under Countrywide's underwriting standards, thereby circumventing the underwriting guidelines. *See supra* ¶¶ 82 to 94.

8
9
10
11
12
13

  - Countrywide intentionally abandoned its underwriting guidelines by deliberately using false metrics to assess borrowers' ability to repay. As set forth above, senior Countrywide executives, including Mozilo, were acutely aware of the dangers of these practices, and regularly discussed the potential crisis when the "teaser" interest rates on Countrywide's ARM products expired, resulting in "payment shock" for the borrowers. Reflecting their intentional abandonment of underwriting guidelines, Countrywide's executives nevertheless justified continuing with their practices because Countrywide would off-load the mortgage loans into the secondary market through securitization. *See supra* ¶¶ 95-105.

14
15
16
17

  - Countrywide intentionally abandoned its underwriting guidelines by creating a sophisticated, permissive culture by which underwriting "exceptions" were liberally issued to borrowers. Employees at all levels were allowed to ignore and over-ride the recommendations of Countrywide's highly touted CLUES underwriting program. Countrywide continued these practices despite repeated warnings from Countrywide's risk officers of the likelihood of high default rates for loans originated as exceptions. *See supra* ¶¶ 106 to 115.

18
19
20
21

  - Countrywide systematically and intentionally corrupted the appraisals of the property collateralizing the mortgage loans that Countrywide originated. By threatening to blackball and otherwise pressuring appraisers to inflate home values, Countrywide was methodicaly and deliberately enlisting appraisers in a scheme to inflate real estate appraisals in contravention of industry approved appraisal standards. *See supra* ¶¶ 116-127.

22
23
24
25
26
27

  - Countrywide collaborated with and gamed the rating agencies in order to secure the highest ratings for Countrywide's RMBS. Countrywide did not disclose the extent of its abandonment of its underwriting guidelines or its use of improper appraisals. Countrywide collaborated with the rating agencies to structure Countrywide's offerings of securities and to obtain sufficient "credit enhancement" to obtain the highest ratings possible. Where the ratings were not to Countrywide's satisfaction, Countrywide went to another rating agency to "shop" for a higher rating. *See supra* ¶¶ 128-139.

28

FIRST AMENDED COMPLAINT                    Case No. CV 10-07275-MRP (MANx)

- Countrywide knew that legal title to the underlying mortgages was not being properly conveyed to the Issuing Trusts, but deliberately failed to take steps to remedy this deficiency. *See supra* ¶¶ 140-147.

- The Underwriter Defendants knew, from the due diligence that they performed on the mortgage loans being pooled for securitization, that there were significant and extensive defects in the mortgage loans. The Underwriter Defendants commissioned due diligence reports from various external parties which showed that a significant proportion of the sampled loans analyzed had defects, including breaches of Countrywide's underwriting guidelines and improper appraisals. Despite this knowledge, the Underwriter Defendants waived the breaches and allowed large numbers of these defective mortgages to be included in the mortgage pools used to collateralize the Certificates sold to ABP and other investors. *See infra* ¶¶ 188-198.

172. Additionally, Countrywide's knowledge is clearly evidenced by Countrywide's self-interested conduct in protecting its own investment portfolio by choosing the best quality loans for retention, while selling the riskiest loans to secondary market investors, including Plaintiff ABP. This conduct was confirmed in the SEC Action, in which Countrywide's former Chief Risk Officer Clifford Rossi testified that, in general, the Company attempted to "cherry-pick" the best loans for its own investment portfolio.

173. Finally, in the SEC Action, relying on some of the evidence referenced in this Complaint, the United States District Court for the Southern District of New York has denied the motions for summary judgment filed by Defendants Mozilo, Sambol and Sieracki, explicitly holding that there was evidence from which a jury could find scienter:

Here, the SEC has presented evidence from which a reasonable jury could conclude that Defendants possessed the requisite scienter. For example, the SEC has demonstrated that defendants were aware that Countrywide routinely ignored its underwriting guidelines and that Defendants understood the accompanying risks......The SEC has also presented evidence that Sambol was aware that Countrywide's matching strategy resulted in Countrywide's composite guidelines being the most aggressive guidelines in the industry....

FIRST AMENDED COMPLAINT                                    Case No. CV 10-07275-MRP (MANx)

Moreover, in addition to demonstrating that Defendants were aware of the facts which made their statements misleading, the SEC has presented evidence that Sambol and Sieracki knew that Countrywide's Chief Risk Officer John McMurray firmly believed that Countrywide should include greater risk disclosure in its SEC filings.... .

*Accordingly, the SEC's evidence is sufficient to raise a genuine issue of material fact with respect to Defendants' scienter, and summary judgment is inappropriate*.

*S.E.C. v. Mozilo*, 2010 WL 3656068, at *16-20.

## XI.   PLAINTIFF ABP HAS SUFFERED LOSSES ON ITS PURCHASES OF CERTIFICATES

### A.   CWABS LOANS

174.   Plaintiff purchased Certificates issued by CWABS Revolving Home Equity Loan Trust, Series 2004-Q, when they were rated Aaa by Moody's, but the Certificates have since been downgraded seven times and are currently rated Ca. At the time of filing of this Complaint, the Certificates were trading at just approximately 52% of par.

175.   Plaintiff purchased Certificates issued by CWABS Revolving Home Equity Loan Trust, Series 2004-R, when they were rated Aaa by Moody's, but the Certificates have since been downgraded nine times and are currently rated Ca. At the time of filing of this Complaint, the Certificates were trading at just approximately 46% of par.

176.   Plaintiff purchased Certificates issued by CWABS Asset-Backed Certificates Trust 2006-24, when they were rated Aaa by Moody's, but the Certificates have since been downgraded three times and are currently rated B3. As of February 2011, of the pool of mortgage loans underlying the Certificates issued by this trust, 59.89% of the loans were delinquent by more than 90 days and 22.11% of the loans were in foreclosure.   At the time of filing of this Complaint, the Certificates were trading at just approximately 93% of par.

FIRST AMENDED COMPLAINT                                    Case No. CV 10-07275-MRP (MANx)

177. Plaintiff purchased Certificates issued by CWABS Asset-Backed Certificates Trust 2007-2, when they were rated Aaa by Moody's but the Certificates have since been downgraded three times and are currently rated B3. As of February 2011, of the pool of mortgage loans underlying the Certificates issued by this trust, 58.41% of the loans were delinquent by more than 90 days and 20.96% of the loans were in foreclosure.   At the time of filing of this Complaint, the Certificates were trading at just approximately 87% of par.

178. Plaintiff purchased Certificates issued by CWABS Asset-Backed Certificates Trust 2007-6, when they were rated Aaa by Moody's but the Certificates have since been downgraded four times and are currently rated Ba2. As of February 2011, of the pool of mortgage loans underlying the Certificates issued by this trust, 60.95% of the loans were delinquent by more than 90 days and 23.13% of the loans were in foreclosure.   At the time of filing of this Complaint, the Certificates were trading at just approximately 98% of par.

179. Plaintiff purchased Certificates issued by CWABS Asset-Backed Certificates Trust 2007-BC2, when they were rated Aaa by Moody's, but the Certificates have since been downgraded four times and are currently rated Baa3. As of February 2011, of the pool of mortgage loans underlying the Certificates issued by this trust, 58.02% of the loans were delinquent by more than 90 days and 19.91% of the loans were in foreclosure.   At the time of filing of this Complaint, the Certificates were trading at just approximately 98% of par.

180. Plaintiff purchased Certificates issued by CWABS Asset-Backed Certificates Trust 2007-8, when they were rated A1 by Moody's but the Certificates have since been downgraded twice and are currently rated Ba2. As of February 2011, of the pool of mortgage loans underlying the Certificates issued by this trust, 54.50% of the loans were delinquent by more than 90 days and 18.24% of the loans were in foreclosure. At the time of filing of this Complaint, the Certificates were trading at just approximately 94% of par.

FIRST AMENDED COMPLAINT                                    Case No. CV 10-07275-MRP (MANx)

181. Plaintiff purchased Certificates issued by CWABS Asset-Backed Certificates Trust 2007-10, when they were rated Aaa by Moody's, but the Certificates have since been downgraded twice and are currently rated B3. As of February 2011, of the pool of mortgage loans underlying the Certificates issued by this trust, 54.19% of the loans were delinquent by more than 90 days and 16.04% of the loans were in foreclosure. At the time of filing of this Complaint, the Certificates were trading at just approximately 83% of par.

### B. CWMBS LOANS

182. Plaintiff purchased Certificates issued by CHL Mortgage Pass-Through Trust 2006-HYB1, when they were rated Aaa by Moody's, but the Certificates have since been downgraded five times and are currently rated Ca. As of February 2011, of the pool of mortgage loans underlying the Certificates issued by this trust, 35.87% of the loans were delinquent by more than 90 days and 14.41% of the loans were in foreclosure. At the time of filing of this Complaint, the Certificates were trading at just approximately 66% of par.

### C. CWHEQ LOANS

183. Plaintiff purchased Certificates issued by CWHEQ Revolving Home Equity Loan Trust, Series 2005-A, when they were rated Aaa by Moody's but the Certificates have since been downgraded six times and are currently rated B3. At the time of filing of this Complaint, the Certificates were trading at just approximately 54.59% of par.

184. Plaintiff purchased Certificates issued by CWHEQ Revolving Home Equity Loan Trust, Series 2005-D, when they were rated Aaa by Moody's, but the Certificates have since been downgraded and are currently rated Aa3. At the time of filing of this Complaint, the Certificates were trading at just approximately 78% of par.

185. Plaintiff purchased Certificates issued by CWHEQ Revolving Home Equity Loan Trust, Series 2005-E, when they were rated Aaa by Moody's but the

1   Certificates have since been downgraded six times and are currently rated B3.  At

2   the time of filing of this Complaint, the Certificates were trading at just

3   approximately 56% of par.

4        **D.   CWALT LOANS**

5        186.  Plaintiff purchased Certificates issued by CWALT Alternative Loan

6   Trust 2005-J1, when they were rated Aaa by Moody's, but the Certificates have

7   since been downgraded four times and are currently rated B3.  As of February

8   2011, of the pool of mortgage loans underlying the Certificates issued by the

9   trust, 7.14% of the loans were delinquent by more than 90 days and 2.81% of the

10  loans were in foreclosure.  At the time of filing of this Complaint, the Certificates

11  were trading at approximately 94% of par.

12       187.  Plaintiff purchased Certificates issued by CWALT Alternative Loan

13  Trust 2005-40CB, when they were rated Aaa by Moody's but the Certificates

14  have since been downgraded five times and are currently rated Caa2.  As of

15  February 2011, of the pool of mortgage loans underlying the Certificates issued

16  by this trust, 13.70% of the loans were delinquent by more than 90 days and

17  5.18% of the loans were in foreclosure.  At the time of filing of this Complaint,

18  the Certificates were trading at just approximately 77% of par.

19  **XII.   THE UNDERWRITER DEFENDANTS DID NOT PERFORM
           ADEQUATE DUE DILIGENCE**

20

21       188.  In their capacity as underwriters of these offerings, each of the

22  Underwriter Defendants had an obligation to conduct due diligence regarding the

23  accuracy and completeness of the Offering Documents prior to their

24  dissemination to investors and prior to consummation of the offerings.   In

25  connection with that due diligence process, the Underwriter Defendants had

26  access to various sources of information that, as described below, should have

27  alerted them to Countrywide's systematic and widespread abandonment of its

28  underwriting guidelines and its touted appraisal methods.   The Underwriter

FIRST AMENDED COMPLAINT                          Case No. CV 10-07275-MRP (MANx)

Defendants were thus supposed to play a "gatekeeper" role for public investors like Plaintiff ABP, who did not have access to non-public information through which to test the assertions in the Offering Documents. However, as set forth below, the Underwriter Defendants failed to discharge their obligations. As concluded in a March 2008 Policy Statement on Financial Market Developments by the President's Working Group on Financial Markets, "[although market participants had economic incentives to conduct due diligence . . . the steps they took were insufficient."

189. Many, if not all, of the Underwriter Defendants received due diligence reports from external firms, including, specifically, Clayton Holdings, Inc. ("Clayton") and the Bohan Group ("Bohan"), when they underwrote offerings for the Issuing Defendants. The Underwriter Defendants hired Clayton or Bohan to review whether the loans to be included in a particular RMBS offering complied with the law and met the lending standards that mortgage companies, such as Countrywide, said that they were using.

190. Clayton provides "services to the leading buyers and sellers of, and investors in, residential and commercial loan portfolios and securities . . . includ[ing] major capital markets firms, banks and lending institutions, including the largest MBS issuers/dealers." Clayton's Form 10-K filed March 14, 2008. Indeed, "[d]uring 2007, 2006 and 2005, [Clayton] worked with each of the 10 largest non-agency MBS underwriters, as ranked by *Inside MBS & ABS*, which accounted for 70%, 73% and 73% of total underwriting volume during those respective periods." *Id.* Additionally, Clayton has specifically identified Defendant Deutsche Bank as a client for its underwriting due diligence services. Bohan is a private company that also provides underwriting due diligences services, with offices in New York and California.

191. In June 2007, the New York Attorney General, Andrew Cuomo ("NYAG"), subpoenaed documents from both Clayton and Bohan related to their

FIRST AMENDED COMPLAINT                                   Case No. CV 10-07275-MRP (MANx)

due diligence efforts on behalf of the investment banks that underwrote substantial amounts of RMBS. The NYAG, along with Massachusetts, Connecticut and the SEC (all of which also subpoenaed documents) are investigating whether investment banks held back information when offering RMBS for sale to investors.

192. On January 27, 2008, Clayton revealed that it had entered into an agreement with the NYAG for immunity from civil and criminal prosecution in the State of New York in exchange for agreeing to provide additional documents and testimony regarding its due diligence reports, including copies of the actual reports provided to its clients. Both THE NEW YORK TIMES and THE WALL STREET JOURNAL ran articles describing the nature of the NYAG's investigation and Clayton's testimony. THE WALL STREET JOURNAL reported that the NYAG's investigation is focused on the fact that "the broad language written in prospectuses about the risky nature of these securities changed little in recent years, even as due-diligence reports noted that the number of exception loans backing the securities was rising." According to THE NEW YORK TIMES article, Clayton is "the nation's largest provider of mortgage due diligence services to investment banks" and it "communicated daily with bankers putting together mortgage securities." THE NEW YORK TIMES also reported that Clayton told the NYAG "that starting in 2005, it saw a significant deterioration of lending standards and a parallel jump in lending exceptions" and "some investment banks directed Clayton to halve the sample of loans it evaluated in each portfolio."

193. On March 17, 2008, in an article entitled "Sub-prime Mortgage Watchdogs Kept on Leash", the LOS ANGELES TIMES reported that Clayton and Bohan employees (including, specifically, eight former reviewers who were interviewed for the article) "raised plenty of red flags about flaws [in subprime home loans] so serious that mortgages should have been rejected outright – such as borrowers' incomes that seemed inflated or documents that looked fake – but

FIRST AMENDED COMPLAINT                                Case No. CV 10-07275-MRP (MANx)

1     the problems were glossed over, ignored or stricken from reports." Moreover,

2     while underwriters, such as the Underwriter Defendants, earlier in the decade

3     would have asked Clayton to review 25%-40% of loans in a pool that was going

4     to be securitized, by 2006 the typical percentage of loans reviewed for due

5     diligence purposes was just 10%.

6         194.   On September 23, 2010 hearings were held by the Financial Crisis

7     Inquiry Commission ("FCIC") in Sacramento, California.   Part of the hearing

8     involved the role that Clayton played in the mortgage securitization process.

9     Congressional testimony by Clayton's current Senior Vice President, Transaction

10     Management Vicki Beal ("Beal") suggests that the investment banks determined

11     the type and scope of review performed on the loan pools. However, rather than

12     directing the firms to conduct thorough reviews that were most likely to identify

13     defective loans, the investment banks pressured the loan reviewers to disregard

14     the problematic loans through exceptions and offsets that did not satisfy the

15     applicable underwriting guidelines.

16         195.   According to testimony provided by Beal and D. Keith Johnson, the

17     former President and Chief Executive Officer of Clayton, from January 2006 to

18     June 2007, Clayton reviewed 911,000 loans for 23 investment or commercial

19     banks.   This was roughly 10% of the total number of mortgages Clayton was

20     contracted to review. Of the mortgage loans reviewed, only 54% met the lenders'

21     underwriting standards. About 28% of the loans sampled were initially rejected,

22     as they were unable to meet numerous underwriting standards.   However,

23     according to the testimony, 39% of these troubled loans were waived back into

24     the mortgage pools and sold to investors during the period.

25         196.   Clayton documents provided to the FCIC also showed that 23% of

26     the loans financed by Countrywide in the fourth quarter of 2006 and the first

27     quarter of 2007 did not meet underwriting standards. Nevertheless, Countrywide

28

FIRST AMENDED COMPLAINT            Case No. CV 10-07275-MRP (MANx)

placed 12% of those loans into the pools for securities sold to investors such as ABP.

197. Additionally, Clayton provided a report which contained the rejection and waiver rates for the loans originated by Countrywide. They are as follows:

|  | 1Q 2006 | 2Q 2006 | 3Q 2006 | 4Q 2006 | 1Q 2007 |
|---|---|---|---|---|---|
| Rejection rate | 24% | 23% | 13% | 14% | 16% |
| Waiver rate | 8% | 14% | 16% | 11% | 14% |

198. Thus, the Underwriter Defendants had access to due diligence reports that revealed that a significant number of the loans underlying Countrywide RMBS were flawed. In breach of their obligations, the Underwriter Defendants omitted to disclose this information and proceeded to market the Certificates to investors such as ABP.

## XIII. THE LIABILITY OF THE CONTROL PERSON DEFENDANTS

### A.   DEFENDANT CFC

199. Defendant CFC was in a position to and in fact controlled each of Defendants CHL, CSC, CCM and the Issuing Defendants.

200. Defendant CFC operated its consolidated subsidiaries (including the Issuing Defendants) as a collective enterprise, making significant strategic decisions for its subsidiaries, monitoring enterprise-wide risk, and maximizing profit for CFC's executives and shareholders. As reported in CFC's 2003 Form 10-K, although mortgage banking remained CFC's "core business," it had expanded operations in recent years "to capitalize on meaningful opportunities to leverage our core Mortgage Banking business and to provide sources of earnings that are less cyclical than the mortgage banking business." In other words, CFC operated an enterprise that involved ramping up mortgage loan origination and then establishing Countrywide subsidiaries to facilitate the packaging of the

FIRST AMENDED COMPLAINT                               Case No. CV 10-07275-MRP (MANx)

mortgage loans for sale as RMBS. Throughout the relevant time period, CFC filed consolidated Form 10-Ks that provided a cumulative assessment of the operations of CFC and all of its subsidiaries including the other Countrywide entity Defendants.

201. Unlike arms-length securitizations where the loan originator, depositor, underwriters, and issuers are unrelated third parties, here the transactions among the loan originator (CHL), the depositors (the Issuing Defendants CWALT, CWMBS, CWABS, CWHEQ), the Issuing Trusts, and the primary underwriter (CSC) were not arms-length transactions at all. CFC controlled every aspect of the origination and securitization processes.

202. All of the mortgage loans underlying the Certificates were originated by CHL, a wholly-owned subsidiary of CFC, or were acquired by CHL from other lenders.

203. CFC then created the Issuing Defendants, Delaware corporations structured as limited purpose wholly-owned subsidiaries to acquire mortgage loans from CHL and to transfer the loans to the Issuing Trusts for sale to investors as RMBS. As the depositors, the Issuing Defendants were shell corporations that had no assets of their own and were controlled by CFC through its appointment of CFC executives (Sandefur, Sieracki, Kurland, Kripalani, and Sambol, among others) as their directors and officers. Through these executives, CFC exercised actual day-to-day control over the Issuing Defendants. Revenues flowing from the issuance and sale of the Certificates were passed through to CFC.

204. The Issuing Defendants in turn created the Issuing Trusts. Like the Issuing Defendants, the Issuing Trusts were shell entities that were established for the sole purpose of holding the pools of mortgage loans assembled by the Issuing Defendants, and issuing Certificates collateralized against these mortgage pools to underwriters for sale to the public. Through the Issuing Defendants, CFC also exercised actual control over the Issuing Trusts.

FIRST AMENDED COMPLAINT                                    Case No. CV 10-07275-MRP (MANx)

205. Once the Issuing Trusts issued the Certificates, the Certificates were purchased by the Underwriter Defendants, including CSC. CSC was an affiliate of CFC and was similarly controlled by CFC.

206. CFC also participated in creating the Offering Documents and CFC executives signed the Offering Documents.

207. In sum, CFC maintained a high level of day-to-day scrutiny and control over its subsidiaries, and controlled the entire process leading to the sale of the Certificates to ABP.

208. CFC culpably participated in the violations of the Issuing Defendants and CSC discussed below. CFC controlled the guidelines for loan origination, determined which traditional or non-traditional loan products to offer, set protocols for servicing the mortgage loans it originated or purchased from other lenders and for which it had servicing rights, approved the manner in which it sold the loans it elected to securitize, and controlled the disclosures made in connection with those securitizations. Among other misconduct, CFC oversaw the actions of its subsidiaries and allowed them, including Defendants CHL and CSC, to engage in underwriting practices that were inconsistent with the descriptions presented in the Offering Documents, and to misrepresent the mortgage loans' characteristics in the Offering Documents.

## B. DEFENDANT CCM

209. Defendant CCM was in a position to and in fact controlled each of Defendants CSC and the Issuing Defendants.

210. CCM exercised a high level of day-to-day control over its subsidiary, CSC. Mandates from CFC passed through Kripalani and CCM to CSC, and Kripalani, who was the President and CEO of both CCM and CSC, ensured that CSC followed priorities and practices established by CFC and CCM.

211. As the division of the Countrywide enterprise charged with marketing the loans originated and acquired by CHL, CCM also exercised control

FIRST AMENDED COMPLAINT                                    Case No. CV 10-07275-MRP (MANx)

1  over each of the Issuing Defendants and, through the Issuing Defendants, over the

2  Issuing Trusts.  Along with CFC, CCM determined and approved the manner in

3  which CSC and the Issuing Trusts selected and securitized the loans as RMBS

4  offerings, and controlled the disclosures made in connection with each

5  securitization.

6    **C.  DEFENDANT MOZILO**

7    212.  Defendant Mozilo was in a position to and in fact controlled each of

8  Defendants CFC, CHL, CSC, CCM and the Issuing Defendants.

9    213.  Mozilo had numerous positions and roles within Countrywide that

10  allowed Mozilo to control and influence all business operations of Defendant

11  CFC and its subsidiaries.  Mozilo exercised his power to control and influence

12  CFC and its subsidiaries (including CSC and the Issuing Defendants) through his

13  involvement in the daily management of all phases of Countrywide's core

14  operations.  This included both approving and overseeing CFC's and CHL's

15  mortgage and loan product offerings, including the same mortgages and loans that

16  were bundled together for the securitizations at issue in this litigation.  Mozilo

17  was actively involved in the development, modification and implementation of

18  CFC's guidelines for making and underwriting new loans and mortgages.  Mozilo

19  has stated that "I participate every day in originations myself, and it keeps me

20  apprised of what's happening."

21    214.  Mozilo also exercised his control and influence through meetings of

22  senior management.  During CFC's monthly "Business Review" meetings,

23  attended by Mozilo and other senior executives, the performance and operations

24  of all Countrywide entities were discussed in detail.

25    215.  Mozilo controlled and influenced CFC and its subsidiaries via his

26  membership of numerous CFC management committees and CFC's board of

27  directors.  Mozilo was a member of the CFC Executive Strategy Committee,

28  Finance Committee and Credit Committee.  Through this membership as well as

FIRST AMENDED COMPLAINT                    Case No. CV 10-07275-MRP (MANx)

his position on the board of directors, Mozilo was an integral member of Countrywide's decision-making team. Because of Mozilo's participation in these committees, as well as his membership on the board of directors, he was up to speed on developments in the business practices of CFC and its subsidiaries and exercised control and influence over the entire business of CFC.

216. In addition, through numerous statements disseminated to the public, Mozilo portrayed himself as the public face of CFC and conveyed that he was speaking on behalf of CFC and all of its subsidiaries. Mozilo also exercised his control and influence over CFC and its subsidiaries by signing numerous materially false and misleading CFC documents filed with the SEC.

217. Mozilo also had the power to control and influence and did control and influence CSC, a wholly-owned subsidiary of CFC. Mozilo was a direct supervisor of Defendant Sambol, who directly supervised Defendant Kripalani, during the time Kripalani was President, Chief Executive Officer, and Managing Director of CSC. Kripalani regularly provided Sambol with business updates regarding CSC, which Sambol then discussed with Mozilo.

**D. DEFENDANT SAMBOL**

218. Sambol had numerous positions and roles within Countrywide. By virtue of his senior management positions, Sambol had the power to control and influence, and did control and influence, Defendants CFC, CHL, CSC, CCM and the Issuing Defendants.

219. Sambol regularly exercised his authority to control and influence CFC and its subsidiaries by signing numerous materially false and misleading CFC documents filed with the SEC. In numerous statements to the public, Sambol portrayed himself as a public face of CFC and its subsidiaries and conveyed that he was speaking on behalf of CFC, CHL and CFC's other subsidiaries (including CSC).

FIRST AMENDED COMPLAINT                    Case No. CV 10-07275-MRP (MANx)

220.   Sambol was closely involved in the daily management of Countrywide's operations.   Sambol created, approved and oversaw CFC's mortgage and loan product offerings through its subsidiary CHL – including loans that were packaged together for the securitizations at issue in this case.  Sambol was the direct supervisor for Kripalani during Kripalani's tenure as President, CEO, and Managing Director of CSC.  Kripalani provided Sambol with regular business updates regarding CSC, and Sambol provided direction to Kripalani regarding CSC's business.  Sambol had the power to control and influence, and did control and influence, CSC in his role as Kripalani's supervisor.

221.   Sambol was deeply involved in developing, modifying, and implementing guidelines for making and underwriting new loans and mortgages. Others within Countrywide routinely acknowledged that Sambol had the ultimate power to approve the relaxation of guideline requirements for issuing new loans and the implementation of any exceptions processes.   Sambol created the Exception Processing System, which was the software designed to approve exception loans routinely.  Sambol also was responsible for revising minimum FICO requirements under Countrywide's underwriting guidelines.  At Sambol's direction, CFC and CHL greatly expanded their roles in the subprime mortgage business despite warnings from employees that these loans were too risky.

222.   Sambol had the power to control and influence, and did control and influence, CFC and its subsidiaries through his membership on several CSC management and board of directors committees.  Sambol was a member of at least the following CFC committees: (1) Executive Strategy Committee; (2) Asset/Liability Committee; (3) Finance Committee; (4) Audit and Ethics Committee; and (5) Committee to Set Loan Loss Allowance. Through his membership of these committees and the Board, Sambol participated in Countrywide's decision-making team.

FIRST AMENDED COMPLAINT                                   Case No. CV 10-07275-MRP (MANx)

## XIV.   THE LIABILITY OF BANK OF AMERICA AS THE SUCCESSOR-IN-INTEREST TO COUNTRYWIDE

223.   On January 11, 2008, Bank of America announced its plans to purchase CFC for $4.1 billion.  The acquisition was completed on July 1, 2008.  This acquisition was a de facto merger because Bank of America intended to take over and did in fact take over CFC and its subsidiaries in their entirety and, thus, should carry the liabilities of CFC, CHL, CSC, and CCM as associative with the benefits it derived from the acquisition.

224.   In its 2008 Annual Report, Bank of America confirmed that "[o]n July 1, 2008, we acquired Countrywide," and stated that the merger "significantly improved our mortgage originating and servicing capabilities, making us a leading mortgage originator and servicer."   In the Q&A section of the same report, the question was posed: "How do the recent acquisitions of Countrywide and Merrill Lynch fit into your strategy?" Bank of America responded that, by acquiring Countrywide, it became the "No. 1 provider of both mortgage originations and servicing" and "as a combined company," it would be recognized as a "responsible lender who is committed to helping our customers become successful homeowners." (emphasis added).   The annual report further stated that "Countrywide's results of operations were included in [Bank of America's] results beginning July 1, 2008.  Similarly, in a July 1, 2008 CFC press release, Mozilo stated that "the combination of Countrywide and Bank of America will create one of the most powerful mortgage franchises in the world."

225.   On November 7, 2008, CFC transferred substantially all of its assets to Bank of America.  Around that time, CFC ceased filing its own financial statements, and its assets and liabilities are now instead included in Bank of America's financial statements.

226.   On April 27, 2009, Bank of America rebranded CHL as "Bank of America Home Loans."  According to press reports, Bank of America Home

FIRST AMENDED COMPLAINT                    Case No. CV 10-07275-MRP (MANx)

Loans will operate out of Countrywide's offices in Calabasas, California with substantially the same employees as the former Countrywide entities. Many former Countrywide locations, employees, assets, and business operations now continue under the Bank of America Home Loans brand. On Bank of America's Form 10-K filed on February 26, 2010, both CCM and CSC were listed as Bank of America subsidiaries.

227. Additionally, CFC's former website now redirects to the Bank of America website. Under the "Merger History" tab of Bank of America's website, Countrywide is included among the list of companies Bank of America has acquired. Under the "Time Line" tab, the website states that Bank of America "became the largest consumer mortgage lender in the country" following its acquisition of Countrywide in 2008. Furthermore, under the "Our Heritage" tab, the website states that the acquisition of Countrywide "resulted in the launch of Bank of America Home Loans in 2009, making the bank the nation's leading mortgage originator and servicer." The Countrywide logo appears on the page.

228. As of September 21, 2009, former Countrywide bank deposit accounts were reportedly converted to Bank of America accounts. Additionally, on November 9, 2009, online account services for Countrywide mortgages were reportedly transferred to Bank of America's online banking website.

229. Bank of America's acquisition of Countrywide also constituted a de facto merger because it resulted in continuity of ownership. The shareholders of CFC became shareholders of Bank of America on July 1, 2008 through an all-stock transaction involving Defendant NB Holdings, which was created for the sole purpose of facilitating the acquisition of CFC.

230. In numerous statements and through other conduct, Bank of America has also taken responsibility for the pre-merger liabilities of CFC, CHL, CSC and CCM, including restructuring hundreds of thousands of loans created and serviced by the Defendants. Bank of America has reached various settlement

FIRST AMENDED COMPLAINT                                    Case No. CV 10-07275-MRP (MANx)

agreements in which it has directly taken responsibility for Countrywide's liabilities.   As part of a $8.4 billion settlement agreement with certain state attorneys general arising from Countrywide's predatory lending, Bank of America agreed to forgive up to 30 percent of the outstanding mortgage balances on up to 390,000 loans extended to former Countrywide customers. These loans were made prior to Bank of America's acquisition of Countrywide.

231.   On January 13, 2010, Brian Moynihan, Bank of America's CEO and President, testified before the FCIC, stating that "our primary window into the mortgage crisis came through the acquisition of Countrywide … . The Countrywide acquisition has positioned the bank in the mortgage business on a scale it had not previously achieved.  There have been losses, and lawsuits, from the legacy of Countrywide operations, but we are looking forward."  Addressing investor demands for refunds on faulty loans sold by Countrywide, Moynihan stated "There's a lot of people out there with a lot of thoughts about how we should solve this, but at the end of the day, we'll pay for the things that Countrywide did."  And, in a NEW YORK TIMES article published in December 2010, Moynihan, speaking about Countrywide, stated that "Our company bought it and we'll stand up; we'll clean it up."

232.   Consistent with these public statements, through the third quarter of 2010, Bank of America has faced $26.7 billion in repurchase requests and has resolved, declined or rescinded $18 billion of those claims.  It has established a reserve fund against the remaining $8.7 billion in repurchase requests, which at the end of the third quarter stood at $4.4 billion.

233.   The pre-merger liabilities of CFC, CHL, CSC and CCM were in fact fully factored into Bank of America's decision to acquire Countrywide. Specifically, Bank of America acquired CFC and its subsidiaries for 27% of book value, with the discount intended to reflect the pending claims and potential claims against Countrywide.  In an interview published on February 22, 2008 in

FIRST AMENDED COMPLAINT                                    Case No. CV 10-07275-MRP (MANx)

the legal publication CORPORATE COUNSEL, a Bank of America spokesperson admitted that Bank of America had taken into account Countrywide's liabilities:

> Handling all this litigation won't be cheap, even for Bank of America, the soon-to-be largest mortgage lender in the country. *Nevertheless, the banking giant says that Countrywide's legal expenses were not overlooked during negotiations. "We bought the company and all of its assets and liabilities,"* spokesman Scott Silvestri says. *"We are aware of the claims and potential claims against the company and have factored these into the purchase."* (emphasis added).

234. Similarly, in a January 23, 2009 NEW YORK TIMES article reporting on the acquisition of CFC and its subsidiaries, Kenneth D. Lewis, Bank of America's former Chairman and Chief Executive Officer, acknowledged that Bank of America was aware of the legal liabilities of CFC and its subsidiaries and impliedly accepted them as being part of the cost of the deal.

> We did extensive due diligence.   We had 60 people inside the company for almost a month. It was the most extensive due diligence we have ever done.  So we feel comfortable with the valuation.  We looked at every aspect of the deal, *from their assets to potential lawsuits* and we think we have a price that is a good price. (emphasis added).

235. Based on the above, Bank of America has de facto merged with CFC, consolidating and merging with CFC, CHL, CSC and CCM and acquiring substantially all of the assets of these Defendants.  Bank of America is thus the successor in liability to CFC, CHL, CSC and CCM, and is jointly and severally or otherwise vicariously liable for the wrongful conduct of those Defendants as set forth *infra* under each of the Causes of Action.

236. Based on the above same facts, in *MBIA Ins. Corp. v. Countrywide Home Loans, et al.*, Index No. 602825/08, the Supreme Court of the State of New York issued a decision on April 29, 2010 holding that the plaintiff, MBIA, had sufficiently alleged a de facto merger "in which Bank of America intended to absorb and continue the operation of Countrywide."

FIRST AMENDED COMPLAINT                                         Case No. CV 10-07275-MRP (MANx)

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### (Violation of Section 10(b) of the Exchange Act and Rule 10b-5)

237. Plaintiff realleges each and every allegation above as if fully set forth herein.

238. This claim is brought under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5, against Mozilo, the Individual Defendants, the Issuing Defendants and the Underwriter Defendants (collectively, the "Section 10(b) Defendants"). The Section 10(b) Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon ABP, in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

239. The Section 10(b) Defendants promoted and sold the Certificates purchased by ABP pursuant to the defective Prospectuses and Prospectus Supplements. The Prospectuses and Prospectus Supplements contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and concealed and failed to disclose material facts.

240. The Section 10(b) Defendants each had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth by failing to ascertain and to disclose such facts even though such facts were available to them, or deliberately refrained from taking steps necessary to discover whether the material facts were false or misleading.

FIRST AMENDED COMPLAINT                    Case No. CV 10-07275-MRP (MANx)

241.   As a result of the Section 10(b) Defendants' dissemination of materially false and misleading information and their failure to disclose material facts, ABP was misled into believing that the Certificates were more creditworthy investments than they really were.

242.   ABP purchased the Certificates without knowledge that the Section 10(b) Defendants had misstated or omitted material facts.   In purchasing the Certificates, ABP relied directly or indirectly on false and misleading statements and omissions made by the Section 10(b) Defendants.   ABP was damaged as a result of its reliance on the Section 10(b) Defendants' false statements and misrepresentations and omissions of material facts.

243.   At the time of the Section 10(b) Defendants' false statements, misrepresentations and omissions, ABP was ignorant of their falsity and believed them to be true.   ABP would not have purchased or otherwise acquired the Certificates had it known the truth about the matters discussed above.

244.   ABP is filing this action within two years following discovery of the facts constituting the violation, including facts establishing scienter and other elements of ABP's claim, and within 5 years after the violations with respect to ABP's investments.

245.   By virtue of the foregoing, the Section 10(b) Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

246.   As a direct and proximate result of the Section 10(b) Defendants' wrongful conduct, ABP has suffered damages in connection with its purchase of the Certificates.

## SECOND CAUSE OF ACTION
### (Violation of Section 20(a) of the Exchange Act)

247.   Plaintiff realleges each and every allegation contained above as if fully set forth herein.

FIRST AMENDED COMPLAINT                    Case No. CV 10-07275-MRP (MANx)

248.   This count is asserted against Defendants CFC, CCM, Mozilo and the Individual Defendants (collectively, the "Section 20(a) Defendants"), and is based upon Section 20(a) of the Exchange Act.

249.   Each of the Section 20(a) Defendants by virtue of its control, ownership, offices, directorship, and specific acts was, at the time of the wrongs alleged herein and as set forth herein, a control person of the Section 10(b) Defendants within the meaning of Section 20(a) of the Exchange Act.

250.   As a result of their control of the Section 10(b) Defendants, the Section 20(a) Defendants reviewed, or had the opportunity to review the Offering Documents for the Certificates prior to their issuance and therefore knew or should have known that those Offering Documents contained misrepresentations and omissions.   The Section 20(a) Defendants could have prevented the issuance of the Offering Documents or caused them to be corrected.   As a result, the Section 20(a) Defendants did not act in good faith.

251.   As set forth above, the Section 10(b) Defendants each violated Section 10(b) of the Exchange act and Rule 10b-5 promulgated thereunder.   By virtue of their positions as control persons, the Section 20(a) Defendants are jointly and severally liable pursuant to Section 20(a) of the Exchange Act.

252.   As a direct and proximate result of the Section 20(a) Defendants' wrongful conduct, ABP suffered damages in connection with its purchase of the Certificates.

### THIRD CAUSE OF ACTION
#### (Common-Law Fraud)

253.   Plaintiff realleges each and every allegation contained above as if fully set forth herein.

254.   This claim is brought against Mozilo, the Individual Defendants, the Issuing Defendants and the Underwriter Defendants (the "Common-Law Fraud Defendants").

FIRST AMENDED COMPLAINT                                       Case No. CV 10-07275-MRP (MANx)

255. The Common-Law Fraud Defendants promoted and sold the Certificates purchased by ABP pursuant to the defective Prospectuses and Prospectus Supplements.   The Prospectuses and Prospectus Supplements contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and concealed and failed to disclose material facts.

256. Each of the Common-Law Fraud Defendants knew their representations and omissions were false and/or misleading at the time they were made.   Each of the Common-Law Fraud Defendants made the misleading statements with an intent to defraud ABP.

257. ABP justifiably relied on the Common-Law Fraud Defendants' false representations and misleading omissions.

258. Had ABP known the true facts regarding the loans underlying the Certificates, including Countrywide's abandonment of its underwriting practices, Countrywide's improper appraisal methods, the inaccuracy of the ratings assigned by the rating agencies, and the failure to convey to the Issuing Trusts legal title to the underlying mortgages, ABP would not have purchased the Certificates.

259. As a result of the Common-Law Fraud Defendants' false and misleading statements and omissions, ABP has suffered damages in connection with its purchase of the Certificates.

## FOURTH CAUSE OF ACTION
### (Aiding and Abetting Fraud)

260. Plaintiff realleges each and every allegation contained above as if fully set forth herein.

261. This is a claim against CFC, CCM, Mozilo and the Individual Defendants (collectively, the "Aiding and Abetting Defendants").

262. The Aiding and Abetting Defendants knew of the fraud perpetrated by the Common-Law Fraud Defendants.  As alleged in detail above, the Aiding

96

and Abetting Defendants directed, supervised and otherwise knew of Countrywide's abandonment of its underwriting practices; Countrywide's improper appraisal methods; the inaccuracy of the ratings assigned by the rating agencies; and the failure to convey to the Issuing Trusts legal title to the underlying mortgages.

263. The Aiding and Abetting Defendants provided the Common-Law Fraud Defendants with substantial assistance in perpetrating the fraud. The Aiding and Abetting Defendants participated in the violations of Countrywide's mortgage loan underwriting and appraisal standards; made false public statements about Countrywide's mortgage loan underwriting and appraisal standards; provided false information about the mortgage loans underlying the Certificates to the rating agencies; provided false information for use in the Offering Documents; and participated in the failure to properly endorse and deliver the mortgage notes and security documents to the Issuing Trusts.

264. As a direct and natural result of the fraud committed by the Common-Law Fraud Defendants, and the knowing and active participation by the Aiding and Abetting Defendants, Plaintiff ABP has suffered substantial damages.

### FIFTH CAUSE OF ACTION
**(False Statements for the Purpose of Inducing the Purchase or Sale of a Security Cal. Corporations Code §§ 25400(d) and 25500)**

265. Plaintiff realleges each and every allegation contained above as if fully set forth herein.

266. Mozilo, the Individual Defendants and the Issuing and Underwriter Defendants committed a primary violation of Sections 25400(d) and 25500 of the California Corporations Code by inducing Plaintiffs to purchase the Certificates. The Individual Defendants and the Issuing and Underwriter Defendants made statements which were, at the time and in light of the circumstances under which they were made, false and misleading with respect to material facts, and which

97

FIRST AMENDED COMPLAINT                    Case No. CV 10-07275-MRP (MANx)

the Individual Defendants and the Issuing and Underwriter Defendants knew or had reasonable grounds to believe were false and misleading.

267. By reason of the foregoing, the Individual Defendants and the Issuing and Underwriter Defendants violated section 25400(d) of the California Corporations Code and are liable to Plaintiff pursuant to Section 25500 of the California Corporations Code.

## SIXTH CAUSE OF ACTION
### (Violation of Section 11 of the Securities Act)

268. Plaintiff repeats and realleges each and every allegation above as if set forth fully herein only to the extent, however, that such allegations do not allege fraud, scienter or the intent of Defendants to defraud plaintiff. This count is predicated upon defendants' *strict liability* for making false and materially misleading statements in the Registration Statements.

269. This cause of action is brought pursuant to Section 11 of the Securities Act against the Individual Defendants and the Issuing and Underwriter Defendants.

270. The Registration Statements (including the Prospectuses and Prospectus Supplements incorporated by reference therein) for the Certificate offerings were materially inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements not misleading, and omitted to state material facts required to be stated therein.

271. The Individual Defendants and the Issuing and Underwriter Defendants are strictly liable to plaintiff for the misstatements and omissions.

272. The Individual Defendants signed CWALT's, CWABS', CWMBS' and CWHEQ's Registration Statements as detailed in ¶ 51 above.

273. Defendant CSC, an affiliate of CFC, acted as an underwriter in the sale of the Issuing Trusts' Certificates, and helped to draft and disseminate the

Offering Documents for the Certificates. Defendant CSC was an underwriter for the specific Issuing Trusts that are identified in ¶ 55 above.

274. Defendant Deutsche Bank acted as an underwriter in the sale of the Issuing Trusts' Certificates, and helped to draft and disseminate the Offering Documents for the Certificates. Defendant Deutsche Bank was an underwriter for the specific Issuing Trusts that are identified in ¶ 55 above.

275. Defendant UBS acted as an underwriter in the sale of the Issuing Trusts' Certificates, and helped to draft and disseminate the Offering Documents for the Certificates. Defendant UBS was an underwriter for the specific Issuing Trusts that are identified in ¶ 55 above.

276. Defendant RBS acted as an underwriter in the sale of the Issuing Trusts' Certificates, and helped to draft and disseminate the Offering Documents for the Certificates. Defendant RBS was an underwriter for the specific Issuing Trusts that are identified in ¶ 55 above.

277. Defendant Barclays acted as an underwriter in the sale of the Issuing Trusts' Certificates, and helped to draft and disseminate the Offering Documents for the Certificates. Defendant Barclays was an underwriter for the specific Issuing Trusts that are identified in ¶ 55 above.

278. The Individual Defendants and the Issuing and Underwriter Defendants owed to Plaintiff the duty to make a reasonable and diligent investigation of the statements contained in the Registration Statements at the time they became effective to ensure that such statements were true and correct and that there was no omission of material facts required to be stated in order to make the statements contained therein not misleading. The Individual Defendants and the Issuing and Underwriter Defendants knew, or in the exercise of reasonable care should have known, of the material misstatements and omissions contained in or omitted from the Registration Statements as set forth herein. As

FIRST AMENDED COMPLAINT                                      Case No. CV 10-07275-MRP (MANx)

1 such, the Individual Defendants and the Issuing and Underwriter Defendants are
2 liable.

3     279.  By reason of the conduct herein alleged, each of the Individual
4 Defendants and the Issuing and Underwriter Defendants violated Section 11 of
5 the Securities Act.

6     280.  Plaintiff acquired the Certificates pursuant and/or traceable to the
7 Registration Statements.

8     281.  At the time it obtained its Certificates, Plaintiff did so without
9 knowledge of the facts concerning the misstatements or omissions alleged herein.

10    282.  Plaintiff has sustained damages.  The value of the Certificates has
11 declined substantially, subsequent to, and due to, the Individual Defendants' and
12 the Issuing and Underwriter Defendants' violations.

13    283.  By virtue of the foregoing, Plaintiff is entitled to damages under
14 Section 11, as measured by the provisions of Section 11(e), jointly and severally
15 from each of the Individual Defendants and the Issuing and Underwriter
16 Defendants.

## SEVENTH CAUSE OF ACTION
### (Violation of Section 12(a)(2) of the Securities Act)

19    284.  Plaintiff repeats and realleges each and every allegation contained
20 above as if fully set forth herein.

21    285.  This cause of action is brought pursuant to Section 12(a)(2) of the
22 Securities Act against the Issuing and Underwriter Defendants.

23    286.  The Issuing and Underwriter Defendants promoted and sold the
24 Certificates pursuant to the defective Prospectuses and Prospectus Supplements.

25    287.  The Prospectuses and Prospectus Supplements contained untrue
26 statements of material facts, omitted to state other facts necessary to make the
27 statements made not misleading, and concealed and failed to disclose material
28 facts.

FIRST AMENDED COMPLAINT                    Case No. CV 10-07275-MRP (MANx)

288.   The Issuing and Underwriter Defendants owed to Plaintiff the duty to make a reasonable and diligent investigation of the statements contained in the Prospectuses and Prospectus Supplements, to ensure that such statements were true and that there was no omission of a material fact required to be stated in order to make the statements contained therein not misleading.  The Issuing and Underwriter Defendants knew of, or in the exercise of reasonable care should have known of, the misstatements and omissions contained in the Prospectuses and Prospectus Supplements as set forth above.

289.   Plaintiff purchased or otherwise acquired Certificates pursuant to and/or traceable to the defective Prospectuses and Prospectus Supplements. Plaintiff did not know, or in the exercise of reasonable diligence could not have known, of the untruths and omissions contained in the Prospectuses and Prospectus Supplements.

290.   By reason of the conduct alleged herein, the Issuing and Underwriter Defendants violated Section 12(a)(2) of the Securities Act.  Plaintiff sustained material damages in connection with its purchases of the Certificates. Plaintiff has the right to rescind and recover the consideration paid for its Certificates, and hereby elects to rescind and tender its Certificates to the Issuing and the Underwriter Defendants.

## EIGHTH CAUSE OF ACTION
### (Violation of Section 15 of the Securities Act)

291.   Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

292.   This count is asserted against CFC, CSC, CCM, CHL and the Individual Defendants and is based upon Section 15 of the Securities Act.

293.   Each of CFC, CSC, CCM, CHL and the Individual Defendants by virtue of its control, ownership, offices, directorship, and specific acts was, at the time of the wrongs alleged herein and as set forth herein, a controlling person of

1   the Issuing Defendants within the meaning of Section 15 of the Securities Act.

2   CFC, CSC, CCM and CHL and the Individual Defendants had the power and

3   influence and exercised the same to cause the Issuing Defendants to engage in the

4   acts described herein.

5       294.   CFC's, CSC's, CCM's, CHL's and the Individual Defendants'

6   control, ownership and position made them privy to and provided them with

7   knowledge of the material facts concealed from Plaintiff.

8       295.   By virtue of the conduct alleged herein, CFC, CSC, CCM, CHL and

9   the Individual Defendants are liable for the aforesaid wrongful conduct and are

10  liable to Plaintiff for damages suffered as a result.

11                        **NINTH CAUSE OF ACTION**
                **(Untrue or Misleading Statements in the Sale of Securities**
12              **Cal. Corporations Code §§ 25401, 25501, 25504)**

13      296.   Plaintiff repeats and re-alleges each and every allegation contained

14  above as if fully set forth herein.

15      297.   The Individual Defendants and the Issuing and Underwriter

16  Defendants committed a primary violation of Sections 25401 and 25501 of the

17  California Corporations Code by selling the Certificates to Plaintiff ABP by

18  means of the Offering Documents, which contained untrue statements of material

19  fact and/or omissions of material fact necessary in order to make the statements in

20  the Offering Documents not misleading.

21      298.   Each of CFC, CSC, CCM, CHL and the Individual Defendants is

22  liable under Section 25504 of the California Corporations Code because it

23  directly and/or indirectly controlled the Issuing Defendants by virtue of its

24  ownership, offices, directorship, and specific acts at the time of the wrongs

25  alleged herein.  CFC, CSC, CCM and CHL and the Individual Defendants had the

26  power and influence and exercised the same to cause the Issuing Defendants to

27  engage in the acts described herein in violation of Sections 25401 and 25501.

28

---

FIRST AMENDED COMPLAINT                    Case No. CV 10-07275-MRP (MANx)

299.   Additionally, each of the Individual Defendants is liable under Section 25504 as a principal executive officer or director of the Issuing Defendants at the time of their violation of Sections 25401 and 25501.

## TENTH CAUSE OF ACTION
### (Negligent Misrepresentation
**Cal. Civil Code §§ 1572 et seq. and 1709 et seq., and Common Law)**

300.   Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

301.   This cause of action is brought against the Individual Defendants and the Issuing and Underwriter Defendants.

302.   As alleged above, the Individual Defendants and the Issuing and Underwriter Defendants made untrue or misleading representations, including, among others, that Countrywide originated loans in compliance with its underwriting guidelines, and that Countrywide originated loans in compliance with proper appraisal methods.

303.   In making the representations referred to above, the Individual Defendants and the Issuing and Underwriter Defendants intended to induce Plaintiff to rely on those representations in making its decision to purchase the Certificates.   Defendants expected that Plaintiff would rely on those representations in deciding whether to purchase the Certificates. Defendants also knew that the facts regarding Countrywide's compliance with its underwriting standards were exclusively within Defendants' knowledge.

304.   When the Defendants made these representations, they had no reasonable ground for believing them to be true.

305.   Plaintiff reasonably and justifiably relied on the representations described above in analyzing and deciding to purchase the Certificates.   Had Defendants not made the false and misleading representations, Plaintiff would not have purchased the Certificates.

FIRST AMENDED COMPLAINT

Case No. CV 10-07275-MRP (MANx)

306.   When it purchased the Certificates, Plaintiff did not know about the untrue and misleading statements alleged herein.

307.   The Individual Defendants and the Issuing and Underwriter Defendants had a duty to provide Plaintiff complete, accurate, and timely information regarding the underlying mortgage loans and the securitization of these loans. Defendants breached their duty to provide such information to Plaintiff.

308.   As a direct and proximate result of the negligent misrepresentations by Defendants, Plaintiff was damaged in an amount to be proved at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment against Defendants, as follows:

1.   For rescission;

2.   For an award of compensatory damages against Defendants in favor of Plaintiff for damages sustained as a result of Defendants' wrongdoing;

3.   For an award to Plaintiff of its costs and disbursements in this suit, including reasonable attorney's fees and expert fees; and

4.   For such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury.

Dated: February 14, 2011

BLECHER & COLLINS, P.C.
MAXWELL M. BLECHER
MARYANN R. MARZANO

By:   */s/ Maryann R. Marzano*
MARYANN R. MARZANO

and

FIRST AMENDED COMPLAINT                              Case No. CV 10-07275-MRP (MANx)

GRANT & EISENHOFER P.A.
JAY W. EISENHOFER
GEOFFREY C. JARVIS
HUNG G. TA
DEBORAH A. ELMAN

By:  */s/ Jay W. Eisenhofer*
     JAY W. EISENHOFER

*Attorneys for Plaintiff*
STICHTING PENSIOENFONDS ABP

105

**PROOF OF SERVICE**

STATE OF CALIFORNIA          )
                             )
COUNTY OF LOS ANGELES        )

    I am employed in the County of Los Angeles, State of California.  I am over the age of 18 and not a party to the within action; my business address is 515 South Figueroa Street, Suite 1750, Los Angeles, California 90071-3334.  On **February 15, 2011**, I served the within:

**FIRST AMENDED COMPLAINT**

on all interested parties in this action as follows:

**BY E-MAIL OR ELECTRONIC TRANSMISSION:**  Based on a court order or an agreement of the parties to accept service by e-mail or electronic transmission, I caused a copy of the document(s) to be sent from e-mail address jgonzalez@blechercollins.com to the persons at the e-mail addresses listed below:

amircheff@gibsondunn.com; inewman@gibsondunn.com; bdevine@goodwinprocter.com; Aboivin@goodwinprocter.com; Menglish@goodwinprocter.com; bpastuszenski@goodwinprocter.com; caldwell@cladwell-leslie.com; hayes@caldwell-leslie.com; wilson@caldwell-leslie.com; david.priebe@dlapiper.com; stacy.murray@dlapiper.com; codell@caldwell-leslie.com; pettit@caldwell-leslie.com; popescu@caldwell-leslie.com; delman@gelaw.com; gjarvis@gelaw.com; hta@gelaw.com; ifriedmanboyce@goodwinprocter.com; jeisenhofer@gelw.com; jeff.coopersmith@dlapiper.com; evelyn.dacuag@dlapiper.com; jennifer.sepic@bingham.com; jrosenberg@omm.com; joshuahamilton@paulhastings.com; melmanahan@paulhastings.com; leiv.blad@biingham.com; lwinawer@goodwinprocter.com; ahsia@goodwinprocter.com; mhipp@omm.com; mclose@omm.com; mtu@orrick.com; mblecher@blechercollins.com; mmarzano@blechercollins.com; nicholas.morgan@dlapiper.com; petercho@paulhastings.com; shirli.weiss@dlapiper.com; emiko.gonzales@dlapiper.com; williamsullivan@paulhastings.com; lisavermeulen@paulhastings.com; and wsushon@omm.com

I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

☒ **(Federal)**    I declare under penalty of perjury that the foregoing is true and correct, and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

☐ **(State)**    I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct.

    Executed on **February 15, 2011**, at Los Angeles, California.


_Jennie González_
Jennie González

BLECHER & COLLINS
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW